UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

BREAD FOR THE CITY,
1525 7th St NW
Washington, D.C. 20001,

                              Plaintiff,

           v.

DISTRICT OF COLUMBIA
c/o Office of the Attorney General
400 6th Street NW
Washington, D.C. 20001,

                              Defendant.

No. _____

**COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF**
(Disability Discrimination in Emergency Response Services)

**INTRODUCTION**

1.     This case challenges the District of Columbia's reliance on Metropolitan Police Department (MPD) officers as the default first responders for mental health emergencies, an approach to emergency response services that discriminates against people with mental health disabilities.

2.     When D.C. residents experience physical health emergencies—such as asthmatic or diabetic crises—calling 911 results in the prompt arrival of paramedics or emergency medical technicians (EMTs) who are specially trained to address the crisis. By contrast, when D.C. residents experience mental health emergencies—such as suicidal ideation or post-traumatic stress episodes—calling 911 will routinely bring to the scene armed MPD officers, who are mainly trained to arrest and detain people suspected of crimes, not to handle mental health emergencies. As a result, when MPD officers arrive at a mental health crisis, they frequently aggravate the

1

emergency and increase the trauma experienced by the individual in crisis by, for instance, needlessly handcuffing the person or using excessive force.

3.     The District's policy and practice of sending armed MPD officers to address mental health crises is therefore ineffective.  It is also unlawful because it denies people with mental health disabilities the benefits of the District's emergency response programs and services and fails to provide them equal access to those services.

4.     National and local experts have concluded that relying on police to address mental health emergencies or crises (terms used interchangeably throughout the Complaint) is generally more likely to exacerbate than alleviate the mental health issue.

5.     The United States Department of Justice has found in multiple investigations that municipalities violate the Americans with Disabilities Act (ADA) by relying on police as the primary first responders for addressing mental health emergencies.

6.     The Substance Abuse and Mental Health Services Administration (SAMHSA)—the federal agency responsible for research and public health initiatives related to mental health—concluded in its National Guidelines for Behavioral Health Crisis Care that it is "unacceptable and unsafe" for local law enforcement to serve as a community's "de facto" mental health crisis first responders. Accordingly, SAMHSA's National Guidelines state that mental health professionals, not armed police officers, should generally respond to mental health emergencies.

7.     Locally, the D.C. Police Reform Commission, an independent body created by the D.C. Council to evaluate policing in the District, found that relying on MPD officers as crisis responders is "a fundamental misuse of law enforcement resources" and, similar to SAMHSA, recommended that the District "[m]ake community-competent behavioral healthcare professionals the default first responders to 911 calls involving individuals in [mental health] crisis."

8.      Likewise, the D.C. Health Matters Collaborative, a non-profit collective of hospitals and health centers, conducted an evaluation of the District's crisis response system in 2021, and concluded that "too often, a call to 911 . . . results in harm to people who are simply experiencing a crisis and need support, understanding, and treatment." The D.C. Health Matters Collaborative called for mental health professionals, not MPD officers, to respond to most mental health emergencies in the District.

9.      The District itself appears to recognize the need for such reform. It employs community response teams (CRTs) of mental health clinicians and certified peer support specialists to address mental health emergencies in the city. Yet the District has failed to provide sufficient funding, training, or coordination to adequately staff and support these teams. As a result, less than 1% of the 911 calls the District receives that primarily or exclusively involve mental health emergencies get a response from a mental health professional.

10.      In contrast to its approach to mental health emergencies, the District has invested the requisite resources to ensure that people experiencing physical health emergencies receive a response from a professional trained in responding to such emergencies.

11.      For example, while the District of Columbia has hired 1600 EMTs, 300 of whom are also paramedics, to respond to physical health emergencies, the District has hired only 44 CRT staff.

12.      And while the District of Columbia has a benchmark for EMTs to respond to 911 calls within 5 minutes and for paramedics to respond to calls within 9 minutes, the response time for CRTs often ranges from one to three hours, and sometimes takes far longer.

13.      The District's reliance on MPD to respond to mental health crises not only harms individuals with mental health disabilities but also impedes the mission of community

organizations, such as Plaintiff Bread for the City ("Bread"). Bread is a District not-for-profit organization that provides primary physical and behavioral healthcare services, legal services, food, clothing, and social services to under-resourced D.C. residents. Bread does not provide either emergency physical or behavioral healthcare services. Bread has learned from experience that calling 911 for a client in a mental health crisis is not an adequate solution to a mental health crisis because it puts that client at risk of harm and reduces the trust that the client—and other clients who witness the incident—have in Bread.

14.     As a result of the District's failure to provide appropriate emergency responses to mental health crises, Bread attempts to protect its clients and preserve its relationships with them by avoiding calling 911 for most mental health crises. Instead, when a mental health crisis occurs at its facilities—which happens frequently—Bread generally has its staff members address the emergency. But this practice hinders staff members' ability to provide services that actually fall within Bread's mission, which in turn negatively impacts clients and reduces what Bread can bill from the entities that fund its services. Further, Bread must expend significant funds ensuring that all staff are trained to help respond to mental health emergencies. The hours that Bread's staff members have spent de-escalating crises to avoid calling 911, the revenue Bread has lost, and the funds it has spent on training, have diverted Bread's resources away from its mission of proactively assisting clients with their basic needs: primary healthcare services, legal services, food, clothing, and social services. If calling 911 resulted in mental health professionals responding promptly to a mental health crisis, Bread would be able to reroute significant resources back to its core programs.

15.     The ADA, as authoritatively construed by its implementing regulations, prohibits local governments, including the District, from:

a.  "Excluding a person with a disability from participating in or denying the benefits of a [District] program . . . to a person with a disability or otherwise discriminating against a person on the basis of disability," 42 U.S.C. § 12132;

b.  Relying on "methods of administration" of a program that "defeat or substantially impair accomplishment" of the program's objectives as to individuals with disabilities, 28 C.F.R. § 35.130(b)(3); and

c.  Providing aids, benefits, or services in such a way that qualified individuals with a disability are not afforded an "equal opportunity to obtain the same result . . . as that provided to others," 28 C.F.R. § 35.130(b)(1)(iii).

16.     Section 504 of the Rehabilitation Act imposes substantially similar obligations on recipients of federal funds, which includes the District government.

17.     In its May 2023 Guidance for Emergency Responses to People with Behavioral Health or Other Disabilities, the United States Department of Justice and Department of Health and Human Services explained public entities' ADA obligations as follows: "Equal opportunity requires that people with behavioral health disabilities receive a health response in circumstances where others would receive a health response—for example, if call centers would dispatch an ambulance or a medic rather than law enforcement to respond to a person experiencing a heart attack or diabetic crisis, equal opportunity would entail dispatching a health response in similar circumstances involving a person with a behavioral health disability."

18.     The District does not provide such equality. Its police-driven approach to mental health emergencies denies individuals with mental health disabilities appropriate care and pales in comparison to the District's provision of physical health emergency services. Both in relative and absolute terms, the District's handling of mental health emergencies discriminates against people

5

with mental health disabilities in violation of the ADA and the Rehabilitation Act. Plaintiff brings

this action to obtain injunctive and declaratory relief to remedy these violations.

## JURISDICTION AND VENUE

19.     This Court has jurisdiction pursuant to 28 U.S.C. § 1331 because this action arises

under the laws of the United States.

20.     This Court has jurisdiction to grant both declaratory and injunctive relief pursuant

to 28 U.S.C. §§ 2201 and 2202.

21.     Venue is proper in the U.S. District Court for the District of Columbia pursuant to

28 U.S.C. §§ 1391(b)(1) and 1391(b)(2), because Defendant comprises and is situated in this

judicial district, and a substantial part of the events that gave rise to Plaintiff's claims occurred in

this judicial district.

## PARTIES

22.     Plaintiff Bread for the City ("Bread") is a not-for-profit organization located in

Washington, D.C., that is committed to helping under-resourced D.C. residents obtain basic needs.

Bread operates a medical clinic that provides primary behavioral healthcare services along with

dental, vision, and physical health care for over 3,000 adults and children in the District. It also

provides legal services, clothing, food, and other social services to District residents. Bread does

not provide emergency health care.

