IN THE UNITED STATES DISTRICT COURT
DISTRICT OF COLUMBIA

BREAD FOR THE CITY, ) CIVIL NO.: 23-1945-ACR
Plaintiff,
vs.
DISTRICT OF COLUMBIA,
Defendant. ) November 27th, 2023 ) Washington, D.C. ) 10:30 a.m.

Transcript of Pre-motion Conference
Before the Honorable Ana C. Reyes
United States District Judge

APPEARANCES:

For the Plaintiff: Michael Krevans Perloff, Esquire
Scott Michelman, Esquire
Ashika Verriest, Esquire
American Civil Liberties Union of the District of Columbia
915 15th Street NW
2nd Floor
Washington, D.C. 20005

For the Defendant: Pamela A. Disney, Esquire
Brendan R. Heath, Esquire
Office of the Attorney General for the District of Columbia
400 Sixth Street NW
Suite 10100
Washington, D.C. 20001

For the Intervenor: Anthony Michael Conti, Esquire
Conti Fenn LLC
36 South Charles Street
Suite 2501
Baltimore, MD 21201-3316

Reported by: Christine T. Asif, RPR, FCRR
Federal Official Court Reporter
333 Constitution Avenue, NW
Washington, D.C. 20001
(202) 354-3247

Proceedings recorded by machine shorthand; transcript produced by computer-aided transcription

P R O C E E D I N G S

THE CLERK: Your Honor, this is criminal -- I'm sorry. This is civil action 23-1945. Bread for the City versus District of Columbia. Will the parties please come forward and identify themselves for the record.

MR. PERLOFF: Good morning, Your Honor. My name is Michael Perloff. I'm with the ACLU of D.C., here for the plaintiff Bread for the City. With me today is my colleague Ashika Verriest, who is with the ACLU's criminal law reform project, Scott Michelman with the ACLU D.C., and Steve Hollman with the law firm of Sheppard Mullin.

THE COURT: Where are your seven other lawyers?

MR. PERLOFF: We're hopeful that they are listening in, but we divide the work among us.

THE COURT: All right. Welcome, everyone.

MS. DISNEY: Good morning, Your Honor, my name is Pamela Disney for the Office of the Attorney General of the District of Columbia, and I'm joined by my colleague Brendan Heath.

THE COURT: Ms. Disney, A for effort, but you're stuck with me. One quick question, so I got put on a jury two weeks ago.

MS. DISNEY: Yes, Your Honor.

THE COURT: And your office was defense counsel. Have you heard about this?

MS. DISNEY: Yes, I did.

THE COURT: Why on earth did you all seat a judge on a jury? Like, the plaintiffs or the defendants. Like, literally everyone I say, oh, I was on a jury. They are like, you mean, you got kicked from the jury. And I was like, no they still had strikes left and they put a judge on the jury. Do you have any idea why that was?

MS. DISNEY: I cannot answer that, Your Honor. It's a very good question, though.

THE COURT: Okay. Well, it was interesting. Your team did a fine job.

MS. DISNEY: I'll pass that on.

THE COURT: I know we ruled for the other side, but I thought everyone did a side job. There were some egregious leading questions, but you know I wasn't the judge on the case. So, all right.

MR. CONTI: Good morning, Your Honor, Anthony Conti on behalf of the proposed intervenor, the D.C. Police UNION.

THE COURT: Okay. Sir, in the future, just everyone really, I expect people to cooperate and get along on my cases. I expect you all to figure stuff out on your own, which means that unless a scheduling dispute involves somebody's mother dying, it should not come to my attention, okay?

MR. CONTI: Understood, Your Honor.

THE COURT: And everyone, the tone of everyone's pleadings should be respectful and civil. Okay?

MR. CONTI: Certainly, Your Honor.

THE COURT: All right. Thank you.

So we're here on your pre-motion conference for a motion to dismiss. Ms. Disney, I have to tell you, I'm not sure you've got much of a motion, but obviously I'm going to let you make it. I haven't made any decision yet, but can you give me sort of thoughts as to what you're thinking and what I'm missing.

MS. DISNEY: Sure, Your Honor.

Thank you, Your Honor. And I'll be happy to answer any questions to perhaps ease some of your concerns.

THE COURT: Well, I guess I have one question, this is for both sides. And I'm sorry I haven't sort of dug into the law on this yet, but is there a case on point that says, from any jurisdiction, that says that the ADA would not cover what they're alleging here in the sense of that basically what they're saying is people with mental disabilities, as I understand it, are being discriminated against in a way that people with physical disabilities are not, because of the response they're getting or rather not getting from D.C.

And I noticed that the plaintiffs cited two instances in which the Justice Department has indicated that calling out police as opposed to trained mental health

professionals was a violation of the ADA and that was -- dOJ found that in Minneapolis and Louisville, which is my home city, so I know it well. But I didn't see that there were any sort of court decisions on that. Can you help me out?

MS. DISNEY: Well, that's right, Your Honor. You know, as far as we've found, and plaintiffs have not cited any decision that would hold -- well, the opposite as well -- that would hold that the discrepancy in service time, for example, and the amount of time it takes for an ambulance or mobile crisis unit to respond to a emergency, or any other aspect of the emergency response, there's been no holding that the ADA would cover such a claim.

THE COURT: There's just been no holding either way. We're like on fresh grounds.

MS. DISNEY: Fresh grounds.

THE COURT: And are those Louisville and Minneapolis cases, are they existent, are they ongoing, or were they not filed, do you know?

MS. DISNEY: They were -- reports I believe, they were just reports and there was no court --

THE COURT: There's no litigation.

MS. DISNEY: Yes. As far as I'm aware. I'll let plaintiffs correct me if that's wrong.

THE COURT: Okay. But as I understand their complaint, and you can correct me if I'm wrong, they're not --

they're not saying what D.C. has to do as a policy matter in terms of responding to mental health issues. They are saying that you respond differently to mental health issues than you do to other issues. And the way you respond differently is discriminatory and therefore a violation of the ADA. My understanding of your position is the ADA does not allow whoever to come in and say this is how you have to treat certain disabilities. And I think everyone would agree with that. But then they'll come back and say that's not what our complaint says. Our complaint says you're treating the disabilities -- certain disabilities in one way, which is effective, and mental disabilities in a different way that's ineffective. And if you had treated them the same you would have effectiveness across the board.

MS. DISNEY: My reading of plaintiff's complaint is different.

THE COURT: Okay. Go ahead.

MS. DISNEY: What they said is different as well. I mean, in their prayer for relief they specifically seek parity between the physical health response and the mental health response. And the ADA is not about parity in this respect. So I think it's important also to note that the services that they're addressing, the point -- the thrust of their complaint is that the services that the District uses to respond to physical emergencies, and maybe safety concerns, for example,

are not the services that should be used to respond to mental health emergencies. What they're seeking in essence is new services, or said another way, it could be seeking a different level of care for the services provided to individuals with mental health emergencies.

THE COURT: Well, they say that that's not the case. Different level of care they say is a negligence action. I tend to agree with them. I don't think they're bringing a negligence action. They're saying if I have asthmatic -- diabetic crisis, you send out someone with an EMT who is trained to do that, right. You wouldn't send out the police to deal with a diabetic crisis, right? I mean, because that would be ridiculous, because the police don't know how to deal with a diabetic crisis.

And so what they're saying is that people with physical disabilities are getting treated and getting services that are specific to their disability and therefore are effective. And that mental disabilities, you are sending out the police, who are equally untrained to deal with mental disabilities as they would be with diabetic disabilities. But instead of sending out the people who could deal with the mental disabilities, you're sending out untrained police. And that you would not, for example, use parity by sending out police to everyone, because that would be silly and people would die. But you're doing it for mental health services in

a way that's discriminatory, because the discrimination is sending out effective -- or services that one can expect to be effective versus services that one knows would not be effective.

MS. DISNEY: So two points on that, Your Honor.

THE COURT: Sure.

MS. DISNEY: The first being that, going back to the ADA itself, what's at issue under Title II is access to particular government service. And it's -- under the law it's meaningful access to that service. And so what plaintiffs will struggle to do, because essentially they're trying to put a square peg in a round hole here, is identify the service at issue.

THE COURT: The service at issue is there's a 911 call, and the person who comes is actually authorized or is actually trained in how to address a 911 call. So if I have a heart attack and I call 911 and they send out a brain surgeon who says I don't know how to deal with heart attacks and so you die. They would say that's bad, that's ineffective, right, even though you had a neurosurgeon that would be ineffective.

And what they're saying is, when I call 911 and I say I'm having a heart attack they send out someone who's trained to deal with heart attacks. But if I have a mental disability and, for example, I have suicidal ideation and I'm

threatening to kill myself and someone comes -- calls 911, you send out a police officer, who has no training whatsoever to deal with suicidal ideation. And therefore that person could die because the police officer will not know how best to bring that person down.

Let's say they're going through a manic or bipolar attack. I'm seeing green men. I don't have suicidal ideation, I have a mental disability. I'm seeing things. I'm seeing green men. I think that they're attacking me or they're going to kill my dog, and so I have a knife and I'm trying to attack people. And you bring out a police officer who isn't trained with how to deal with people who are having these mental sort of episodes.

MS. DISNEY: Yeah, so --

THE COURT: And they're not saying here's what you have to provide, they're not saying you have to provide, you know, people with Ph.D.s who have been doing this for at least ten years. They're saying you have to do something to make sure that the people who come out are trained and not just leave it up to the police who are untrained.

MS. DISNEY: That argument, though, Your Honor, is essentially questioning the adequacy of care, right. It's the --

THE COURT: No. No, it's not.

MS. DISNEY: -- adequacy of services provided --

THE COURT: It's saying that you have a system where you provide care that we can presume to be effective, whether it's not we can at least presume it to be effective because the people being sent out are trained in the area versus care for a different group which we can presume to be ineffective. Not because the police are bad police, not because they're not trying to do their best. There's zero aspersions against the police here on my behalf. But because they're just not trained in this area at all.

MS. DISNEY: So, I would say, you know, I'll go back to this and we'll also talk about some cases that are relevant as well. But the ADA requires meaningful access to a specific service or benefit provided by the government. Courts have interpreted this and I could talk about some cases.

