**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| **BREAD FOR THE CITY,** | |
| **Plaintiff,** | |
| **v.** | **Civil Action No. 1:23-cv-01945-ACR** |
| **DISTRICT OF COLUMBIA,** | |
| **Defendant.** | |

<u>**MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT**</u>
<u>**OF DEFENDANT'S MOTION TO DISMISS PLAINTIFF'S COMPLAINT**</u>

# TABLE OF CONTENTS

INTRODUCTION ………………………………………………………...… 1

BACKGROUND ………………………………………………………… 2

    I.    The District's Emergency Response System ………………………………... 2

    II.    Plaintiff's Allegations ………………………………………………… 3

    III.    Procedural History ………………………………………………….... 4

LEGAL STANDARD………………………………………………………… 5

    I.    Rule 12(b)(1) ………………………………………………………… 5

    II.    Rule 12(b)(6) ………………………………………………………… 6

ARGUMENT ……………………………………………………………… 6

    I.    Plaintiff Lacks Article III Standing to Bring Their Claim …………………………... 6

    II.    Plaintiff Fails to Allege a Violation of the ADA or the Rehabilitation Act ………… 12

        A.  Plaintiff Was Not Excluded from Participation or Denied the Benefits of Services ……………………………………………………………… 12

            1.   Plaintiff Misidentifies the Service at Issue. ………………………….. 14

            2.   Plaintiff's Request for a Higher Standard of Care Is Not Covered Under the ADA………………………………………………………… 17

            3.   Plaintiff's Request for New Services Is Not Covered Under the ADA………………………………………………………………... 19

        B.  Plaintiff Is Not A Qualified Individual With a Disability and Was Not Denied Services By Reason of Plaintiff's Disability ……………………………………22

CONCLUSION …………………………………………………………… 23

# TABLE OF AUTHORITIES

**Cases**                                                                                                              **Page(s)**

*Alexander v. Choate,*
   469 U.S. 287 (1985) ............................................................................................................... Passim

*Am. Council of the Blind v. Paulson,*
   525 F.3d 1256 (D.C. Cir. 2008) ................................................................................... 12, 13, 16

*Am. Soc'y for Prevention of Cruelty to Animals v. Feld Entmt, Inc.,*
   659 F.3d 13 (D.C. Cir. 2011) ................................................................................................ 7, 11

*Ashcroft v. Iqbal,*
   556 U.S. 662 (2009) ..................................................................................................................... 6

*Bell Atl. Corp. v. Twombly,*
   550 U.S. 544 (2007) ..................................................................................................................... 6

*Brooklyn Center for Independence of the Disabled v. Bloomberg,*
   980 F. Supp. 2d 588 (S.D.N.Y. 2013) ............................................................................... 15, 16

*Brownback v. King,*
   141 S. Ct. 740 (2021) ................................................................................................................... 5

*Buchanan v. Maine,*
   469 F.3d 158 (1st Cir. 2006) ............................................................................................... 18, 20

*Center for Responsible Science v. Hahn,*
   809 Fed. Appx 10 (D.C. Cir. 2020) (*per curiam* ..................................................................... 11

*Clapper v. Amnesty Int'l USA,*
   568 U.S. 398 (2013) ..................................................................................................................... 7

*Communities Actively Living Independent & Free v. City of Los Angeles,*
   2011 WL 4595993 (C.D. Cal. 2011) ................................................................................. 15, 16

*Ctr for Responsible Sci. v. Gottlieb,*
   346 F. Supp. 3d 29 (D.D.C. 2018) .............................................................................. 9, 10, 11

*Ctr for Responsible Sci. v. Hahn,*
   809 Fed. 10 (D.C. Cir. 2020) ..................................................................................................... 9

*Disability Rights New Jersey, Inc. v. Commissioner, New Jersey Department of Human Services,*
   796 F.3d 293 (3d Cir. 2015) ......................................................................................... 18, 19, 22

*Doe v. Pfrommer*,
    148 F.3d 73 (2d Cir. 1998) ................................................................. 19, 20, 21, 22

*EEOC v. St. Francis Xavier Parochial Sch.*,
    117 F.3d 621 (D.C. Cir. 1997) ............................................................................ 6

*Equal Rts. Ctr. v. District of Columbia*,
    741 F. Supp. 2d 273 (D.D.C. 2010) ................................................................... 12

*Fair Emp't Council of Greater Wash., Inc. v. BMC Marketing Corp.*,
    28 F.3d 1268 (D.C. Cir. 1994) .......................................................................... 10

*Firestone v. Firestone*,
    76 F.3d 1205 (D.C. Cir. 1996) ............................................................................ 6

*Food & Water Watch, Inc. v. Vilsack*,
    808 F.3d 905 (D.C. Cir. 2015) ............................................................................ 8

*Friends of the Earth v. Laidlaw Envtl Servs. (TOC), Inc.*,
    528 U.S. 167 (2000) ........................................................................................... 8

*Halcomb v. Office of the Senate Sergeant-At-Arms*,
    563 F. Supp. 2d 228 (D.D.C. 2008) ..................................................................... 6

*Hargrave v. Vermont*,
    340 F.3d 27 (2d Cir. 2003) ............................................................................... 16

*Harrison v. Rubin*,
    174 F.3d 249 (D.C. Cir. 1999) .......................................................................... 12

*Khadr v. United States*,
    529 F.3d 1112 (D.C. Cir. 2008) .......................................................................... 5

*Kokkonen v. Guardian Life Ins. Co. of Am.*,
    511 U.S. 375 (U.S. 1994) .................................................................................... 5

*L.E. by & Through Cavorley v. Superintendent of Cobb Cnty. Sch. Dist.*,
    55 F.4th 1296 (11th Cir. 2022) ......................................................................... 14

*Laughlin v. Holder*,
    923 F.Supp.2d 204 (D.D.C. 2013) ....................................................................... 6

*Loughlin v. United States*,
    393 F.3d 155 (D.C. Cir. 2004) ............................................................................ 5

*Nat'l Treasury Emps. Union v. United States*,
  101 F.3d 1423 (D.C. Cir. 1996) ........................................................................... 9, 11

