**UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

| |
|---|
| BREAD FOR THE CITY, |
| Plaintiff, |
| v. |
| DISTRICT OF COLUMBIA, |
| Defendant. |

No. 1:23-cv-01945-ACR

**<u>AMICUS BRIEF IN SUPPORT OF DEFENDANT'S MOTION TO DISMISS</u>**

## TABLE OF CONTENTS

TABLE OF AUTHORITIES AND EXHIBIT LIST ........................................................................ i

INTEREST OF AMICUS CURIAE ............................................................................................. 2

ARGUMENT ............................................................................................................................... 3

    I.      Bread Fails to Plead Essential Facts to Establish Liability or Causation and
            Instead Makes a Policy Argument for this Court to Legislate ................................. 4

    II.     Liability Cannot Be Established Under an Inadequate Training Theory ................. 8

CONCLUSION .......................................................................................................................... 16

CERTIFICATE OF SERVICE .................................................................................................. 18

# TABLE OF AUTHORITIES AND EXHIBIT INDEX

## CASES

*Am. Council of the Blind v. Paulson*,
   525 F.3d 1256 (D.C. Cir. 2008) ........................................................ 8

*Baker v. Carr*,
   369 U.S. 186 (1962) ..................................................................... 6, 7

*Bates ex rel. Johns v. Chesterfield Cnty., Va.*,
   216 F.3d 367 (4th Cir. 2000) ........................................................ 13

*Board of County Comm'rs of Bryan County v. Brown*,
   520 U.S. 397 (1997) .................................................................. 9, 15

*Brooklyn Ctr. for Indep. of Disabled v. Bloomberg*,
   980 F.Supp.2d 588 (S.D.N.Y. 2013) ............................................ 8, 14

*City of Canton, Ohio v. Harris*,
   489 U.S. 378 (1989) ...................................................................... 12

*Clapper v. Amnesty Int'l USA*,
   568 U.S. 398 (2013) ........................................................................ 5

*Connick v. Thompson*,
   563 U.S. 51 (2011) ....................................................................... 15

*Haberle v. Troxell*,
   885 F.3d 170 (3rd Cir. 2018) ........................................................ 14

*Hainze v. Richards*,
   207 F.3d 795 (5th Cir. 2000) ........................................................ 11

*Henrietta D. v. Bloomberg*,
   331 F.3d 261 (2nd Cir. 2003) .......................................................... 8

*Hollandsworth v. City & Cnty. of Honolulu*,
   440 F.Supp.3d 1163 (D. Haw. 2020) ...................................... 15, 15 n. 3

*Japan Whaling Ass'n v. Am. Cetacean Soc'y*,
   478 U.S. 221 (1986) ........................................................................ 6

*Lujan v. Defs. of Wildlife*,
   504 U.S. 555 (1992) .................................................................... 4, 5

i

*Marbury v. Madison*,
　　5 U.S. 137 (1803)......................................................................................... 6

*Merritt v. Cty. of Los Angeles*,
　　875 F.2d 765 (9th Cir. 1989) ........................................................................ 15

*Monell v. Dep't of Social Servs. of N.Y.*,
　　436 U.S. 658 (1978)...................................................................................... 15

*Sacchetti v. Gallaudet Univ.*,
　　181 F.Supp.3d 107 (D.D.C. 2016) ............................................................. 8, 9

*Sanders v. City of Minneapolis, Minnesota*,
　　474 F.3d 523 (8th Cir. 2007) ........................................................................ 10

*Schorr v. Borough of Lemoyne*,
　　243 F.Supp.2d 232 (M.D. Pa. 2003) ....................................................... 13, 14

*Spokeo, Inc. v. Robins*,
　　578 U.S. 330 (2016)........................................................................................ 5

*Snyder v. United States*,
　　2023 WL 5000736 (D. Idaho Aug. 4, 2023)................................................ 15

*Thao v. City of St. Paul*,
　　481 F.3d 565 (8th Cir. 2007) ........................................................................ 11

*Waller v. City of Danville, Va.*,
　　515 F.Supp.2d 659 (W.D. Va. 2007) ...................................................... 11, 12

*Waller ex rel. Est. of Hunt v. Danville, Va.*,
　　556 F.3d 171 (4th Cir. 2009) ................................................................... 12, 13

## STATUTES

29 U.S.C. § 794............................................................................................................ 8

42 U.S.C. § 12132........................................................................................................ 8

D.C. Code § 5-103.01 .................................................................................................. 6

D.C. Code § 5-107.02 ............................................................................................. 2, 10

