# Exhibit 1

# GENERAL ORDER



**DISTRICT OF COLUMBIA**

| Subject | | |
|---|---|---|
| **Calls for Service** | | |
| Topic | Series | Number |
| SPT | 302 | 01 |
| Effective Date | | |
| **February 28, 2023** | | |
| Replaces: GO-SPT-302.01 (Calls for Service), Effective Date February 16, 2022 | | |
| Related to: GO-SPT-302.09 (Use and Operation of Mobile Data Computers) GO-SPT-401.01 (Field Reporting System) | | |
| Rescinds: CIR-16-04 (Barring Notices), Effective Date June 9, 2016 | | |

| I. | Purpose | Page | 1 |
|---|---|---|---|
| II. | Procedures | Page | 1 |
| II.A | Classifying Calls for Service | Page | 1 |
| II.B | Call Signs | Page | 2 |
| II.C | Operating Emergency Vehicles | Page | 3 |
| II.D | Use of Emergency Warning Devices | Page | 3 |
| II.E | Responding to Radio Assignments | Page | 4 |
| II.F | Mandatory Reporting and Broadcast | Page | 5 |
| II.G | Code 10-33 (Officer in Trouble) | Page | 5 |
| II.H | Officer-Involved Incidents | Page | 5 |
| II.I | Foot Pursuits | Page | 5 |
| II.J | Family Disputes | Page | 8 |
| II.K | Fire Scenes | Page | 8 |
| II.L | Fire Safety Hazards | Page | 9 |
| II.M | Medical Assistance | Page | 9 |
| II.N | Overdose Response and the Good Samaritan Law | Page | 12 |
| II.O | Hospital Courtesy | Page | 14 |
| II.P | Disorderly Conduct (Noise at Night) | Page | 15 |
| II.Q | Barring Notices | Page | 15 |
| II.R | Training | Page | 16 |

## I. PURPOSE

The Metropolitan Police Department (MPD) allocates resources in a manner that expeditiously addresses the most serious calls, while accepting all calls for service in a manner that treats community members fairly, equitably, and with concern. The policy of the MPD is to provide the appropriate law enforcement service in all cases that are, or may be, of a legitimate law enforcement nature.

## II. PROCEDURES

A. Classifying Calls for Service

1. When information is received that requires dispatching a mobile unit, the Office of Unified Communications (OUC) dispatcher receiving the call will determine the classification in accordance with OUC procedures.

2. The OUC computer-aided dispatch (CAD) system automatically assigns calls for service as priority one, priority two, or priority three based on the call type. The OUC member or the district watch commander may upgrade the priority, if necessary.

| Assignment Classifications | |
|---|---|
| Priority one | Calls that require an expeditious response. |
| Priority two | Calls that do not pose an immediate threat to the safety of any person. |
| Priority three | All other calls (e.g., traffic complaints, crash reports). |

3. If OUC determines the call is a priority one assignment, the dispatcher will broadcast an alert tone to notify field units of a priority one assignment within their patrol district. Members shall cease all but emergency radio transmissions and standby for dispatch of the priority one assignment. A supervisor shall respond to all priority one assignments.

4. Members are able to self-assign priority 2 and priority 3 calls for service to the member's unit without going over the radio. When safe to do so, members shall monitor their mobile data terminal (MDT) and use this option to take calls for service within their police service area (PSA).

B. Call Signs

1. Members shall log in with their MPD call sign using their MDT or the mobile application on their department-issued cell phone when beginning their shift. Call signs are standardized, and the assigned member's individual profile includes his or her certifications.

2. Members shall ensure that call signs are precisely entered and all of their certifications are properly recorded when coming in-service. A comprehensive list of all call signs is located on the MPD intranet home page.

3. If a member is unable to log in by MDT or cell phone, he or she shall notify an official to request approval to use the radio to log in and call the OUC Help Desk (202-373-3737) before the end of the shift to request technical assistance. Any non-functioning MDTs shall be reported to OUC for repair or replacement.

