UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

BREAD FOR THE CITY,

               Plaintiff,

       v.

DISTRICT OF COLUMBIA,

               Defendant.

Civil Action No. 23-01945-ACR

## STATEMENT OF INTEREST OF THE UNITED STATES OF AMERICA

## TABLE OF CONTENTS

INTRODUCTION ................................................................................................................ 1

LEGAL BACKGROUND ................................................................................................... 3

FACTUAL BACKGROUND ............................................................................................... 4

ARGUMENT ....................................................................................................................... 7

    I.    The District's Emergency Response System Is a Service, Program, or Activity under Title
II and Section 504. ........................................................................................................... 7

    II.    The ADA Prohibits Public Entities from Denying Individuals the Benefit of their Public
Health and Safety Services or Providing Unequal Opportunity Based on Disability ............... 10

        A.    Bread for the City's Claim Does Not Involve a New Service, Program, or Activity. 12

        B.    Bread for the City's Claim Does Not Call for a Higher Standard of Care. ................ 14

CONCLUSION.................................................................................................................... 167

# TABLE OF AUTHORITIES

**Cases**

*Alexander v. Choate,*
    469 U.S. 287 (1985)..................................................................................... 9, 13

*Allah v. Goord,*
    405 F. Supp. 2d 265 (S.D.N.Y. 2005)............................................................. 11

*Am. Council of the Blind v. Paulson,*
    525 F.3d 1256 (D.C. Cir. 2008)................................................................... 4, 13

*Anderson v. City of Blue Ash,*
    798 F.3d 338 (6th Cir. 2015) ............................................................................ 7

*Barden v. City of Sacramento,*
    292 F.3d 1073 (9th Cir. 2002) .......................................................................... 7

*Brooklyn Ctr. for Indep. of Disabled v. Bloomberg,*
    980 F. Supp. 2d 588 (S.D.N.Y 2013)................................................................ 8

*Buchanan v. Maine,*
    469 F.3d 158 (1st Cir. 2006)........................................................................... 15

*Cmntys. Actively Living Indep. & Free v. City of Los Angeles,*
    Civ. A. No. 09-0298, 2011 WL 4595993 (C.D. Cal. Feb. 10, 2011)................ 8

*Disability Rts. N.J., Inc. v. Comm'r, N.J. Dep't of Hum. Servs.,*
    796 F.3d 293 (3d Cir. 2015)............................................................................ 13

*Disabled in Action v. Bd. of Elections in City of N.Y.,*
    752 F.3d 189 (2d Cir. 2014)............................................................................ 10

*Est. of LeRoux v. Montgomery Cnty.,*
    Civ. A. No. 22-0856, 2023 WL 2571518 (D. Md. Mar. 20, 2023)................... 15

*Franklin v. Capitol Hilton Hotel,*
    325 F. Supp. 3d 25 (D.D.C. 2018) .................................................................... 4

*Hason v. Med. Bd. of Cal.,*
    279 F.3d 1167 (9th Cir. 2002) ........................................................................ 10

*Henrietta D. v. Bloomberg,*
    331 F.3d 261 (2d Cir. 2003)....................................................................... 11, 13

*Hindel v. Husted*,
    875 F.3d 344 (6th Cir. 2017) ........................................................................ 12

*Innovative Health Systems v. City of White Plains*,
    117 F.3d 37 (2d Cir. 1997) ............................................................................ 7

*K.N. v. Gloucester City Bd. of Educ.*,
    379 F. Supp. 3d 334 (D.N.J. 2019) .............................................................. 15

*Messier v. Southbury Training Sch.*,
    562 F. Supp. 2d 294 (D. Conn. 2008) .......................................................... 14

*Nat'l Fed'n of the Blind v. Lamone*,
    813 F.3d 494 (4th Cir. 2016) .................................................................. 8, 15

*Olmstead v. L.C. ex rel. Zimring*,
    527 U.S. 581 (1999) .......................................................................... 11, 12, 13

*Pierce v. District of Columbia*,
    128 F. Supp. 3d 250 (D.D.C. 2015) ..................................................... 2, 10, 15

*Rodriguez v. City of New York*,
    197 F.3d 611 (2d. Cir. 1999) ........................................................................ 13

*Tugg v. Towey*,
    864 F. Supp. 1201 (S.D. Fla 1994) .............................................................. 16

*Yeskey v. Pa. Dep't of Corr.*,
    118 F.3d 168 (3d Cir. 1997) .......................................................................... 7