23.     Defendant District of Columbia is a municipal corporation, the local government

of Washington, D.C. It operates and governs District agencies, including MPD, the D.C. Office of

Unified Communications, D.C. Fire and Emergency Medical Services, and the D.C. Department

of Behavioral Health pursuant to the laws of the District of Columbia.

# FACTS

I.  **Mental Health Experts Agree That Police Officers Should Not Respond to Typical Mental Health Emergencies.**

A.  **Typical Mental Health Emergencies Arise from Depression, Anxiety, and Post-Traumatic Stress Disorders and Pose Risks Only to the Person in Crisis, If They Pose Risks to Anyone at All.**

24.     The typical, or most common, mental health emergencies arise from depression, anxiety, and post-traumatic stress disorders (PTSD). Bipolar disorders and schizophrenia may also underlie mental health crises, but both are much lower incidence disabilities in the general population. Depression, anxiety, PTSD, bipolar disorders, and schizophrenia are all disabilities covered under the ADA and the Rehabilitation Act.

25.     The typical mental health emergency, including ones involving thoughts of suicide or self-harm, do not present a danger to others; if such emergencies involve a risk of danger to anyone at all, it is to the person in crisis alone.

26.     A great deal of stigma attaches to mental health disabilities, and that stigma often includes stereotypes that people with mental health disabilities are violent.

27.     The reality is that "[p]eople with mental illnesses are not more likely to be violent than the general public."[1]

28.     Indeed, "the overwhelming majority of people with mental illness are not violent and the majority of people who are violent do not have identifiable mental illness."[2]

---

[1] Council for State Governments, Addressing Misconceptions about Mental Health and Violence 1 (Aug. 2021), https://csgjusticecenter.org/wp-content/uploads/2021/08/CSGJC_Field-Notes_Addressing-Misconceptions-about-Mental-Health-and-Violence_2019-MO-BX-K001_508.pdf.

[2] John S. Rozel & Edward P. Mulvey, *The Link Between Mental Illness and Firearm Violence: Implications for Social Policy and Clinical Practice*, 13 Annual Rev. of Clinical Psych. 445, 448 (2017), https://www.annualreviews.org/doi/pdf/10.1146/annurev-clinpsy-021815-093459.

29.     The D.C. Department of Behavioral Health wrote a report that documents the frequency with which officers who completed MPD's Crisis Intervention Officer training program encountered weapons at the scene of a mental health emergency. Between FY 2019 and FY 2022, approximately 92% of all reported calls answered by Crisis Intervention Officers did not involve an individual with a weapon, and less than 1% of calls—only seven instances overall—involved an individual who had a gun.

### B. Mental Health Experts Agree That Police Should Not Address Typical Mental Health Crises.

30.     Even though "the overwhelming majority of people with mental illness are not violent and the majority of people who are violent do not have identifiable mental illness,"[3] police nationwide are 11.6 times more likely to use force against people with serious mental health disabilities than other individuals,[4] and 16 times more likely to kill people with untreated mental health disabilities than other individuals.[5]

31.     National and local experts agree that police should not serve as the default first responders for mental health crises.

32.     In 2020, the Substance Abuse and Mental Health Services Administration (SAMHSA), the federal agency responsible for research and public health initiatives related to mental health, issued National Guidelines for Behavioral Health Crisis Care. In those guidelines, SAMHSA concluded that relying on "local law enforcement [as] the *de facto* mental health mobile

---

[3] Rozel & Mulvey, 13 Annual Rev. of Clinical Psych. at 448.

[4] Ayobami Laniyonu & Phillip A. Goff, *Measuring disparities in police use of force and injury among persons with serious mental illness*, 21 BMC Psychiatry 1, 6 (2021), https://doi.org/10.1186/s12888-021-03510-w.

[5] Doris Fuller et al., *Overlooked in the Undercounted: The Role of Mental Illness in Fatal Law Enforcement Encounters*, Treatment Advocacy Center 1 (Dec. 2015), https://www.treatmentadvocacycenter.org/storage/documents/overlooked-in-the-undercounted.pdf.

crisis system" is "unacceptable and unsafe" because police presence often, on its own, escalates individuals in crisis.[6]

33.     The SAMHSA National Guidelines explain that one of the essential elements of a mental health crisis response is "mobile crisis teams," consisting of mental health professionals, including peer support specialists, who can be deployed to provide in-person care to people experiencing mental health emergencies and "[r]espond without law enforcement accompaniment" absent special circumstances.[7]

34.     In its June 2023 investigation into Minneapolis and its police department, the United States Department of Justice concluded that "a law enforcement-led response can cause real harm in the form of trauma, injury, and death to people experiencing behavioral health issues, as well as other impacts."[8] The Justice Department reached similar conclusions in its March 2023 investigation into the Louisville Metro Police Department.[9]

35.     Both the Minneapolis and Louisville investigations concluded that the municipalities violated the ADA by relying on police officers as the primary first responders to mental health emergencies and diverting only a small share of 911 mental health emergency calls to alternative first responder programs staffed by mental health professionals.[10]

---

[6] SAMHSA, National Guidelines for Behavioral Health Crisis Care: Best Practice Toolkit 33 (Feb. 2020), https://www.samhsa.gov/sites/default/files/national-guidelines-for-behavioral-health-crisis-care-02242020.pdf.

[7] *Id.* at 12, 18.

[8] Department of Justice, Investigation of the City of Minneapolis and the Minneapolis Police Department 64 (June 2023), https://www.justice.gov/opa/press-release/file/1587661/download (hereinafter "Minneapolis Investigation Report").

[9] Department of Justice, Investigation of the Louisville Metro Police Department and Louisville Metro Government 60 (Mar. 2023), https://www.justice.gov/crt/case-document/file/1572951/download.

[10] *See id.* at 59, 65, 67; Minneapolis Investigation Report at 57, 65.

36.     The National Alliance on Mental Illness (NAMI), a non-profit organization that serves people with mental health disabilities and their families, has concluded that for people in mental health crises "the primary response should come from mental health crisis response professionals."[11]

37.     Similarly, locally, the D.C. Police Reform Commission, an independent body created by the D.C. Council to evaluate policing practices in D.C. based on interviews with officers, community members, and a review of national best practices, concluded in 2021 that "[r]elying mainly or exclusively on police as crisis responders unnecessarily puts both residents and officers at risk of harm" and constitutes "a fundamental misuse of law enforcement resources."[12]

38.     The D.C. Police Reform Commission recommended that the District "[m]ake community-competent behavioral healthcare professionals the default first responders to 911 calls involving individuals in crisis."[13]

39.     In 2021, the D.C. Health Matters Collaborative ("the Collaborative"), a non-profit collective of hospitals and health centers, evaluated the District's mental health emergency response system. As part of its evaluation, the Collaborative interviewed D.C. mental healthcare professionals, emergency departments, local advocates, and publicly funded services and also reviewed white papers and best practices from other jurisdictions.[14]

---

[11] National Alliance on Mental Illness, Crisis Response for Mental Health, https://www.nami.org/Advocacy/Policy-Priorities/Responding-to-Crises/Crisis-Response (last accessed July 6, 2023).
[12] D.C. Police Reform Commission, De-Centering Police To Improve Public Safety 34 (April 2021), https://dccouncil.gov/wp-content/uploads/2021/04/Police-Reform-Commission-Full-Report.pdf (hereinafter, "D.C. Police Reform Commission Report").
[13] *Id.* at 36.
[14]  D.C. Health Matters Collaborative, Re-Routing Crisis Response 8–9 (May 2021) https://www.dchealthmatters.org/content/sites/washingtondc/Re-

40.     The Collaborative concluded in its 2021 report that "an armed response may be the antithesis of what and who is needed to address [mental health emergencies]. Too often, a call to 911 from a worried family member, neighbor, or care provider results in harm to people who are simply experiencing a crisis and need support, understanding, and treatment."[15]

41.     The Collaborative recommended that the District dispatch trained mental health professionals instead of law enforcement to mental health crisis calls.[16] The Collaborative reported that when it asked mental healthcare professionals "from more than a dozen organizations for their top recommendations to policymakers," "in nearly every case, they named that a model like CAHOOTS . . . would make the biggest positive impact."[17]

42.     CAHOOTS refers to "Crisis Assistance Helping Out on the Street." It is a program based in Eugene, Oregon that deploys mental health professionals to the vast majority of mental health emergency calls received by the city's 911 service.