THE COURT: Sure.

MS. DISNEY: So courts have interpreted this to understand that even if, for example, a benefit is provided -- is not provided to individuals with -- you know, let me just talk about a case, how about --

THE COURT: Okay.

MS. DISNEY: -- let's talk about *Rodriguez v. The City of New York*.

THE COURT: Okay. One second let me bring it up.

MS. DISNEY: Sure. This is 2nd Circuit.

THE COURT: One second. Okay. What's the cite?

MS. DISNEY: The citation for that is 197 F.3d 611, you can look at pages 618 to 619. It's cited in our brief as well.

THE COURT: You want 6 what page?

MS. DISNEY: You can look at I think 618 to 619, but you could just take a look at the case generally I think will give you the gist.

THE COURT: Okay. So this is a 2nd Circuit decision.

MS. DISNEY: A 2nd Circuit decision.

THE COURT: Okay. Go ahead.

MS. DISNEY: I think it's a nice comparator there, because in that case what they were looking at is the -- there's a question of whether or not to provide this extra safety monitoring service to mentally disabled individuals. And the issue there was that the service was not provided to individuals with physical disabilities. And the argument was essentially that the service was necessary for individuals with mental disabilities to achieve the same health outcome, right.

THE COURT: Uh-huh.

MS. DISNEY: To be able to stay in their home and not be institutionalized or to remain safe in their home. It is a separate service, though. And the Courts --

THE COURT: This was a service that was provided to

people with physical disabilities?

MS. DISNEY: It was not provided to people with physical disabilities. Sorry, I should have backed up. The case involves services that are provided in the home.

THE COURT: Okay.

MS. DISNEY: In the home setting, medical services. And the argument there -- well, what the Court held there was that the ADA did not compel the state to provide such services to individuals with mental disabilities because it did not already provide that service. It was a new service. And even though the provision of that service would have helped individuals with mental disabilities achieve the same outcome, which is being able to remain in their home, if they had this safety monitoring provision. That part of it, that achieving the same outcome was not an ADA claim.

THE COURT: Okay. But isn't Mr. Perloff about to stand up and say to me, yes, Your Honor, that's exactly our point. It was a service that wasn't provided to anyone, so therefore, New York wasn't require to provide it to some people. And he's going to say that's not our case. Our case is we have a service here that's being provided to the people who have physical disabilities, which is the service -- the people who respond are trained in the response. And that service, people who are trained in the response is not being provided to people with mental disabilities.

MS. DISNEY: But --

THE COURT: I mean, Mr. Perloff, is that what you were about to get up and tell me? Just say yes.

MR. PERLOFF: Yes, Your Honor.

THE COURT: Thank you.

MS. DISNEY: That is two different programs, though. Two different services, two different benefits.

THE COURT: Okay.

MS. DISNEY: You know you're talking about FEMS going out to help individuals with physical disabilities, for example, and a totally different department, Department of Behavioral Health is the one who would be at issue assisting people with, according to plaintiffs --

THE COURT: But that's their point, that the department -- my guess is their point is the Department of Behavioral Health is not involved, that it's the police department that's involved. Their whole point is they want the department of behavioral health involved and that if you're treating it like you treated people with the physical disabilities, that they would be involved.

MS. DISNEY: That's correct. I agree that that appears to be their point as well. But under the law, the law looks at the very particular service at issue. It's not the amorphous question of what's providing adequate care or what's providing a proper level of care for individuals with mental

health disabilities.

THE COURT: Yeah, but you keep going back to negligence point, his is a discriminatory point. I mean, the reason I'm pushing on this is so when you write your motion you know exactly what I'm focused on. Which is that his point is not about individual service levels. His point is not about what the ADA requires for one group or not for another point. His point is -- their point is that there's discrimination in the way that services are being meted out to people with physical disabilities as with respect to people with mental disabilities.

So let's say, for example, that D.C. had a policy that under the ADA everyone who has a physical disability and calls and gets a 911 response automatically gets $1,000 to do whatever they want with, you know, because we think that it's expensive. And people with mental disabilities get charged $1,000 just for no reason, just because we think we want to charge them $1,000. And you would say that's purely discriminatory, you're discriminating based on the type of disability they have; right?

MS. DISNEY: That would be a different case.

THE COURT: See, I think he's going to say that's the exact same case.

MS. DISNEY: I understand he says that, but this case -- that would involve the same program, that would

involve the same response.

THE COURT: So really we're at a question of what does the word service and program mean.

MS. DISNEY: Yes.

THE COURT: And that would be fact specific.

MS. DISNEY: That's the disagreement that I believe plaintiffs and the District have.

THE COURT: And that's a facts specific issue, one where one where I have to give him -- draw inferences in his favor; right?

MS. DISNEY: You do need to draw inferences in his favor, but it's not fact specific, it's also legal. I mean, it's a question of law here.

THE COURT: It's a question of what the services as a matter of fact in D.C., and what the program is as a matter of fact in D.C., right? Once I figure out what service means as a matter of law, I have to apply that to the facts.

MS. DISNEY: Correct, of course, Your Honor.

THE COURT: You're going to have a disagreement as to the facts. As a factual matter he's going to say it's the same program, and I have to accept that on a motion to dismiss. And as a factual matter you're going to say they are totally separate programs.

MS. DISNEY: As a factual matter I will say it's separate programs, but that's also -- if he were to say that

the same -- those programs are the same program, I -- that's a legal conclusion not factual conclusion.

THE COURT: I think that's a -- how is that a legal conclusion, that's factual conclusion?

MS. DISNEY: I will be happy to brief extensively all the case law related to this.

THE COURT: Okay. Well, look, I'm going to let you brief it. I have not made a decision. I'm not going to make a decision until I see the case. I don't want you to think I've prejudged this. But I do have a pre-sense of it. And I can you I think we're in the world of maybe you have a summary judgment motion, but you probably don't have a very strong motion to dismiss argument. But now you know sort of where my head is so you can move accordingly.

Mr. Perloff, do you want to say anything in terms of what your view is on this, to help her with her brief? I don't mean that condescendingly. I mean, like, one of the reasons I do this is so people aren't just writing in the wind and they know what I'm focused on.

MR. PERLOFF: Your Honor, thank you. We don't have much to add to the discussion that Your Honor had with opposing counsel. Your understanding of our complaint is exactly right. We don't believe we're asking for new services. We're asking for an existing service to be provided equally to people with mental health disabilities in the same

way it's provided to everyone else.

THE COURT: And is there any like -- what's the specific language in the ADA that says that people with physical disabilities have to be treated the same as people with mental disabilities, because your case is going to hinge on that; right?

MR. PERLOFF: Well, Your Honor, we actually don't view ourselves as comparing people with mental health disabilities and physical health disabilities. We would say we're comparing people with mental health disabilities to a service that's relied on by everyone. So the program we're talking about here for mental health disabilities, the emergency response services are predominantly used with mental health disabilities. The physical emergency response are used by everyone. So this is really a comparison between a program that is people with mental health disabilities versus everyone else.

To the extent Your Honor believes this case requires a comparison between people with mental health disabilities and people with physical health disabilities, I would refer Your Honor to the *Olmstead* decision from the Supreme Court, where the Court recognized that type of comparison as being appropriate.

THE COURT: Okay. All right. Any sort of key cases that you rely on that she's going to want to look at while she

drafts her brief?

MR. PERLOFF: Your Honor, in addition to the cases that we cited in our brief, I would also refer opposing counsel to *Rodde v. Bonta*, which is a case from the 9th Circuit at 357 F.3d 988, 9th Circuit from 2004. And in that case what essentially was at stake was a challenge to an effort by a county hospital to reduce or eliminate rehabilitation services predominantly relied on by people with disabilities. And just like in this case, the Court defined the benefit as -- the Court defined benefit there as specialized medical expertise. And it said basically, if we allow this to move forward, if we allow this to happen, the specialized medical expertise that's available to people with disabilities will be lower than available to the general population. And we submit that our case is very similar in terms of the theory that it advances.

The other point that I would make in response to the government's discussion of this being some sort of separate programs, I would also refer and emphasize the recent guidance that was issued by the Department of Justice explaining how the ADA operates in the context of emergency response programs. And there the --

THE COURT: That's what you cited to or that's something different than you cited to?

MR. PERLOFF: We cite that in our complaint but not

in the letter brief.

THE COURT: Okay. So Ms. Disney, you're going to want to take that up.

MR. PERLOFF: And in that document the Department of Justice makes quite clear that comparisons between a physical emergency response program and the mental emergency response programs are quite appropriate and, indeed, necessary to evaluate whether or not a emergency response program is achieving equality. And that comparison is appropriate, because when we look at the functions that are at issue between emergency medical response and emergency physical response, those functions are essentially the same. They're assessing the situation. They're stabilizing the individual. They're determining what care the person needs. The purposes are the same.

As a factual matter we see that the districts are applying the same functions in both contexts. They're pursuing the same purposes in both contexts. And, indeed, the same entry points exist in both contexts, whether you have a physical medical health emergency or a mental health medical emergency, if you're calling 911, it's a 911 employee who is decide who's going to respond. We think that the cases we cite in our letter brief, particularly the emergency preparedness cases, support the argument this is a factual question. And when the complaint is construed with the

benefit of favorable inferences, plaintiffs have plausible alleged that as a factual matter these are one programs, they need to be analyzed as such.

THE COURT: Okay. Thank you.

Ms. Disney, any response?

MS. DISNEY: Just touching on the very last point that Mr. Perloff made regarding the emergency response cases that they cite in their letter brief. I think those are a good read for the District as well. The point of those is that they both involve -- there's Brooklyn Independent -- Center for Independent Living as well as the Califor -- city of Los Angeles. Both of those involve kind of this wide-ranging emergency response program. You know, same thing, it involves lots of different agencies, it involves lots of different departments. And what the Courts look at in terms of the relevant comparison under the ADA is meaningful access to particular services within those response systems. And so --

THE COURT: But is it -- and if you don't have an answer to any of this, this is fine. I'm not expecting argument today, but just to help me if you can, and if you want to reserve, totally fine. Is it the District's position that having police respond to mental health issues is sufficient and adequate.

MS. DISNEY: I -- I don't think we should answer

that today.