*Olmstead v. Zimring*,
  527 U.S. 581 (1999) ........................................................................................ 17, 20

*People for the Ethical Treatment of Animals v. U.S. Dep't of Agric.*,
  797 F.3d 1087 (D.C. Cir. 2015) ..................................................................................... 8

*Privacy Info. Ctr. v. Presidential Advisory Comm'n on Election Integrity*,
  878 F.3d 371 (D.C. Cir. 2017) ....................................................................................... 7

*Privacy Info. Ctr. v. U.S. Dep't of*,
  928 F.3d 95 (D.C. Cir. 2019) ......................................................................................... 8

*Rasul v. Bush*,
  542 U.S. 466 (2004) ....................................................................................................... 5

*Rodriguez v. City of New York*,
  197 F.3d 611 (2d Cir. 1999) ............................................................................. 14, 20, 22

*Roell v. Hamilton Cnty.*,
  870 F.3d 471 (6th Cir. 2017) ....................................................................................... 12

*Turlock Irrigation Dist. v. FERC*,
  786 F.3d 18 (D.C. Cir. 2015) ......................................................................................... 8

## INTRODUCTION

Plaintiff Bread for the City, a not-for-profit organization, challenges the adequacy of the District's response to mental health emergencies under Title II of the Americans with Disabilities Act of 1990 (ADA), 42 U.S.C. § 12132, and Section 504 of the Rehabilitation Act of 1973, 29 U.S.C. § 794.  Through this lawsuit, Plaintiff seeks to change the way emergency services are provided to individuals experiencing mental health crises "that provides parity" with the services offered to individuals experiencing physical health crises.  The District shares with Plaintiff the goal of enhancing its mental health emergency response system and is already making great strides toward that end.  But Plaintiff's advocacy for the creation of new services and standards of care presents a policy argument, not a legal claim.

First, Plaintiff lacks standing because the District's existing system for responding to mental health emergencies does not directly injure Plaintiff's organizational mission.  Rather, Plaintiff chooses to spend its own resources to treat individuals experiencing mental health emergencies at its facilities because it believes it can do a better job than the District does. This is a self-inflicted injury that is insufficient to establish standing.

Second, Plaintiff has not pled facts sufficient to establish any violation of the ADA or Rehabilitation Act.  Plaintiff's allegations do not show that individuals with mental health disabilities are denied the benefits of any existing District service due to disability.  Plaintiff fails to identify any existing service that individuals experiencing a mental health crisis were denied. Instead, Plaintiff's claims boil down to either seeking to raise the standard of care of the services the District currently provides in a mental health emergency or requiring the District to provide new services to individuals experiencing a mental health emergency.  Neither basis can sustain an ADA or Rehabilitation Act claim.  Likewise, Plaintiff cannot satisfy the Acts' requirement

that any individual with a disability is "otherwise qualified" for the services it seeks and denied services based on discrimination because the services Plaintiff seek does not exist.  Without identifying any existing services that are provided to non-disabled individuals but denied to individuals with disabilities, Plaintiff has failed to state an ADA or Rehabilitation Act claim. Plaintiff's Complaint should be dismissed.

**BACKGROUND**

I.    <u>**The District's Emergency Response System**</u>

There are four District agencies that may be involved in a response to a mental health emergency:  Metropolitan Police Department (MPD), D.C Fire and Emergency Medical Services (FEMS), D.C. Department of Behavior Health (DBH), and the Office of Unified Command (OUC).  *See id.* ¶ 23.  Each agency plays a distinct role in response to different emergencies, and each agency follows its own sets of policies and protocols.[1]

Generally, there are several ways an individual experiencing a mental health crisis, or a witness calling on their behalf, may get help from one or more District agencies.  *See* Compl. ¶ 78.  First, individuals can call DBH's Access Helpline, which is staffed by mental health professionals who can either address mental health emergencies by phone or can send teams of mental health professionals, called Community Response Teams (CRTs), to provide assistance at the scene.  *See id.* ¶ 80.  Additionally, individuals can call 911.  Call-takers at OUC can dispatch

---

[1]    *See* MPD, *MPD* Policy, available at https://mpdc.dc.gov/page/mpd-policy (last accessed Jan. 17, 2024); Fire and EMS Department, *EMS Protocols*, available at https://fems.dc.gov/page/ems-protocols (last accessed Jan. 17, 2024); Office of Unified Command, available at https://ouc.dc.gov/page/our-offices-and-divisions (last accessed Jan. 17, 2024) (noting the Office of the Director establishes the agencies policies and procedures); D.C. Code § 1-327.51, et seq (Office of Unified Command); Department of Behavioral Health, *Policies, Rules and Bulletins,* available at https://dbh.dc.gov/page/policies-rules-bulletins (last accessed Jan. 17, 2023).

2

MPD or FEMS to the scene.  *See id.* ¶ 87.  OUC call-takers can also divert calls involving mental health concerns to the Access Helpline, which can, in turn, attempt to resolve the issue by phone or deploy a CRT.  *See id.* ¶ 88.

## II.    Plaintiff's Allegations

Plaintiff alleges it "is a not-for-profit organization . . . committed to helping under-resourced D.C. residents obtain basic needs" by operating "a medical clinic that provides primary behavioral healthcare services along with dental, vision, and physical health care for over 3,000 adults and children in the District" in addition to "legal services, clothing, food, and other social services." *Id*. ¶ 22.  Plaintiff alleges that "mental health cris[e]s occur[] at its facilities . . . frequently." *Id.* ¶ 14.  When this happens, Plaintiff "generally has its staff members address the emergency" but finds that doing so causes it to "expend significant funds [to] ensur[e] that all [its] staff are trained to help respond to mental health emergencies" and "hinders staff members' ability to provide services" that it "can bill from the entities that fund its services." *Id.*; *see also id.* ¶¶ 182–83, 199, 207.  Plaintiff believes that calling 911 to help its clients experiencing mental health crises "diminishe[s] the trust [its] clients have in" Plaintiff, *id.* ¶ 151, because many of its "clients have told [Plaintiff's] staff members that they do not want MPD officers present when they are having a mental health crisis," *id.* ¶ 154, and that Plaintiff's "clinicians have found that MPD officers" do not look for "solutions" that "would be the most appropriate and effective response" to mental health crises, *id.* ¶ 155.  Specifically, Plaintiff alleges that MPD officers may transport someone in crisis "to a hospital" rather than "escorting the individual to stay with a friend or family member." *Id.* ¶ 155; *see also id.* ¶ 58 ("mental health facility").  Plaintiff itself lacks facilities or resources to fully respond to mental health

emergencies, such as beds for overnight stays, staff or vehicles to transport individuals to hospitals, or mental health prescriptions.  *See id.* ¶ 148.