OTHER MATERIALS

Melissa Millar, Esq., *et al.*, *Re-Routing Behavioral Health Crisis Calls from Law Enforcement to the Health System* (May 2021) https://www.dchealthmatters.org/content/sites/washingtondc/Re-Routing_Crisis_Response_white_paper_May_2021.pdf) ................................................... 16 n. 3

MPD General Order GO-SPT-302.01 (https://go.mpdconline.com/GO/GO_302_01.pdf) (Exhibit 1) ........................................................................................................................................ 7

MPD General Order GO-OPS-308.4 (https://go.mpdconline.com/GO/GO_308_04.pdf) (Exhibit 2) ................................................................................................................................... 7, 10

EXHIBIT INDEX

Exhibit 1:          MPD General Order GO-SPT-302.01

Exhibit 2:          MPD General Order GO-OPS-308.4

**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| BREAD FOR THE CITY,<br><br>       Plaintiff,<br><br>v.<br><br>DISTRICT OF COLUMBIA,<br><br>       Defendant. | Civil Action No.  1:23-cv-01945-ACR |

**<u>AMICUS BRIEF IN SUPPORT OF DEFENDANT'S MOTION TO DISMISS</u>**

Plaintiff Bread for the City ("Bread") is a not-for-profit organization whose mission is "to ensure under-resourced D.C. residents can access basic needs." Compl. at ¶141.  Using the Americans with Disabilities Act and Section 504 of the Rehabilitation Act, Bread challenges the use of Metropolitan Police Department ("MPD") officers as first responders to calls for service for a mental health crisis.  Significantly, Bread does not claim in the Complaint that MPD officers are not trained to respond to calls involving a person experiencing a mental health crisis. Instead, the Complaint alleges that MPD officers are indeed trained to respond to such calls, however, it contends that the training is inadequate and more often has a negative outcome when compared with an unarticulated, hypothetical alternative.

The Complaint expressly states that "MPD officers receive limited training on interacting with civilians during mental health crises. . . ." Compl at ¶53, ¶45.  The Complaint further admits that the "most advanced training MPD offers on responding to mental health emergencies is its Crisis Intervention Officer training course . . . that lasts only 40 hours." *Id*. at ¶46-47.  This 40-

hour training is claimed to be inadequate when compared with the 80.5 hours of classroom instruction and 80-hour field practicum that the D.C. Department of Behavioral Health requires individuals to undergo to become certified peer support specialists. *Id*. at ¶48-52.

Bread also takes issue with the content and approach to training that is employed by the MPD for interacting with persons experiencing mental health crises, mainly through reference to an anonymous police officer's personal observations. *Id*. at ¶54-70. As an odd contrast, the Complaint alleges that as a result of delays in the response times to mental health crisis calls for service, "Bread staff effectively serve as first responders for mental health emergencies at its sites." *See* Compl. at ¶162. To do so, "Bread provides a six-hour de-escalation training to employees in all departments, including departments outside the social services and medical departments (such as development and administration) so that all staff can treat people in crisis with dignity and assist in providing care if needed." *See* Compl. at ¶162.

Not surprisingly, Bread considers its own "de-escalation training" to be appropriate to prepare its own staff for a mental health crisis response, but fails to make any mention of the independent, annual mental health and de-escalation training that the MPD provides to all of its officer that is outside of and beyond the admitted mental health response training Bread cites in its Complaint as inadequate. *See* D.C. Code §5-107.02(b)(3) & (5) (mandating 32 hours of mandatory annual training for MPD officers to include training on de-escalation tactics and mental health).

## <u>INTEREST OF *AMICUS CURIAE*</u>

*Amicus curiae* is the exclusive representative of all police officers, sergeants, investigators, detectives, and detective sergeants of the D.C. Metropolitan Police Department and is comprised of approximately 3,400 members. The challenge at issue in this case centers

around the response by MPD police officers to mental health related calls for service.   Any ruling of this Court has the potential to impact the job responsibilities, risks and exposure of the members of the D.C. Police Union.  In addition, the D.C. Police Union has a unique perspective that it believes can assist the Court in reaching a correct and appropriate resolution of this matter.  In fact, most of the allegations in the Complaint are aimed at the training, conduct and practices of D.C. Police Union members, who are the front line first responders providing the emergency services at issue.  The Plaintiff has recognized that the D.C. Police Union is invested in the outcome of this litigation and the parties jointly stipulated, with the approval and an Order of this Court, for the appointment of the D.C. Police Union as *amicus curiae* and to permit the submission of this brief.  *See* ECF Document 36.