4. Members requiring a new call sign that is not currently in existence shall submit a written request to their bureau head through their chain of command. The request shall include the reason for the new call sign request.

    a. Approved requests shall be forwarded to the MPD OUC liaison.

    b. The OUC liaison shall implement the new call sign and inform the requesting member.

5. Following roll call, supervisors shall ensure that all units are in-service and monitor unit statuses throughout the shift.

6. Watch commanders shall ensure that the roll call is submitted to the OUC operations team (911ops@dc.gov) and the Command Information Center (CIC) (mpdcic@dc.gov) at the beginning of each shift. Watch commanders shall also ensure that supervisors monitor unit statuses throughout the shift.

C. Operating Emergency Vehicles

1. Members shall respond swiftly to emergencies, keeping in mind that it is equally important to reach the destination safely. Members shall exercise extreme caution in the area of schools, at intersections, and other locations where a potential danger may arise to the public or to any other law enforcement member.

2. Members operating department vehicles as emergency vehicles shall:

   a. Activate all required emergency warning devices, turn on headlights regardless of the time of day, ensure that seatbelts are securely fastened, and open both front windows so that the driver can hear other units responding to the area and to avoid a collision.

   b. Comply with the following traffic regulations:

   | Traffic Regulations |
   |---|
   | (1) When approaching an intersection controlled by electric signal devices, stop before entering the intersection when facing a red signal; slow to the maximum legal speed limit when a green signal or a flashing yellow signal is displayed; and stop before entering an intersection where four-way pedestrian walk signals are displayed. |
   | (2) When approaching an intersection controlled by a stop sign, stop before entering the intersection. |
   | (3) When approaching an uncontrolled intersection or an intersection controlled by yield signs, slow to the maximum legal speed limit before entering the intersection and comply with all other requirements applicable to uncontrolled intersections or intersections controlled by yield signs. |

   c. When responding to an assignment, operate at a speed that is no greater than 10 miles per hour in excess of the posted or prima facie speed limit, except when in pursuit of a fleeing felon in accordance with GO-OPS-301.03 (Vehicle Pursuits).

D. Use of Emergency Warning Devices

1. Members operating department vehicles shall make minimum use of emergency warning devices consistent with the safe performance of police functions, and shall request OUC authorization prior to activating emergency warning devices, except as indicated below:

   | Emergency Warning Devices |
   |---|
   | a. When assigned to priority one calls. |
   | b. When, in the opinion of the member, an emergency exists or is imminent, the activation of emergency warning devices is necessary to protect life or render |

|   |                                                                                                              |
|---|--------------------------------------------------------------------------------------------------------------|
|   | necessary police aid, and the situation is such that contacting OUC is impractical or impossible.           |
| c.| When conducting a traffic stop.                                                                              |
| d.| As directed by an official.                                                                                  |

2. In instances when OUC is not aware of the member's use of emergency warning devices, the member shall contact OUC at the first opportunity and advise the dispatcher of the circumstances surrounding the use of emergency devices.

3. Members who operate emergency vehicles shall deactivate all emergency warning devices immediately upon arrival at the scene of a call or when the need for the activation of warning devices ceases.

E. Responding to Radio Assignments

1. Units dispatched to respond to priority one assignments will be designated as primary or secondary response units by OUC.

   a. Primary units shall respond directly to the reported location of the call by the most direct route, using emergency lights and sirens to assist in a safe and swift response to the reported emergency. Primary units shall use the wail position on the siren selector.

   b. Secondary units shall respond to the area of the assignment using appropriate emergency lights and sirens to assist in a safe and swift response to the reported emergency. Secondary units shall use the yelp position on the siren selector. Upon arrival on-scene, secondary units shall notify the dispatcher if more units are needed and establish a perimeter for the purpose of apprehending escaping violators and providing support for primary units in the event the incident escalates.

2. Units selected to respond to priority two and priority three assignments shall respond to the assigned location by the most direct route, complying with District of Columbia traffic regulations and shall not use emergency warning devices. The first member on the scene shall advise OUC if additional assistance is needed or when no further assistance is necessary.