**Statutes**

28 U.S.C. § 517 .................................................................................................... 2

29 U.S.C. § 794 .................................................................................................... 1

42 U.S.C. § 12101 ............................................................................................ 2, 3

42 U.S.C. § 12131 ............................................................................................ 1, 2

42 U.S.C. § 12132 ......................................................................................... 1, 2, 3

42 U.S.C. § 12133 ............................................................................................ 1, 2

42 U.S.C. § 12134 ......................................................................................... 1, 2, 3

42 U.S.C. § 12206 ........................................................................................................... 2

42 U.S.C. § 2000d-1 ...................................................................................................... 3

**Other Authorities**

Department of Justice and Department of Health & Human Services Guidance for Emergency

    Responses to People with Behavioral Health or Other Disabilities .......................... 15

Investigation of the City of Minneapolis and the Minneapolis Police Department ....................... 2

Investigation of the Louisville Metro Police Department and Louisville Metro Government ....... 2

Washington D.C. Office of Unified Communications, "911 for Emergency Services" ................. 4

**Regulations**

28 C.F.R. § 35.102 ........................................................................................................... 7

28 C.F.R. § 35.130 ............................................................................................... 3, 4, 11, 15

28 C.F.R. § 35.190 ........................................................................................................... 3

28 C.F.R. § Pt. 35, App. B ............................................................................................. 7

# INTRODUCTION

Plaintiff Bread for the City contends that Defendant the District of Columbia (the "District") administers its emergency response system in a manner that discriminates against people with mental health disabilities, in violation of Title II of the Americans with Disabilities Act, 42 U.S.C. §§ 12131–12134 ("ADA"), and Section 504 of the Rehabilitation Act, 29 U.S.C. § 794. As alleged, the purpose of this system is to provide a timely and effective response to a wide range of emergencies, including mental health emergencies. Pl.'s Compl. ¶ 77, ECF No. 1. According to Plaintiff, in the event of a physical health crisis, the District almost always sends its certified emergency medical technicians or paramedics to the scene. *Id.* ¶¶ 118, 121–23. But in the event of a mental health emergency, the District routinely relies on police officers. *Id.* ¶¶ 2, 89–90. It does so even though the officers' primary role is to enforce the law, not to resolve mental health emergencies, and even though their responses to mental health emergencies are often harmful and ineffective. *See, e.g.*, *id.* ¶¶ 2, 44–46. And it does so even though the District has multi-disciplinary teams of mental health clinicians and peer support staff, which are specifically designed to address mental health emergencies, that the District could expand to respond to these emergencies instead of police officers where appropriate. *See, e.g.*, *id.* ¶ 9. Plaintiff contends that the District's reliance on police officers as the default responders to mental health emergencies denies people with mental health disabilities an equal opportunity to benefit from the District's system, in violation of Title II of ADA and Section 504 of the Rehabilitation Act.[1]

---

[1]  Before this Court is the District's Motion to Dismiss, which asserts in part that Plaintiff fails to allege a violation of Title II and Section 504. The United States files this statement to assist the Court in evaluating a narrow set of issues raised by the District involving the Title II and Section 504 claims, and takes no position on any other issue before this Court. Because the D.C. Circuit "has long held that the claims and defenses under [Section 504 and Title II] are virtually identical and that cases interpreting either [statute] are applicable and interchangeable," *Pierce v.*

The federal government "plays a central role . . . in enforcing" the ADA, and furthering Congress's intent to create "clear, strong, consistent, enforceable standards addressing discrimination against individuals with disabilities." 42 U.S.C. §§ 12133–12134, 12101(b)(2), (3). Congress charged the Department of Justice with implementing Title II of the ADA by promulgating regulations, issuing technical assistance, and bringing suits in federal court to enforce the statute. 42 U.S.C. §§ 12133–12134, 12206. Pursuant to its authority, the Department conducts work around the country to remedy violations of Title II of the ADA where people with disabilities are excluded from participation in, denied the benefits of, or subjected to discrimination in the services, programs, and activities of public entities. This includes ensuring that public entities' emergency response services do not discriminate against people with disabilities. *See Investigation of the City of Minneapolis and the Minneapolis Police Department*, U.S. DEP'T OF JUSTICE (June 16, 2023) https://perma.cc/STU8-HQ3J, at 57 (finding that people with behavioral health disabilities are deprived of an equal opportunity to benefit from a city's emergency response services in violation of the ADA where many behavioral health-related calls for service do not require a police response, but police respond to the majority of those calls, and those responses are often harmful and ineffective); *Investigation of the Louisville Metro Police Department and Louisville Metro Government*, U.S. DEP'T OF JUSTICE (March 8, 2023) https://perma.cc/W9CA-2BNR, at 59–60 (same). The United States therefore has a strong interest in the proper interpretation of Title II in this context. Accordingly, as the Court considers the District's dispositive motion and Plaintiff's response thereto, the United States respectfully submits this Statement of Interest under the Attorney General's authority "to attend to the interests of the United

---

*District of Columbia,* 128 F. Supp. 3d 250, 266 n. 10 (D.D.C. 2015) (internal citations and quotation marks omitted), this Statement focuses on Title II of the ADA but applies to both claims.