43.     Several other jurisdictions have implemented programs similar to CAHOOTS.

## II.     MPD Officers Are Not Appropriate First Responders for Typical Mental Health Emergencies.

44.     In responding to mental health emergencies, MPD officers display the types of behavior that concern national experts and that have led local experts to call for mental health professionals, rather than MPD officers, to serve as the default responders. These outcomes are a result of District policies that increase the risk that officers will exacerbate, rather than resolve, mental health crises.

_____

Routing_Crisis_Response_white_paper_May_2021.pdf (hereinafter "D.C. Health Matters Collaborative Report").

[15] *Id.* at 7

[16] *Id.* at 30–31.

[17] *Id.*

**A. MPD Trains Officers To Interact With Civilians in Ways Antithetical to Effective Crisis Response, While Vesting Officers With Broad Discretion To Handle Crises.**

45.    MPD officers receive limited training on interacting with civilians during mental health crises but significant training on engaging them as suspects. This disparity in training frequently causes officers to adopt law enforcement strategies to address mental health emergencies. That approach is more likely to exacerbate than alleviate the trauma of the person in crisis.

46.    The most advanced training MPD offers on responding to mental health emergencies is its Crisis Intervention Officer training course.

47.    The Crisis Intervention Officer training course is an optional training course that lasts only 40 hours.

48.    The D.C. Health Matters Collaborative report stated that the Crisis Intervention Officer training program "provides [officers] with a surface-level understanding of mental health issues and best practices" and does not last "an adequate number of hours for true skill-building."[18]

49.    The Crisis Intervention Officer training course requires fewer hours than the training that the D.C. Department of Behavioral Health requires individuals to undergo to become "certified peer support specialists," a credential that allows individuals to provide various services in the behavioral health system, including addressing mental health emergencies.

50.    The certified peer support specialist program invites individuals who have lived experience with mental health and substance use disorders to undergo training so that they can support others in similar situations.

---

[18] D.C. Health Matters Collaborative Report at 19.

51.     To receive certification as a peer support specialist by the D.C. Department of Behavioral Health, individuals must either have five years of relevant experience and pass a skills test, or complete approximately 80.5 hours of classroom instruction and an 80-hour field practicum.

52.     The 160.5 hours of mental-health-specific classroom and field instruction required of certified peer specialists is more than four times as many hours of instruction as MPD officers must receive to become Crisis Intervention Officers. In addition, peer support specialists begin their training with lived experiences with mental health issues. Most MPD officers lack this experience, which makes the effective training disparity even greater.

53.     According to an MPD officer with 14 years of experience on the force who completed MPD's Crisis Intervention Officer training, most MPD training focuses on law enforcement. In these settings, MPD officers are generally taught to take on a "command-and-control mentality," which entails assuming that non-compliance with police orders constitutes a threat to personal or public safety. Officers are further taught always to be prepared to defend themselves from attack and always to adopt a tactical mindset; to adopt during patrols a tactical stance that involves keeping their hands at the ready in case they need to use force; and to deter non-compliance with their orders by adopting an authoritative presence and making clear that the officer is in charge. Officers are not taught to adopt a distinct, open, and non-threatening stance when interacting with people experiencing a mental health crisis.

54.     For example, non-threatening, inviting body language would often require an officer to sit down, and invite the other person to sit as well.

55.     According to the 14-year MPD veteran, MPD officers frequently apply their tactical law enforcement training in addressing mental health emergencies, even when the person in crisis

poses no threat to the officer or anyone else. And when MPD officers interact with someone in crisis whom they transport to a hospital for evaluation, they generally treat the individual no differently than someone suspected of a crime.

56.     Using aggressive tones, crowding someone, touching them without consent, and attempting to assert control over them can make a person feel stressed and anxious. This effect is likely to be particularly pronounced for individuals in a mental health crisis, who may endure greater trauma and shame when police respond to them using command-and-control tactics.

57.     Despite providing officers with training that is often antithetical to effectively addressing mental health emergencies, MPD vests officers with broad discretion in determining how to resolve crises, including by executing involuntary transports.

58.     D.C. policy permits all MPD officers, including those who have not received Crisis Intervention Officer training, to involuntarily transport an individual to a mental health facility for evaluation.

59.     Involuntarily being detained and transported to a hospital is a traumatizing experience.  Practitioners believe such an extreme measure should occur as rarely as possible.

60.     Because MPD provides officers with little guidance on how to exercise their discretion, and because MPD training frequently leads officers to view crises through a tactical rather than clinical lens, officers initiate transports far more frequently than needed and do so in ways that exacerbate the harm of the experience.

61.     Between June 1, 2019 and June 30, 2022, 72.9% of the young people brought to Children's National Hospital for involuntary mental health evaluations arrived based on an MPD officer's decision to initiate the transport.[19]

62.     Overall, between FY 2019 and FY 2022, Crisis Intervention Officers—the MPD officers who receive the most training on handling mental health emergencies—transported individuals to mental health facilities for evaluation 71% of the times they responded to crises, doing so without the individual's consent 50% of the time.[20]

63.     Local social service and mental health professionals confirm that, based on their experience, MPD officers frequently involuntarily transport people to mental health hospitals unnecessarily.

64.     For instance, Kimberly Perry, executive director of D.C. Action, a youth advocacy coalition, stated in a declaration submitted in 2021 in *M.J. v. District of Columbia*, 1:18-cv-1901 that Crisis Intervention Officers frequently transport young people to psychiatric emergency rooms due to their inexperience and lack of adequate training on working with young people who have mental health disabilities.

65.     A psychiatrist at Children's National Hospital informed undersigned counsel that officers have unnecessarily involuntarily transported children to her emergency room in cases where sexual assault survivors said they wanted to kill their assailant shortly after the assault (a normal response, the psychiatrist says); where students told their school that they cut themselves

---

[19] According to data provided to undersigned counsel by a psychiatrist at Children's National Hospital.
[20] According to yearly averages of reported incidents in an analysis performed by the D.C. Department of Behavioral Health, produced to counsel via a Freedom of Information Act request.

(behavior that, according to the psychiatrist, generally requires only outpatient treatment); and where children threw tantrums but calmed down before the police arrived.

66.     The methods by which MPD officers conduct involuntary transports increase the risk of trauma for the transported person and the risk of conflict.

67.     MPD General Order 308.04, which governs interactions with "mental health consumers" requires officers to handcuff any adult or young person transported in a police vehicle for a mental health evaluation and search any adult transported in a police vehicle for such an evaluation.

68.     Handcuffing an individual during a mental health crisis often significantly exacerbates the trauma the person experiences, increases the risk of conflict, and breeds mistrust of police officers.[21]

## B. MPD Officers' Response to Mental Health Crises Deprives Individuals of the Care They Need and Frequently Makes the Situation Worse.

69.     According to SAMHSA, responding appropriately and effectively to someone displaying symptoms of suicidality—which, according to licensed clinical social workers Gretchen Gates and Susannah Stein, is also the appropriate method for responding to mental health crises more generally—entails doing the following:

    a.  When necessary, de-escalating the situation by helping the individual in crisis regulate their nervous system through, for instance, grounding and breathing exercises;

    b.  Assessing the individual's needs by asking about, among other things, (i) the events precipitating the crisis, (ii) whether the individual has thought about harming

---

[21] D.C. Police Reform Commission Report at 39.

themselves or others, or has formulated a plan to do so; and (iii) the individual's

relevant risk factors (e.g. substance use and past acts of harm) and protective factors

(e.g. coping skills and connections to family);

c. Making a treatment recommendation based on the information gathered in the

assessment phase, with standard treatment recommendations including (i) allowing

the individual to stay in the community with their loved ones and developing a

safety plan (covering topics such as: potential warning signs for crisis, coping

strategies the person can use for a crisis, and individuals to call if a crisis occurs)

so that the individual can self-regulate if crisis symptoms resume; (ii) connecting

or reconnecting the individual with ongoing outpatient mental health care or other

community supports; or (iii) referral for emergency psychiatric assessment and,

depending on the results, inpatient hospitalization.