THE COURT: Okay. All right. I mean, obviously that's something you're going to need to answer throughout the course of the litigation, because his view is -- and I'm just accepting as true for now, not in general, his view is that these police officers aren't trained. And so it creates more problems than it solves. And, obviously, if we continue on a fact finding mission, which I have a feeling we're going to, you're going to want to have to address that.

MS. DISNEY: Understood, Your Honor. My hesitancy to address that at the moment is based on the facts in the complaint and requires a more fulsome analysis. Just going back to those couple of emergency response cases, I think those are important cases to look at as well. Because what they show is how the ADA is properly applied in the emergency response setting, as I mentioned involves multiple services, multiple agencies. But what it does is it looks at the treatment that an individual with disabilities receives versus an individual without disabilities receives, within a Applied to a narrow service offered under the plan. And also crucially, under the same emergency, for example.

And so, if you look at that case, for example, it could compare someone who has auditory difficulties with someone who doesn't have auditory difficulties. And challenging the provision of services that provide alerts in

the case of an earthquake in California, for example. And that's how the Court looks at the services. They look at -- they list out the specific services. It could involve access to emergency shelters in the event of an evacuation, whether again, someone with disabilities and someone without disabilities has access to that same service, that sheltering service.

THE COURT: Okay.

MS. DISNEY: And I find that to be a good comparison.

THE COURT: All right. Thank you.

Mr. Conti, do you want to add anything?

MR. CONTI: If I could just briefly, Your Honor. I appreciate it. I did just want to state for the Court that at least my reading of the plaintiff's complaint is not that MPD officers, sworn officers, are untrained to deal with these mental health crises. They are trained. And my reading of the complaint is that they contend that the training is inadequate.

And I think that's important, because this court has decided whether or not, on a motion to dismiss, a cause of action under the ADA for inadequate training exists, and has declined that relief. That's the *Sacchetti* case.

THE COURT: What's the cite?

MR. CONTI: The cite is 181 F.Supp.3d 107.

THE COURT: 3d 107, one second, please.

Okay. This is a case involving arrest -- police arrest conduct by police officers.

MR. CONTI: That's correct. And on page 130, that's where the Court discusses the failure to train component.

THE COURT: Okay. All right. Well, this is helpful. I'm happy for you to talk about it, but Mr. Perloff, Ms. Disney, you're both going to want to address this. I mean, it seems like just on a quick review, you're right, that Judge Walton, who's a pretty smart person, far more experienced than I am, declined a failure to train allegation or claim, but did move forward on discovery with a failure to accommodate claim. And my guess is that what Mr. Perloff is going to say to me is that he's not making a failure to train allegation. But I understand that's going to be an issue between all of you or among all of you.

Why don't you stay up for a moment. You and Mr. Perloff you are working on what to do about your intervention, where are you all? You can both come up.

MR. PERLOFF: Yes, Your Honor, my colleague Ms. Verriest and I are working with Mr. Conti on this. We had a productive conversation a couple of weeks ago. And we're hopeful we can continue to talk and reach some sort of agreement as to a way for the Union to participate in the case that both sides find acceptable.

THE COURT: So what's like the area of dispute?

MR. PERLOFF: We've talked -- we haven't talked about all areas so far. The main areas we've talked about are discovery and settlement and working out ways of involvement that we feel are representative of both parties' interests.

THE COURT: Okay. All right. Well, you guys work it out. I will need to approve it. But it does seem to me that the police have an interest in the case. I mean, I can't imagine I'm going to say they can't be involved in some way. Now, whether they're involved as a party or amicus or whatnot, I don't know, but you're going to have your say one way or the other.

Okay. Mr. Conti, and then just for you in general, can you just explain to me a little bit about sort of -- and if you don't want to because you're not prepared, that's fine -- but I have to think the Union -- it's not obvious to me the Union would side with the district here. I mean, don't you guys want to go police? I mean, do you guys really want to be responding to mental health emergencies?

MR. CONTI: It's a good question, because I, you know, without disclosing privileged communications, it's a conversation I had with my client. And I think what -- I think what we want the Court to appreciate is first and foremost we do believe that there are studies that exist that show that providing a nonpolice response does not exacerbate

or escalate these situations anymore more so than a police response. And so if we start from that premise, then the question becomes, are our officers more or less protected if they're not involved in the first response.

And my client's view is that we're less protected, not just from the standpoint of officer safety but public safety, because they have been called out as a second responder in situations. And it is often more difficult to deal with under this pilot program that this city is implementing, because there are more folks on the scene. It's more chaotic. There are more individuals to protect and you're coming into a situation that has been exacerbated, as opposed to going out and being able to control it before it is. So there are serious implications that my client is concerned with.

But, of course, Your Honor, it goes to the issue of training as well. My client welcomes more training. And my client would love to not have to deal with situations that are more social service situations. But unfortunately, there are real world implications. And that's why they want those at least to be considered in this litigation.

THE COURT: Okay. Well, that's helpful. And Mr. Perloff if we could forward in discovery, I mean, obviously those are important points that we're going to need to ferret out. Those are solid points that he just raised. I don't

know if he's right about any of it, but I assume he's not totally wrong. And so, he knows what he's talking about, so those are things that would be interesting to me.

MR. PERLOFF: We appreciate that, Your Honor. We disagree on the facts. And we have consulted experts in the course of developing the complaint we believe will support us on this issue, but we certainly recognize the importance of developing that factual issue.

THE COURT: Okay. And what's this pilot program that you just mentioned? Ms. Disney, can you come up and tell me what this pilot program is.

MS. DISNEY: I think Mr. Conti is referring to the access help line is my assumption and the CRTs, the crisis response teams. We could get into the facts more later. There's a lot of information that's left out of the complaint regarding the access help line and regarding services offered --

THE COURT: My question is more generally like, are you guys trying to work this out? If so, why are you in front of me and not just trying to work it out amongst yourselves?

MS. DISNEY: Are we trying to work it out in terms of settlement?

THE COURT: Yeah, I mean, I think --

MS. DISNEY: Yeah, because Your Honor --

THE COURT: Without putting you on the record, like,

I understand you have your defenses and your discovery and the whatevers. But in the real world of let's be practical, do you all recognize that maybe services could be better and are you guys trying to sort of effectuate that? And if so, are you working with -- I'm sure you're working with the police union. Are you working with Mr. Perloff and his group to see if there's a way that you all and his experts, which I'm sure would be happy to help, can sort of come together on all of this.

MS. DISNEY: Without, you know, all of the facts on the table, the district is constantly working to enhance their response to mental health crises and working to coordinate among the agencies. I, you know, it's public fact that the district is a member of the Harvard Kennedy School Government Performance Lab.

THE COURT: Well, thank God it's not Yale, because then I would be unimpressed, but you said Harvard so now my interest is piqued.

MS. DISNEY: Well, as long as -- it is definitely of interest. It's the alternative 911 emergency response implementation cohort. This is their second year doing it, which is entirely focused on developing best practices, overcoming a lot of the technological burdens that exist in order to change the way that response works for 911 for mental health emergencies, DBH is doing this. I could go on and on

about the coordination --

THE COURT: Before you go on and on, Mr. Perloff, are you guys aware of this? Are your experts working with them on any of this?

MR. PERLOFF: We're aware of what Ms. Disney is discussing, we're aware of its efforts, but we still have concerns about the efficacy of the pilot program.

THE COURT: Well, I know, but that's why I'm asking why don't your experts get together with their experts, instead of having me, who knows nothing about any of this and is the least capable or intelligent person to decide this, why don't you have the experts try to work together while this is ongoing, to see if you all can come to an agreement, which seems like it would be better for everybody.

MR. PERLOFF: We certainly welcome the opportunity to --

THE COURT: Okay. Great. Because I'm going to make you do it.

So, Ms. Disney?

MS. DISNEY: If I could say, we also are, you know, open to the idea of discussions as well, we're always open to discussions. But before the Court in a motion to dismiss is two very straight forward legal questions.

THE COURT: Oh, yeah, I know that they're --

MS. DISNEY: We would not be interested in

entertaining some sort of settlement discussions until that's resolved.

THE COURT: Okay. Well, spoiler alert, you should entertain settlement discussions because the chances that this gets dropped on a motion to dismiss are not zero, because I haven't looked at your papers. But based on what I've seen so far, they're not high. And I'm not going to hold up this litigation on it. So the next thing we're going to be discussing -- everyone can be seated. Mr. Conti, thank you -- is a schedule, because I'm going to let things proceed while we do the motion to dismiss briefing.

So what I want to do is set a trial date, assuming that I allow discovery -- if I allow limited discovery to start now, and you all brief the motion, and then I decide the motion, how long until you guys can be ready for trial? The period from today until when I decide the motion should not be taken into account is what I'm trying to say. Pretend you don't have a motion to dismiss pending, how much time do you all feel like you need to be ready for trial? And before you give me an answer you should know the following, which I'm sure you may have already heard, I do not move trial dates, at all, end stop, zero. So once we set a trial date, absent extraordinary cause, the trial date does not get moved.

And let me explain to you what I mean by extraordinary cause. What I mean is aliens come down from

outer space and wipe all of your hard drives and steal all of your witnesses. And you come to me and say we have no witnesses and no documents, we need to move the trial date. The first question I have is where is this all backed up? Because that's not going to be enough for me to move the trial date. Are we clear?

MR. PERLOFF: Yes, Your Honor.

THE COURT: Great. Okay. When will you guys be ready for trial?

MR. PERLOFF: Your Honor, our view is that discovery -- we believe that about 14 months would be an appropriate time period to set a trial date. And I'll just walk through our thought process there. We think it will take about nine months to get through discovery. In part, there are a lot of complicated issues, factual issues, some of which Mr. Conti mentioned. We think that it may take about three months for there to be summary judgment briefing and a decision on summary judgment. And we were hoping for another two months for trial preparation. So that was our approach. We welcome the opportunity to work with the District in developing a time line.

THE COURT: Ms. Disney.

MS. DISNEY: Yes. Your Honor, I'd first like to note that we're fine setting a schedule now. I believe that we would really benefit from an opportunity to meet and confer

with plaintiffs regarding -- you know, go through the motions of doing the Rule 16 conference, Rule 26, so we could, you know, figure out more about the scope of discovery. This is a sprawling case across four agencies. And it's very difficult to say off the cuff what an appropriate schedule would look like.