Plaintiff therefore "will call 911 if an individual presents a danger to others" but otherwise it "will attempt to de-escalate the situation before calling 911 and call 911 only if de-escalation efforts fail."  *Id.* ¶ 157; *see also id.* ¶ 158.  Plaintiff believes that "[i]f calling 911 resulted in mental health professionals responding promptly to mental health cris[e]s, [it] would be able to call more frequently," *id.* ¶ 14, and its own staff would not have to "cancel[], postpon[e] . . . short[en]" or "miss[] an appointment to provide behavior health support" or "treatment" to other clients, *id.* ¶¶ 175–76; *see also id.* ¶¶ 171, 178.  In sum, Plaintiff claims that "[i]f the District employed mental health professionals who could respond to crises promptly and provide appropriate care," it "would not have to expend time and money to provide staff outside [its] social services and medical departments with [the] six-hour de-escalation training course," *id.* ¶ 193, it currently provides "so that all [its] staff can treat people in crisis with dignity and assist in providing care if needed," *id.* ¶ 189; *see also* ¶¶ 181–92.

### III.   <u>Procedural History</u>

Plaintiff filed this case on August 6, 2023 against the District, alleging that the District's reliance on Metropolitan Police Department (MPD) officers discriminates against people with mental health disabilities under the ADA and Section 504 because the practice of employing MPD to respond to mental health crises falls short of national standards for best practices in such situations.  Compl. ¶¶ 1, 3, 4.  Plaintiff alleges that, as a result, it has diverted resources from its core organizational purpose in order to respond to mental health emergencies at its facilities itself, rather than calling for District services.  *Id*. ¶¶ 150, 186, 193. Plaintiff seeks (1) "a declaratory judgment . . . that the [District's] operation of its emergency response program violates" the ADA and Rehabilitation Act; (2) "permanent injunctive relief requiring, within a limited a reasonable

time, that" the District "implement and operate an emergency response program that provides parity between physical health emergencies and mental health emergencies, and that ensures that mental health professionals are the default first responders for typical mental health emergencies"; (3) costs and attorneys' fees; and (4) miscellaneous relief to be determined by the Court.  *See id.* at 45–46 (Prayer for Relief).

On September 26, the District filed a timely Notice [17] of intent to file this Motion to Dismiss.  *See* Standing Order [11] ¶ 7.f.  Plaintiff filed a Response [21].  The Court held a Pre-Motion Conference on November 27 and subsequently entered a briefing schedule for this Motion agreed to by the Parties.  12/01/2023 Second Minute Order.

## LEGAL STANDARD

In cases where an Article III court lacks subject-matter jurisdiction, it "ordinarily" has no authority to reach the merits and "must dismiss the case under just Rule 12(b)(1)."  *Brownback v. King*, 141 S. Ct. 740, 750 n.8 (2021); *see* Fed. R. Civ. P. 12(h)(3) ("must dismiss the action").  But "where a plaintiff fails to plausibly allege an element that is both a[n] element of [his substantive] claim and a jurisdictional element, the district court may dismiss the claim under Rule 12(b)(1) or Rule 12(b)(6).  Or both."  *Brownback*, 141 S. Ct. at 750 n.8.

## I.   <u>Rule 12(b)(1)</u>

Because federal courts are courts of limited jurisdiction, the law presumes that "a cause lies outside this limited jurisdiction."  *Rasul v. Bush*, 542 U.S. 466, 489 (2004) (quoting *Kokkonen v. Guardian Life Ins. Co. of Am.*, 511 U.S. 375, 377 (U.S. 1994)).  Thus, on a motion to dismiss under Federal Rule of Civil Procedure 12(b)(1), the plaintiff bears the burden of demonstrating that the court's jurisdiction is proper by a preponderance of the evidence.  *Khadr v. United States*, 529 F.3d 1112, 1115 (D.C. Cir. 2008).  "[S]ubject matter jurisdiction is, of necessity, the first issue for an Article III court."  *Loughlin v. United States*, 393 U.S. 155, 170

(D.C. Cir. 2004).  In determining whether it has jurisdiction, a district court may consider material outside of the pleadings.  *See, e.g.*, *Halcomb v. Office of the Senate Sergeant-At-Arms*, 563 F. Supp. 2d 228, 235 (D.D.C. 2008).  "If the court determines at any time that it lacks subject-matter jurisdiction, the court must dismiss the action."  Fed. R. Civ. P. 12(h)(3).

## II.   <u>Rule 12(b)(6)</u>

To survive a motion to dismiss under Rule 12(b)(6), "a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'"  *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)).  A claim is facially plausible "when the plaintiff pleads factual content that allows the court to draw [a] reasonable inference that the defendant is liable for the misconduct alleged."  *Id*. (quoting *Twombly*, 550 U.S. at 556).  "While legal conclusions can provide the framework of a complaint, they must be supported by factual allegations."  *Id*. at 679.  "[A] complaint [does not] suffice if it tenders 'naked assertion[s]' devoid of 'further factual enhancement.'"  *Id*. at 678 (quoting *Twombly*, 550 U.S. at 557).  In evaluating a motion under Rule 12(b)(6), the Court "may consider . . . the facts alleged in the complaint, any documents either attached to or incorporated in the complaint, and matters of which [the Court] may take judicial notice."  *EEOC v. St. Francis Xavier Parochial Sch.*, 117 F.3d 621, 624 (D.C. Cir. 1997); *see Laughlin v. Holder*, 923 F.Supp.2d 204, 209 (D.D.C. 2013).  The dismissal should be with prejudice if "the allegation of other facts consistent with the challenged pleading could not possibly cure the deficiency."  *Firestone v. Firestone*, 76 F.3d 1205, 1209 (D.C. Cir. 1996).