## **ARGUMENT**

Bread argues that the District's emergency response program violates both the American with Disabilities Act as well as Section 504 of the Rehabilitation Act.  In Bread's view, the District's default first responders for *physical* health emergencies are paramedics and EMT's "who have the skills and training to provide an adequate response," but the default first responders for *mental* health emergencies are MPD officers "who do not have the skills and training to provide an adequate response."  Complaint at ¶ 197.  (emphasis added).  As a result of this alleged inadequate training, Bread claims the District is "denying qualified individuals with disabilities and equal opportunity to benefit from" the District's emergency response program in violation of Title II of the ADA and Section 504 of the Rehabilitation Act. Complaint at ¶ 197.

The D.C. Police Union's position is that Bread has deliberately avoided asserting an associational standing claim because it would focus the Court on the underlying facts of the police-related interactions with its members and whether they rise to the level of an ADA

3

violation.  Foremost, there is nothing that would prevent these individuals from asserting ADA violations in their own right under the ADA.  However, in order for those individuals to convey associational standing to Bread, each individual would have to state a viable ADA claim under the inadequate training theory advanced by Bread.  Moreover, even if the theory was permitted by this Court, the individuals would be required to establish the alleged inadequacies of training were the legal cause of the injury to each identified person.

Bread has attempted to avoid the burdens that are plainly imposed by avoiding a claim based on associational standing.  Bread is not a person with a disability, and despite proceeding under an organizational standing argument, it is still required to prove that a person with a disability has been discriminated against in violation of the ADA.  Bread is also required to prove that this discrimination was an independent legal cause of harm to the person as well as its organization.  The facts alleged in the Complaint cannot establish either element required for Bread's Complaint to survive the District's motion to dismiss.

Even if this Court allows the case to proceed on Bread's organizational standing claim, it must still address whether its theories of liability and causation are viable.  Liability under the ADA and the Rehabilitation Act cannot be established under an inadequate training theory.  As Courts have almost universally recognized, claims of inadequate training fail because they are tenuous and establishing causation is not possible.  Parties advancing inadequate training claims invariably pose a host of alternative responses to the police response at issue that would cause Court's to engage in impermissible guesswork.

## I.      Bread Fails to Plead Essential Facts to Establish Liability or Causation and Instead Makes a Policy Argument for this Court to Legislate

In order to maintain a lawsuit a party must have suffered an injury in fact.  *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560 (1992).  To establish injury in fact, a plaintiff must "show that

[they] suffered 'an invasion of a legally protected interest' that is 'concrete and particularized' and 'actual or imminent, not conjectural or hypothetical.'" *Spokeo, Inc. v. Robin*s, 578 U.S. 330, 339 (2016) (citing *Lujan* at 560).  Failing to do so jeopardizes the government's balance; it threatens to shift policy-making powers away from political entities and towards the courts. *Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 408 (2013) (internal citations omitted).

Bread makes generalized claims relating to the MPD's mental health training throughout its pleading.  Bread cites opinions and second-hand knowledge to bolster its Complaint, but ignores its burden to plead the necessary underlying facts to state a viable cause of action.  For example, Bread cites statistics from a host of studies to support its position that police are inappropriate first responders.  *Id*.  Bread relies on academic journals, Department of Justice investigations, reports from various advocacy organizations and interviews conducted by others as their main authorities.  Complaint at ¶30-41.

Bread, however, does not allege any facts personal to a specific person who has a disability who was caused to suffer harm but for the response of an MPD officer.  The closest Bread comes to doing so is mentioning several anonymous cases occurring in the District of Columbia and expressing that the circumstances created an undesirable outcome.  There is no allegation that but for the alleged inadequate training a different result would have occurred. There is no allegation that but for the police response the incident would not have resulted in the same outcome.  Even if these facts can be inferred, there is no allegation that these actions were done with any intent, awareness, or deliberate indifference by the officers involved to cause harm to the individuals involved or Bread's financial interests.  There is no allegation of any notice that Bread provided to the MPD of its financial claim of harm from its perceived need to divert its resources.  Instead, Bread's Complaint offers policy suggestions as to why it believes the

5

District's emergency response should be different, it does not offer facts sufficient to obtain relief from this Court.