3. Upon arrival, members shall ensure that on-scene notification is reported to the dispatcher by marking their arrival using the MDT, mobile application, or by radio and handle the scene in accordance with MPD policy and procedures including, but not limited to, GO-SPT-401.01 (Field Reporting System) and GO-SPT-302.09 (Use and Operation of Mobile Data Computers).

4. Members shall notify the OUC dispatcher, over the air, of any call type that needs to be changed (e.g., dispatched to a disorderly but upon arrival on-scene there is a man down).

5. Members shall log out of service at the end of their shift through their MDT after they have cleared all calls for service. Members held on priority 1 calls

shall give their disposition over the air prior to logging off. Before the check-off sergeant is relieved, he or she must contact the dispatcher, over the air or by telephone, to ensure all shift units have properly checked off.

F. Mandatory Reporting and Broadcast

1. After the scene is rendered safe and any relevant lookouts and broadcasts are made in accordance with GO-SPT-302.02 (Radio Broadcasts and Lookouts), the first responding member shall provide the CIC with the following information via the district radio zone:

| Broadcast Information |
|---|
| a. Offense location |
| b. Preliminary description of the offense and suspect |
| c. Lookout information |
| d. Traffic closures |
| e. Any other pertinent facts |

2. The district watch commander shall ensure that the CIC is notified and briefed of all required information in accordance with GO-HSC-803.06 (Command Information Center).

G. Code 10-33 (Officer in Trouble)

1. OUC dispatches two primary units and a supervisor upon receipt of a code 10-33 (officer in trouble) request. OUC assigns secondary units to respond, as necessary. Secondary units shall respond to the scene and be guided by the primary unit and on-scene supervisor.

2. Upon cancellation of the code 10-33 by OUC, all secondary units shall immediately return to normal patrol assignments.

H. Officer-Involved Incidents

Any department member who responds to a call for service involving a sworn member of MPD or any other law enforcement agency who is alleged to have engaged in criminal conduct shall immediately notify an official who shall respond without delay.

I. Foot Pursuits

1. A foot pursuit is a situation where a member, on foot, chase a subject who is evading a stop or arrest. The safety of MPD members, the subject of the foot pursuit, and the public shall be the primary consideration when members determine whether a foot pursuit should be initiated or continued.

2. Members may engage in foot pursuits when there is reasonable suspicion (i.e., minimal level of objective justification; more than a hunch or mere speculation but less than probable cause) to believe that the subject has committed, is committing, or is about to commit a crime. However, the decision to continue foot pursuits must continuously be re-evaluated in light of

the evolving circumstances.

3. In determining whether or not to initiate or continue a foot pursuit, members should give consideration to the following as it relates to the specific facts and circumstances of the incident:

| Considerations |
|---|
| a. Seriousness and nature of the offense committed; the likelihood that the offense will continue, recur, or endanger the safety of others if the subject is not apprehended; and/or the potential loss of evidence. |
| b. Availability of communications with the OUC. |
| c. Likelihood of subject apprehension. |
| d. Member familiarity with area, area characteristics (e.g., residential, school zone, roadway, area hostility) and environment (e.g., weather, lighting, time of day). |
| e. Availability of backup units. |
| f. Whether the subject is believed or known to be armed, or there are multiple subjects. |
| g. Whether alternative responses would be both feasible and appropriate such as containment of the area or specialized unit assistance (e.g., canine, air support), |
| h. Whether the subject's identity is known or other information exists that would likely allow for the subject's probable apprehension at a later time and there is no immediate threat to the public or members. |

4. Members **shall not** engage in a foot pursuit based **solely** on a subject's response to the presence of police, including a subject's attempt to avoid contact with a member (e.g., walking away, declining to talk, running away, or crossing the street to avoid contact). Unprovoked flight may be used as one factor to help establish reasonable suspicion, but members must be able to articulate and document the other, additional factors (e.g., subject's actions, demeanor, characteristics) that led them to determine that reasonable suspicion existed to pursue the subject.