States" in any case pending in federal court, 28 U.S.C. § 517, to explain the legal framework as applied to emergency response services.

## LEGAL BACKGROUND

Congress enacted the ADA in 1990 "to provide a clear and comprehensive national mandate for the elimination of discrimination against individuals with disabilities." 42 U.S.C. § 12101(b)(1). It found that "discrimination against individuals with disabilities continue[s] to be a serious and pervasive social problem" which persists in several critical areas, including access to public services. 42 U.S.C. § 12101(a)(2), (3). Such discrimination takes several forms, including "outright intentional exclusion," "overprotective rules and policies," failure to make modifications to existing practices, and "relegation to lesser services, programs, activities, benefits, jobs, or other opportunities." 42 U.S.C. § 12101(a). To combat these varied forms of exclusion, Congress broadly prohibited discrimination against individuals with disabilities by public entities. Title II provides that:

> [N]o qualified individual with a disability shall, by reason of such disability, be
> excluded from participation in or be denied the benefits of the services, programs,
> or activities of a public entity, or be subjected to discrimination by any such entity.

42 U.S.C. § 12132.

As directed by Congress, the Attorney General issued regulations implementing Title II that are based on regulations issued under Section 504 of the Rehabilitation Act. *See* 42 U.S.C. § 12134(a); 28 C.F.R. § 35.190(a); Exec. Order 12250, 45 Fed. Reg. 72995 (1980), *reprinted in* 42 U.S.C. § 2000d-1. Of particular relevance to this case, the Title II regulations prohibit public entities, in providing any aid, benefit, or service, from denying people with disabilities an equal opportunity to participate, "obtain the same result," or "gain the same benefit." 28 C.F.R. §§ 35.130(b)(1)(i)–(iii). In addition, public entities may not utilize "methods of administration that . . . defeat[] or substantially impair[] accomplishment" of the program's objectives with respect

3

to individuals with disabilities.  28 C.F.R. § 35.130(b)(3)(ii).  Further, public entities have an

affirmative obligation to make "reasonable modifications in policies, practices, or procedures"

when necessary to avoid discrimination on the basis of disability, "unless the public entity can

demonstrate that making the modifications would fundamentally alter the nature of the service,

program, or activity."  28 C.F.R. § 35.130(b)(7).  "Fundamental alteration" is an affirmative

defense, which the defendant bears the burden of establishing.  *See Am. Council of the Blind v.*

*Paulson*, 525 F.3d 1256, 1271 (D.C. Cir. 2008).

## FACTUAL BACKGROUND

This case challenges the District of Columbia's administration of its emergency response

system.[2]  According to the Complaint, the purpose of this system is to "timely and effectively

respond to a wide range of emergencies."  Compl. ¶ 77.  The most common way to request

assistance is by calling 911, *id.* ¶ 82, which is intended to be "the public's lifeline for police, fire,

and medical services."  Washington D.C. Office of Unified Communications, "911 for Emergency

Services," *available at* https://perma.cc/UDX9-8PU8 (last visited Jan. 31, 2024).  By design, this

is one way District residents may seek help for mental health emergencies.  *See* Def.'s Mot. to

Dismiss at 2–3, ECF No. 42-1 ("Def.'s Mot.").  The D.C. Office of Unified Communications

("Communications Office" or "OUC") answers all 911 calls.  *Id.* ¶ 79.  Depending on the type of

emergency, Communications Office staff may dispatch Metropolitan Police Department ("MPD")

officers or D.C. Fire and Emergency Medical Services ("D.C. Fire and Medical").  Compl. ¶ 87.

They may also transfer the call to the District's Access Helpline, which then decides whether to

---

[2]      When considering a Rule 12(b)(6) motion to dismiss for failure to state a claim, courts
"must construe the complaint in a light most favorable to Plaintiff and must accept as true all
reasonable factual inferences drawn from well-pleaded factual allegations."  *Franklin v. Capitol
Hilton Hotel*, 325 F. Supp. 3d 25, 28 (D.D.C. 2018).

send a mobile crisis team to respond to people who are experiencing mental health emergencies. *Id.* ¶¶ 9, 80, 88, 93.