70.     A 14-year MPD veteran and Crisis Intervention Officer told undersigned counsel

that he has not received and has never heard of MPD officers receiving training on the type of de-

escalation strategies discussed in paragraph 69(a) or on developing the type of safety plan

discussed in paragraph 69(c). Nor has he received or heard about other officers receiving more

than cursory training on asking the type of questions identified in paragraph 69(b). According to

the officer, the tactical training that officers receive at the academy and during in-services—

training that emphasizes a closed, tactical stance and encourages officers to take charge of the

scene—is antithetical to the collaborative approach described above.

71.     On approximately 15 occasions while working at an outpatient mental health clinic

in the District from 2014 to 2021, Ms. Gates, who as previously noted is a licensed social worker,

was either present when MPD officers responded to a mental health crisis or had detailed

conversations about the MPD crisis response with a supervisee or colleague who was present. In Ms. Gates's view, based on what she observed, or the detailed report of her colleague or supervisee, officers provided effective and appropriate care on only one occasion out of the 15. In the remaining incidents, the officers used intimidating language when speaking with the person in crisis, spoke in loud and aggressive tones to the person, and/or used handcuffs when doing so was unnecessary and harmful. On these occasions, Ms. Gates either observed or learned that, in response to the officers' presence and/or conduct, the clients displayed increased anxiety (e.g. shaking, difficulty speaking, avoiding eye contact), in ways that would impede subsequent clinical interventions.

72.     While working at Children's National Hospital from 2017 to 2020, Ms. Stein (who, as noted, is also a licensed clinical social worker) either observed or had detailed conversations with colleagues about 10 incidents where a young person entered the hospital as a walk-in or for a routine visit and had a crisis at the hospital involving highly agitated behavior (e.g., pacing up and down the hospital hall and refusing to stop or yelling loudly). MPD responded to all these instances and, in Ms. Stein's view, the officers never provided effective and appropriate care. Instead, the officers spoke to the young people in aggressive tones and, when the young people failed to obey commands, either ordered compliance or physically evicted the young person from the hospital. The officers' response either prevented the young person from receiving needed care or escalated the young person to the point where he or she had to be involuntarily hospitalized.

73.     From 2017 to 2020, Ms. Stein had detailed conversations with more than 40 parents about instances where police officers responded to their child during a mental health crisis. In her view, officers provided effective and appropriate care on only one occasion of the 40. Indeed, on

some occasions, the officer's arrival alone caused the young person to run away from the scene, thereby ensuring that the young person received no care at all.

74.     MPD officers often respond to mental health emergencies in ways that subject the individual in crisis to unnecessary force and/or unwarranted legal actions. For example:

a.     During the 2022 D.C. Department of Behavioral Health Performance Oversight Hearing, Councilmember Janeese Lewis George described an incident where a constituent's loved one experienced a mental health crisis and called for assistance from the District's Community Response Team (CRT). In response to the call, both MPD and CRT responded, but CRT ended up sidelined, with MPD taking control and barricading the individual in his home. Neither MPD nor CRT helped the family communicate with the individual, and, ultimately, MPD shot and killed the individual.

b.     Between five and eight times, from March to May 2023, Marques Banks, an attorney at the Thurgood Marshall Civil Rights Center at Howard Law School, witnessed the Metropolitan Police Department arrive at the Giant near the Van Ness Metro Station to respond to someone inside the store who was either yelling to themselves, hitting themselves, or displaying other clear signs of a mental health crisis. Mr. Banks never saw the individuals make a threat, destroy property, or physically touch any individual. Nonetheless, every time the MPD officers arrived, they forcibly removed the individual from the store and handcuffed the individual. Once, a person was hitting himself, making it difficult for the officers to apply handcuffs. An officer slammed the person against the ground and then placed handcuffs on him. On another occasion, a person was yelling at himself when the

police arrived and then began cursing at an officer. An officer accused the person of spitting on him, pushed the person on the ground, and applied so much force to him that it seemed like the person was choking. Mr. Banks never saw the police attempt to communicate calmly with the person in the crisis before using force. Nor did Mr. Banks see the police attempt to connect the person in crisis to mental health services.[22]

c. In May 2022, Dasjhae Phillips' mother called 911 to report that Ms. Phillips was experiencing a mental health crisis related to postpartum depression and might hurt herself or her children but did not have any weapons. Six or seven MPD officers responded to Ms. Phillips's home.  After Ms. Phillips had been with the police for about an hour, she said she planned to see her therapist. An officer nonetheless grabbed her, forced her into a police cruiser, and drove her to a psychiatric facility against her will.[23]

d. As detailed in *Wheeler v. American University*, 2022 WL 160226 (D.D.C. Jan. 18, 2022), on September 26, 2019, administrators at American University asked campus police officers to transport Gianna Wheeler, an undergraduate student, to a mental health hospital for evaluation based on reports about her behavior from a student and a professor. Campus police officers and MPD officers went to Ms. Wheeler's apartment and remained there for several hours, demanding that she go to a psychiatric hospital, even after EMTs reported to the scene and concluded that her mental health status was normal. Eventually, Ms. Wheeler began shouting at

---

[22] As recounted to undersigned counsel by Mr. Banks.
[23] As recounted to undersigned counsel by Ms. Phillips.

the police to leave and disrobed in an attempt to get them to leave. MPD and campus police officers tackled her, handcuffed her, wrapped her in a blanket, and carried her out of her apartment building. They then brought her to Washington Hospital Center. This Court denied the officers' pre-discovery summary judgment motion on Ms. Wheeler's Fourth Amendment unreasonable seizure/false arrest claims, and the case ultimately settled.

e.  In 2019, Charnal Chaney's boyfriend choked her until she passed out. Neighbors overheard the incident and called MPD, with officers arriving after Ms. Chaney regained consciousness. The police questioned her in front of her abuser, with Ms. Chaney repeatedly saying that she didn't want to answer questions and just wanted the abuser to leave. Exasperated, Ms. Chaney said that if the officers did not remove her abuser, she would jump out of the window. The officers responded by saying that they had to transport her for an involuntary psychiatric evaluation. Ms. Chaney experienced significant anxiety and began crying. Officers did not contact mental health professionals to address the situation. Instead, they lifted Ms. Chaney off the ground, carried her by her hands and feet to a squad car as she cried and screamed, and took her to an emergency room.[24]

f.  As documented in *Lewis v. District of Columbia*, No. 1:22-cv-03369 (D.D.C. Nov. 3, 2022), ECF 1, on January 13, 2022, after Malaika Lewis called the D.C. Child and Family Services Agency and was told that it could not help her with a problem, she said that the agency only helps people who say they are going to kill themselves and hung up. The agency called 911 and reported that Ms. Lewis mentioned self-

---

[24] As recounted to undersigned counsel by Ms. Chaney.

harm; 911 dispatched MPD officers to Ms. Lewis's apartment with the false understanding that Ms. Lewis was experiencing a mental health emergency. Standing outside her apartment because Ms. Lewis had not let them in, the officers threatened to take Ms. Lewis's younger daughter away with them unless Ms. Lewis left the apartment. Even after an employee with Child and Family Services told the officers that Ms. Lewis had not threatened self-harm, the officers stayed outside her apartment for hours. Shortly after a D.C. Department of Behavioral Health employee entered the apartment and began talking with Ms. Lewis, MPD officers rammed open the door to the apartment, dragged Ms. Lewis outside, slammed her against the wall in the apartment hall, placed handcuffs around Ms. Lewis's wrists so tightly that they left bruises, searched Ms. Lewis by unzipping her sweatshirt and exposing her breasts, and took her to a psychiatric facility. While Ms. Lewis was outside her home, a Child and Family Services Agency employee entered the apartment, took pictures, and, based on the pictures, opened an investigation against Ms. Lewis because the apartment appeared cluttered. The agency closed the investigation without taking any formal legal action.

## III.   MPD Is the District's Default First Responder for Mental Health Emergencies.

75.   As explained above, experts agree that cities generally, and the District specifically, should not rely on police to respond to typical mental health emergencies. MPD's training, policies, and record of performance demonstrate the importance of leaving such duties to mental health professionals.

76.     Nonetheless, the District has adopted a series of policies and made a series of funding decisions that ensure that MPD officers, rather than mental health professionals, serve as the default first responders to mental health emergencies in D.C.

**A. Background on The District's Emergency Response Program**

77.     The District operates an emergency response program, the purpose of which is to provide timely and effective responses to a wide range of emergencies, including mental health emergencies.

78.     There are several ways individuals can request assistance for a mental health emergency from the District's emergency response system.