THE COURT: Okay. Well, you guys meet and confer and by the end of the week, I don't need the full Rule 26 conference, but by the end of the week I want three trial dates from you guys.

MS. DISNEY: Understood.

THE COURT: That if I pick any one of them you all would be comfortable with. You can just email it to my chambers. We will set the trial date. And I don't mean a trial date five years from now. I mean 14 months sounds about right to me. Much less than that I imagine you would have issues, much more than that I imagine he would have issues. But you know, two, three, four months, I'm not going to like go crazy about. But we're not talking three or four years here and we're not talking six months here.

All right. So you guys figure out the trial date by tend of the week. And then you guys take whatever time you need under Rule 26 with that trial date in mind in terms of working back with all the deadlines. All right? Does that make sense?

MS. DISNEY: Your Honor, in terms of timing, for when we would then do the --

THE COURT: I want a trial date by the end of the week. I do not care about any other date.

MS. DISNEY: Understood.

THE COURT: I could care less about the other dates. You all work out the other dates amongst yourselves. I don't care. I want a trial date set by the end of the week. And if I don't have a trial dates from you by the end of the week I will set one myself. Okay?

MS. DISNEY: Thank you, Your Honor.

MR. PERLOFF: Your Honor, if I may, one suggestion that we would like to bring forward in terms of making an accurate time line and also expedite the process would be if the District were able to answer the complaint --

THE COURT: They can't answer the complaint, I haven't ruled on their motion yet. They have no idea if I'm going the grant some of it, or deny some of it, which I might do. I'm not going to make them answer a complaint before I rule on motion to dismiss. Having done this for 22 years, I can tell you what their complaint is going to say. It's going to say on information and belief, or denied, or that's an issue of law on which we take no position, or they're going to admit that they reside in the district. That's their answer to your complaint.

Ms. Disney am I pretty much dead on that? Say yes, because I am.

MR. PERLOFF: Thank you, Your Honor.

THE COURT: They're not going to admit to anything that's going to alleviate your burden on discoveries by any substantial amount. And I'm going to give limited discovery here, not full discovery to start.

Ms. Disney?

MS. DISNEY: That's just what I wanted to address. Given all the issues, the need to discuss the scope of discovery, the need to --

THE COURT: Here's what I'm going to rule on right now, I want their experts to start talking with your experts, and to start talking with his experts. And by experts I mean either hired experts or the people who are involved in these pilot programs. And I want you all three in a room talking to each other about the best way to proceed on this. So that I am not the one at the end of the day making this decision. Because I will make a decision. And I'm a pretty smart person and I'll figure it out and I'll do the best that I can. But I think everyone, including your clients and the D.C. public, and your clients and the D.C. agencies, and definitely his clients, are going to be much happier if you all very intelligent people, all committed to this cause, and who know about it a lot more than I do figure out a way forward among

yourselves. Okay.

So, Mr. Perloff.

MR. PERLOFF: Yes, Your Honor.

THE COURT: What discovery would you need in order to start talking to them about the best way for them to develop their pilot program, which it seems like in good faith they're trying to do. I take the government at its word that in good faith it's trying to figure out a better solution here. So what I want is since you guys think you have a better solution, for you all to talk to them in a way that's meaningful.

And, Mr. Conti, if you have any ideas, feel free to speak up.

MR. PERLOFF: Your Honor, there are a few things that come to mind immediately, but it would be helpful if I could confer with my colleagues and client to discuss them more. Just to preview a few of our thoughts, one thing that would be helpful is to better understand the office of unified communications processees for deciding who responds to what types of crises. Another thing that would be very helpful would be for us to examine some of the incident reports or some sort of random sample of incident reports involving behavioral health crises so we could bring those to our experts and have them look at how those crises are handled, how they're coded, and those sorts of information, so we begin

to evaluate how this system works.

THE COURT: Ms. Disney and Mr. Conti, who are your -- like, who are the people leading this effort on your behalf? Like, if I were to say I want to speak to your experts who are trying to put together this pilot program or who have been working on it, who would those people be? I don't need their names, but do you know in your head who those people are?

MS. DISNEY: There's a number of them.

THE COURT: Okay. Give me the top three.

MS. DISNEY: From the Department of Behavioral Health.

THE COURT: There are four agencies; right?

MS. DISNEY: There are four agencies at issue.

THE COURT: Okay. Here's what I want, within two weeks I want plaintiff's experts to get on a phone call with somebody or two people picked by the Union, and one person picked by you all from each agency, and I want them all in a room talking about what exactly happening and what ways they can make it better, and what information his people need to get it to go better, okay. And then within three weeks I want you all to provide me a status report which says here's what the experts have decided and thought about in terms of limited discovery.

And Mr. Perloff, I underscore the word limited,

limited -- so choose your battles here -- limited discovery that you all need for this working group that is going to be created to be able to do its job. And if I need to get all these experts here in a room for us to talk all this through, I'm happy to do that. But what I want is for you all to talk to each other and help each other. Okay?

MS. DISNEY: Understood, Your Honor, I would, of course, request that all of this take place after the motion to dismiss decision.

THE COURT: No, it's happening now. Because we're not -- this isn't getting kicked.

MS. DISNEY: Okay. Understood.

THE COURT: Chances are this isn't getting kicked. And even if it gets kicked, this is a worthwhile exercise. And right now before it gets kicked I have jurisdiction.

MS. DISNEY: Understood, Your Honor.

THE COURT: Okay.

MR. PERLOFF: And, Your Honor, we understood the limited nature of the discovery you're authorizing, so we will be mindful of that in our requests.

THE COURT: Okay.

MS. DISNEY: Just to clarify, so in three weeks we will have a report you which will propose discovery.

THE COURT: Yes. Hopefully that -- after all the relevant people have talked to each other and figured out a

plan forward and ways for you all to have a working group to continue to work together on this.

MS. DISNEY: Understood.

THE COURT: Within a week I want a trial date, by Friday I want three trial dates. Again, if I don't get something by 5:00 p.m. on Friday I'm setting it myself.

MS. DISNEY: Understood, Your Honor.

THE COURT: It's going to be dead heat of August or right in the holiday period. It's going to be unpleasant. Okay.

MS. DISNEY: Thank you.

THE COURT: All right. Thank you, everybody. Oh sorry, and you guys figure out a briefing schedule on the motion to dismiss, whatever you guys want.

Mr. Perloff, whatever she wants on that she's going to get. So if she wants a month, she gets a month. If she wants you all to have two weeks, you get two weeks. You've got 11 people on this, you can do it quickly. All right. Thank you.

(The proceedings were concluded at 11:16 a.m.)

I, Christine Asif, RPR, FCRR, do hereby certify that the foregoing is a correct transcript from the stenographic record of proceedings in the above-entitled matter.

_________/s/______________
Christine T. Asif
Official Court Reporter

< Dates >.
August 37:8.
$1 14:14, 14:17, 14:18.
.
.
< 0 >.
00 37:6.
000 14:14, 14:17, 14:18.
.
.
< 1 >.
10100 1:34.
107 22:25, 23:1.
10:30 a.m. 1:12.
11 37:18, 37:20.
130 23:4.
14 30:11, 31:15.
15th 1:25.
16 31:2, 37:20.
181 22:25.
197 11:1.
.
.
< 2 >.
20001 1:35, 1:46.
20005 1:27.
2004 18:5.
202 1:47.
2023 1:10.
21201-3316 1:41.
22 32:20.
23-1945 2:3.
23-1945-ACR 1:5.
2501 1:40.
26 31:2, 31:8, 31:23.
2nd 1:26, 10:24, 11:8, 11:10.
.
.
< 3 >.
333 1:45.
354-3247 1:47.
357 18:5.
36 1:39.
3d 23:1.
.
.
< 4 >.
400 1:33.
.
.
< 5 >.
5 37:6.
.
.
< 6 >.
6 11:4.
611 11:1.
618 11:2, 11:5.
619 11:2, 11:5.
.
.
< 9 >.
911 8:14, 8:16, 8:17, 8:22, 9:1, 14:14, 19:21, 27:20, 27:24.
915 1:25.
988 18:5.
9th 18:4, 18:5.
__________/s/___ ___________ 37:26.
.
.
< A >.
A. 1:29.
a.m. 37:20.
able 11:22, 12:13, 25:13, 32:15, 36:3.
above-entitled 37:24.
absent 29:22.
accept 15:21.
acceptable 23:25.
accepting 21:5.
access 8:8, 8:10, 10:12, 20:17, 22:3, 22:6, 26:13, 26:16.
accommodate 23:13.
according 13:13.
accordingly 16:14.
account 29:17.
accurate 32:14.
achieve 11:19, 12:12.
achieving 12:14, 19:9.
ACLU 2:7, 2:9, 2:10.
across 6:14, 31:4.
action 2:3, 7:7, 7:9, 22:22.
actually 8:15, 8:16, 17:7.
ADA 4:17, 5:1, 5:11, 6:5, 6:6, 6:21, 8:8, 10:12, 12:8, 12:15, 14:7, 14:13, 17:3, 18:21, 20:16, 21:15, 22:22.
add 16:21, 22:12.
addition 18:2.
address 8:16, 21:9, 21:11, 23:8, 33:9.
addressing 6:23.
adequacy 9:22, 9:25.
adequate 13:24, 20:24.
admit 32:24, 33:4.
advances 18:16.
agencies 20:14, 21:17, 27:13, 31:4, 33:22, 35:13, 35:14.
agency 35:18.
ago 2:22, 23:22.
agree 6:8, 7:8, 13:21.
agreement 23:24, 28:13.
ahead 6:17, 11:11.
alert 29:3.
alerts 21:25.
aliens 29:25.
allegation 23:11, 23:15.
alleged 20:2.
alleging 4:18.
alleviate 33:5.
allow 6:6, 18:12, 29:13.
already 12:10, 29:21.
alternative 27:20.
ambulance 5:9.
American