## ARGUMENT

## I.   <u>Plaintiff Lacks Article III Standing To Bring Their Claims.</u>

Plaintiff alleges that "the District's failure to provide appropriate emergency responses to mental health crises" has caused it to "attempt[] to protect its clients and preserve its

6

relationships with them by avoiding calling 911 for most mental health crises," and instead "generally has its staff members address the emergency."  Compl. ¶ 14.  And, in turn, these efforts "hinder[] staff members' ability to provide services that actually fall within [its] mission."  *Id.*; *see also id.* ¶ 140.  In other words, Plaintiff does not assert that the District itself causes Plaintiff harm or causes it to expend any resources.  Rather, Plaintiff simply believes that it can do a better job at addressing mental health emergencies than the District does and has spent its own resources to do so.  As pled, this is a manufactured, self-inflicted harm that is insufficient to establish an Article III injury for standing.  *See Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 416 (2013).

"[T]here is no justiciable case or controversy unless the plaintiff has standing."  *Elec. Privacy Info. Ctr. v. Presidential Advisory Comm'n on Election Integrity*, 878 F.3d 371, 376 (D.C. Cir. 2017) (citations omitted).  "To establish standing, the plaintiff must show (1) it has suffered a concrete and particularized injury (2) that is fairly traceable to the challenged action of the defendant and (3) that is likely to be redressed by a favorable decision . . . ."  *Id.* at 376–77. (citations and quotations omitted).  "The plaintiff bears the burden of establishing all three elements of standing."  *Id.* (citation omitted).  Although Bread is an organization, not a natural person, "it must make the same showing required of individuals . . . ."  *Am. Soc'y for Prevention of Cruelty to Animals v. Feld Entmt, Inc.* (*ASPCA*), 659 F.3d 13, 24 (D.C. Cir. 2011).  Therefore, "an organization's abstract interest in a problem is insufficient to establish standing," and "organizations who seek to do no more than vindicate their own value preferences through the judicial process generally cannot establish standing."  *Id.* at 24–25 (citations and quotations omitted).

"To allege an injury to its interest, 'an organization must allege that the defendant's conduct perceptibly impaired the organization's ability to provide services in order to establish injury in fact.'" *Food & Water Watch, Inc. v. Vilsack*, 808 F.3d 905, 919 (D.C. Cir. 2015) (quoting *Turlock Irrigation Dist. v. FERC,* 786 F.3d 18, 24 (D.C. Cir. 2015)).[2] "An organization's ability to provide services has been perceptibly impaired when the defendant's conduct causes an 'inhibition of [the organization's] daily operations.'" *Id.* (quoting *People for the Ethical Treatment of Animals v. U.S. Dep't of Agric.* (*PETA*)*,* 797 F.3d 1087, 1094 (D.C. Cir. 2015)). Put another way, the defendant's action must "cause a concrete and demonstrable injury to the organization's activities that is more than simply a setback to the organization's abstract social interests." *Elec. Privacy Info. Ctr. v. U.S. Dep't of Com.*, 928 F.3d 95, 100–01 (D.C. Cir. 2019). "To determine whether an organization's injury is 'concrete and demonstrable' or merely a 'setback' to its 'abstract social interests,' we ask, first, whether the agency's action or omission to act injured the organization's interest and, second, whether the organization used its resources to counteract that harm." *PETA*, 797 F.3d at 1094 (citations and quotations omitted).

Here, Plaintiff alleges that having its staff respond to mental health emergencies has various deleterious effects. For example, it asserts that "[i]f Bread's staff were not responding to mental health crises, they would generally be meeting with clients or preparing to meet with clients." Compl. ¶ 171. And because Plaintiff's responding staff may end up canceling their other appointments in the interim, it "believes that many clients endure more intense or persistent symptoms than they otherwise would have . . . ." *Id.* ¶ 178. Plaintiff's staff allegedly find these extra duties "extremely emotionally draining," *id.* ¶ 181, and it allegedly loses revenue when

---

[2]     Plaintiff does not assert that it has members who would otherwise have standing to sue in their own right, as would be required to establish associational standing. *See Friends of the Earth v. Laidlaw Envtl Servs. (TOC), Inc.*, 528 U.S. 167, 181 (2000).

they cancel appointments due to crises.  *Id.* ¶¶ 182–83.  Separately, Plaintiff alleges that it has

provided de-escalation training even to employees not directly involved in responding to crises,

on the theory that "the individual in crisis frequently interacts with people outside [its] social

services and medical departments;" for instance, "a development staff member may walk

through the lobby while the de-escalation process is ongoing, or an agitated individual may walk

into [its] administrative offices as clinicians are attempting to calm them."  *Id.* ¶¶ 187–88.

Plaintiff concludes that the money spent on such training "reduces the money it has to buy food

for its pantry, drugs for its clinic, and support for other services."  *Id.* ¶ 192.

      Crucially, none of these effects can be traced directly to the District's mental health

emergency response system, but rather stem directly from Plaintiff's own efforts to address

mental health emergencies themselves because they do not want MPD to come into their

facilities to respond to mental health crises unless there is a threat of physical harm.  *See id.*

¶¶ 150–58.  At bottom, Plaintiff "directed its resources to mitigating [risks] that it thought the

government should have exercised more diligence in preventing."  *Ctr for Responsible Sci. v.*

*Gottlieb*, 346 F. Supp. 3d 29, 42 (D.D.C. 2018), *aff'd per curiam sub nom. Ctr for Responsible*

*Sci. v. Hahn*, 809 Fed. 10 (D.C. Cir. 2020).  But there is no "direct conflict between the

defendant's conduct and the organization's *mission.*" *Nat'l Treasury Emps. Union v. United*

*States,* 101 F.3d 1423, 1430 (D.C. Cir. 1996) (emphasis in original).