Some questions, by their very nature, are political and non-justiciable. *Marbury v. Madison*, 5 U.S. 137, 170 (1803). The political question doctrine prevents courts from reviewing controversies centered around public policy choices "committed for resolution" to the legislature or the executive branch. *Japan Whaling Ass'n v. Am. Cetacean Soc'y*, 478 U.S. 221, 230 (1986). The doctrine is intended to constrain the judiciary and ensure the appropriate separation of powers. *Baker v. Carr*, 369 U.S. 186, 217 (1962). The Supreme Court has explained that a claim is non-justiciable when there is:

> [1] a textually demonstrable constitutional commitment of the issue to a coordinate political department; or [2] a lack of judicially discoverable and manageable standards for resolving it; or [3] the impossibility of deciding without an initial policy determination of a kind clearly for nonjudicial discretion; or [4] the impossibility of a court's undertaking independent resolution without expressing lack of the respect due coordinate branches of government; or [5] an unusual need for unquestioning adherence to a political decision already made; or [6] the potentiality of embarrassment from multifarious pronouncements by various departments on one question.

*Id*. Independent resolution of Bread's underlying claims would "express a lack of respect . . . [towards] branches of [the District of Columbia's] government." *See Id*.

The Mayor of the District is conferred broad executive powers, most fundamentally to protect the public health and safety. *See e.g.*, D.C. Code Ann. § 5-103.01 (permitting "[t]he Mayor . . . to cause to be collected into compact form all the laws and ordinances in force in the District having relation and applicable to police . . . and to publish the same in a form easily accessible to all members of the community as the Police Code of the District."). As the District's Motion to Dismiss makes clear, the D.C. Council has enacted a statutory regime establishing multiple agencies that handle and coordinate calls for emergency service, including

calls involving citizens experience a mental health crisis.  The Mayor is charged with governing these various executive agencies and implementing the statutory framework of the Council's emergency response network.  The Mayor has delegated the power of carrying out these laws and regulations to the MPD, which carries them out through written directives, including General Orders.  The MPD has enacted General Orders pertaining to calls for emergency service that impose duties and obligations on members of the MPD to respond to such calls for service.  *See* **Exhibit 1** GO-SPT-302.01;[1] **Exhibit 2** GO-OPS-308.4.[2]  General Order 302.01 establishes that Office of Unified Communications' dispatchers receive 911 calls and then assign those calls to the MPD based on the perceived severity of the call.  When those calls involve mental health consumers, General Order 308.04 regulates the conduct of officers, providing a detailed framework for the officers in their response as well as the providing the additional mental health resources available to assist in such calls.

General Order 308.04 establishes the procedures and policy for the "processing and disposition of suspected mental health consumers coming into contact with members of [the MPD]."  For example, the General Order guides MPD members "to work with the Department of Behavioral Health" and handle interactions with mental health consumers "in a manner which reflects sensitivity." *Id*.  Bread's Complaint ignores the complex involvement and interaction of these agencies and the balance struck by the D.C. Council and the Mayor in structuring the most appropriate response to emergency calls involving mental health crises.  Bread's Complaint seeks to re-write these laws, rules and regulations, which is inherently political and unsuitable for judicial review. *See Baker* at 217.

---

[1] https://go.mpdconline.com/GO/GO_302_01.pdf
[2] https://go.mpdconline.com/GO/GO_308_04.pdf

II.     <u>**Liability Cannot be Established Under an Inadequate Training Theory.**</u>

Several courts have explicitly found that the ADA does not apply where a plaintiff alleges that a locality failed to adequately train its police officers and, in doing so, excluded or denied the benefits of a public service to the plaintiff.  In *Sacchetti v. Gallaudet Univ.*, plaintiffs sued Gallaudet University and the District of Columbia and alleged that the MPD failed to accommodate their deaf son's disability by handcuffing him and neglecting to contact a mental health care provider to transport him to a mental health facility.  181 F. Supp. 3d 107, 114 (D.D.C. 2016).  Plaintiffs asserted a "failure to train" theory of liability.  They alleged the District failed to properly train its officers and personnel for encounters with disabled persons and failed to modify or implement its police policies, procedures, and training, which resulted in discriminatory treatment.  *Id*. at 130. (internal citations omitted).

In *Sacchetti*, this Court observed that "even assuming a cause of action for failure to train under the ADA," the plaintiffs did not have a viable ADA claim.  *Id*. at 131.  The *Sacchetti* Court applied the "deliberate indifference" standard, which requires "proof that a municipal actor disregarded a known or obvious consequence of his action."  *Board of County Comm'rs of Bryan County v. Brown*, 520 U.S. 397, 410 (1997).  *Id.*  The Court made note of the plaintiff's various allegations of the District failing "to have created, drafted, adopted, modified and/or implemented policies and a training program to provide officers with tools and resources to handle individuals with disabilities, such as mental illness and deafness."  *Id.* at 131.