5. Members engaged in foot pursuits shall:

    a. Ensure their body-worn cameras are activated in accordance with GO-SPT-302.13 (Body-Worn Camera Program).

    b. As soon as practicable, notify OUC and broadcast their location, reason for the pursuit, description and number of subjects, direction of travel, and whether or not the subject is confirmed or believed to be armed. Members shall provide updates to the OUC, when practicable, during the foot pursuit and notify OUC of any discontinuation of a pursuit or apprehension of the subject.

    c. **Not** pursue subjects with their firearm un-holstered except where the subject poses an immediate danger of death or serious physical injury.

    d. When practicable, coordinate with responding members to establish a perimeter to contain the subject.

  e. For foot pursuits that enter an outside jurisdiction, adhere to the procedures for fresh pursuit in GO-OPS-301.03.

6. Foot pursuits by members in plain clothes or undercover can be inherently dangerous. Members should exercise extreme caution in these situations.

  a. Although circumstances may dictate that a member in plain clothes or undercover may need to pursue subjects consistent with this order, they shall always follow a uniformed member's commands (e.g., to lay down a weapon).

  b. Plain clothes and undercover members shall notify OUC as soon as practicable upon initiation of the pursuit that they are in plain clothes or undercover, and attempt to provide their clothing description. When practicable, members shall make reasonable efforts to make themselves identifiable as police officers (e.g., have their badges visible).

  c. Plain clothes and undercover members shall terminate participation in a foot pursuit when uniformed members have joined the pursuit and it is reasonably safe and tactically sound to do so.

7. Absent exigent circumstances, foot pursuits shall be terminated by the pursuing member under the following conditions:

| Termination |
|---|
| a. The member reasonably believes that the danger to the public or the member outweighs immediate apprehension of the subject. |
| b. The member loses possession of their firearm or loses the ability to communicate with OUC. |
| c. The member becomes unsure of the subject's location or continued direction of travel. |
| d. The member is unsure of their own location or direction of travel. |
| e. The subject flees into and building, confined space, or into a wooded or otherwise isolated area **and** the member does not have sufficient backup and containment of the area. |
| f. A member or a third party is injured during the pursuit and requires immediate assistance, and there are no other police or medical personnel able to render assistance. |

NOTE: For incidents involving an active shooter or combatant, members shall, in all cases, prioritize their actions to stop the threat.

8. When deciding not to engage in or to terminate a foot pursuit, members shall take any other appropriate police action (e.g., making required notifications, requesting additional assistance).

9. When a subject is apprehended, the stop shall be documented in accordance with GO-OPS-304.10 (Field Contacts, Stops, and Protective Pat Downs). Reviewing officials shall ensure that members properly document all factors contributing to the member's reasonable suspicion in the records management system (RMS) report.

J.   Family Disputes

OUC will dispatch a two-person unit or two single-person units to family disturbance and domestic calls. Single-person units will not be dispatched to family disputes without additional assistance.

K.   Fire Scenes

Members shall assist District of Columbia Fire and Emergency Medical Service (DCFEMS) personnel in their effort to protect life and property. Members shall respond promptly to the scene of all fires to which they are dispatched or observe while on patrol and:

1. If arriving prior to firefighters or rescue workers, quickly assess the scene to determine what happened, the number of people injured or trapped, and the extent of injuries.

2. When requested by a DCFEMS official, or as needed, assist with the activities of DCFEMS personnel. When a DCFEMS official or MPD official is at the scene of a fire, members shall be guided by the official regarding appropriate actions to be taken. MPD officials shall implement the incident command structure immediately to provide support. MPD efforts at the scene of a fire shall be relegated to traffic control, evacuation of the premises, maintaining points of egress, and preservation of life and safety.

3. Clear the immediate area and prevent interference by pedestrians and traffic. Members shall wear reflective clothing at all times when directing or controlling traffic, regardless of the weather or time of day.

4. Prevent persons from crowding near entrances to burning buildings.

5. Notify an on-scene DCFEMS official or OUC dispatcher prior to entering and upon exiting a burning building. Members shall only enter a fire to evacuate injured or trapped persons when it is safe to do so.

6. If contemplating extinguishing or suppressing the fire with an MPD fire extinguisher, attempt to determine that the fire extinguisher is appropriate for use with the material burning, as some fire extinguishers are ineffective on certain fires.