Mental health emergencies typically arise from mental health disabilities, including depression, anxiety, and post-traumatic stress disorders ("PTSD"), and typically do not present a danger to others. *Id.* ¶¶ 24–29.  But when D.C. residents experience mental health emergencies, requests for assistance "routinely bring to the scene armed MPD officers, who are mainly trained to arrest and detain people suspected of crimes, not to handle mental health emergencies." *Id.* ¶ 2; *see also id.* ¶ 9 (less than 1% of 911 calls that primarily or exclusively involve mental health emergencies get a response from a mental health professional); *id.* ¶¶ 89–90 (Communications Office dispatched MPD to approximately 84% of such calls and D.C. Fire and Medical to approximately 15%).

As alleged, MPD officers receive limited training on how to respond to mental health emergencies, and often adopt law enforcement strategies that are "antithetical to effectively addressing" them. *Id.* ¶¶ 45–57.  This has included using aggressive and intimidating language, unnecessarily handcuffing people, executing unnecessary involuntary transports to hospitals, and subjecting people to unnecessary force.  Such responses often exacerbate the emergency and increase the trauma and harm the person experiences. *See, e.g., id.* ¶¶ 2, 8, 40, 66–68, 71, 74

The District also funds teams of mental health clinicians and certified peer support specialists, who can provide an in-person mobile crisis response at the scene of the mental health emergency. *Id.* ¶¶ 9, 80–81.  These teams are specifically designed to respond to mental health emergencies and are better equipped than MPD officers to do so. *See id.* ¶¶ 33, 131.  But their capacity is insufficient, *see, e.g., id.* ¶¶ 9, 80–81, 109, 131–33, and inadequate coordination across the system further impedes their ability to timely respond. *Id.* ¶¶ 93–104.  When one of these

teams does respond, it can take hours for them to arrive, risking further escalation of the crisis and making it more difficult to resolve.  *Id.* ¶¶ 105–08.

By contrast, other health emergencies result in the prompt arrival of professionals who are equipped to address the specific crisis.  *Id.* ¶ 2, *see also id.* ¶¶ 118, 121–23 (D.C. Fire and Medical is dispatched to approximately 90% of 911 calls primarily or exclusively concerning physical health emergencies, all their 1,600 staff members are certified as emergency medical technicians, and 300 of their staff are certified as paramedics); *id.* ¶ 12 (the benchmark response time is five minutes for EMTs and nine minutes for paramedics).  These staff are not armed or authorized to make arrests, and they are not trained to adopt law enforcement strategies.  *Id.* ¶¶ 127–29.

Plaintiff, Bread for the City, "provides primary physical and behavioral healthcare services, legal services, food, clothing, and social services to under-resourced D.C. residents." *Id.* ¶ 13.  It does not provide emergency healthcare.  *Id.* ¶¶ 143–47.  When Bread for the City's clients experience physical health emergencies, staff call 911, and they receive a health-led response.  *Id.* ¶¶ 118, 149.  But Bread for the City has found based on experience that police-led responses to mental health emergencies result in unnecessary escalation and trauma and diminish client trust in the organization.  *Id.* ¶¶ 150–55.  To avoid this, it attempts to independently deescalate crises at its facilities.  *Id.* ¶¶ 14, 140–43, 156–93.  Bread for the City alleges that the District's reliance on MPD officers as the default responders to mental health emergencies denies people with mental health disabilities the benefits of the emergency response system and causes ongoing injury to its mission. *Id.* ¶¶ 3, 198–99.

## ARGUMENT

**I.     The District's Emergency Response System Is a Service, Program, or Activity under Title II and Section 504.**

The District's emergency response system, as alleged in the Complaint, is properly defined as a single service, program, or activity.  Without offering a clear definition to the contrary, the District complains that its responses to all emergencies are too vast to makeup a singular government program, and asks this Court to focus solely on its responses to mental health emergencies.  *See* Def.'s Mot. at 16.  As explained below, such a limited view is at odds with the interrelated nature of the system it administers and serves to obscure discrimination that may otherwise be apparent.