79.     First, individuals can call 911. The D.C. Office of Unified Communications (OUC) manages the District's 911 program, and its call-takers answer all 911 calls in the District.

80.     Second, individuals can contact the D.C. Department of Behavioral Health's Access Helpline, which is staffed with mental health professionals who attempt to resolve mental health emergencies by phone. Individuals can contact the Access Helpline either by dialing the Access Helpline's direct number, or by dialing 988, the new number for the National Suicide and Crisis Hotline, for which the Access Helpline is the District's local crisis center. When Access Helpline staff members cannot resolve a crisis by phone, they can send teams of mental health clinicians and certified peer support specialists, called Community Response Teams (CRTs), to provide assistance at the scene. Individuals can contact CRTs directly by dialing 202-673-6495 but, according to an outreach specialist at a local direct service provider, few members of the public know that phone number.

81.     Third, when young people ages 6-17 have a mental health emergency, individuals can contact Child and Adolescent Mobile Psychiatric Services (ChAMPS), a program run by

Catholic Charities through a grant provided by the D.C. Department of Behavioral Health. ChAMPS employs mental health professionals who attempt to resolve calls via phone. ChAMPS can also send teams of mental health professionals to respond to mental health emergencies when telehealth services are insufficient.

82.     The vast majority of people seeking government assistance with a mental health emergency contact the District's emergency response program by dialing 911.

83.     In February 2023, as part of its written responses to questions from the D.C. Council ahead of annual performance oversight hearings, OUC provided data on 911 calls received since 2018, including data reflecting which agency OUC asked to respond to the call. These data provide the basis for all statistics in the Complaint about the way OUC responds to 911 calls unless otherwise stated.

84.     The OUC data include "event types," codes used by OUC to classify calls. It is possible to identify calls primarily or exclusively involving mental health emergencies by aggregating calls classified with event types such as "suicide attempted," "check on welfare," or "mental health consumer."

85.     Also in February 2023, the D.C. Department of Behavioral Health provided the D.C. Council data on the number of mental health emergency calls received by the crisis call centers it operates.

86.     In FY 2022, OUC received nearly four times as many 911 calls primarily or exclusively involving a mental health emergency as the number of reported calls that the D.C. Department of Behavioral Health's crisis call centers received on mental health emergencies.

**B. OUC Staff Generally Dispatch MPD to 911 Mental Health Emergency Calls.**

87.     When OUC staff receive a 911 call, they choose which first responders to dispatch to the scene. Generally, OUC staff choose between dispatching MPD or D.C. Fire and Emergency Medical Services ("D.C. Fire and Medical").

88.     In June 2021, the Mayor gave OUC staff an additional option, authorizing them to route a limited set of mental health emergency calls to the Access Helpline, rather than MPD or D.C. Fire and Medical. As noted above, Access Helpline staff members may send CRTs to the crisis.

89.     In FY 2022, OUC dispatched MPD to the scene of approximately 84% of the 911 calls it received that exclusively or primarily concerned a mental health emergency. This default to MPD has remained consistent over time: between FY 2018 and FY 2021, OUC dispatched MPD to the scene of approximately 83% of 911 calls exclusively or primarily concerning a mental health emergency.

90.     In FY 2022, OUC dispatched D.C. Fire and Medical to approximately 15% of the 911 calls it received that exclusively or primarily concerned a mental health emergency. This figure has also remained consistent: between FY 2018 and FY 2021, OUC dispatched D.C. Fire and Medical to approximately 17% of such calls.

91.     As reported to the D.C. Council in February 2023 by the D.C. Department of Behavioral Health, in FY 2022 OUC routed only 327 calls to the Access Helpline—a total that amounts to only 0.76% of the 911 calls OUC received in FY 2022 that exclusively or primarily concerned a mental health emergency.

92. In sum, a call to 911 for a mental health emergency is highly unlikely to get a response from a mental health professional. Instead, a call to 911 is overwhelmingly likely to result in a police officer, rather than a mental health professional, responding to the crisis.

**C. District Policies Limit OUC's Ability and Authority To Route Mental Health Emergency Calls to Mental Health Professionals.**

93. OUC cannot directly dispatch CRTs or any other mental health professionals to a mental health emergency. Instead, its staff must transfer the call to the Access Helpline, which then decides whether to send a CRT to the scene.

94. District policy limits OUC call-takers in their ability to transfer calls to the Access Helpline.

95. For instance, according to public statements from OUC officials in February 2023, call-takers cannot transfer a mental health emergency call to the Access Helpline if the individual in crisis is under 18 or has ingested a substance such as alcohol or drugs.

96. According to a former senior OUC official, who is familiar with OUC's practices through spring 2022, more than half the time OUC transfers a call to the Access Helpline, no one answers.

97. When no one at the Access Helpline answers OUC's attempt to transfer a call, the call stays with OUC, and OUC dispatches MPD instead. The recurring unavailability of the Access Helpline discourages OUC call-takers from transferring calls to the Access Helpline.

98. Unsurprisingly, as the data discussed in the previous section show, OUC routes few 911 calls primarily or exclusively involving mental health emergencies to the Access Helpline, the only mental health professionals whom OUC can contact.

99. OUC's systems are not integrated with the Access Helpline's systems.

100.    If a CRT heads toward the scene of an emergency, OUC cannot communicate with the CRT members to share new information or coordinate support from other agencies. This means that CRTs may not be able to learn valuable information that would help them provide effective treatment or reach the person in crisis more quickly.

101.    The District has not provided either Access Helpline or OUC operators with the technology needed to track, in real time, the location of CRTs.

102.    Without such tracking, Access Helpline and OUC operators cannot determine whether any CRTs are close to the scene. The inability to conduct such tracking also means that, when faced with multiple calls, operators cannot determine the best route for each CRT such that the travel time between calls is as low as possible. By contrast, OUC has the capacity to track the real-time location of MPD and D.C. Fire and Medical responders, and OUC uses this ability to route the closest responders to calls, thereby lowering response times.

103.    OUC has four supervisors on site for every shift: one for fire and medical dispatch, one for police dispatch, one for call-taking, and one to ensure coordination across the other three divisions. OUC does not have a shift supervisor assigned to mental health emergency dispatches.

104.    OUC tracks calls routed to MPD and D.C. Fire and Medical in its primary database. OUC does not track calls routed to the Access Helpline in that database.

**D. The District Has Deprived CRTs and ChAMPS of the Resources Necessary To Provide Emergency Mental Health Services.**

105.    Whether individuals contact the Access Helpline, CRTs, or ChAMPS directly, or reach the Access Helpline through 911, it can take hours for mental health professionals to arrive at the scene.

106.    Long delays between the beginning of a crisis and the time a professional arrives to help can cause the crisis to escalate and make it harder for mental health professionals to de-escalate the situation and provide treatment.

107.    From 2014 to 2021, Licensed Clinical Social Worker Gretchen Gates worked at an outpatient mental health provider in the District. During that period, she called ChAMPS, CRTs, and mobile crisis units (the predecessor to CRTs which was also managed by the D.C. Department of Behavioral Health), approximately 20-25 times for mental health emergencies. In Ms. Gates's experience, it took ChAMPS between one and four hours to arrive. In her experience with CRTs and mobile crisis units, it took between one and two hours for mental health professionals to arrive.

108.    Approximately 30% to 40% of the times Ms. Gates called ChAMPS, CRTs, mobile crisis units, the delay escalated the crisis, with the individual either becoming more agitated (yelling or shaking) or shutting down and dissociating. Either response made it harder for Ms. Gates and other mental health professionals to communicate with the person in crisis, which in turn made it harder to stabilize them. Based on her clinical experience, Ms. Gates believes the number of individuals whose crises escalated because of the delay would have been even higher had she or another trained clinician not been present to help the individual in crisis remain calm while waiting for mental health professionals to respond.

109.    The District has not provided CRTs or ChAMPS with sufficient staffing and technological resources to respond to mental health emergencies in a timely manner.

110.    CRT, for instance, does not even have enough employees to consistently answer the phone for calls of service. According to a former CRT employee, the phone "rings and rings" without anyone picking up.

111.    Sometimes, Access Helpline and OUC operators send MPD even when individuals request a CRT. For example, Councilmember Janeese Lewis George stated at a recent D.C. Council hearing that residents frequently tell her that they call for assistance from CRTs but are told that no CRT is available and, as a result, police alone are sent to the scene of the crisis.