1:23.
amicus 24:10.
among 2:14, 23:16, 27:13, 33:25.
amongst 26:20, 32:7.
amorphous 13:24.
amount 5:9, 33:6.
Ana C. Reyes 1:15.
analysis 21:12.
analyzed 20:3.
Angeles 20:12.
answer 3:8, 4:12, 20:20, 20:25, 21:3, 29:20, 32:15, 32:16, 32:19, 32:24.
Anthony 1:37, 3:17.
APPEARANCES 1:18.
appears 13:22.
Applied 21:15, 21:19.
apply 15:17.
applying 19:17.
appreciate 22:14, 24:23, 26:4.
approach 30:19.
appropriate 17:23, 19:7, 19:9, 30:12, 31:5.
approve 24:7.
area 10:4, 10:9, 24:1.
areas 24:3.
argument 9:21, 11:17, 12:7, 16:13, 19:24, 20:21.
arrest 23:2, 23:3.
Ashika 1:22, 2:9.
Asif 1:43, 37:22, 37:27.
aspect 5:10.
aspersions 10:7.
assessing 19:13.
assisting 13:12.
assume 26:1.
assuming 29:12.
assumption 26:13.
asthmatic 7:9.
attack 8:17, 8:23, 9:7, 9:11.
attacking 9:9.
attacks 8:18, 8:24.
attention 3:23.
Attorney 1:31, 2:17.
auditory 21:23, 21:24.
authorized 8:15.
authorizing 36:19.
automatically 14:14.
available 18:13, 18:14.
Avenue 1:45.
aware 5:22, 28:3, 28:5, 28:6.
.
.
< B >.
back 6:9, 8:7, 10:10, 14:2, 21:13, 31:24.
backed 12:3, 30:4.
bad 8:19, 10:6.
Baltimore 1:41.
based 14:19, 21:11, 29:6.
basically 4:18, 18:11.
battles 36:1.
becomes 25:3.
begin 34:25.
behalf 3:18, 10:8, 35:4.
Behavioral 13:12, 13:16, 13:18, 34:23, 35:11.
belief 32:22.
believe 5:19, 15:6, 16:23, 24:24, 26:6, 30:11, 30:24.
believes 17:18.
benefit 10:13, 10:17, 18:10, 20:1, 30:25.
benefits 13:7.
best 9:4, 10:7, 27:22, 33:17, 33:20, 34:5.
better 27:3, 28:14, 34:8, 34:10, 34:18, 35:20, 35:21.
bipolar 9:6.
bit 24:14.
board 6:14.
Bonta 18:4.
brain 8:17.
Bread 2:3, 2:8.
BREAD FOR THE CITY 1:4.
Brendan 1:30, 2:18.
brief 11:2, 16:5, 16:8, 16:16, 18:1, 18:3, 19:1, 19:23, 20:8, 29:14.
briefing 29:11, 30:17, 37:13.
briefly 22:13.
bring 9:4, 9:11, 10:23, 32:13, 34:23.
bringing 7:8.
Brooklyn 20:10.
burden 33:5.
burdens 27:23.
.
.
< C >.
C. 1:11, 1:27, 1:35, 1:46, 2:7, 2:10, 3:18, 4:22, 6:1, 14:12, 15:15, 15:16, 33:21, 33:22.
Califor 20:11.
California 22:1.
call 8:15, 8:16, 8:17, 8:22,

35:16.
called 25:7.
calling 4:25, 19:21.
calls 9:1, 14:14.
capable 28:11.
care 7:4, 7:7, 9:22, 10:2, 10:4, 13:24, 13:25, 19:14, 32:4, 32:6, 32:8.
case 3:16, 4:16, 7:6, 10:19, 11:6, 11:13, 12:4, 12:20, 14:21, 14:23, 14:25, 16:6, 16:9, 17:5, 17:18, 18:4, 18:6, 18:9, 18:15, 21:22, 22:1, 22:23, 23:2, 23:24, 24:8, 31:4.
cases 3:21, 5:17, 10:11, 10:14, 17:24, 18:2, 19:22, 19:24, 20:7, 21:13, 21:14.
cause 22:21, 29:23, 29:25, 33:24.
Center 20:11.
certain 6:8, 6:11.
Certainly 4:3, 26:7, 28:15.
certify 37:22.
challenge 18:6.
challenging 21:25.
chambers 31:14.
Chances 29:4, 36:13.
change 27:24.
chaotic 25:11.
charge 14:18.
charged 14:16.
Charles 1:39.
choose 36:1.
Christine 1:43, 37:22, 37:27.
Circuit 10:24, 11:8, 11:10, 18:5.
citation 11:1.
cite 10:25, 18:25, 19:23, 20:8, 22:24, 22:25.
cited 4:23, 5:6, 11:2, 18:3, 18:23, 18:24.
City 2:3, 2:8, 5:3, 10:22, 20:11, 25:9.
Civil 1:4, 1:23, 2:3, 4:2.
claim 5:12, 12:15, 23:12, 23:13.
clarify 36:22.
clear 19:5, 30:6.
CLERK 2:2.
client 24:22, 25:5, 25:14, 25:17, 25:18, 34:16.
clients 33:21, 33:22, 33:23.
coded 34:25.
cohort 27:21.
colleague 2:8, 2:18, 23:20.
colleagues 34:16.
Columbia 1:2, 1:24, 1:32, 2:4, 2:18.
comes 8:15, 9:1.
comfortable 31:13.
coming 25:12.
committed 33:24.
communications 24:21, 34:19.
comparator 11:12.
compare 21:23.
comparing 17:8, 17:10.
comparison 17:15, 17:19, 17:22, 19:9, 20:16, 22:10.
comparisons 19:5.
compel 12:8.
complaint 5:25, 6:10, 6:15, 6:23, 16:22, 18:25, 19:25, 21:12, 22:15, 22:18, 26:6, 26:15, 32:15, 32:16, 32:19, 32:21, 32:25.
complicated 30:15.
component 23:5.
computer-aided 1:50.
concerned 25:15.
concerns 4:13, 6:25, 28:7.
concluded 37:20.
conclusion 16:2, 16:4.
condescendingly 16:17.
conduct 23:3.
confer 30:25, 31:7, 34:16.
conference 4:5, 31:2, 31:9.
considered 25:21.
constantly 27:11.
Constitution 1:45.
construed 19:25.
consulted 26:5.
contend 22:18.
context 18:21.
contexts 19:17, 19:18, 19:19.
Conti 1:37, 1:38, 3:17, 22:12, 23:21, 24:13, 26:12, 29:9, 30:16, 34:12, 35:2.
continue 21:7, 23:23, 37:2.
control 25:13.
conversation 23:22, 24:22.
cooperate 3:20.

coordinate 27:12.
coordination 28:1.
Correct 5:23, 5:25, 13:21, 15:18, 23:4, 37:23.
counsel 2:24, 16:22, 18:4.
county 18:7.
couple 21:13, 23:22.
course 15:18, 21:4, 25:16, 26:6, 36:8.
Courts 10:13, 10:16, 11:24, 20:15.
cover 4:17, 5:12.
crazy 31:19.
created 36:3.
creates 21:6.
criminal 2:2, 2:9.
crises 22:17, 27:12, 34:20, 34:23, 34:24.
crisis 5:10, 7:10, 7:12, 7:14, 26:13.
Crts 26:13.
crucially 21:21.
cuff 31:5.
.
.
< D >.
date 29:12, 29:22, 29:23, 30:3, 30:6, 30:12, 31:14, 31:15, 31:21, 31:23, 32:3, 32:4, 32:8, 37:4.
dates 29:21, 31:10, 32:6, 32:7, 32:9, 37:5.
day 33:18.
DBH 27:25.
dead 33:1, 37:8.
deadlines 31:24.
deal 7:12, 7:13, 7:19, 7:21, 8:18, 8:24, 9:3, 9:12, 22:16, 25:9, 25:18.
decide 19:22, 28:11, 29:14, 29:16.
decided 22:21, 35:23.
deciding 34:19.
decision 4:8, 5:7, 11:9, 11:10, 16:8, 16:9, 17:21, 30:18, 33:18, 33:19, 36:9.
decisions 5:4.
declined 22:23, 23:11.
Defendant 1:11, 1:29.
defendants 3:3.
defense 2:24.
defenses 27:1.
defined 18:9, 18:10.
definitely 27:19, 33:22.
denied 32:22.
deny 32:18.
Department 4:24, 13:11, 13:15, 13:17, 13:18, 18:20, 19:4, 35:11.
departments 20:15.
determining 19:14.
develop 34:6.
developing 26:6, 26:8, 27:22, 30:21.
diabetic 7:10, 7:12, 7:14, 7:20.
die 7:25, 8:19, 9:4.
Different 6:12, 6:16, 6:18, 7:3, 7:7, 10:5, 13:6, 13:7, 13:11, 14:21, 18:24, 20:14, 20:15.
differently 6:3, 6:4.
difficult 25:8, 31:4.
difficulties 21:23, 21:24.
disability 7:17, 8:25, 9:8, 14:13, 14:20.
disabled 11:15.
disagree 26:5.
disagreement 15:6, 15:19.
disclosing 24:21.
discoveries 33:5.
discovery 23:12, 24:4, 25:23, 27:1, 29:13, 30:11, 30:14, 31:3, 33:6, 33:7, 33:11, 34:4, 35:24, 36:1, 36:19, 36:23.
discrepancy 5:8.
discriminated 4:20.
discriminating 14:19.
discrimination 8:1, 14:9.
discriminatory 6:5, 8:1, 14:3, 14:19.
discuss 33:10, 34:16.
discusses 23:5.
discussing 28:6, 29:9.
discussion 16:21, 18:18.
discussions 28:21, 28:22, 29:1, 29:4.
dismiss 4:6, 15:22, 16:13, 22:21, 28:22, 29:5, 29:11, 29:18, 32:20, 36:9, 37:14.
DISNEY 1:29, 2:17, 2:20, 2:23, 4:6, 19:2, 20:5, 23:8, 26:10, 28:5, 28:19, 30:22, 33:1, 33:8, 35:2, 37:11.
dispute 3:22,