      Here, Plaintiff's mission is to provide basic services for D.C. residents, and it repeatedly

emphasizes that it "does not provide emergency health care."  *E.g.*, Compl. ¶ 22. "Satisfying

standing thus requires that Plaintiff show that its *ability* to engage in these tasks [providing basis

services] has been impaired."  *Gottlieb*, 346 F. Supp. 3d at 40 (emphasis in original).  Plaintiff's

alleged injury, however, relies entirely on the resources it has spent to treat mental health

emergencies itself rather than calling 911, which it claims could have spent elsewhere.  *E.g.*,
Compl. ¶ 192.  But such diversion alone is categorically insufficient to establish organizational
standing:

> That [Plaintiff] has diverted resources . . . is certainly relevant to step two—
> 'whether the organization used its resources to counteract that harm,'—but comes
> into play only after Plaintiff shows an initial impairment to its programs.  Put
> otherwise, an organization can only divert resources to counteract 'that harm'
> once there is a harm to counteract. The diversion itself cannot alone constitute the
> harm. Holding otherwise would be hopelessly circular.

*Gottlieb*, 346 F. Supp. 3d at 41.  As a result, "organizational standing is not based on 'diversion
of resources from one program to another, but rather on the alleged injury that the defendants'
actions themselves had inflicted upon the organization's programs.'"  *Id*. (quoting *Fair Emp't
Council of Greater Wash., Inc. v. BMC Marketing Corp.*, 28 F.3d 1268, 1277 (D.C. Cir. 1994)).

    That is precisely the crux of the issues here.  Plaintiff claims that it is injured by spending
its money and staff time on activities that it admits are outside its core interest and which it
elected itself to undertake:  treating mental health emergencies.  But Plaintiff never explains how
the District's existing mental health emergency response program directly and concretely harms
Plaintiff's daily activities or core organizational mission of providing basic services, thereby
*necessitating* Plaintiff's diversion of resources away from that mission.  At most, Plaintiff alleges
that the District's current response to mental health emergencies has negative effects for the
person receiving treatment rather than Plaintiff itself.  For example, Plaintiff claims that MPD
"either agitates the person in crisis or causes them to shut down, either of which makes it harder
for the person in crisis to receive treatment" because "[m]any of [Plaintiff]'s clients have had
negative encounters with MPD officers" and "clients have told staff that they are uncomfortable
being around MPD officers."  *Id*. ¶¶ 153, 154.  But again, that is not a harm to Plaintiff itself
that can establish organizational standing.  Finally, Plaintiff generally accuses MPD of

"handcuff[ing] people unnecessarily, us[ing] unnecessarily aggressive tones, and crowd[ing] people in crisis," as well as "address[ing] crises only by taking someone to a hospital or doing nothing—even when other solutions . . . would be the most appropriate and effective response." *Id*. ¶ 155.  In each of these examples, Plaintiff cites only harm to the individual being treated, not harm to Plaintiff itself.  In fact, Plaintiff admits that it *will* call 911 under some circumstances, such as "if an individual presents a physical danger to others."  *Id*. ¶ 157.  This only reinforces the point:  The District's program is not causing Plaintiff any harm.  When "the challenged conduct affects an organization's activities, but is neutral with respect to its substantive mission, [courts] have found it 'entirely speculative' whether the challenged practice . . . actually impair[s] the organization's activities."  *ASPCA*, 659 F.3d at 25 (citing *Nat'l Treasury Emps. Union*, 101 F.3d at 1430).

In short, "Plaintiff must show . . . that something about the challenged action itself— rather than the organization's response to it—makes the organization's task more difficult." *Gottlieb*, 346 F. Supp. 3d at 41.  The only harm alleged here is that Plaintiff believes the District's emergency mental health response program is harmful to those it is treating, and a *separate* harm that Plaintiff causes itself by choosing to divert its resources away from its core mission in order to treat mental health emergencies itself.  It, like the plaintiff in *Center for Responsible Science v. Hahn*, 809 Fed. Appx 10, 12 (D.C. Cir. 2020) (*per curiam*), asserts that it is in essence "stepping into the breach and doing what the agency should have done."  But a plaintiff cannot manufacture standing this way.  The Complaint should consequently be dismissed.

II.     **Plaintiff Fails To Allege a Violation of the ADA or the Rehabilitation Act.**

Plaintiff has not pled facts sufficient to state a claim under the ADA or the Rehabilitation Act.  Title II of the ADA provides that "no qualified individual with a disability shall, by reason of such disability, be excluded from participation in or be denied the benefits of the services, programs, or activities of a public entity, or be subjected to discrimination by any such entity." 42 U.S.C. § 12132.  "Two types of claims are cognizable under Title II: claims for intentional discrimination and claims for a reasonable accommodation."  *Roell v. Hamilton Cnty.*, 870 F.3d 471, 488 (6th Cir. 2017).  As to the latter (at issue here), to prove that public services or programs violate Title II, a plaintiff must show that:

> (1) he or she is a qualified individual with a disability; (2) he or she was either excluded from participation in or denied the benefits of a public entity's services, programs or activities, or was otherwise discriminated against by the public entity; and (3) such exclusion, denial of benefits, or discrimination was by reason of his or her disability.

*Equal Rts. Ctr. v. District of Columbia*, 741 F. Supp. 2d 273, 283 (D.D.C. 2010) (cleaned up); *see also Am. Council of the Blind v. Paulson*, 525 F.3d 1256, 1267–68 (D.C. Cir. 2008) (same standard applies to Rehabilitation Act claims).[3]  Plaintiff's claim fails each prong.

A.     **Plaintiff Was Not Excluded from Participation or Denied the Benefits of Services.**

Plaintiff cannot satisfy the second prong of the Title II standard, because it was not excluded from or denied any existing service or program.  "In determining whether an individual has been 'excluded' or 'denied' benefits of a service or program, courts evaluate whether the individual has 'meaningful access' to the service or program at issue."  *Am. Council of the Blind*,

---

[3]      "[C]laims and defenses" under the ADA and Section 504 of the Rehabilitation Act are "virtually identical."  *Harrison v. Rubin*, 174 F.3d 249, 253 (D.C. Cir. 1999); *see also Am. Council of the Blind*, 525 F.3d at 1260 n.2 (discussing that courts have treated cases interpreting Title II of the ADA and Section 504 as interchangeable).