The Court determined that in order to state a claim, the plaintiffs would have to allege that the District knew or should have known that the MPD's handling of the matter at issue and the types and categories of disabled individuals "would likely violate the ADA, and yet failed to act."  This Court rejected the plaintiffs' failure-to-train theory, holding: "The plaintiffs'

allegations here suggest that the District should have proactively created such tools and resources, but such an allegation does not rise to the level of deliberate indifference." *Id.* Ultimately, the *Sacchetti* Court ruled that the "plaintiffs' failure-to-train allegations are insufficient to state a claim for relief under the ADA."

Unlike the claims advanced in *Sacchetti*, the pleadings in this case establish that Bread is far from meeting its burden to plead facts sufficient to withstand a motion to dismiss.  Foremost, Bread does not contend that the District knew of the specific interactions that MPD officers encountered at its facilities that it claims were unfavorable, was aware of the interruptions that such interactions caused to Bread's operations, and that the MPD failed to adopt policies to avoid harm to Bread's clients or the disruption to Bread's services.  In fact, there is no allegation in Bread's Complaint that the District or members of the MPD acted with deliberate indifference towards Bread, Bread's client's or any of Bread's interests.

Bread fails to make any allegation of deliberate indifference because there is no factual basis or support for such a contention.  Even though the *Sacchetti* Court held that the District is not obligated to proactively create tools and resources to meet the obligations under the ADA, there is ample evidence in this case that such tools and resources exist.  Bread admits that MPD officers are trained to deal with mental health consumers.  Moreover, this Court can take notice of the District Code sections mandating 32 hours of annual training for all MPD officers in the areas of mental health and de-escalation.  *See* D.C. Code §5-107.02(b)(3) & (5) (mandating 32 hours of mandatory annual training for MPD officers to include training on de-escalation tactics and mental health).  Moreover, the MPD's publicly-available General Orders establish that the MPD and its members have ample tools and resources at their disposal for their interactions and calls for service the involve mental health consumers.  *See* **Exhibit 2**, General Order 308.04.

Other courts have considered and flatly rejected the inadequate training theory under the ADA.  In a case involving the use of force against a person suffering from bipolar disorder, the Eighth Circuit rejected an inadequate training argument as the basis for an ADA violation.  *See Sanders v. City of Minneapolis, Minnesota*, 474 F.3d 523, 527 (8th Cir. 2007).  The *Sanders* Court considered the facts presented and found that the individual's attempt to injure responding officers precipitated the dangerous situation, not the City of Minneapolis's failure to train its officers.  *Id*.  On the crucial element of causation, the *Sanders* Court reasoned that "[i]t was not the City's failure to train its officers, but Alfred's apparent attempt to run over the officer that precipitated the shooting."

Similarly, in *Thao v. City of St. Paul*, 481 F.3d 565, 568 (8th Cir. 2007), the Court refused to find liability under a failure to train theory where the City of St. Paul provided its police officers with *some* ADA training and "[p]laintiffs . . . failed to demonstrate that more 'adequate' training to accommodate the mentally ill would [require] a different response" than that which occurred.  The *Thao* Court ruled that the inadequate training claim failed because the police did not "create a dangerous situation" at issue and there is no way the plaintiff could prove that "the police would have responded differently had they received other training under the ADA."  *Id*. at 569.

In *Hainze v. Richards*, 207 F.3d 795 (5th Cir. 2000), the Fifth Circuit rejected an argument that a local police department's "policy of treating mental health calls identical to criminal response calls and those not involving people with mental disabilities resulted in [the plaintiff's] discriminatory treatment."  *Id.* at 801.  In the *Hainze* Court's view, requiring officers to consider whether their case-specific responses comply with the ADA before even having a chance to assess the danger of a given situation would pose an unneeded safety risk to both

officers and the public at-large.  *Id*.  The court doubted that Congress intended to prioritize the objectives of the ADA "at the expense of the safety of the general public."  *Id*.

Similarly, the United States District Court for the Western District of Virginia, did not find "[any] basis in the Act's text" to support a claim based on failure to train.  *Waller v. City of Danville, Virgina*, 515 F. Supp. 2d 659, 665 (W.D. Va. 2007).  In the *Waller* Court's view, a violation of Title II cannot occur until a person has been "excluded from or denied participation in, or the benefits of, a public entity's service."  *Id*.  This intrinsically occurs *after* a government agent's training, not before or during.  *Id*.  Any claimed "failure" in training could not "equate to a specific act of intentional discrimination" against an individual with a mental health disability by itself, there must be more.  *Id*.