7. Until DCFEMS has cleared the location safe for occupancy or passage, keep all persons out of the building except DCFEMS personnel or employees of the gas or electric company in connection with their official duties.

8. When responding to an arson, suspicious fire, or fires resulting in injuries or death, request that an official respond and:

    a. Request Department of Forensic Sciences (DFS) response through OUC to assist in the evidence collection and documentation of arson cases pursuant to GO-OPS-304.08 (Crime Scene Response and

     Evidence Collection). In cases where the fire results in a critical injury or death, members shall request the Arson and Explosives Task Force through OUC.

    b. In cases where the reporting member's preliminary investigation, in consultation with the on-scene official, indicates that a fire is of a suspicious origin or suspected arson, consult with the on-scene DCFEMS officials and, when appropriate, request DCFEMS Fire Investigations Unit (FIU) response through OUC.

  9. Upon conclusion of the member's assistance, the responding unit shall return to service once the conditions are returned to normal.

  10. Members shall only complete an RMS report in the below circumstances. Reports shall include all important details, the name of persons notified, individuals who responded, and firefighters injured or fatally injured by the fire.

| Fires Requiring a Report |
|---|
| a. Arson (as determined by the on-scene fire investigator); |
| b. Suspicious fires (as determined by the on-scene fire investigator); |
| c. Fires resulting in injuries or death; |
| d. Fires that yield found property; and |
| e. When directed by an official. |

NOTE: In cases of arson and suspicious fires, the investigating Arson and Explosives Task Force/Fire Investigations Unit member will complete the RMS report.

L. Fire Safety Hazards

  1. MPD works with DCFEMS and the Department of Consumer and Regulatory Affairs (DCRA) on reporting and responding to potential fire code violations. When a member is dispatched to or observes what he or she believes to be a serious fire code violation (i.e., conditions that appear to present a serious hazard or possible life-safety threat), he or she shall notify the DCFEMS fire liaison officer through OUC to report the location and potential safety threat.

  2. DCFEMS will assign an on-duty battalion fire chief to respond to the scene, meet the on-scene MPD member, and perform an inspection of the premises. In cases where the battalion fire chief is unable to respond within 30 minutes, the member shall send an email to mpdcic@dc.gov, dcra@dc.gov, and fems.fireprevention@dc.gov prior to the end of his or her shift that includes the location's address, an explanation of the alleged violation, and the associated central complaint number (CCN).

  3. In all cases, the member shall complete the appropriate RMS report and document notifications made in the internal narrative.

M. Medical Assistance

1. When encountering individuals in need of medical attention, members shall ascertain if the individual has a medic alert decal, bracelet, necklace, or wallet card indicating a medical condition so that this information can be provided to the paramedics and noted in the member's RMS report.

2. Members shall assist DCFEMS personnel and others in their effort to provide emergency medical services.

3. Vehicle Escorts

    a. Officials shall assign a marked, four-wheel vehicle to escort DCFEMS ambulances when:

        (1) It is believed that the subject to be transported to the hospital may be the victim of a violent crime including, but not limited to, shooting victims and victims in drug or gang-related crimes.

        (2) An ambulance crew or the ranking DCFEMS official at a medical emergency scene requests an escort or it is deemed necessary by an official of MPD.

        (3) The subject is under arrest and is in the custody of MPD.

    b. Prior to leaving the scene of the incident, the escort unit shall consult with the ambulance crew to determine the route of travel to the hospital. The DCFEMS dispatcher will notify the destination hospital that a police-escorted ambulance is in transit to that location.

    c. The escort unit shall notify OUC of the time the ambulance and escort leave the scene and follow the transporting ambulance and operate as a code-1 secondary unit, with emergency lights and siren (yelp position) activated. The escort unit shall govern its speed by, and not exceed, the speed of the ambulance, maintain a safe distance between the two vehicles, and remain close enough to provide immediate assistance if required.

    d. Upon arrival at the hospital, the escort unit shall notify OUC of the time of arrival at the destination hospital, ensure that no suspicious persons are in close proximity to the ambulance and the emergency room entrance, notify the hospital security officers of the transported subject's arrival, and request that a security officer respond to the emergency room.