Title II applies broadly to "all services, programs, and activities provided or made available by public entities."  28 C.F.R. § 35.102(a).  This language encompasses "anything a public entity does."  28 C.F.R. § Pt. 35, App. B (2011); *Yeskey v. Pa. Dep't of Corr.,* 118 F.3d 168, 171 (3d Cir. 1997), *aff'd,* 524 U.S. 206 (1998); *see also Anderson v. City of Blue Ash*, 798 F.3d 338, 356 (6th Cir. 2015) ("[T]he phrase 'services, programs, or activities' encompasses virtually everything a public entity does."); *Barden v. City of Sacramento*, 292 F.3d 1073, 1076 (9th Cir. 2002) (It is "a catch-all phrase that prohibits all discrimination by a public entity, regardless of the context." (internal citations omitted)).  That includes emergency response systems.[3]

---

[3]     Some courts focus not on whether a public function can technically be categorized as a service, program, or activity, but whether it is "a normal function of a governmental entity." *Barden*, 292 F.3d at 1076 (maintaining public sidewalks is a normal government function); *Innovative Health Sys. v. City of White Plains*, 117 F.3d 37, 45 (2d Cir. 1997) (zoning decisions are a normal government function), *superseded on other grounds, Zervos v. Verizon N.Y., Inc.*, 252 F.3d 163, 171 n.7 (2d Cir. 2001).  Here, emergency dispatch and response is "without a doubt something [the District] does."  *Cf. Barden*, 292 F.3d at 1076 (internal quotation marks and citations omitted).

Here, it is appropriate to look at the District's entire emergency response system to evaluate compliance with the ADA.  Indeed, courts assessing similar emergency planning programs have looked at the entire program.  *Brooklyn Ctr. for Indep. of Disabled v. Bloomberg*, 980 F. Supp. 2d 588, 641 (S.D.N.Y 2013); *Cmntys. Actively Living Indep. & Free ("CALIF") v. City of Los Angeles*, Civ. A. No. 09-0298, 2011 WL 4595993, at *2 (C.D. Cal. Feb. 10, 2011).  The District posits that because multiple agencies are involved in emergency response, it necessarily follows that multiple government "programs" are in place.  *See* Def.'s Mot. at 14.  But *Brooklyn Center* and *CALIF* support a more comprehensive view.  Like the District's emergency response system, emergency planning programs require coordination across multiple City Departments to address a wide range of incidents, *see CALIF*, 2011 WL 4595993, at *2, and they provide a "variety of 'benefits'" in furtherance of their overarching purpose, *id*. at *13.  Nevertheless, when assessing ADA claims involving aspects of these expansive systems, courts have considered the entire system. *See id.; Brooklyn Center*, 980 F. Supp. 2d. at 641.  Proof that people with disabilities were denied an equal opportunity to benefit from some—but not all—aspects of the unified program was sufficient to show a violation.  *See Brooklyn Ctr.*, 980 F. Supp. 2d. at 597, 658–59; *CALIF*, 2011 WL 4595993, at *14, 17.

Further, the Supreme Court has made clear that the relevant service, program, or benefit "cannot be defined in a way that effectively denies otherwise qualified [] individuals the meaningful access to which they are entitled."  *Alexander v. Choate*, 469 U.S. 287, 301 (1985).  Consistent with this prohibition, some courts have avoided defining a public program expansively so that they do not "overlook real difficulties in accessing government services."  *Nat'l Fed'n of the Blind v. Lamone*, 813 F.3d 494, 504 (4th Cir. 2016) (focusing on the state's absentee voting program, rather than its entire voting program, because full access to in-person polling places did

not eliminate the ADA violation). But while an expansive definition might obscure discrimination in some cases, a narrow definition will certainly have that effect in others. "Antidiscrimination legislation can obviously be emptied of meaning if every discriminatory policy is 'collapsed' into one's definition of what is the relevant benefit," *Alexander*, 469 U.S. at 301, n.21. For example, the ADA's requirement that students with disabilities have equal opportunity to participate in a school's program of instruction would be meaningless if the program or benefit was defined as "oral education in English" and found equally available to students who are deaf and communicate using American Sign Language. Jurisdictions cannot avoid ADA liability through cramped definitions of services.

Here, the District suggests that each form of emergency response offers a distinct "constellation" of services and benefits, to be evaluated separately, Def.'s Mot. at 16, and then denies providing the mental health response at issue. *Id.* at 7, 22. But a rigid separation of each type of emergency is inconsistent with the interconnected nature of the District's system. By design, it requires answering calls about a wide range of crises—including mental health crises—and rapidly dispatching the appropriate response. *See* Compl. ¶¶ 77, 87–88, 136.