112.    Ms. Gates has supervised individuals who have called the number for CRTs directly and informed the operator that a person under their care needs urgent mental health attention and does not pose a danger to any third party, but nonetheless received a response from armed MPD officers rather than a CRT.

113.    D.C. requires MPD officers to provide assistance any time a CRT decides to initiate an involuntary transport of a person to a psychiatric hospital for evaluation—even when the MPD officers did not initially respond to the emergency.

114.    The District's reluctance to engage mental health professionals for mental health crises has been a pattern over several years.

115.    In 2016, the D.C. Council passed the Neighborhood Engagement Achieves Results Act, which required the District to "pair mental and behavioral health clinicians and outreach specialists with MPD officers in teams in order to immediately identify individuals in need of assistance and connect those who may be impacted by homelessness, mental illness, or substance abuse with available services." D.C. Code § 5-132.31(b). The Council mandated that the District "establish no fewer than 5 teams" within six months of receiving funds or by October 1, 2016. *Id.* § 5-132.31.

116.    A June 2022 report by the Office of the D.C. Auditor found that, six years later, the District had not established any of the teams required by the NEAR Act.

**IV.     The District's Response to Mental Health Emergencies Pales in Comparison to the District's Response to Physical Health Emergencies.**

117.    D.C. Fire and Medical is the default first responder for physical health emergencies in the District.

118.    In FY 2022, OUC dispatched to D.C. Fire and Emergency approximately 90% of 911 calls primarily or exclusively concerning physical health emergencies (as reflected by OUC's classification of them using event codes such as "Diabetic Seizure," "OD with Prescription Drugs," or "Animal Bite"). OUC dispatched 7.4% of such calls to MPD, and 2.6% to a nurse triage hotline.[25] This approach to physical health emergencies is consistent with historic patterns: from FY 2018 to FY 2021, OUC dispatched approximately 85% of 911 calls primarily or exclusively involving physical health emergencies to D.C. Fire and Medical and approximately 15% to MPD.

119.    Based on the experiences of an Emergency Medical Service (EMS) professional who has served as an EMS provider for over 30 years and has taught EMTs in multiple jurisdictions, including the District, the draw upon emergency response systems to respond to mental health emergencies is disproportionate to the training that first responders receive. Also, mental health crises can be more complicated to treat in the field prior to emergency transport than physical health crises, such as cardiac arrest, which first responders treat using standardized protocols every single time.

120.    Yet, the training on responding to mental health emergencies that the District provides MPD officers (D.C.'s default first responders for mental health emergencies) is substantially less than the training on responding to physical health emergencies that D.C.

---

[25] In addition to the data provided by OUC discussed in ¶ 83, the figures in this paragraph rely on information produced publicly by D.C. Fire and Medical in February 2023.

mandates be completed by D.C. Fire and Medical staff (D.C.'s default first responders for physical health emergencies).

121.    All 1,600 D.C. Fire and Medical operational staff members are certified as emergency medical technicians (EMTs).

122.    To obtain certification as an EMT, D.C. Fire and Medical staff must complete a 150-hour course and pass a national registry certification exam that requires candidates to show that they possess the skills needed to stabilize physical health emergencies.

123.    Three hundred of D.C. Fire and Medical's 1,600 EMTs are also certified as paramedics.

124.    Paramedics must be previously certified as EMTs and complete with passing marks an additional paramedic educational program that ranges from 1,200 to 1,800 hours of training. Paramedics also must pass a national registry certification examination.

125.    By contrast, only a quarter of MPD's officers—the District's default first responders for mental health emergencies—complete the 40-hour Crisis Intervention Officer course, MPD's most advanced training on mental health emergencies.[26]

126.    The 40-hour Crisis Intervention Officer training course is approximately four times shorter than the training provided to EMTs and between 30 and 45 times shorter than the training provided to paramedics.

127.    D.C. Fire and Medical employees are not trained to adopt command-and-control tactics or otherwise encouraged to perceive people in physical health crises who disobey orders as threats.  They are not trained to adopt aggressive responses to interactions with people in crisis.

---

[26] *See* D.C. Police Reform Commission Report at 43.

128.    D.C. Fire and Medical employees are not armed with firearms or other weapons when responding to physical health emergencies.

129.    D.C. Fire and Medical employees are not authorized to make arrests or conduct law enforcement searches or evidence seizures.

130.    Individuals experiencing physical health emergencies face little risk of entanglement with the criminal legal system as a result of requesting and receiving emergency response services.

131.    Although CRT members are better trained for handling mental health emergencies than MPD officers and less likely to impose deleterious law enforcement consequences on individuals in crisis, D.C.'s investment in CRTs pales in comparison to its funding for physical-health emergency response.

132.    Mental health crises are common and frequently require more time for first responders to resolve than do physical health crises.

133.    Yet D.C. employs around 36 times more EMTs and paramedics than CRT members: 1,600 to 44.

134.    In FY 2022, D.C. employed approximately 9 EMTs per 1,000 911 calls OUC received that primarily or exclusively concerned a physical health emergency. Further, D.C. employed approximately seven D.C. Fire and Medical operational staff per 1,000 911 calls dispatched to D.C. Fire and Medical in FY 2022.

135.    In FY 2022, D.C. employed approximately one CRT member per 1,000 911 calls that OUC received that primarily or exclusively concerned a mental health emergency.

136.    D.C. Fire and Medical sets a benchmark of five minutes for EMTs to respond to time-sensitive calls and a benchmark of nine minutes for paramedics to respond to time-sensitive calls.

137.    The benchmark for EMTs' response to crises is more than 12 times faster than the one-to-three hours that Bread and other similar providers report generally waiting for CRTs.

138.    The benchmark for paramedics' response to crises is more than six times faster than the one-to-three hours that Bread and other similar providers report generally waiting for CRTs.

139.    The District has structured its emergency response program to provide timely, emergency medical care to people experiencing physical health emergencies. It has not done the same for mental health emergencies.

**V.    The District's Reliance on MPD as Its Default First Responders for Mental Health Emergencies Frustrates Bread's Mission and Causes It To Divert Resources To Counteract the Harm.**

140.    The District's reliance on MPD officers as its primary first responders for mental health emergencies has frustrated Bread's mission by causing it to divert substantial resources to handling crises at its facilities, impeding its ability to advance its core mission.

**A.  Bread's Mission Requires It To Minimize MPD's Presence at Its Facilities.**

141.    Bread's mission is to ensure under-resourced D.C. residents can access basic needs. It achieves this mission by operating a food bank where individuals can get free groceries, operating a clothing boutique where individuals can get free clothes, providing pro bono legal services, providing a range of social services, and operating a primary care clinic that provides primary medical and behavioral health care to 3,000 adults and young people.

142.    Bread provides services at two sites, one in Southeast D.C. and another in Northwest D.C.

143.    With respect to health care, Bread provides only primary healthcare services, not emergency care.

144.    In the physical health context, Bread's primary care services include annual checkups, care for ongoing chronic conditions (like diabetes), diagnosis of and care for common illnesses, and referrals to specialists.

145.    In the behavioral health context, Bread's primary care services include supporting patients' health goals by helping them achieve behavioral change (such as quitting smoking or improving sleep hygiene), short-term therapy to develop coping skills for anxiety or depression, and referrals to specialty behavioral healthcare professionals.

146.    Bread's behavioral healthcare professionals support the physical health clinic by checking in with patients who come to that clinic. Sometimes, patients make appointments with both a physical health and behavioral health provider. Other times, the physical health provider or the patient requests assistance from a behavioral health clinician after the patient arrives for a physical health appointment.

147.    Bread's mission does not encompass providing emergency health services.

148.    Bread does not have beds where an individual who needs ongoing monitoring can stay overnight. It does not have staff or vehicles authorized to transport individuals to hospitals or other facilities to receive additional care. If an individual is experiencing a mental or physical health crisis because they ran out of medication, it is unlikely that Bread will have the prescription in stock.

149.    When someone experiences a *physical* health emergency at one of Bread's facilities, staff call 911.

150.     When someone experiences a *mental* health emergency at one of Bread's facilities, staff try to avoid calling 911 because calling 911 has historically resulted in MPD officers arriving at the scene. Based on dozens of experiences, Bread staff have found that MPD's presence either agitates the person in crisis or causes them to shut down, either of which makes it harder for the person in crisis to receive treatment.