24:1.
District 1:1, 1:2, 1:16, 1:24, 1:32, 2:4, 2:18, 6:24, 15:7, 20:9, 20:22, 24:17, 27:11, 27:14, 30:20, 32:15, 32:24.
DISTRICT OF COLUMBIA 1:9.
districts 19:16.
divide 2:14.
document 19:4.
documents 30:3.
dog 9:10.
doing 7:25, 9:17, 27:21, 27:25, 31:2.
doj 5:1.
done 32:20.
down 9:5, 29:25.
drafts 18:1.
draw 15:9, 15:11.
drives 30:1.
dropped 29:5.
dug 4:15.
dying 3:23.
.
.
< E >.
earth 3:2.
earthquake 22:1.
ease 4:13.
effective 6:12, 7:18, 8:2, 8:3, 8:4, 10:2, 10:3.
effectiveness 6:14.
effectuate 27:4.
efficacy 28:7.
effort 2:20, 18:7, 35:3.
efforts 28:6.
egregious 3:14.
either 5:13, 33:15.
eliminate 18:7.
email 31:13.
emergencies 6:25, 7:2, 7:5, 24:19, 27:25.
emergency 5:10, 5:11, 17:13, 17:14, 18:21, 19:6, 19:8, 19:11, 19:20, 19:21, 19:23, 20:7, 20:13, 21:13, 21:15, 21:21, 22:4, 27:20.
emphasize 18:19.
employee 19:21.
EMT 7:10.
end 29:22, 31:8, 31:9, 32:3, 32:8, 32:9, 33:18.
enhance 27:11.
enough 30:5.
entertain 29:4.
entertaining 29:1.
entirely 27:22.
entry 19:19.
episodes 9:13.
equality 19:9.
equally 7:19, 16:25.
escalate 25:1.
Esquire 1:20, 1:21, 1:22, 1:29, 1:30, 1:37.
essence 7:2.
essentially 8:11, 9:22, 11:18, 18:6, 19:12.
evacuation 22:4.
evaluate 19:8, 35:1.
event 22:4.
everybody 28:14, 37:12.
everyone 2:15, 3:4, 3:14, 3:19, 4:1, 6:8, 7:24, 14:13, 17:1, 17:11, 17:15, 17:16, 29:9, 33:21.
exacerbate 24:25.
exacerbated 25:12.
exact 14:23.
exactly 12:17, 14:5, 16:23, 35:19.
examine 34:21.
example 5:8, 6:25, 7:23, 8:25, 10:17, 13:11, 14:12, 21:21, 21:22, 22:1.
exercise 36:14.
exist 19:19, 24:24, 27:23.
existent 5:17.
existing 16:24.
exists 22:22.
expect 3:20, 3:21, 8:2.
expecting 20:20.
expedite 32:14.
expensive 14:16.
experienced 23:11.
expertise 18:11, 18:13.
experts 26:5, 27:7, 28:3, 28:9, 28:12, 33:13, 33:14, 33:15, 34:24, 35:5, 35:16, 35:23, 36:4.
explain 24:14, 29:24.
explaining 18:20.
extensively 16:5.
extent 17:18.
extra 11:14.
extraordinary 29:23, 29:25.
.
.
< F >.
F.3d 11:1, 18:5.
F.supp.3d 22:25.
fact 15:5, 15:12, 15:15, 15:16, 21:8, 27:13.

facts 15:8, 15:17, 15:20, 21:11, 26:5, 26:14, 27:10.
factual 15:20, 15:22, 15:24, 16:2, 16:4, 19:16, 19:24, 20:2, 26:8, 30:15.
failure 23:5, 23:11, 23:12, 23:14.
faith 34:6, 34:8.
far 5:6, 5:22, 23:10, 24:3, 29:7.
favor 15:10, 15:12.
favorable 20:1.
FCRR 1:43, 37:22.
Federal 1:44.
feel 24:5, 29:19, 34:12.
feeling 21:8.
FEMS 13:9.
Fenn 1:38.
ferret 25:24.
few 34:14, 34:17.
figure 3:21, 15:16, 31:3, 31:21, 33:20, 33:25, 34:8, 37:13.
figured 36:25.
filed 5:18.
find 22:9, 23:25.
finding 21:8.
fine 3:11, 20:20, 20:22, 24:16, 30:24.
firm 2:11.
first 8:7, 24:23, 25:4, 30:4, 30:23.
five 31:15.
Floor 1:26.
focused 14:5, 16:19, 27:22.
folks 25:10.
following 29:20.
foregoing 37:23.
foremost 24:24.
forward 2:5, 18:12, 23:12, 25:23, 28:23, 32:13, 33:25, 37:1.
found 5:2, 5:6.
four 31:4, 31:18, 31:19, 35:13, 35:14.
free 34:12.
Fresh 5:14, 5:15.
Friday 37:5, 37:6.
front 26:19.
full 31:8, 33:7.
fulsome 21:12.
functions 19:10, 19:12, 19:17.
future 3:19.
.
.
< G >.
General 1:31, 2:17, 18:14, 21:5, 24:13.
generally 11:6, 26:18.
gets 14:14, 29:5, 36:14, 36:15, 37:16.
getting 4:22, 7:16, 36:11, 36:13.
gist 11:7.
Give 4:9, 11:7, 15:9, 29:20, 33:6, 35:10.
Given 33:10.
God 27:16.
Government 8:9, 10:13, 18:18, 27:14, 34:7.
grant 32:18.
Great 28:17, 30:8.
green 9:7, 9:9.
grounds 5:14, 5:15.
group 10:5, 14:7, 27:6, 36:2, 37:1.
guess 4:14, 13:15, 23:13.
guidance 18:19.
guys 24:6, 24:18, 26:19, 27:4, 28:3, 29:15, 30:8, 31:7, 31:10, 31:21, 31:22, 34:9, 37:13, 37:14.
.
.
< H >.
handled 34:24.
happen 18:12.
happening 35:19, 36:10.
happier 33:23.
happy 4:12, 16:5, 23:7, 27:8, 36:5.
hard 30:1.
Harvard 27:14, 27:17.
head 16:14, 35:7.
Health 4:25, 6:2, 6:3, 6:20, 7:2, 7:5, 7:25, 11:19, 13:12, 13:16, 13:18, 14:1, 16:25, 17:8, 17:9, 17:10, 17:12, 17:14, 17:16, 17:19, 17:20, 19:20, 20:23, 22:17, 24:19, 27:12, 27:25, 34:23, 35:12.
heard 2:25, 29:21.
heart 8:17, 8:18, 8:23, 8:24.
heat 37:8.
Heath 1:30, 2:19.
held 12:7.
help 5:4, 13:10, 16:16, 20:21, 26:13, 26:16, 27:8, 36:6.
helped 12:11.
helpful 23:7, 25:22, 34:15, 34:18, 34:20.
hereby 37:22.
hesitancy 21:10.
high 29:7.

hinge 17:5.
hired 33:15.
hold 5:7, 5:8, 29:7.
holding 5:11, 5:13.
hole 8:12.
holiday 37:9.
Hollman 2:10.
home 5:2, 11:22, 11:23, 12:4, 12:6, 12:13.
Honorable 1:15.
hopeful 2:13, 23:23.
Hopefully 36:24.
hoping 30:18.
hospital 18:7.
.
.
< I >.
idea 3:7, 28:21, 32:17.
ideas 34:12.
ideation 8:25, 9:3, 9:8.
identify 2:5, 8:12.
II 8:8.
imagine 24:9, 31:16, 31:17.
immediately 34:15.
implementation 27:21.
implementing 25:10.
implications 25:14, 25:20.
importance 26:7.
important 6:22, 21:14, 22:20, 25:24.
inadequate 22:19, 22:22.
incident 34:21, 34:22.
including 33:21.
Independent 20:10, 20:11.
indicated 4:24.
individual 14:6, 19:13, 21:18, 21:19.
individuals 7:4, 10:18, 11:15, 11:17, 11:18, 12:9, 12:12, 13:10, 13:25, 25:11.
ineffective 6:13, 8:19, 8:21, 10:5.
inferences 15:9, 15:11, 20:1.
information 26:15, 32:22, 34:25, 35:20.
instances 4:24.
instead 7:21, 28:10.
institutionalized 11:23.
intelligent 28:11, 33:24.
interest 24:8, 27:18, 27:20.
interested 28:25.
interesting 3:10, 26:3.
interests 24:5.
interpreted 10:14, 10:16.
Intervenor 1:37, 3:18.
intervention 23:18.
involve 14:25, 15:1, 20:10, 20:12, 22:3.
involved 13:16, 13:17, 13:18, 13:20, 24:9, 24:10, 25:4, 33:15.
involvement 24:4.
involves 3:22, 12:4, 20:14, 21:16.
involving 23:2, 34:22.
issue 8:8, 8:13, 8:14, 11:16, 13:12, 13:23, 15:8, 19:10, 23:15, 25:16, 26:7, 26:8, 32:23, 35:14.
issued 18:20.
issues 6:2, 6:3, 6:4, 20:23, 30:15, 31:17, 33:10.
itself 8:8.
.
.
< J >.
job 3:11, 3:14, 36:3.
joined 2:18.
Judge 1:16, 3:2, 3:6, 3:15, 23:10.
judgment 16:12, 30:17, 30:18.
jurisdiction 4:17, 36:15.
jury 2:21, 3:3, 3:4, 3:5, 3:6.
Justice 4:24, 18:20, 19:5.
.
.
< K >.
keep 14:2.
Kennedy 27:14.
key 17:24.
kicked 3:5, 36:11, 36:13, 36:14, 36:15.
kill 9:1, 9:10.
kind 20:12.
knife 9:10.
knows 8:3, 26:2, 28:10.
Krevans 1:20.
.
.
< L >.
Lab 27:15.
language 17:3.
last 20:6.
later 26:14.
law 2:9, 2:11, 4:16, 8:9, 13:22, 15:13, 15:17, 16:6, 32:23.
lawyers 2:12.
leading 3:15, 35:3.
least 9:17, 10:3, 22:15, 25:21,