525 F.3d at 1267.  A lack of "[m]eaningful access" is generally found "[w]here the plaintiffs identify an obstacle that impedes their access to a government program or benefit."  *Id*.  "By contrast, where the plaintiffs seek to expand the substantive scope of a program or benefit, they likely seek a fundamental alteration to the existing program or benefit and have not been denied meaningful access."  *Id*.

Here, Plaintiff theorizes that the District's emergency response programs and services discriminate against individuals experiencing mental health crises because the District does not dispatch first responders to mental health crises who have the same level of speed, skill, and training as the responders dispatched to individuals experiencing physical health crises.  Compl. ¶ 197.  But this theory suffers from several fatal defects.  First, "emergency response" is not a singular "service or program at issue;" it is in fact, as Plaintiff pleads, *many* services and programs.  *Am. Council of the Blind*, 525 F.3d at 1267; *see also* above Background (explaining the various roles of the several agencies involved in emergency responses); Compl. ¶ 23.  And Plaintiff fails to identify any particular service provided by any agency that denies meaningful access to individuals with disabilities.  Second, by seeking a mental health crisis response tailored to the needs of mental health consumers in a way that is not currently provided, Plaintiff is seeking a different and higher standard of care, or, in other words, "a fundamental alteration to the existing program or benefit."  *Am. Council of the* Blind, 525 F.3d at 1267.  This is not discrimination and is not required under the ADA.  Third, to the extent Plaintiff claims that the District should provide *new* services to individuals experiencing mental health crises, the ADA does not compel any such outcome.  In other words, viable ADA claims allege that the plaintiff needs accommodations to access a specific existing service that is currently available to individuals without disabilities.  Instead, Plaintiff here alleges that an existing suite of services

fails to adhere to Plaintiff's desired standards and does not include certain services it wishes were offered instead. *That* claim is not cognizable under the ADA, because Plaintiff has not shown that it has been denied meaningful access to any existing service. For all of these reasons, Plaintiff fails to state a claim and the Complaint should be dismissed.

1.       **Plaintiff Misidentifies the Service at Issue.**

"The Supreme Court instructs courts to focus on narrow programs and benefits offered by a public entity when evaluating claims under the ADA and Section 504." *L.E. by & Through Cavorley v. Superintendent of Cobb Cnty. Sch. Dist.*, 55 F.4th 1296, 1302 (11th Cir. 2022) (citing *Alexander v. Choate*, 469 U.S. 287, 301 & n.21 (1985) ("Antidiscrimination legislation can obviously be emptied of meaning if every discriminatory policy is 'collapsed' into one's definition of what is the relevant benefit")). Plaintiff contends that the "District's emergency response program" constitutes "a service, program, or activity within the meaning of Title II." Compl. ¶ 195. But "emergency response" is not *a* "program" offered by the District. *See id.* ¶ 77. There are, at least, four separate District agencies involved in responses to emergencies, each of which provides its own set of services. *See* Compl. ¶ 23; Background, Section I. In other words, Plaintiff fails to identify a *particular* service for which it requires an accommodation to access, and this alone is fatal to its ADA claim. *See, e.g.*, *Alexander*, 469 U.S. at 303 (finding that the ADA claim involved a "package of services [that] has the general aim of assuring that individuals will receive necessary medical care, but the benefit provided remains the individual services offered"); *Rodriguez v. City of New York*, 197 F.3d 611, 618 (2d Cir. 1999) (defining the service at issue as "independently tasked safety monitoring" when plaintiffs challenged the state's failure to include that service among its personal care services offerings).

Two cases involving cities' emergency response services help illustrate the need to narrowly define the service or benefit at issue in an ADA lawsuit.  In *Communities Actively Living Independent & Free v. City of Los Angeles*, 2011 WL 4595993 (C.D. Cal. 2011) and *Brooklyn Center for Independence of the Disabled v. Bloomberg*, 980 F. Supp. 2d 588 (S.D.N.Y. 2013), the plaintiffs challenged the cities' provision of *particular services* offered to disabled and non-disabled residents during an emergency.  *Cmntys. Actively Living Indep. & Free*, 2011 WL 4595993, at \*2; *Brooklyn Ctr. for Indep. of Disabled*, 980 F. Supp. 2d at 644.  In *Communities*, for example, the court found that Los Angeles failed to provide accommodations in the provision of services to notify, evacuate, transport, and shelter its residents in the event of an emergency or disaster because those services lacked accommodations that would provide emergency notifications to people with auditory impairments or cognitive disabilities and transportation or temporary housing to people with disabilities.  *Cmntys. Actively Living Indep. & Free*, 2011 WL 4595993, at \*13.  Similarly, in *Brooklyn*, the court held that New York City did not accommodate the needs of people with disabilities in responding to natural disasters by failing "to ensure that people with disabilities are able to evacuate before or during an emergency," "to provide sufficiently accessible shelters," and to "sufficiently inform people with disabilities of the availability and location of accessible emergency services."  *Brooklyn Ctr. for Indep. of Disabled*, 980 F. Supp. 2d at 597.  In other words, the courts in both cases found that the government failed to provide reasonable accommodations during an emergency or disaster that would allow for individuals *with* disabilities to meaningfully access the *same* services that individuals *without* disabilities would access when facing the *same emergency*.  *Id*.; *Cmntys. Actively Living Indep. & Free*, 2011 WL 4595993, at \*13.

15

By contrast, here, Plaintiff asks the Court to compare entire emergency response systems for *different types of emergencies*.  Compl. ¶¶ 117–139.  In essence, Plaintiff relies on the mistaken belief that the ADA requires that a constellation of services aimed at one emergency—mental health emergencies—must have similar resources and outcomes as a different constellation of services aimed at different kind of emergency—physical health emergencies.  Compl. ¶¶ 197, 205.  Applying this framework to *Brooklyn* and *Communities* would look like plaintiffs asking the courts to compare the services offered to disabled victims of an earthquake to the services offered non-disabled victims of floods.  Put the other way, if a person with a mental health condition is experiencing a heart attack, Plaintiff is *not* alleging that EMTs will fail to show up to help that individual with the emergency.  Rather, if a person with a cardiac condition is experiencing a mental health crisis, Plaintiff wants someone with completely different expertise to come to that person's aid.  Because the emergencies are different and the services at issue would necessarily vary based on the particular emergency, the comparison is inapt and unworkable.  In contrast, the ADA offers a sensible approach to determining whether there is discrimination by requiring an examination of whether individuals with disabilities lack meaningful access to a *particular* service provided to individuals without disabilities.  *Am. Council of the Blind*, 525 F.3d at 1267; *see Hargrave v. Vermont*, 340 F.3d 27, 36–37 (2d Cir. 2003) ("A program may discriminate on the basis of mental illness if it treats a mentally ill individual in a particular set of circumstances differently than it treats non-mentally ill individuals in the same circumstances.").