Even if such a claim were viable, a plaintiff would need to make a threshold showing that such a failure in training was the proximate cause of any injury.  *See id*. at 665; *see also City of Canton, Ohio v. Harris*, 489 U.S. 378, 379 (1989) ("[plaintiff] must still prove that the deficiency in training actually caused the police officers' indifference to her medical needs").  As the *Waller* Court reasoned, "to hold otherwise would be to command police everywhere to retain a psychiatrist or social worker to take the first crack at every hostage situation, no matter the threat to life or limb.  Neither the text nor [the] intent of the [ADA] contemplates such commandeering of police authority in life threatening situations."  *Id*. at 664-665.

In *Waller*, the Fourth Circuit did not reach the "failure to train" issue on appeal; however, the appellate court analyzed the plaintiff's argument that alternative actions were available, contending that the officers could have called "mental health professionals."  *Waller ex rel. Est. of Hunt v. Danville, VA*, 556 F.3d 171, 175 (4th Cir. 2009).  In the instant case, Bread's claims are premised on an unspecified, subjective category of calls Bread desires to be re-directed to

mental health providers to avoid a police response.  The Fourth Circuit's observations in *Waller*

found the same premise to be "problematic" for several reasons that are equally applicable to the

claims brought by Bread, observing:

> First, it would be unclear to officers which of plaintiff's various
> alternatives they would be required to pursue.  Officers would be
> second-guessed for pursuing one over the other, on grounds that
> there was always something more or different that could have been
> done.   Moreover, the delay involved in getting the proper
> professionals or medications or determining which family member
> to call, for instance, might itself be considerable.  *See, e.g., Bates*,
> 216 F.3d at 372.  As to mental health professionals, it is unclear even
> now which or how many professionals should have been called or
> what the officers were required to permit them to do once they
> arrived.  Officers were likewise in no position to know what sort of
> relationships existed within [decedent's] family, and if they had
> called to the scene a family member from whom [the decedent] was
> alienated or estranged, they could have escalated the situation rather
> than defusing it.  As for medications, there is no indication that [the
> decedent] would have taken medicines the police or anyone else
> provided.  Officers in particular are not trained as medical doctors,
> and nothing in the record suggests that they knew which medications
> [the decedent] should take, whether he had recently taken
> medications, or what dosage would be appropriate, or that they
> could have easily obtained the relevant medical information while
> monitoring [bystander] safety as well as their own. Given the
> circumstances of the standoff, we believe the sorts of suggestions
> proposed by plaintiff go beyond what is meant by "reasonable
> accommodation." *See Hainze*, 207 F.3d at 801–02.

*Id*. at 176

The Fourth Circuit in *Waller* expressly stated: "we do not reach the question of whether

the ADA supports a claim for failure to train."  *Waller v. Danville,* 556 F.3d 171, 177 n.3 (4th

Cir. 2009).  However, the Fourth Circuit recognized that "[w]hile plaintiff attempts to pose

training in dealing with those with mental health problems as an 'accommodation,' it is well-

settled that the failure to train must have caused some violation of law for an action against a

municipality to lie." (citing *City of Canton v. Harris*, 489 U.S. 378, 388 (1989); *Bates ex rel.*

*Johns v. Chesterfield Cnty., Va.*, 216 F.3d 367, 373 n.3 (4th Cir. 2000)).  It is noteworthy that outside of the ADA and Rehabilitation Act claims, Bread does not allege an independent violation of the law.

Conversely, in *Schorr v. Borough of Lemoyne*, the Middle District of Pennsylvania recognized an ADA claim based on failure to train theory.  243 F. Supp. 2d 232 (M.D. Pa. 2003).  According to the *Schorr* Court, it was "irrelevant" whether an ADA claim existed on the day of an arrest because the purported injury "occurred well before that day, when the . . .  policy makers failed to institute [policies] to accommodate disabled individuals . . . ." *Id*. at 238.  The *Schorr* Court found that the text of the ADA, a 1991 Department of Justice summary within the Federal Register, a statement made by the House Judiciary Committee, and notes by the House Committee on Education and Labor together indicated that the ADA should be interpreted broadly.  *Id.* at 236-37.

The *Schorr* Court's overly-broad interpretation was rightly criticized by the Third Circuit in *Haberle v. Troxell*, 885 F.3d 170 (3d Cir. 2018).  The Third Circuit explained that the reasoning in *Schorr* was "incompatible" with the ADA's text.  *Id*. at 179 n. 7.  The Third Circuit reasoned that a locality's failure to train is not, by itself, actionable under the ADA unless it directly leads to "the denial of a needed accommodation or improper discrimination," therefore, violations cannot occur *before* a specific incident between a person and the police.  *Id*.  The *Haberle* Court explained that when such an interaction occurs, the facts surrounding that incident "must be the focus of attention," not the training policies instituted.  *Id*.