    e. Upon the arrival of a hospital security officer at the emergency room, the escort unit shall notify the security officer of the subject's status (e.g., under arrest, victim of violent crime), determine that no apparent threat exists to the safety of the victim or ambulance crew, and advise OUC that the escort detail is terminated.

    f. When the hospital destination is located outside the confines of the

police district in which the incident occurred, the OUC dispatcher will notify the appropriate district watch commander that a victim is being transported by ambulance to a hospital within the district, assisted by an MPD escort.

g. When a report is prepared, the narrative section shall indicate the vehicle number of the escort unit. Situations where the subject to be transported to the hospital may be the victim of a violent crime shall also be documented in the internal narrative of the report.

h. In instances when the transport shall terminate at a hospital destination outside the District of Columbia, the MPD escort shall notify OUC and an MPD official, and proceed to the destination with the transport. Should an escort be required beyond the District, the dispatcher is responsible for contacting the appropriate jurisdiction for assistance.

4. Ambulance Safety

Officials shall assign an officer to ride in the rear of the ambulance if the subject is under arrest or in the custody of MPD or if the subject to be transported is combative and the ambulance crew or ranking DCFEMS official makes a request.

a. In these cases, the member shall determine the means by which the subject is restrained based upon the subject's behavior (e.g., whether the subject is under arrest or in the custody of the MPD or the subject is being transported for a psychiatric evaluation).

b. Any deviation from this policy shall require prior approval from the element watch commander who shall document the circumstances on his or her PD Form 150 (Tour of Duty Supervisors Report).

5. Death Pronouncements

a. DCFEMS will provide a pronouncement time to MPD members in instances when a deceased person is pronounced on-scene.

b. Members shall obtain the pronouncement time and name of the doctor or DCFEMS employee pronouncing a deceased person before he or she leaves the scene. Failure to obtain the pronouncement time will cause a delay in response by Office of the Chief Medical Examiner (OCME) investigators since they will not respond without a pronouncement time.

c. Members shall provide all pertinent information to the responding homicide detective and document the information in the RMS report.

6. Emergency Delivery of Blood or Donor Organs

      a. MPD services for delivery of blood or donor organs are not normally required unless the emergency is so critical that emergency warning lights and sirens are necessary. The OUC commanding official and the MPD district watch commander will coordinate when MPD vehicles and personnel may be used and ensure coordination between MPD mobile units and other departments.

      b. When delivering outside of the District of Columbia, members shall deliver the blood or donor organs to the DC line where they shall be transferred to a designated Maryland or Virginia authority, unless otherwise directed by the chief of police or his or her designee.

N. Overdose Response and the Good Samaritan Law

   1. Members responding to a suspected overdose shall assess the subject's condition, check vital signs, and summon emergency medical assistance for any person who is, or is reasonably believed to be, experiencing an overdose. If an opioid overdose is suspected, members shall administer naloxone pursuant to GO-OPS-307.02 (Naloxone Program).

   2. If naloxone is deployed by DCFEMS pursuant to a suspected overdose, members shall obtain a CCN for an "Overdose" and complete an incident report.

      a. Members **shall not** classify the incident as a "Sick Person" event, even if the subject walked away.

      b. Members **shall not** mark 10-8 "Handled by the Board" without completing the overdose incident report.

   3. If the subject is deceased, members shall notify the Homicide Branch, obtain a CCN for an "Overdose" incident report, and provide the CCN to the Tactical Information Center (TIC) via tic.notifications@dc.gov.

   4. In incidents involving a fatality or mass overdose (i.e., three or more events in close geographic proximity that could be related), members shall attempt to identify information related to the source of the drugs.

      a. If naloxone was deployed successfully, members shall convey to the subject that they are an overdose victim, and in order to protect any other victims from harm or death, it is important to identify the source of the drugs.

      b. Members shall ascertain as much information as possible regarding the source of illegal drugs. This includes identifying all persons on the scene and their relationship to the subject.

      c. If illegal drug usage is suspected, members shall secure the crime scene, and canvas the area for evidence of a crime.