Moreover, by cabining the analysis to emergencies predominantly experienced by people with mental health disabilities, *see* Compl. ¶¶ 24–25, the District's framework would successfully hide many alleged inequalities from view. In particular, Plaintiff's Complaint contrasts the emergency assistance afforded to people with mental health disabilities against the emergency assistance afforded to the general population. As alleged, the District retains a variety of emergency response staff with the skills and experience to address different crises. District residents generally receive emergency assistance from staff with the skills and experience tailored to their specific emergency—for instance, a physical health-led response to physical health

emergencies.  But the one type of emergency primarily experienced by people with mental health disabilities is typically met with a police-led response, not a mental health-led response.  *See, e.g.*, Compl. ¶¶ 9, 87–88.  The District's narrow framing would exclude the allegations about the general population's experience from the court's analysis, thereby preventing a meaningful comparison.

This approach would undermine the ADA's fundamental purpose of "provid[ing] a clear and comprehensive national mandate for the elimination of discrimination against individuals with disabilities." *Hason v. Med. Bd. of Cal.*, 279 F.3d 1167, 1172–73 (9th Cir. 2002) (internal citations omitted) (recognizing that remedial legislation like the ADA should be construed broadly to effectuate its purpose).  To define the relevant benefit of this system as anything less than "timely and effective responses to emergencies," Compl. ¶ 77, would only obscure discrimination that would otherwise be apparent and "render meaningless the mandate that public entities may not 'afford [] persons with disabilities services that are not equal to that afforded others.'" *Disabled in Action v. Bd. of Elections in City of N.Y.*, 752 F.3d 189, 199 (2d Cir. 2014) (internal citations omitted) (defining the relevant benefit as the opportunity to fully participate in a voting program).

## II.   **The ADA Prohibits Public Entities from Denying Individuals the Benefit of their Public Health and Safety Services or Providing Unequal Opportunity Based on Disability.**

To state a claim of disability-based discrimination under the ADA and Section 504, a plaintiff must show that (1) a qualified individual with a disability; (2) "is being excluded from participation in, or is being denied benefits, services, programs, or other activities for which a public entity is responsible, or is otherwise being discriminated against by the public entity; and (3) that such exclusion, denial of benefits, or discrimination is by reason of his disability." *Pierce v. District of Columbia*, 128 F. Supp. 3d 250, 267 (D.D.C. 2015).  Public entities must afford

people with disabilities "the opportunity to participate in or benefit from" their services that is "equal to that afforded others" and is "as effective in affording equal opportunity to obtain the same result." 28 C.F.R. § 35.130(b)(1)(ii)–(iii).  Failing to do so may constitute a denial of benefits or other discrimination in violation of the ADA and Section 504.

Consistent with these regulations, a plaintiff can state a claim even where people with disabilities are not entirely excluded from participation.  People with disabilities are also denied an equal opportunity to benefit when they must risk serious harm to access the service, program, or activity.  *See Allah v. Goord*, 405 F. Supp. 2d 265, 280–81 (S.D.N.Y. 2005) (holding that where plaintiff was "at risk of incurring serious injuries each time he attempts to take advantage of outside medical attention, surely he is being denied the benefits of this service"); *Henrietta D. v. Bloomberg*, 331 F.3d 261, 267–69, 277 (2d Cir. 2003) (finding an ADA violation where individuals were unable to access social services without risk of physical harm due to their functional limitations and medical risks from AIDS and advanced HIV); *see also Olmstead v. L.C. ex rel. Zimring*, 527 U.S. 581, 600–01 (1999) (plurality op.) ("[d]issimilar treatment" inherent in the fact that people with disabilities were required to "relinquish participation in community life they could enjoy given reasonable accommodations, while persons without mental disabilities can receive the medical services they need *without similar sacrifice*" (emphasis added)).

Here, Bread for the City claims that the District's emergency response system—a system relied on by all residents—is not equally accessible to people with mental health disabilities.  This is because the District relies on ineffective and harmful police-led responses to mental health emergencies, while the population as a whole benefits from health-led responses to health-related emergencies.  *See, e.g.*, Compl. ¶ 2.  As alleged, MPD officers often adopt law enforcement strategies that are "antithetical to effectively addressing" mental health emergencies, *id.* ¶¶ 45–57,

and police-led responses result in harmful outcomes including: unnecessarily escalating the emergency, unnecessarily handcuffing people, unnecessarily transporting people to hospitals against their will, and subjecting people to unnecessary force.  *See, e.g.*, *id.* ¶¶ 2, 8, 66–68, 71, 74. Consequently, to get help through the existing system, people with mental health disabilities must risk serious harm.

The District attempts to circumvent Plaintiff's allegations by arguing that Bread for the City is (a) seeking a new service, program, or activity and (b) calls for a higher standard of care. Neither argument has merit.