151.     MPD's presence has diminished the trust Bread's clients have in Bread.

152.     Most of Bread's clients are people of color who reside in D.C. Wards 7 and 8.

153.     Many of Bread's clients have had negative encounters with MPD officers that resulted in unnecessary escalation and trauma.

154.     Many of Bread's clients have told Bread staff members that they do not want MPD officers present when they are having a mental health crisis. And, more generally, many of Bread's clients have told staff that they are uncomfortable being around MPD officers.

155.     In the past, when Bread has called 911 to address mental health crises, MPD officers have shown up, handcuffed people unnecessarily, used unnecessarily aggressive tones, and crowded people in crisis. Additionally, Bread's clinicians have found that MPD officers address crises only by taking someone to a hospital or doing nothing—even when other solutions, such as designing a safety plan and escorting the individual to stay with a friend or family member, would be the most appropriate and effective response.

156.     To protect clients in crisis, and to preserve relationships with all clients, Bread has a practice of refraining from contacting MPD to the greatest extent possible.

157.     Bread will call 911 if an individual presents a physical danger to others. Unless the individual has a weapon (which is rare), Bread will attempt to de-escalate the situation before calling 911 and call 911 only if de-escalation efforts fail.

158.     If an individual presents a danger only to themselves, Bread will attempt to de-escalate the situation on its own and call CRT or ChAMPS directly. Bread generally calls 911 in these scenarios only if de-escalation efforts have failed, CRTs or ChAMPS are unable to respond, or the individual needs transport to a hospital.

**B. Bread Diverts Significant Resources to Providing The Emergency Mental Health Services That the District's Emergency Response Program Exists To Supply But in Fact Does Not.**

**1.   Lost Staff Time and Lost Revenue**

159.     Individuals frequently have mental health crises at Bread's sites. Bread's conservative estimate is that typical mental health emergencies occur at Bread's facilities approximately three times per month.

160.     Although Bread will call CRT or ChAMPS to assist with mental health emergencies at its sites, both entities take a long time to respond. For example, in the past calendar year, Bread contacted CRT multiple times per month, with staff generally waiting between one and three hours for CRTs to come.

161.     Staff have waited as long as six hours for a CRT to arrive.

162.     Because CRTs and ChAMPS do not provide prompt responses to mental health emergencies, Bread has developed a system whereby Bread staff effectively serve as first responders for mental health emergencies at its sites.

163.     Bread has tasked around 10 individuals across both its facilities with taking the lead in responding to crises. These individuals are either clinicians or individuals who have extensive de-escalation experience. Other staff know to contact one of these individuals when they see a crisis unfolding.

164.    Addressing a mental health crisis takes approximately 2.5 hours on average, time that includes de-escalating the individual, designing a safety plan, attempting to contact the individual's primary mental health care provider and loved ones, and/or waiting for CRT or ChAMPS to arrive to provide additional services.

165.    For example, last month, a Bread staff member spent three hours trying to deescalate a woman who was experiencing passive suicidal ideation. The patient was crying and lying on the floor while the Bread staff member tried to keep her grounded, instill some sense of hope, engage in relationship-building to build trust, and develop a safety plan. Bread did not call CRT because, in Bread's experience, CRTs refuse to respond to people who are experiencing passive suicidal ideation. The staff member had to cancel three behavioral health appointments that day and could not reschedule them until the following week.

166.    After the responding staff member calmed the patient down and determined that she was not suicidal, the patient remained at Bread until closing time, while other staff members checked in on her, because she did not want to be home by herself yet.

167.    Sometimes, addressing a mental crisis can take all day.

168.    Because of how long a crisis can last, two or three different staff members must focus on stabilizing and providing crisis care for the person in crisis, with new staff subbing in every hour or so.

169.    After a crisis, the staff who responded to it debrief with a supervisor for between 30 minutes and two hours.

170.    Bread estimates that staff spend more than 300 hours each year responding to mental health crises and debriefing those encounters.

171.    If Bread's staff were not responding to mental health crises, they would generally be meeting with clients or preparing to meet with clients. Responding to mental health crises pulls staff away from these and other daily tasks, such as making phone calls to clients.

172.    The approximately 10 individuals responsible for addressing crises were not hired as full-time crisis responders.

173.    Each of the approximately 10 individuals Bread has designated as a crisis responder is primarily responsible for tasks other than responding to crises. They provide clients with primary care behavioral health services (as described above), manage finances for individuals legally determined to be unable to manage their money independently, and/or connect individuals with social services.

174.    Enlisting staff to address crises imposes significant hardships on Bread's clients and staff.

175.    When a crisis occurs, the responding staff members may need to cancel, shorten or postpone at least one client meeting. At minimum, those staff members are not available to physical healthcare professionals, who may have needed to pull them into an appointment to provide behavioral health support.

176.    Canceling, postponing or shortening a behavioral health appointment, or missing an opportunity to provide behavioral health support, impedes clients' treatment.

177.    For example, postponing an appointment with a client suffering from anxiety or depression will cause the client to go additional days or weeks without receiving strategies to mitigate the symptoms.

178.    Bread's staff believes that many clients endure more intense or persistent symptoms than they otherwise would have when staff members must cancel, postpone, or shorten behavioral health appointments to address crises.

179.    Behavioral health staff who are responding to crises are not available to assist physical health professionals with clients who may need behavioral health interventions and provide therapy to those clients. Bread staff believe several clients have slipped through the cracks in this way and not received therapy that they needed.

180.    One of the Bread staff members designated to respond to mental health crises is a Behavioral Health Manager, whose role is to provide short-term behavioral health support to stabilize Bread clients so that they can receive medical help at the primary care clinic. For example, the primary care clinic may ask the Behavioral Health Manager to engage in deep breathing techniques with someone who has high blood pressure or feels nervous before dental work. When she has to respond to a crisis, the Behavioral Health Manager is unavailable to the primary care clinic to provide behavioral health support to patients and, as a result, some patients will be unable to receive medical treatment.

181.    Staff members who respond to mental health crises find doing so extremely emotionally draining. Consequently, staff sometimes take time off from work the day after a crisis occurs.

182.    When Bread staff members cancel or postpone a client behavioral health appointment, or miss an opportunity to provide behavioral health support, it not only deprives the client of needed services, but also reduces Bread's revenue.

183.    Bread has contracts such that it receives reimbursement for behavioral health appointments, including even brief meetings with physical health clients to provide behavioral

health support. When staff cancel or postpone a behavioral health appointment, or miss an opportunity to provide behavioral health support, Bread loses money.

184.    Even if an appointment can be rescheduled for a later time, it may take away from billable time that staff could spend meeting with another client had the original appointment not been canceled.

185.    Bread estimates that appointments canceled or postponed due to responding to mental health crises, along with lost opportunities to provide behavioral health support due to responding to crises, results in thousands of dollars of lost revenue each year.

186.    If the District employed mental health professionals who could respond to crises promptly and provide appropriate care, Bread believes that staff would spend significantly less time responding to crises. While Bread staff would still attempt to calm the individual in crisis until the District's mental health professionals arrived, that period would be relatively brief, and Bread could rely on District employees to perform the time-consuming tasks of de-escalating the crisis, developing a safety plan, and attempting to connect the individual in crisis with care. The time Bread saved would allow staff to cancel, postpone, and curtail fewer client meetings and be more available to provide behavioral health support—outcomes that would benefit clients and prevent Bread from losing billing revenue to crisis response.

## 2.  Training Costs

187.    During the approximately 2.5 hours that Bread staff spend addressing a given crisis, the individual in crisis frequently interacts with people outside Bread's social services and medical departments.

188.    For example, a development staff member may walk through the lobby while the de-escalation process is ongoing, or an agitated individual may walk into Bread's administrative offices as clinicians are attempting to calm them.

189.    Bread provides a six-hour de-escalation training to employees in all departments, including departments outside the social services and medical departments (such as development and administration) so that all staff can treat people in crisis with dignity and assist in providing care if needed.

190.    Providing de-escalation training to staff outside the medical and social services departments costs Bread approximately $3,250 annually.