28:11.
leave 9:20.
left 3:6, 26:15.
legal 15:12, 16:2, 16:3, 28:23.
less 25:3, 25:5, 31:16, 32:6.
letter 19:1, 19:23, 20:8.
level 7:4, 7:7, 13:25.
levels 14:6.
Liberties 1:23.
limited 29:13, 33:6, 35:23, 35:25, 36:1, 36:19.
line 26:13, 26:16, 30:21, 32:14.
list 22:3.
listening 2:13.
literally 3:4.
litigation 5:21, 21:4, 25:21, 29:8.
little 24:14.
Living 20:11.
LLC 1:38.
long 27:19, 29:15.
look 11:2, 11:5, 11:6, 16:7, 17:25, 19:10, 20:15, 21:14, 21:22, 22:2, 31:5, 34:24.
looked 29:6.
looking 11:13.
looks 13:23, 21:17, 22:2.
Los 20:12.
lot 26:15, 27:23, 30:15, 33:25.
lots 20:14, 20:15.
Louisville 5:2, 5:16.
love 25:18.
lower 18:14.
.
.
< M >.
machine 1:49.
main 24:3.
manic 9:6.
matter 6:1, 15:15, 15:17, 15:20, 15:22, 15:24, 19:16, 20:2, 37:24.
MD 1:41.
mean 3:5, 6:19, 7:12, 13:2, 14:3, 15:3, 15:12, 16:17, 21:2, 23:9, 24:8, 24:17, 24:18, 25:23, 26:23, 29:24, 29:25, 31:14, 31:15, 33:14.
meaningful 8:10, 10:12, 20:16, 34:11.
means 3:22, 15:16.
medical 12:6, 18:11, 18:13, 19:11, 19:20.
meet 30:25, 31:7.
member 27:14.
men 9:7, 9:9.
mentally 11:15.
mentioned 21:16, 26:10, 30:16.
meted 14:9.
Michael 1:20, 1:37, 2:7.
Michelman 1:21, 2:10.
mind 31:23, 34:15.
mindful 36:20.
Minneapolis 5:2, 5:16.
missing 4:10.
mission 21:8.
mobile 5:9.
moment 21:11, 23:17.
monitoring 11:15, 12:14.
month 37:16.
months 30:11, 30:14, 30:17, 30:19, 31:15, 31:18, 31:20.
morning 2:6, 2:16, 3:17.
mother 3:23.
motion 4:6, 4:7, 14:4, 15:21, 16:12, 16:13, 22:21, 28:22, 29:5, 29:11, 29:14, 29:15, 29:16, 29:18, 32:17, 32:20, 36:8, 37:14.
motions 31:1.
move 16:14, 18:12, 23:12, 29:21, 30:3, 30:5.
moved 29:23.
MPD 22:15.
MR. CONTI 3:17, 3:25, 4:3, 22:13, 22:25, 23:4, 24:20.
MR. PERLOFF 2:6, 2:13, 13:4, 16:20, 17:7, 18:2, 18:25, 19:4, 23:20, 24:2, 26:4, 28:5, 28:15, 30:7, 30:10, 32:12, 33:3, 34:3, 34:14, 36:18.
MS 2:20, 2:23, 4:6, 19:2, 20:5, 23:8, 23:21, 26:10, 28:5, 28:19, 30:22, 33:1, 33:8, 35:2, 37:11.
Mullin 2:11.
multiple 21:16, 21:17.
myself 9:1, 32:10, 37:6.
.
.
< N >.
name 2:6, 2:16.
names 35:7.
narrow 21:20.
nature 36:19.
necessary 11:18, 19:7.
need 15:11, 20:3, 21:3, 24:7, 25:24, 29:19, 30:3, 31:8, 31:23, 33:10, 33:11, 34:4, 35:7, 35:20, 36:2,

36:3.
needs 19:14.
negligence 7:7, 7:9, 14:3.
neurosurgeon 8:20.
New 7:2, 10:22, 12:10, 12:19, 16:23.
next 29:8.
nice 11:12.
nine 30:14.
No. 1:4, 9:24.
nonpolice 24:25.
note 6:22, 30:24.
nothing 28:10.
noticed 4:23.
November 27th 1:10.
number 35:9.
NW 1:25, 1:33, 1:45.
.
.
< O >.
obvious 24:16.
obviously 4:7, 21:2, 21:7, 25:23.
offered 21:20, 26:17.
Office 1:31, 2:17, 2:24, 34:18.
officer 9:2, 9:4, 9:11, 25:6.
officers 21:6, 22:16, 23:3, 25:3.
Official 1:44, 37:28.
often 25:8.
Olmstead 17:21.
Once 15:16, 29:22.
One 2:21, 4:14, 6:11, 8:2, 8:3, 10:23, 10:25, 13:12, 14:7, 15:8, 15:9, 16:17, 20:2, 23:1, 24:11, 31:12, 32:10, 32:12, 33:18, 34:17, 35:17.
ongoing 5:17, 28:13.
open 28:21.
operates 18:21.
opportunity 28:15, 30:20, 30:25.
opposed 4:25, 25:13.
opposing 16:22, 18:3.
opposite 5:7.
order 27:24, 34:4.
ourselves 17:8.
outcome 11:19, 12:12, 12:15.
outer 30:1.
overcoming 27:23.
own 3:21.
.
.
< P >.
p.m. 37:6.
page 11:4, 23:4.
pages 11:2.
Pamela 1:29, 2:17.
papers 29:6.
parity 6:19, 6:21, 7:23.
part 12:14, 30:14.
participate 23:24.
particular 8:9, 13:23, 20:17.
particularly 19:23.
parties 2:4, 24:5.
party 24:10.
pass 3:12.
peg 8:12.
pending 29:18.
Performance 27:15.
perhaps 4:13.
period 29:16, 30:12, 37:9.
Perloff 1:20, 2:7, 12:16, 13:2, 16:15, 20:7, 23:7, 23:13, 23:18, 25:23, 27:6, 28:2, 34:2, 35:25, 37:15.
person 8:15, 9:3, 9:5, 19:14, 23:10, 28:11, 33:19, 35:17.
Ph.d.s 9:17.
phone 35:16.
physical 4:21, 6:20, 6:25, 7:16, 11:17, 12:1, 12:3, 12:22, 13:10, 13:19, 14:10, 14:13, 17:4, 17:9, 17:14, 17:20, 19:5, 19:11, 19:20.
pick 31:12.
picked 35:17, 35:18.
pilot 25:9, 26:9, 26:11, 28:7, 33:16, 34:6, 35:5.
piqued 27:18.
place 36:8.
Plaintiff 1:6, 1:20, 2:8, 6:15, 22:15, 35:16.
plaintiffs 3:3, 4:23, 5:6, 5:23, 8:10, 13:13, 15:7, 20:1, 31:1.
plan 21:20, 37:1.
plausible 20:1.
pleadings 4:2.
please 2:4, 23:1.
point 4:16, 6:23, 12:18, 13:14, 13:15, 13:17, 13:22, 14:3, 14:5, 14:6, 14:8, 18:17, 20:6, 20:9.
points 8:5, 19:19, 25:24, 25:25.
Police 3:18, 4:25, 7:11, 7:13, 7:19, 7:22, 7:24, 9:2, 9:4, 9:11, 9:20, 10:6, 10:8, 13:16, 20:23, 21:6, 23:2, 23:3, 24:8, 24:18, 25:1, 27:5.
policy 6:1, 14:12.
population

18:15.
position 6:6, 20:22, 32:23.
practical 27:2.
practices 27:22.
prayer 6:19.
pre-motion 4:5.
Pre-motion Conference 1:14.
pre-sense 16:10.
predominantly 17:13, 18:8.
prejudged 16:10.
premise 25:2.
preparation 30:19.
prepared 24:15.
preparedness 19:24.
presume 10:2, 10:3, 10:5.
Pretend 29:17.
pretty 23:10, 33:1, 33:19.
preview 34:17.
privileged 24:21.
probably 16:12.
problems 21:7.
proceed 29:10, 33:17.
Proceedings 1:49, 37:20, 37:24.
process 30:13, 32:14.
processees 34:19.
produced 1:49.
productive 23:22.
professionals 5:1.
program 14:25, 15:3, 15:15, 15:21, 16:1, 17:11, 17:15, 19:6, 19:8, 20:13, 25:9, 26:9, 26:11, 28:7, 34:6, 35:5.
programs 13:6, 15:23, 15:25, 16:1, 18:19, 18:22, 19:7, 20:2, 33:16.
project 2:10.
proper 13:25.
properly 21:15.
propose 36:23.
proposed 3:18.
protect 25:11.
protected 25:3, 25:5.
provide 9:16, 10:2, 11:14, 12:8, 12:10, 12:19, 21:25, 35:22.
provided 7:4, 9:25, 10:13, 10:17, 10:18, 11:16, 11:25, 12:2, 12:4, 12:18, 12:21, 12:25, 16:24, 17:1.
providing 13:24, 13:25, 24:25.
provision 12:11, 12:14, 21:25.
public 25:6, 27:13, 33:21.
purely 14:18.
purposes 19:14, 19:18.
pursuing 19:18.
pushing 14:4.
put 2:21, 3:6, 8:11, 35:5.
putting 26:25.
.
.
< Q >.
question 2:21, 3:9, 4:14, 11:14, 13:24, 15:2, 15:13, 15:14, 19:25, 24:20, 25:3, 26:18, 30:4.
questioning 9:22.
questions 3:15, 4:13, 28:23.
quick 2:21, 23:9.
quickly 37:18.
quite 19:5, 19:7.
.
.
< R >.
R. 1:30.
raised 25:25.
random 34:22.
rather 4:22.
reach 23:23.
read 20:9.
reading 6:15, 22:15, 22:17.
ready 29:15, 29:19, 30:9.
real 25:20, 27:2.
really 3:20, 15:2, 17:15, 24:18, 30:25.
reason 14:4, 14:17.
reasons 16:18.
receives 21:18, 21:19.
recent 18:19.
recognize 26:7, 27:3.
recognized 17:22.
record 2:5, 26:25, 37:24.
recorded 1:49.
reduce 18:7.
refer 17:20, 18:3, 18:19.
referring 26:12.
reform 2:9.
regarding 20:7, 26:16, 31:1.
rehabilitation 18:8.
related 16:6.
relevant 10:11, 20:16, 36:25.
relied 17:11, 18:8.
relief 6:19, 22:23.
rely 17:25.
remain 11:23, 12:13.
report 35:22,