Here, because Plaintiff does not identify a particular specific service that treats non-disabled individuals differently than disabled individuals, their request for "emergency services" tailored for mental health crises is simply another way of stating that they seek different or better

services they believe would better suit mental health crises than the ones the District currently

has to offer.  *See Alexander,* 469 U.S. at 303 (holding that Medicaid "benefits" under the

Rehabilitation Act are "the individual services offered" not the "amorphous objective of

'adequate health care'").  As explained below, neither of these is a cognizable basis for an ADA

claim.

### 2. Plaintiff's Request for a Higher Standard of Care Is Not Covered Under the ADA.

The Supreme Court has made clear that the ADA does not create an entitlement to a

particular standard of care in the provision of services to individuals with disabilities.  *See*

*Olmstead v. Zimring*, 527 U.S. 581, 603 n.14 (1999).  In *Alexander*, the Court found that

Medicaid's limitation of inpatient coverage to 14 days for all beneficiaries did not deny

individuals "meaningful access" to the service, even though plaintiffs argued that individuals

with disabilities required additional days of coverage to obtain "adequate health care."  469 U.S.

at 303.  The Court reasoned that the state was not required to "guarantee that each recipient will

receive that level of health care precisely tailored to his or her particular needs" and "the benefit

provided remains the individual services offered—not 'adequate health care.'"  *Id.*  Echoing this

theme, in response to the dissent's concerns in *Olmstead,* the Court clarified:  "We do not in this

opinion hold that the ADA imposes on the States a 'standard of care' for whatever medical

services they render, or that the ADA requires States to 'provide a certain level of benefits to

individuals with disabilities.'"  527 U.S. at 603 n.14 (citation omitted) (quoting *id*. at 623, 624

(Thomas, J., dissenting) (contending that "the type of claim approved of by the majority does not

concern a prohibition against certain conduct (the traditional understanding of discrimination),

but rather concerns imposition of a standard of care")).

Courts of appeals have routinely applied this standard.  *Buchanan v. Maine*, 469 F.3d 158, 174 (1st Cir. 2006) (collecting cases).  For example, in *Buchanan*, the plaintiff challenged the lack of procedures and training to assist officers in "successfully communicating" with mentally ill individuals.  469 F.3d at 177 (emphasis omitted).  But the First Circuit rejected this argument and affirmed summary judgment for defendant because "the claim was not about . . . denial of services, but rather . . . [the] adequacy of treatment."  *Id.* at 173.  Similarly, in *Disability Rights New Jersey, Inc. v. Commissioner, New Jersey Department of Human Services*, 796 F.3d 293 (3d Cir. 2015), the plaintiff challenged a lack of judicial process before medication was forcibly administered to psychiatric patients.  796 F.3d at 304.  The Third Circuit rejected an ADA challenge to the policy, in part, because the service at issue was not provided to non-disabled individuals and "allowing [the ADA claim] could improperly transform the ADA from an antidiscrimination statute into a law regulating the quality of care the States provide to the disabled."  796 F.3d 293, 307 n.5.

Here, Plaintiff seeks an injunction that would alter the standard of care an individual receives.  *See* Compl. at 45–46 (Prayer for Relief).  Plaintiff acknowledges that MPD officers and CRT respond to calls seeking assistance with mental health emergencies. Comp. ¶ 2, 9.  But Plaintiff complains that the MPD officers are not the right people to be responding because they are law enforcement and that they are not properly or sufficiently trained to handle mental health crises, that mental health professionals could do it better, and that the wait time for mental health professionals (CRTs) is currently too long.  *Id*. ¶¶ 97, 105, 206.  Plaintiff also provides ample allegations referencing national experts to suggest best practices in a mental health crisis require a different type of response.  Compl. ¶¶ 30–42.

18

Put simply, Plaintiff's claim is that the District's current response to mental health emergencies is not good enough. But whether the services provided to individuals with disabilities are adequate is a question of standard of care, not discrimination. "Neither the ADA nor the Rehabilitation Act establish an obligation to meet a disabled person's particular needs vis-à-vis the needs of other handicapped individuals, but mandate only that the services provided . . . to non-handicapped individuals not be denied to a disabled person because he is handicapped." *Doe v. Pfrommer*, 148 F.3d 73, 83 (2d Cir. 1998). Thus, the applicable question under the ADA is not, as Plaintiff suggests, whether an individual experiencing a mental health emergency receives care at the same level of care as a non-disabled individual experiencing a physical emergency. *See* Compl., (Prayer for Relief) (seeking "parity" between physical and mental health responses). Instead, the ADA asks whether an individual with a mental health disability experiencing a physical emergency can access the same care a non-disabled individual receives when experiencing a physical emergency. *See Disability Rts. New Jersey,* Inc., 796 F.3d at 305 ("[W]e are unaware of any case holding that a Title II violation can be stated in the absence of an allegation that a qualified person with a disability has been denied access to a public service, program, or activity to which nondisabled people have access."); *Alexander*, 469 U.S. at 304 (1985) (holding that "benefits" under the Rehabilitation Act are "the individual services offered" not the "amorphous objective of 'adequate health care'"). There is no allegation in the Complaint that individuals with mental health disabilities are denied access to any program available to individuals without such disabilities. Plaintiff therefore fails to state a claim under the ADA.