The text of both Title II and Section 504 prohibit those with disabilities from being "excluded from the participation in [or] denied the benefits of" a public entity's services *Brooklyn*, 980 F. Supp. 2d 588, 639 (S.D.N.Y. 2013).  Based on this language, an ADA claim

will fundamentally arise *after* an exclusion or denial from the benefits of an existing "service" takes place, not before.  An ADA violation cannot occur absent an interaction between an individual and a government actor relating to a public service.  *Haberle* at 179 n. 7.  These facts and claims are not alleged as the basis of the Bread's Complaint, instead the Bread seeks to avoid pleading and providing such underlying facts when it avoids making an associational standing argument.

When courts have found ADA failure to train claims cognizable, the *Monell* framework has been applied, as was implicitly acknowledges by Judge Walton's application of the deliberate indifference standard in *Sacchetti*.  *See Snyder v. United States*, No. 1:23-CV-00176-BLW, 2023 WL 5000736, at *2 (D. Idaho Aug. 4, 2023) (citing *Monell v. Department of Social Services of New York*, 436 U.S. 658 (1978)).  To survive dismissal under this framework, a plaintiff must allege facts to show that "(1) the existing training program is inadequate in relation to the tasks the [police] officers must perform; (2) the failure to train amounts to deliberate indifference to the rights of persons with whom the police came into contact; and (3) the inadequacy of the training actually caused the deprivation of the alleged . . . right." *Hollandsworth v. City & Cnty. of Honolulu*, 440 F. Supp. 3d 1163, 1181 (D. Haw. 2020) (citing *Merritt v. Cty. of Los Angeles*, 875 F.2d 765, 770 (9th Cir. 1989)).  The deliberate indifference standard of prong two requires proof that a public entity "disregarded a known or obvious consequence of [its] action." *Bd. of Cnty. Comm'rs of Bryan Cnty., Okl. v. Brown*, 520 U.S. 397, 410 (1997).  Courts have observed that a municipality's culpability for a deprivation of rights is at its most tenuous" when a claim rests upon a failure to train theory.  *Connick v. Thompson*, 563 U.S. 51, 61 (2011); *Hollandsworth v. City & Cnty. of Honolulu*, 440 F. Supp. 3d 1163, 1181 (D. Haw. 2020).

Applying the *Monell* framework to the face of the Complaint, Bread fails to allege facts in support of prongs two and three.[3]   Bread fails to allege in its pleading that the District acted with deliberate indifference towards an obvious consequence of MPD's mental health training. Similarly, Bread avoids the scrutiny of alleging facts to show that MPD's mental health training has actually caused the deprivation of any rights of a person with a disability by limiting its Complaint to claims on its own behalf, as opposed to alleging associational standing on behalf of its clients.   Given the extensive MPD General Order detailing the resources available to MPD officers dealing with mental health consumers, combined with the statutorily mandated 32 hours of annual training involving mental health and de-escalation, as well as the 40 hour Crisis Intervention Officer training available to MPD officers, Bread could not in good faith cure this pleading defect by alleging a claim of deliberate indifference.   As such, even if this Court considers the failure to train theory as viable and justiciable, it should dismiss the case for failure to state a claim due to these pleading deficiencies.

---

[3] Applying careful scrutiny to the allegations in the Complaint, this Court could likely conclude that the Complaint is insufficient to demonstrate the first prong, namely that "(1) the existing training program is inadequate in relation to the tasks the [police] officers must perform." *Hollandsworth* at 1181.  Bread contends throughout its Complaint that MPD officers "do not have the skills and training to provide an adequate response" to mental health emergencies.  *See generally* Complaint.  Bread relies solely upon a 2021 report issued by the D.C. Health Matters Collaborative and apparent statements made by a single, anonymous MPD officer for its factual allegations related to the MPD;s mental health training.  Complaint at ¶39-41; ¶47; ¶53; ¶55; ¶70.