      (1) Any evidence of criminal activity shall be collected, packaged, and logged as **evidence**.

      (2) If the subject is deceased, members shall attempt to locate a cellular device. Any cellular devices shall be collected, packaged, and logged as **evidence**.

    d. If naloxone was deployed to revive the subject prior to members' arrival on-scene, members shall inquire about the amount given and include this information in the incident report, regardless of whether the person was transported to the hospital by DCFEMS.

5. Mass Overdose

    a. If an official suspects that three or more overdoses occurred in the same geographic proximity that could be related, he or she shall notify the Violent Crime Suppression Division (VCSD) commanding official to determine whether the overdose cases should be classified as a mass overdose.

    b. When a mass overdose classification is made, the watch commander shall respond to the scene. The watch commander shall document all CCNs and personnel on the scene of each incident and email them to the TIC.

6. Good Samaritan Law

    a. <u>DC Law 19-243 (Good Samaritan Overdose Prevention Amendment Act of 2012)</u> offers immunity from the protected conduct listed in Part II.N.7.b for a person who:

| Good Samaritan Law Immunity |
|---|
| (1) Reasonably believes that he or she is experiencing a drug or alcohol-related overdose and in good faith seeks health care (e.g., emergency medical assistance or a person who provides Naloxone) for or administers an opioid antagonist to him or herself; |
| (2) Reasonably believes that another person is experiencing a drug or alcohol-related overdose and in good faith seeks health care (e.g., emergency medical assistance or a person who provides Naloxone) for or administers an opioid antagonist to that person; |
| (3) Is reasonably believed to be experiencing a drug or alcohol-related overdose and for whom health care (e.g., emergency medical assistance or a person who provides Naloxone) is sought or to whom an opioid antagonist is administered; or |
| (4) Is a bystander to a situation described in Part II.N.7.b of this order. |

    b. The law covers conduct that would otherwise be criminal offenses:

| Protected Conduct |
|---|
| (1) Unlawful possession of a controlled substance [DC Official Code § 48-904.01(d)]; |
| (2) Unlawful use or possession with intent to use drug paraphernalia [DC Official Code § 48-1103(a)]; |

> (3) Possession of alcohol by persons under 21 years of age [DC Official Code §25-1002]; and
>
> (4) In situations where the minor is at least 16 years of age and the provider is 25 years of age or younger, purchasing an alcoholic beverage for the purpose of delivering it to a person under 21 years [DC Official Code § 25-785(a)]; contributing to the delinquency of a minor with regard to possessing or consuming alcohol, or without a prescription, a controlled substance [DC Official Code § 22-2811(a)(2) and subject to the penalties provided in DC Official Code § 22-811(b)(1)]; and the sale or delivery of an alcoholic beverage to a person under 21 years of age [DC Official Code § 25-781(a)(1)].

c. A person may be arrested for an offense other than the offenses listed in protected conduct above and regardless of whether the offense arose from the same circumstances as a person needing medical assistance for an overdose (e.g., a person who is in unlawful possession of an unregistered firearm or has any outstanding arrest warrants).

d. The law does not apply to a person who seeks medical assistance for alcohol or drug use in connection with the execution of a search warrant, arrest warrant, or lawful arrest or search.

e. A person on probation or parole who seeks medical assistance for an overdose cannot have their probation or parole revoked or modified as a result of their seeking medical assistance for an overdose.

f. Members responding to an overdose call may investigate or arrest individuals at the scene if they cannot determine that the facts meet the protections granted under the law. Members shall seize illegal narcotics or other contraband.

g. In accordance with GO-SPT-309.06 (Child Abuse and Neglect), members shall notify the DC Child and Family Services Agency (CFSA) in all instances where narcotics, weapons, or hazardous material are found in a vehicle containing a child or a home where a child resides (regardless of whether the child is present at the time).

O. Hospital Courtesy

1. Upon arrival at a medical facility or hospital, members shall immediately contact security personnel, or in their absence, a hospital authority.

2. In accordance with hospital procedure, the hospital staff member will arrange, assist, and cooperate with MPD in conducting their investigations. During the emergency treatment of a patient, the investigating member shall work with hospital personnel to limit emergency room access to authorized persons.