### A.   Bread for the City's Claim Does Not Involve a New Service, Program, or Activity.

The District makes the perfunctory argument that because the ADA does not obligate public entities to provide new programs or services, Plaintiff's claim must fail.  Def.'s Mot. at 19–22.  But Bread for the City challenges the District's response to mental health emergencies— a type of emergency response that already exists.  As alleged, the District routinely responds to mental health emergencies, *see* Compl. ¶ 2, and it deploys mental health professionals to a portion of them.  Compl. ¶ 2, 9, 78–81; *see* also Def.'s Mot. at 2–3.  The suggestion that Bread for the City seeks a wholly new service is simply incompatible with the facts alleged.   In addition, consideration of a fact-bound affirmative defense such as the fundamental alteration defense is premature at the motion to dismiss stage.  *See Hindel v. Husted*, 875 F.3d 344, 347-48 (6th Cir. 2017) (finding that district court erred by "merely accepting defendant's [fundamental alteration] affirmative defense without requiring facts and evidence to support it").

In pursuit of its argument, the District points to cases such as *Olmstead v. L.C. ex rel. Zimring*, 527 U.S. 581, 603, n.14 (1999), to assert that the ADA does not require public entities to

provide new or better services.  Def.'s Mot. at 20.[4]  Some courts have indeed denied Title II and Section 504 claims where the plaintiff sought an entirely new service or benefit.  *See, e.g.*, *Rodriguez v. City of New York*, 197 F.3d 611 (2d. Cir. 1999) (plaintiff sought safety-monitoring services, which New York's Medicaid program did not offer); *Disability Rts. N.J., Inc. v. Comm'r*, *N.J. Dep't of Hum. Servs.*, 796 F.3d 293 (3d Cir. 2015) (plaintiff sought a pre-medication judicial process that was not a service, program, or activity of the State).  These cases are distinct from Bread for the City's because, as alleged, its claim does not involve a new type of emergency response.  *See infra* at 6.

Bread for the City's claim is more analogous to cases like *Am. Council of the Blind*, 525 F.3d at 1267, in that Plaintiff has identified "an *obstacle* that impedes [] access to a government program or benefit."  *Id.* (emphasis added).  There, the D.C. Circuit affirmed a judgment that the Treasury Department violated Section 504 by failing to "design and issue paper currency that is readily distinguishable to the visually impaired."  *Id.* at 1259–60.  The fact that the existing design "sp[rang] from the world of the sighted," *id.* at 1269—and that the changes needed were substantial—did not transform plaintiff's claim into a request for a new service that would fundamentally alter the existing program.  The Court found that plaintiffs sought to remove an obstacle to benefiting from the United States' paper currency and not, as in *Alexander*, a substantively different benefit.  *Id.* at 1268; *see also Henrietta D.*, 331 F.3d at 281–84 (affirming

---

[4]      In its landmark case involving the unnecessary segregation of people with disabilities in institutions, the Supreme Court clarified that the ADA does not impose on States a "standard of care" or require states to "provide a certain level of benefits," but that "States must adhere to the ADA's nondiscrimination requirement with regard to the services they in fact provide."  *Olmstead*, 527 U.S. at 603, n.14.

injunctive relief that required primarily procedural changes to provide meaningful access to public benefits and finding that this did not amount to the provision of "extra substantive benefits").[5]

Similarly, here, Bread for the City does not seek to expand the District's "existing suite" of emergency responses. Def.'s Mot. at 13. Bread for the City alleges that the existing system already responds to mental health emergencies and deploys mental health professionals to a portion of them, *see e.g.*, Compl. ¶¶ 2, 9, but is administered in a manner that exposes people with disabilities to a serious risk of harm and deters people from seeking assistance. *See, e.g.*, *id.* ¶¶ 2, 14. Thus, it seeks to tailor the existing system to eliminate a harmful obstacle, so that people with disabilities have an equal opportunity to benefit. Compl. at 45–46 (Prayer for Relief).

Moreover, the changes Bread for the City seeks—the expanded use of existing mental health response teams—are consistent with District's own goal of "enhancing" its mental health emergency responses. Def.'s Mot. at 1. Courts have found proposed modifications that expand existing services are reasonable, particularly when the modifications align with the jurisdiction's own stated plans and obligations. *See, e.g.*, *Messier v. Southbury Training Sch.*, 562 F. Supp. 2d 294, 344–45 (D. Conn. 2008) (plaintiffs' requested service expansion, which was consistent with defendants' publicly stated plans, was reasonable).