191.    This cost includes trainer recertification and books for each person who attends the training.

192.    The funds Bread spends on de-escalation training for staff outside the social services and medical departments reduces the money it has to buy food for its pantry, drugs for its clinic, and support for other services.

193.    If the District employed mental health professionals who could respond to crises promptly and provide appropriate care, Bread would not have to expend the time and money to provide staff outside the social services and medical departments with the six-hour de-escalation training course.

## CAUSES OF ACTION

### FIRST CAUSE OF ACTION:
### Title II of the Americans with Disabilities Act, 42 U.S.C. §§ 12131, et seq.
*(Discrimination on the Basis of Disability by a Local Government Entity)*

194.    Title II of the Americans with Disabilities Act (ADA) prohibits state and local government entities from denying qualified individuals with disabilities an equal opportunity to benefit from the entity's services, programs, or activities. 42 U.S.C. § 12132. The ADA's

41

protections extend to all aspects of a public entity's activities, including the provision of emergency response services.

195.     The District of Columbia is a public entity as defined by Title II of the ADA. 42 U.S.C. § 12131(1). The District's emergency response program, including the 911 system and other systems that receive information about potential emergency situations and that dispatch personnel to respond to those situations, is a service, program or activity within the meaning of Title II.

196.     The ADA, as authoritatively construed by its implementing regulations, provides that public entities may not provide aids, benefits, or services in such a way that qualified individuals are denied opportunities to participate or benefit, 28 C.F.R. § 35.130(b)(1); may not rely on "methods of administration that . . . defeat[] or substantially impair[] accomplishment" of the program's objectives,  28 C.F.R. § 35.130(b)(3); and may not "provide aids, benefits, or services in such a way that qualified individuals are not afforded "equal opportunity to obtain the same result . . . as that provided to others," or are "otherwise limit[ed] . . . in the enjoyment of any right, privilege, advantage, or opportunity enjoyed by others receiving the aid, benefit, or service," 28 C.F.R. § 35.130(b)(1).

197.     The District's default first responders for physical health emergencies are paramedics and EMTs who have the skills and training to provide an adequate response. But for typical mental health emergencies, the District's default first responders are MPD officers who do not have the skills and training to provide an adequate response. In fact, MPD officers' training and record of performance establishes that their presence creates a substantial risk that they will provide ineffective services and, instead, unnecessarily exacerbate the psychological trauma experienced by the person in crisis. This inequity deprives people with mental health disabilities

of an equal opportunity to benefit from the District's emergency response program, in violation of the ADA.

198.     Because the District relies on MPD officers as its default first responders for typical mental health emergencies, and because those officers' training and record of performance establishes that their presence creates a substantial risk that they will exacerbate, rather than alleviate, the situation, the District administers its emergency response program in a way that denies people with mental health disabilities the type of effective services for mental health emergencies that the program exists to provide. The District thereby administers its emergency response program in a way that substantially impairs accomplishment of its purposes with respect to individuals with mental health disabilities.

199.     The District's reliance on MPD officers as its default first responders for typical mental health emergencies is causing ongoing injury to Bread's mission by requiring it to divert its resources to counteract the harm caused by the deficiencies in the District's mental health crisis response system and by impeding Bread's relationships with, and ability to provide services to, its clients.

**SECOND CAUSE OF ACTION:**
**Section 504 of the Rehabilitation Act, 29 U.S.C. § 794**
*(Discrimination on the Basis of Disability by Recipient of Federal Financial Assistance)*

200.     Section 504 of the Rehabilitation Act of 1973 ("Section 504") prohibits discrimination against people with disabilities by any program or activity receiving federal financial assistance. Under Section 504, otherwise qualified individuals with disabilities may not be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any such program. 29 U.S.C. § 794(a). A program or activity includes "all of the operations of a

department, agency, special purpose district, or other instrumentality of a State or of a local government." 29 U.S.C. § 794(b)(1).

201.    The District receives "Federal financial assistance" within the meaning of 29 U.S.C. § 794(a).

202.    The operations of the District, including its emergency response program, are "program[s] or activit[ies]" within the meaning of 29 U.S.C. § 794(b)(l)(A)–(B).

203.    Section 504 prohibits covered entities from providing aids, benefits, or services in such a way that qualified individuals are denied opportunities to participate or benefit, are not afforded equal opportunity to obtain the same result as that provided to others, or are otherwise limited in the enjoyment of any right, privilege, advantage, or opportunity enjoyed by others receiving the aid, benefit, or service.

204.    Further, Section 504 prohibits methods of administration that defeat or substantially impair accomplishment of the program's objectives.

205.    The District's default first responders for physical health emergencies are paramedics and EMTs who have the skills and training to provide an adequate response. But for typical mental health emergencies, the District's default first responders are MPD officers who do not have the skills and training to provide an adequate response. In fact, MPD officers' training and record of performance establishes that their presence creates a substantial risk that they will provide ineffective services and, instead, unnecessarily exacerbate the psychological trauma experienced by the person in crisis. This inequity deprives people with mental health disabilities an equal opportunity to benefit from the District's emergency response program, in violation of the Rehabilitation Act.

206.     Because the District relies on MPD officers as its default first responders for typical mental health emergencies, and because those officers' training and record of performances establishes that their presence creates a substantial risk that they will exacerbate, rather than ameliorate, the situation, the District administers its emergency response program in a way that denies people with mental health disabilities the type of effective services for mental health emergencies that the program exists to provide. The District thereby administers its emergency response program in a way that substantially impairs accomplishment of its purposes with respect to individuals with mental health disabilities.

207.     The District's reliance on MPD officers as its default first responders for typical mental health emergencies is causing ongoing injury to Bread's mission by requiring it to divert its resources to counteract the harm caused by the deficiencies in the District's mental health crisis response system and by impeding Bread's relationships with, and ability to provide services to, its clients.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiff respectfully requests this Court:

A. Issue a declaratory judgment, pursuant to 28 U.S.C. §§ 2201 and 2202 and Federal Rules of Civil Procedure Rule 57, declaring that the Defendant's operation of its emergency response program violates Title II of the Americans with Disabilities Act of 1990, 42 U.S.C. § 12132, and Section 504 of the Rehabilitation Act of 1973, 29 U.S.C. 794;

B. Grant Plaintiffs' permanent injunctive relief requiring, within a limited and reasonable period of time, that Defendant, its agents, employees, and those persons acting in concert with it implement and operate an emergency response program that provides parity between physical health emergencies and mental health emergencies, and that ensures that

mental health professionals are the default first responders for typical mental health emergencies;

C.  Order Defendant to pay Plaintiff's costs, expenses, and reasonable attorneys' fees incurred in the prosecution of this action, as authorized by, inter alia, 42 U.S.C. § 12205, 42 U.S.C. § 1988, and other applicable laws; and

D.  Order such other relief as the Court may deem just and proper, including such orders as may be necessary to effectuate and implement the foregoing.

Dated: July 6, 2023

Respectfully submitted,
*/s/ Michael Perloff*_____
Michael Perloff (D.C. Bar No. 1601047)
Scott Michelman (D.C. Bar No. 1006945)
American Civil Liberties Union Foundation
  of the District of Columbia
915 15th Street NW, 2nd Floor
Washington, D.C. 20005
(202) 601-4278
mperloff@acludc.org

Ashika Verriest (D.C. Bar No. 90001468)
Brian Dimmick (D.C. Bar No. 1013979)
Susan Mizner
Jenn Rolnick Borchetta
West Resendes
American Civil Liberties Union Foundation
125 Broad Street
New York, NY 10004
(240) 676-3240
averriest@aclu.org

Daniel L. Brown (N.Y. Bar No. 2978559)
Steven Hollman (D.C. Bar No. 375658)
Nikole Snyder (D.C. Bar No. 1670948)
Calla N. Simeone (D.C. Bar No. 1766258)
SHEPPARD, MULLIN, RICHTER &
HAMPTON LLP
2099 Pennsylvania Ave. NW, Ste. 100
Washington, D.C.  20006
Telephone: (202) 747-1941

46

dbrown@sheppardmullin.com
shollman@sheppardmullin.com
nsnyder@sheppardmullin.com
csimeone@sheppardmullin.com

*Counsel for Plaintiff**

---

* Counsel would like to acknowledge Intake Manager Elaine Stamp and law student Daniel Xu for their assistance checking citations and Intake Specialist Jada Collins for her assistance proofing the Complaint.