36:23.
Reported 1:43.
Reporter 1:44, 37:28.
reports 5:19, 5:20, 34:21, 34:22.
representative 24:5.
request 36:8.
requests 36:20.
require 12:19.
requires 10:12, 14:7, 17:18, 21:12.
reserve 20:22.
reside 32:24.
resolved 29:2.
respect 6:21, 14:10.
respectful 4:2.
respond 5:10, 6:3, 6:4, 6:24, 7:1, 12:23, 19:22, 20:23.
responder 25:8.
responding 6:2, 24:19.
responds 34:19.
response 4:22, 5:11, 6:20, 6:21, 12:23, 12:24, 14:14, 15:1, 17:13, 17:14, 18:17, 18:21, 19:6, 19:8, 19:11, 19:12, 20:5, 20:7, 20:13, 20:17, 21:13, 21:16, 24:25, 25:2, 25:4, 26:14, 27:12, 27:20, 27:24.
review 23:9.
ridiculous 7:13.
Rodde 18:4.
Rodriguez 10:21.
room 33:16, 35:19, 36:4.
round 8:12.
RPR 1:43, 37:22.
Rule 31:2, 31:8, 31:23, 32:20, 33:12.
ruled 3:13, 32:17.
.
.
< S >.
Sacchetti 22:23.
safe 11:23.
safety 6:25, 11:15, 12:14, 25:6, 25:7.
sample 34:22.
saying 4:19, 6:1, 6:2, 7:9, 7:15, 8:22, 9:15, 9:16, 9:18, 10:1.
says 4:16, 4:17, 6:10, 8:18, 14:24, 17:3, 35:22.
scene 25:10.
schedule 29:10, 30:24, 31:5, 37:13.
scheduling 3:22.
School 27:14.
scope 31:3, 33:10.
Scott 1:21, 2:10.
seat 3:2.
seated 29:9.
second 10:23, 10:25, 23:1, 25:7, 27:21.
seeing 9:7, 9:8, 9:9.
seek 6:19.
seeking 7:2, 7:3.
seem 24:7.
seems 23:9, 28:14, 34:6.
seen 29:6.
send 7:10, 7:11, 8:17, 8:23, 9:2.
sending 7:18, 7:21, 7:22, 7:23, 8:2.
sense 4:18, 31:25.
sent 10:4.
separate 11:24, 15:23, 15:25, 18:18.
serious 25:14.
service 5:8, 8:9, 8:10, 8:12, 8:14, 10:13, 11:15, 11:16, 11:18, 11:24, 11:25, 12:10, 12:11, 12:18, 12:21, 12:22, 12:24, 13:23, 14:6, 15:3, 15:16, 16:24, 17:11, 21:20, 22:6, 22:7, 25:19.
services 6:22, 6:24, 7:1, 7:3, 7:4, 7:16, 7:25, 8:2, 8:3, 9:25, 12:4, 12:6, 12:8, 13:7, 14:9, 15:14, 16:24, 17:13, 18:8, 20:17, 21:16, 21:25, 22:2, 22:3, 26:16, 27:3.
set 29:12, 29:22, 30:12, 31:14, 32:8, 32:10.
setting 12:6, 21:16, 30:24, 37:6.
settlement 24:4, 26:22, 29:1, 29:4.
seven 2:12.
sheltering 22:6.
shelters 22:4.
Sheppard 2:11.
shorthand 1:49.
show 21:15, 24:25.
side 3:13, 3:14, 24:17.
sides 4:15, 23:25.
silly 7:24.
similar 18:15.
Sir 3:19.
situation 19:13, 25:12.
situations 25:1, 25:8, 25:18, 25:19.

six 31:20.
Sixth 1:33.
smart 23:10, 33:19.
social 25:19.
solid 25:25.
solution 34:8, 34:10.
solves 21:7.
somebody 3:23, 35:17.
someone 7:10, 8:23, 9:1, 21:23, 21:24, 22:5.
Sorry 2:3, 4:15, 12:3, 37:13.
sort 4:9, 4:15, 5:4, 9:13, 16:13, 17:24, 18:18, 23:23, 24:14, 27:4, 27:8, 29:1, 34:22.
sorts 34:25.
sounds 31:15.
South 1:39.
space 30:1.
specialized 18:11, 18:13.
specific 7:17, 10:12, 15:5, 15:8, 15:12, 17:3, 22:3.
specifically 6:19.
spoiler 29:3.
sprawling 31:4.
square 8:12.
stabilizing 19:13.
stake 18:6.
stand 12:17.
standpoint 25:6.
start 25:2, 29:14, 33:7, 33:13, 33:14, 34:5.
state 12:8, 22:14.
States 1:1, 1:16.
status 35:22.
stay 11:22, 23:17.
steal 30:1.
stenographic 37:23.
Steve 2:10.
stop 29:22.
straight 28:23.
Street 1:25, 1:33, 1:39.
strikes 3:6.
strong 16:12.
struggle 8:11.
stuck 2:21.
studies 24:24.
stuff 3:21.
submit 18:15.
substantial 33:6.
sufficient 20:24.
suggestion 32:12.
suicidal 8:25, 9:3, 9:7.
Suite 1:34, 1:40.
summary 16:11, 30:17, 30:18.
support 19:24, 26:6.
Supreme 17:21.
surgeon 8:17.
sworn 22:16.
system 10:1, 35:1.
systems 20:17.
.
.
< T >.
T. 1:43, 37:27.
table 27:11.
talked 24:2, 24:3, 36:25.
team 3:11.
teams 26:14.
technological 27:23.
ten 9:18.
tend 7:8, 31:22.
terms 6:2, 16:15, 18:16, 20:16, 26:21, 31:23, 32:1, 32:13, 35:23.
themselves 2:5.
theory 18:16.
they'll 6:9.
thinking 4:9.
though 3:9, 8:20, 9:21, 11:24, 12:11, 13:6.
thoughts 4:9, 34:17.
threatening 9:1.
three 30:16, 31:9, 31:18, 31:19, 33:16, 35:10, 35:21, 36:22, 37:5.
throughout 21:3.
thrust 6:23.
timing 32:1.
Title 8:8.
today 2:8, 20:21, 21:1, 29:16.
together 27:8, 28:9, 28:12, 35:5, 37:2.
tone 4:1.
top 35:10.
totally 13:11, 15:23, 20:22, 26:2.
touching 20:6.
train 23:5, 23:11, 23:14.
trained 4:25, 7:11, 8:16, 8:24, 9:12, 9:19, 10:4, 10:9, 12:23, 12:24, 21:6, 22:17.
training 9:2, 22:18, 22:22, 25:17.
Transcript 1:14, 1:49, 37:23.
transcription 1:50.
treat 6:7.
treated 6:13, 7:16, 13:19, 17:4.
treating 6:10, 13:19.
treatment 21:18.
trial 29:12, 29:15, 29:19, 29:21, 29:22, 29:23, 30:3, 30:5, 30:9, 30:12, 30:19, 31:9, 31:14, 31:15, 31:21, 31:23, 32:3, 32:8, 32:9, 37:4, 37:5.
true 21:5.
try 28:12.
trying 8:11, 9:11, 10:7,

26:19, 26:20, 26:21, 27:4, 29:17, 34:7, 34:8, 35:5.
Two 2:21, 4:23, 8:5, 13:6, 13:7, 28:23, 30:19, 31:18, 35:15, 35:17, 37:17.
type 14:19, 17:22.
types 34:20.
.
.
< U >.
underscore 35:25.
understand 4:20, 5:24, 10:17, 14:24, 23:15, 27:1, 34:18.
understanding 6:6, 16:22.
Understood 3:25, 21:10, 31:11, 32:5, 36:7, 36:12, 36:16, 36:18, 37:3, 37:7.
unfortunately 25:19.
unified 34:18.
unimpressed 27:17.
Union 1:23, 3:18, 23:24, 24:16, 24:17, 27:6, 35:17.
unit 5:10.
United 1:1, 1:16.
unless 3:22.
unpleasant 37:9.
until 16:9, 29:1, 29:15, 29:16.
untrained 7:19, 7:22, 9:20, 22:16.
uses 6:24.
.
.
< V >.
v. 10:21, 18:4.
Verriest 1:22, 2:9, 23:21.
versus 2:4, 8:3, 10:4, 17:16, 21:18.
view 16:16, 17:8, 21:4, 21:5, 25:5, 30:10.
violation 5:1, 6:5.
vs 1:7.
.
.
< W >.
walk 30:13.
Walton 23:10.
wanted 33:9.
wants 37:15, 37:16, 37:17.
Washington 1:11, 1:27, 1:35, 1:46.
ways 24:4, 35:19, 37:1.
week 31:8, 31:9, 31:22, 32:4, 32:8, 32:9, 37:4.
weeks 2:22, 23:22, 35:16, 35:21, 36:22, 37:17.
Welcome 2:15, 28:15, 30:20.
welcomes 25:17.
whatever 14:15, 31:22, 37:14, 37:15.
whatevers 27:2.
whatnot 24:10.
whatsoever 9:2.
whether 10:2, 11:14, 19:8, 19:19, 22:4, 22:21, 24:10.
whoever 6:7.
whole 13:17.
wide-ranging 20:13.
Will 2:4, 8:11, 9:4, 11:6, 15:24, 16:5, 18:14, 24:7, 26:6, 30:8, 30:13, 31:14, 32:10, 33:19, 36:19, 36:23.
wind 16:18.
wipe 30:1.
Within 20:17, 21:19, 35:15, 35:21, 37:4.
Without 21:19, 22:5, 24:21, 26:25, 27:10.
witnesses 30:2, 30:3.
word 15:3, 34:7, 35:25.
work 2:14, 24:6, 26:19, 26:20, 26:21, 28:12, 30:20, 32:7, 37:2.
working 23:18, 23:21, 24:4, 27:5, 27:6, 27:11, 27:12, 28:3, 31:24, 35:6, 36:2, 37:1.
works 27:24, 35:1.
world 16:11, 25:20, 27:2.
worthwhile 36:14.
write 14:4.
writing 16:18.
.
.
< Y >.
Yale 27:16.
year 27:21.
years 9:18, 31:15, 31:19, 32:20.
York 10:22, 12:19.
yourselves 26:20, 32:7, 34:1.
.
.
< Z >.
zero 10:7, 29:5, 29:22.