### 3.    Plaintiff's Request for New Services Is Not Covered Under the ADA.

Hand-in-hand with the principle that the ADA does not require a particular standard of care goes the equally well-established principle that Title II of the ADA does not require states

"to provide new programs or services to the disabled which it has not previously provided to any group." *Buchanan*, 469 F.3d at 173. Instead, "[s]tates must adhere to the ADA's nondiscrimination requirement with regard to the services they in fact provide." *See Olmstead*, 527 U.S. at 603 n.14. The ADA thus seeks to ensure "even handed treatment" in the services provided and does not require an increase in services to achieve "equal results." *Alexander,* 469 U.S. at 304. Plaintiff's request that the District provide new and better services for individuals with mental health disabilities plainly fails to state a claim under this prong of the ADA.

Several cases illustrate this principle. In *Rodriguez*, the plaintiffs argued that the state's failure to provide safety-monitoring services to individuals with mental disabilities when the state provided other personal care services to Medicaid beneficiaries with physical disabilities violated the ADA. 197 F.3d at 614. Plaintiff argued that the additional services were necessary for individuals with mental disabilities to remain in their home, which was the state's aim in providing other personal care services for individuals with physical disabilities. *Id*. The Second Circuit rejected this argument and found that where the state did not provide safety-monitoring services to the physically disabled, the ADA did not compel the state to provide such services to the mentally disabled. *Id.* at 618–19. Likewise, in *Doe*, the Second Circuit rejected an ADA claim based on the plaintiff's argument that the state's vocational services for disabled individuals failed to provide a particular service tailored to the plaintiff's disability. 148 F.3d at 83. The court found that where the state did not already provide the requested service, the ADA did not compel the creation of such a service because "the central purpose of the ADA and § 504 of the Rehabilitation Act is to assure that disabled individuals receive 'evenhanded treatment' in relation to the able-bodied." *Id.*

Here, in addition to requesting a higher level of care for the services provided to individuals with disabilities experiencing mental health crises, Plaintiff also appears to request that the District provide new services.  Like the *Rodriguez* plaintiffs, Plaintiff argues that the aim of package of services offered by District (emergency response) is to "provide timely and effective responses," and the District needs to provide additional services tailored to mental health disabilities in order to meet that objective.  Compl. ¶ 77.  At base, Plaintiff alleges that MPD is currently the default responder to mental health emergencies and, instead, the District should make mental health professionals the default responders for mental health emergencies. *See, e.g.*, Compl. ¶ 1, 6. Plaintiff wants the District to replace a currently offered service with a *new* service that is not currently offered, whether to individuals with mental health disabilities or individuals without such disabilities.  Put another way, Plaintiff does not allege that the District is currently sending mental health professionals to respond to mental health emergencies experienced by individuals without a mental health disability and sending police officers to respond to mental health emergencies experienced by those with mental health disabilities.  The point is this:  Plaintiff is seeking to tailor a new service for individuals with a specific disability. That is not an ADA claim.

**B.**    **Plaintiff Is Not a Qualified Individual With a Disability and Was Not Denied Services By Reason of Plaintiff's Disability.**

The first and third prong of the Title II standard can be analyzed together because "the question of who is 'otherwise qualified' and what actions constitute 'discrimination' . . . would seem to be two sides of a single coin."  *Alexander*, 469 U.S. at 299 n.19.  To begin, an "otherwise qualified individual with a disability" is defined as:

> an individual with a disability who, with or without reasonable modifications to rules, policies, or practices, the removal of architectural, communication, or transportation barriers, or the provision of auxiliary aids and services, meets the

> essential eligibility requirements for the receipt of services or the participation in programs or activities provided by a public entity.

42 U.S.C. § 12131(2). Here, it cannot be said that individuals with mental health disabilities "meet[] the essential eligibility requirements" for the services Plaintiff seeks because, as explained above, Plaintiff seeks new or enhanced mental health emergency response services *that are not currently provided to anyone else*. *See* Section II.A.2,3, above; *Disability Rts. New Jersey, Inc.*, 796 F.3d at 304 ("The fatal defect in Disability Rights' ADA claim is that this right does not exist in New Jersey for nondisabled people, which means the denial of that right to psychiatric patients is not discriminatory."); *see also Rodriguez*, 197 F.3d at 618 ("Nor do appellees 'meet[ ] the essential eligibility requirements for the receipt' of separately tasked safety monitoring services because New York does not even have any such requirements."). Thus, Plaintiff cannot be "otherwise qualified" and there is no argument that any lack of access to those services are by reason of disability rather than by virtue of the fact that the service does not exist. And even if the services Plaintiff seeks were provided, they would be directed at individuals with disabilities, which would also preclude a discrimination claim based on disability. *See Doe,* 148 F.3d at 83 ("In the context of federal or public programs directed specifically at the disabled, however, it is difficult to apply the traditional analysis for determining whether an applicant meets the "otherwise qualified" prong . . ."); *id.* ("[W]here the handicapping condition is related to the benefit provided, it will rarely, if ever, be possible to say with certainty that a particular decision was discriminatory." (internal citation and quotation removed)). The impossibility of placing Plaintiff's claims in the ADA framework shows that Plaintiff's claim is not properly brought.

**CONCLUSION**

For the foregoing reasons, the Court should dismiss Plaintiff's Complaint.


Date: January 19, 2024.                    Respectfully Submitted,


                                           BRIAN L. SCHWALB
                                           Attorney General for the District of Columbia

                                           STEPHANIE E. LITOS
                                           Interim Deputy Attorney General
                                           Civil Litigation Division

                                           */s/ Matthew R. Blecher*
                                           MATTHEW R. BLECHER [1012957]
                                           Chief, Civil Litigation Division, Equity
                                           Section

                                           /s/ *Honey Morton*
                                           HONEY MORTON [1018978]
                                           Assistant Chief, Equity Section

                                           */s/ Pamela A. Disney*
                                           PAMELA A. DISNEY [1601225]
                                           BRENDAN HEATH [1619960]
                                           ADAM P. DANIEL [1048359]
                                           Assistant Attorneys General
                                           Civil Litigation Division
                                           400 6th Street, NW
                                           Washington, D.C. 20001
                                           Phone: (202) 807-0371
                                           Email: pamela.disney@dc.gov

                                           *Counsel for Defendants*