In 2021, D.C. Health Matters published a report focusing on the District's emergency response system. D.C. Health Matters is a non-profit coalition of participating health networks and hospitals that aim to "assess and address community needs in the District of Columbia."  D.C. Health Matters Collaborative Report at 2.  Plaintiff Bread for the City is a participating organization within D.C. Health Matters.  *Id*.  In its 2021 report, without citation and in a single sentence, D.C. Health Matters describes the Crisis Intervention Officer (CIO) training within MPD as a one-time, forty-hour training that focuses on mental health education and de-escalation techniques.  *Id*. at 19. Neither the report nor the Complaint provide any additional details of this training before characterizing it as "surface level" and inadequate for "true skill-building." Complaint ¶48 (citing D.C. Health Matters Collaborative Report at 19).

Bread then turns to the apparent statements of a single, unidentified MPD officer who allegedly completed MPD's CIO training.  Complaint at ¶53. According to the anonymous source, MPD officers are taught to take a "command and control mentality" wherein they "prepare to defend themselves," keep "at the ready . . . to use force," and avoid "open, non-threatening stance[s] when interacting with people experiencing a mental health crisis."  *Id*. Again, Bread provides no additional details beyond this for its conclusory allegations of inadequate training.

## **CONCLUSION**

Bread's choice to artfully plead around associational standing to avoid demonstrating meritorious and viable underlying claims is fatal to the Complaint.  Bread does not allege that it has been denied a service.  Bread's theory of inadequate training fails as a matter of law because the harm caused to its organization is even more tenuous.  Bread must prove that the mere presence and response of a police officer to a call to its facility for service caused the person receiving service to consume more of their resources rather than the mental health crisis itself being the cause of the increase expenditure of resources.  Under this theory, Bread must also prove that the responding officers and the MPD were deliberately indifferent to the clients of Bread's that they were called upon to address as well as the impacts that their mere presence had on Bread's resources.

Bread's theory of liability should be rejected.  The theory ignores the text of both Title II of the ADA and Section 504 Rehabilitation Act, shifts policymaking to the judicial branch, and creates an unnecessary risk to public safety.  Bread is not a qualified individual with a disability denied services by reason of its disability.  Instead, it is attempting to serve as a proxy for its clients who Bread suggests are qualified individuals with disabilities who have been illegally discriminated against by virtue of having what Bread perceives as less qualified individuals handling their mental health crisis calls for service.  Bread has fashioned its case ignoring these essential elements to seek a ruling that would have a broad programmatic impact.  Even if Bread can pass the District's standing analysis, Courts are prohibited from engaging in such sweeping forays.

For the reasons presented above, *amicus curiae* support Defendant District of Columbia's Motion to Dismiss.

Respectfully submitted,

/s/ Anthony M. Conti
Anthony M. Conti (D.C. Bar No. 479152)
Daniel J. McCartin (D.C. Bar No. 976580)
Aleksander J. Stathakis (D.C. Bar No. 90014700)
CONTI FENN LLC
36 South Charles Street, Suite 2501
Baltimore, Maryland 21201
Tel. (410) 837-6999
Fax: (410) 510-1647
tony@contifenn.com
dan@contifenn.com
alek@contifenn.com

*Counsel for Amicus Curiae*
*D.C. Police Union*

## CERTIFICATE OF SERVICE

I hereby certify that on this 26th Day of January 2024, a copy of the foregoing was served

via the Court's CM/ECF system on:

Michael Perloff
Scott Michelman
AMERICAN CIVIL LIBERTIES UNION
FOUNDATION OF THE DISTRICT OF COLUMBIA
915 15th Street, N.W., 2nd Floor
Washington, D.C. 20005
(202) 601 – 4278
mperloff@acludc.org
smichelman@acludc.org

Ashika Verriest
Brian Dimmick
Susan Mizner
Jenn Rolnick Brochetta
West Resendes
AMERICAN CIVIL LIBERTIES UNION
FOUNDATION
125 Broad Street
New York, New York 10004
(240) 676 – 3240
averriest@aclu.org

Daniel L. Brown
Steven Hollman
Nikole Snyder
Calla N. Simeone
SHEPPARD, MULLIN, RICHTER
& HAMILTON LLP
2099 Pennsylvania Avenue, N.W.
Suite 100
Washington, D.C. 20006
(202) 747 – 1941
Dbrown@sheppardmullin.com

*Counsel for Plaintiff*

Pamela A. Disney
Brendan Russell Heath
OFFICE OF THE ATTORNEY GENERAL FOR
THE DISTRICT OF COLUMBIA

400 Sixth Street, N.W.
Suite 10100
Washington, D.C. 20001
(202) 442 – 9880
Pamela.disney@dc.gov
Brendan.heath@dc.gov

*Counsel for Defendant*

*s/ Anthony M. Conti*
Anthony M. Conti (D.C. Bar No. 479152)