3. Prior to interviewing patients, members shall obtain permission of the attending physician or a designated member of the nursing staff who will determine the medical capability of the patient to withstand such an interview. Members shall strictly adhere to any instructions issued by the medical team.

4. Members shall notify the hospital administrator of interviews with administrative, medical, or support staff unless notification could compromise the investigation. Members interviewing staff shall conduct the interview in a confined space so as not to interfere with hospital business.

P. Disorderly Conduct (Noise at Night)

1. Members observing or responding to disorderly conduct (noise at night) calls shall be mindful that the content of the speech, music, or other communications is not relevant. Members shall consider the following:

| Disorderly Conduct (Noise at Night) Considerations |
|---|
| a. The noise must occur between 10:00 p.m. and 7:00 a.m. |
| b. The noise must be likely to annoy or disturb one or more persons in their residences (e.g., not offices, stores, cars). However, it is not required that the noise was heard by a person in a home, only that it was likely to be heard. |
| c. The noise can occur anywhere it is likely to annoy or disturb people in their residences. |
| d. When a noise complaint involves a business that is regulated through the city, members shall first refer it to the regulatory agency for that business. An arrest shall only be considered after efforts have been made to resolve the complaint through the other regulatory agencies, and the district commander and the Office of the General Counsel have been consulted. |
| f. The Noise Control Act requires decibel levels to be measured by DCRA, therefore, members shall not make arrests under the Noise Control Act. |

2. Prior to making a custodial or non-custodial arrest, members shall give a warning and provide a reasonable amount of time for the person to comply.

3. Disorderly conduct (noise at night) is not a misdemeanor offense for which DC Official Code § 23-581 provides an exception to the warrant requirement. Members must witness the offense in order to make an arrest or seek an arrest warrant.

4. Members shall not make a custodial arrest for disorderly conduct (noise at night) incidents without first calling an official (the rank of lieutenant or above) to the scene.

5. When completing arrest narratives for disorderly conduct (noise at night) reports, members shall document the cause of the noise, time of the offense, location of the nearby dwellings, specific warnings given, member who gave the warnings, how many warnings were given, time warnings were given, and an amount of time given between warnings and arrest. In cases where no complaints were received about the noise, members shall document how they determined that the noise could likely be heard from dwellings.

Q. Barring Notices

1. Members may assist community members (e.g., resident managers of apartment buildings, business owners, nightclub managers, school administrators and recreation center managers) in the service of barring notices upon individuals by acting as a witness and by maintaining the peace.

2. When business or private property owners request MPD assistance in the service of barring notices upon individuals, the business or property owner should have a completed barring notice that includes the insignia or letterhead for the business or property, with the required information needed by the United States Attorney's Office (USAO) and/or the Office of Attorney General (OAG). The member may act as a witness and ensure the peace is maintained during service. Members shall secure of copy of the previously served barring notice when arresting an individual for unlawful entry in violation of a barring notice, as it is required during the papering process.

3. MPD members **shall not**

   a. Create, draft, or serve barring notices unless:

   | Barring Notices ||
   |---|---|
   | a. | The department is barring an individual from an MPD facility or District of Columbia Housing Authority (DCHA) complex; |
   | b. | The member is serving the notice in response to a recommendation by the Office of the OAG Nuisance Task Force; |
   | c. | The member is serving the notice at a District of Columbia (DC) park or facility (i.e., <u>not</u> a federal park or facility) at the request of the Department of Parks and Recreation (DPR); or |
   | d. | The member is serving the notice while working at an approved outside employment location at the request of the outside employer. |

   b. Knowingly create or allow any entity to use a barring notice containing MPD insignia or letterhead.

4. Members may distribute a barring notice to business or private property owners upon request. A <u>sample barring notice</u> is posted on the MPD website.

R. Training

The Metropolitan Police Academy (MPA) commanding official shall ensure members receive initial and refresher training on this order.

*Robert J. Contee* (signature)

Robert J. Contee III
Chief of Police

RJC:KDO:MOC:SMM