### B. Bread for the City's Claim Does Not Call for a Higher Standard of Care.

The District incorrectly asserts that expanding the use of its mental health response teams would alter the "standard of care," which is outside the ADA's mandate. Def.'s Mot. at 17–19. In

---

[5]     The District's argument that people with mental health disabilities do not meet the "essential eligibility requirements" for a mental health emergency response must fail for the same reason. Def.'s Mot. at 22. The District's wide range of emergency responses are available to all D.C. residents, *see* Compl. ¶¶ 2, 77, and people are eligible for assistance by virtue of having experienced an emergency. Just as the identification of an obstacle does not amount to a request for substantively different benefit, it also cannot mean that the people burdened by that obstacle are excluded from eligibility in D.C.'s broad system.

so doing, the District misapplies cases such as *Buchanan v. Maine*, 469 F.3d 158 (1st Cir. 2006),

where the plaintiff's claim rested on the adequacy of an individual case manager's treatment.  But

tailoring the manner of response has nothing to do with abstract qualitative standards.  Rather,

Bread for the City seeks to eliminate a harmful obstacle in the existing system so that people with

disabilities have an equal opportunity to participate and benefit.  This is consistent with the ADA's

requirements.

The District has an affirmative obligation to modify its emergency response system when

necessary to avoid discrimination on the basis of disability, unless it can demonstrate that the

modifications would fundamentally alter its system.  28 C.F.R. § 35.130(b)(7).  *See Pierce*, 128 F.

Supp. 3d at 266 (Public entities "may very well need to act affirmatively to modify, supplement,

or tailor their programs and services to make them accessible to persons with disabilities.").  In

fact, "[r]equiring public entities to make changes to rules, policies, practices, or services is exactly

what the ADA does."  *Lamone*, 813 F.3d at 508.  This may include dispatching a different type of

response to an emergency call when necessary to avoid discrimination based on disability.  For

example, deploying mobile crisis teams staffed with behavioral health professionals may be a

reasonable modification.  *See Est. of LeRoux v. Montgomery County*, Civ. A. No. 22-0856,

2023 WL 2571518, at *12 (D. Md. Mar. 20, 2023) (reasonable accommodations by the County

included dispatching a mobile crisis team).[6]

In other contexts, courts have similarly held that the ADA may require changes in

personnel to ensure people with disabilities have an equal opportunity to benefit.  *See, e.g.*, *K.N.*

*v. Gloucester City Bd. of Educ.*, 379 F. Supp. 3d 334 (D.N.J. 2019) (providing a one-to-one aide

---

[6]     *See also* Department of Justice and Department of Health & Human Services Guidance
for Emergency Responses to People with Behavioral Health or Other Disabilities (May 2023), at 4,
https://perma.cc/V6J2-R7BN.

supported by a special education teacher to assist a student with autism was reasonable and necessary under the ADA); *Tugg v. Towey*, 864 F. Supp. 1201 (S.D. Fla. 1994) (requiring qualified mental health counselors with sign language ability where the presence of an interpreter greatly inhibited the effectiveness of mental health services).  The fact that such modifications may be necessary does not transform this into a claim about adequate healthcare.

*     *     *

**CONCLUSION**

For the foregoing reasons, the United States respectfully requests that the Court consider

this Statement of Interest with respect to Plaintiff's Title II and Section 504 claims.

Respectfully Submitted,

MATTHEW M. GRAVES                          KRISTEN CLARKE
D.C. Bar. #481052                          Assistant Attorney General
United States Attorney                     Civil Rights Division

BRIAN P. HUDAK                             STEVEN H. ROSENBAUM
Chief, Civil Division                      Chief, Special Litigation Section

By:    /s/ *John C. Truong*                REGAN RUSH
    JOHN C. TRUONG                         Principal Deputy Chief
    D.C. BAR #465901                       Special Litigation Section
    CHRISTOPHER HAIR
    Assistant United States Attorneys      */s/ Sarah. T. Russo*
    601 D Street, N.W.                     SARAH T. RUSSO
    Washington, D.C. 20530                 Trial Attorney
    (202) 252-2524 (Truong)                United States Department of Justice
    (202) 252-2543 (Hair)                  Civil Rights Division
    john.truong@usdoj.gov                  Special Litigation Section
    christopher.hair@usdoj.gov             U.S. Department of Justice
                                           150 M Street, N.E. 10th Floor
                                           Washington, D.C. 20002
                                           Telephone: (202) 598-0138
                                           Email: sarah.russo@usdoj.gov

*Attorneys for the United States of America*

17