# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

|  |  |
|---|---|
| BREAD FOR THE CITY, <br><br>　　　　　　Plaintiff, <br><br> v. <br><br> DISTRICT OF COLUMBIA, <br><br>　　　　　　Defendant. | No. 1:23-cv-01945-ACR |

**AMICUS BRIEF ON BEHALF OF MENTAL HEALTH AMERICA, THE AMERICAN ASSOCIATION OF PEOPLE WITH DISABILITIES, MIRIAM'S KITCHEN, THE PUBLIC DEFENDER SERVICE FOR THE DISTRICT OF COLUMBIA, THE TOTAL FAMILY CARE COALITION, WHITMAN-WALKER HEALTH, THE ARC OF DC, DISABILITY RIGHTS DC AT UNIVERSITY LEGAL SERVICES, THE SCHOOL JUSTICE PROJECT, AND THE JUDGE DAVID L. BAZELON CENTER FOR MENTAL HEALTH LAW IN OPPOSITION O DEFENDANT'S MOTION TO DISMISS**

| | |
|---|---|
| BAKER & HOSTETLER LLP | THE JUDGE DAVID L. BAZELON CENTER FOR MENTAL HEALTH LAW |
| Elizabeth B. McCallum <br> (DC Bar No. 541361) <br> Orga Cadet (DC Bar No. 1719508) <br> Daniel P. Wicklund  (Admitted in DC On 2/23/24; Bar No. Pending) <br> Washington Square, Suite 1100 <br> 1050 Connecticut Avenue, NW <br> Washington, D.C.  20036 <br> Telephone: 202.861.1500 <br> Facsimile: 202.861.1783 <br> Email:  emccallum@bakerlaw.com <br>　　　　ocadet@bakerlaw.com <br>　　　　dwicklund@bakerlaw.com | Megan E. Schuller (CA Bar No. 281468) <br> (Application for DC Bar Admission pending) <br> Ira Burnim (DC Bar No. 406154) <br> Lewis Bossing (DC Bar No. 984609) <br> Brit Vanneman (DC Bar No. 1736194) <br> 1090 Vermont Avenue NW, Suite 220 <br> Washington, DC 20005 <br> Tel: (202) 467-5730 <br> Email: megans@bazelon.org <br>　　　　irab@bazelon.org <br>　　　　lewisb@bazelon.org <br>　　　　britv@bazelon.org |

*Attorneys for Amici Curiae Mental Health America, the American Association of People with Disabilities, Miriam's Kitchen, the Public Defender Service for the District of Columbia, the Total Family Care Coalition, Whitman-Walker Health, the Arc of DC, Disability Rights DC at University Legal Services, the School Justice Project, and the Judge David L. Bazelon Center for Mental Health Law*

## CONSENT OF THE PARTIES TO THE FILING
## FEDERAL RULE OF APPELLATE PROCEDURE 29(A)(2)

This brief is filed with the consent of Michael Perloff, counsel for Plaintiff.  Defendant takes no position on the filing of this brief.

## CORPORATE DISCLOSURE STATEMENT

Pursuant to Rule 26.1 of the Federal Rules of Appellate Procedure, counsel for *amici curiae* certifies that no *amici* has a parent corporation and that no publicly held corporation owns 10% or more of any *amici*'s respective stock.

## STATEMENT PURSUANT TO FEDERAL RULE
## OF APPELLATE PROCEDURE 29(a)(4)(E)

The undersigned certifies that no party's counsel authored this brief in whole or in part, and that no party, party's counsel, or any other person other than *amici*, their members, or their counsel, contributed money that was intended to fund preparing or submitting this brief.


Dated:  February 23, 2024                    By:  */s/ Elizabeth B. McCallum*

                                             Elizabeth B. McCallum (DC Bar No. 541361)
                                             Washington Square, Suite 1100
                                             1050 Connecticut Avenue, NW
                                             Washington, D.C.  20036
                                             Telephone: 202.861.1500
                                             Facsimile: 202.861.1783
                                             Email:  emccallum@bakerlaw.com

# TABLE OF CONTENTS

**Page**

CONSENT OF THE PARTIES TO THE FILING.........................................................................ii

CORPORATE DISCLOSURE STATEMENT ...........................................................................ii

STATEMENT PURSUANT TO RULE 29(a)(4)(E)...................................................................ii

TABLE OF AUTHORITIES ................................................................................................... iv

INTEREST OF AMICI CURIAE .............................................................................................1

SUMMARY OF ARGUMENT ................................................................................................3

ARGUMENT ...........................................................................................................................5

     I.     THE DISTRICT'S EMERGENCY RESPONSE SYSTEM UNLAWFULLY DISCRIMINATES AGAINST PEOPLE WITH MENTAL HEALTH DISABILITIES ...........................................................................................................5

     II.    DISPATCHING MENTAL HEALTH RESPONDERS RATHER THAN POLICE TO ADDRESS MENTAL HEALTH EMERGENCIES IS NOT ONLY REQUIRED BY LAW, IT IS ALSO SAFER AND MORE EFFECTIVE THAN DISPATCHING POLICE.........................................................8

          A.     Experts Agree Mental Health Responders, Not Police, Should Be Dispatched to Respond to Emergencies Involving Mental Health Crises.........................................................................................................8

          B.     Unnecessary Police Response to Mental Health Emergencies Places People with Mental Health Disabilities at Risk of Serious Harm.............12

     III.   EXPERIENCES OF PEOPLE WITH MENTAL HEALTH DISABILITIES DEMONSTRATE THE TRAGIC CONSEQUENCES THAT CAN RESULT WHEN POLICE ARE DISPATCHED TO MENTAL HEALTH CRISES .........18

     IV.   THE RELIEF SOUGHT IS READILY ACHIEVABLE .....................................19

CONCLUSION.......................................................................................................................23

# TABLE OF AUTHORITIES

**Page**

**Cases**

*Bragdon v. Abbott*,
  524 U. S. 624 (1998)..........................................................................................7

*Olmstead v. L.C.*,
  527 U.S. 521 (1999)........................................................................................6, 7

*Skidmore v. Swift & Co.*,
  323 U. S. 134 (1944).........................................................................................7

**Statutes**

29 U.S.C. § 794 .....................................................................................................5

42 U.S.C. § 12132 .................................................................................................5

**Other Authorities**

28 C.F.R. § 35.130(b)(1)(i)-(iii).............................................................................5

28 C.F.R. § 35.130(b)(1)(iv) ..................................................................................5

28 C.F.R. § 35.130(b)(3) ........................................................................................5

28 C.F.R. § 35.130(b)(7) ........................................................................................6

28 C.F.R. § 41.51(b)(1)(i)-(iii) ...............................................................................5

28 C.F.R. § 41.51(b)(1)(iv) .....................................................................................5

Albertson E, Scannell C, Ashtari N., *Eliminating gaps in medicaid coverage
  during reentry after incarceration*, AJPH 2020;110(3)............................................15

Ayobami Laniyonu and Phillip Atiba Goff, *Measuring disparities in police use of
  force and injury among persons with serious mental illness*, BMC Psychiatry,
  2021.......................................................................................................................13

Chris Lee, *Amid a Mental Health Crisis in the U.S., A New KFF Report Examines the Steps that State Medicaid Programs Are Taking to Help Shore Up the Availability of Crisis Services*, KAISER FAM. FOUND. (May 25, 2023), https://www.kff.org/mental-health/press-release/amid-a-mental-health-crisis-in-the-u-s-a-new-kff-report-examines-the-steps-that-state-medicaid-programs-are-taking-to-help-shore-up-the-availability-of-crisis-services-beneficiaries/ .......................21

Cops, Clinicians, or Both? Collaborative Approaches to Responding to Behavioral Health Emergencies, NATIONAL ASSOCIATION OF STATE MENTAL HEALTH PROGRAM DIRECTORS (Aug. 2020), https://www.nasmhpd.org/sites/default/files/2020paper11.pdf ...............................14

*County Funding Opportunities to Support Community Members Experiencing a Behavioral Health Crisis*, NAT'L ASS'N OF COUNTIES (NACo) (Feb. 8, 2023, https://www.naco.org/resources/county-funding-opportunities-support-community-members-experiencing-behavioral-health ...........................................21

D.C. Police Reform Commission, *Decentering Police to Improve Public Safety* (2021), https://dccouncil.gov/police-reform-commission-full-report/ ........................................................................................910, 11, 12, 13, 15, 17

David Murphy, *I live with PTSD in DC. The city both helped and endangered me*, GREATER GREATER WASHINGTON, Aug. 2, 2023 .............................................16, 17

DC COUNCIL COMMITTEE ON HEALTH, FY 2023 PERFORMANCE OVERSIGHT PRE-HEARING QUESTIONS DEP'T. OF BEHAVIORAL HEALTH 84 (Jan. 29, 2024), https://lims.dccouncil.gov/Hearings/hearings/247...................................................19

DC DEPT. OF HEALTH CARE FINANCE, DISTRICT OF COLUMBIA PROPOSED SECTION 1115 BEHAVIORAL HEALTH TRANSFORMATION DEMONSTRATION  (June 3, 2019), https://www.medicaid.gov/sites/default/files/Medicaid-CHIP-Program-Information/By-Topics/Waivers/1115/downloads/dc/dc-behavioral-health-transformation-pa.pdf..............................................................................................21

DIST. TASK FORCE ON JAILS & JUST., JAILS & JUSTICE: OUR TRANSFORMATION STARTS TODAY 36 (2021); Compl. ¶¶ 87-92 ........................................3, 15, 19, 20

Dumont DM, Brockmann B, Dickman S, Alexander N, Rich JD, *Public health and the epidemic of incarceration*, ANNUAL REV PUBLIC HEALTH 2012 ...............................15

Dylan Goforth, *Bartlesville family copes with questions, loss, following fatal officer-involved shooting*, THE FRONTIER, Oct. 21, 2019, https://www.readfrontier.org/stories/bartlesville-family-copes-with-questions-following-officer-involved-shooting ...............................................................18

*Enhancing Police Response to People with Mental Illness in D.C.: Incorporating the Crisis Intervention Team (CIT) Community Policing Model*, GOV'T OF D.C. OFF. OF POLICE COMPLAINTS  7 (2006) ...................................................................14

*Equipped for War: Exposing militarized policing in California*, AMERICAN
  FRIENDS SERVICE COMMITTEE, Apr. 2022, at 12 ...................................................18

Eric Flack & Jordan Fischer, *DMV police are called on tens of thousands of
  mental health runsa year. Most don't get any training on how to handle it*
  (Nov. 11, 2020), https://www.wusa9.com/article/news/911-mentally-ill-crisis-
  intervention-training-police-mental-health-dc-police-secret-service-metro-
  transit-police-fairfax-montgomery/65-3270ab6a-e15c-4ecb-9605-
  de5490668ca2 (last visited Feb. 16, 2024) ...........................................................12

Eric Westervelt, *Removing Cops From Behavioral Health Crisis Calls: "We Need
  To Change the Model,"* NPR (Oct. 19, 2020),
  https://www.npr.org/2020/10/19/924146486/removing-cops-from-behavioral-
  crisis- calls-we-need-to-change-the-model .............................................................16

Frankham, Emma, *Mental Illness Affects Police Fatal Shootings*, CONTEXTS, Jul.
  27, 2018...................................................................................................................13

Fuller, Doris et al., *Overlooked in the Undercounted: the Role of Mental Illness in
  Fatal Law Enforcement Encounters*, TREATMENT ADVOCACY CENTER, Dec.
  2015........................................................................................................................13

G. Frank & Vikki Wachino, *Building A Sustainable Behavioral Health Crisis
  Continuum*, BROOKINGS (Jan. 6, 2022), https://www.brookings.edu/blog/usc-
  brookings-schaeffer-on-healthpolicy/2022/01/06/building-a-sustainable-
  behavioral-health-crisis-continuum/ .....................................................................20

Glaze LE, James DJ, *Mental Health Problems Of Prison And Jail Inmates*,
  Bureau of Justice Statistics. NIMH Statistics [Internet]. 2006; Available from:
  https://www.nimh.nih.gov/health/statistics/index.shtml........................................15

Greenberg G, Rosenheck R., *Jail Incarceration, Homelessness, and Mental
  Health: A National Study* [Internet]. 2008; Available from:
  ps.psychiatryonline.org ........................................................................................15

. Richard Lamb et al., *The Police and Mental Health* PSYCHIATRIC SERVS. 1266
  (2002).; Eddie Kane et al., *Effectiveness of Current Policing-Related Mental
  health Interventions: A Systematic Review*, 28 CRIM. BEHAV. AND MENTAL
  HEALTH 108 (2018)................................................................................................12

Kane, Eddie et al., *Effectiveness of Current Policing-Related Mental health
  Interventions: A Systematic Review*, 28 CRIM. BEHAV. AND MENTAL HEALTH
  108 (2018)..............................................................................................................12

Heather Stuart, *Violence and Mental Illness: An Overview*, 2 WORLD
  PSYCHIATRY 121 (2003).......................................................................................16

How Many Individuals With Serious Mental Illness Are In Jails And Prisons?,
    Treatment Advoc. Ctr. (last updated Nov. 2014),
    https://www.treatmentadvocacycenter.org/storage/documents/backgrounders/h
    ow%20many%20individuals%20with
    %20serious%20mental%20illness%20are%20in%20jails%20and%20prisons
    %20final.pdf..............................................................................................................................14

*Improving Mental Health Services and Outcomes for All: The D.C. Department of
    Behavioral Health and the Justice System*, OFF. OF THE D.C. AUDITOR at
    x (Feb. 2018).........................................................................................................................14

Jennifer Bronson, Phd. & Marcus Berzofsky, Indicators Of Mental Health
    Problems Reported By Prisoners And Jail Inmates, 2011-2012, BUREAU OF
    JUST. STAT. at 16 (June 2017),
    https://bjs.ojp.gov/content/pub/pdf/imhprpji1112.pdf ............................................14

Jon Gerberg & Alice Li, *When a call to the police for help turns deadly*, THE
    WASH. POST (June 22, 2022) .....................................................................................12, 13

Judge David L. Bazelon Center for Mental Health Law, *When There's a Crisis,
    Call a Peer*  (2024), https://www.bazelon.org/wp-
    content/uploads/2024/01/Bazelon-When-Theres-a-Crisis-Call-A-Peer-full-01-
    03-24.pdf............................................................................................................8, 13, 20

Judge David L. Bazelon Ctr. For Mental Health & Legal Def. Fund, *Community-
    Based Services for Black People with Mental Illness* 15 (Jan. 2023),
    https://www.naacpldf.org/wp-content/uploads/2023-LDF-Bazelon-brief-
    Community-Based-Services-for-MH48.pdf ................................................................11

Judge David L. Bazelon Ctr. For Mental Health L., *Diversion To What?
    Evidence-Based Mental Health Services That Prevent Needless Incarceration*
    (Sept. 2019), http://www.bazelon.org/wp-content/uploads/2019/09/Bazelon-
    Diversion-to-What-Essential-Services- Publication_September-2019.pdf ...........................16

Kristen M. Folkerts, Isra Merchant, & Chenxi Yang, *A Tri-Country Analysis of
    the Effects of White Supremacy in Mental Health Practice and Proposed
    Policy Alternatives*, 19 COLUM. SOCIAL WORK REV. 86, 97 (2022) ..............................15

LEGAL ACTION CTR., KEY CRISIS RESPONSE PROVISIONS IN THE FY 2023 OMNIBUS
    FUNDING BILL 1, https://www.lac.org/assets/files/march-2023-Key-Crisis-
    Provisions-of-FY-2023-Omnibus.pdf (last visited Oct. 9, 2023) ...........................21

*Mental Health Myths and Facts*, MENTALHEALTH.GOV,
    https://www.mentalhealth.gov/basics/mental-health-myths-facts ...........................16

Michael S. Rogers, MD et al., *Effectiveness of Police Crisis Intervention Training
    Programs*, 47 J. AM. ACAD. PSYCHIATRY L. 414, 414 (2019),
    http://jaapl.org/content/jaapl/47/4/414.full.pdf ........................................................12

Millar, Melissa et al., *Re-Routing Behavioral Health Crisis Calls from Law Enforcement to the Health System* HEALTH MATTERS COLLABORATIVE, May 2021, at 7......................................................................................................................3, 4

The Office of National Drug Control Policy, Washington DC [Internet]. Available from: https://www.whitehouse.gov/ondcp/.............................................................15

Peggy L. El-Mallakh, et. al., *Costs and Savings Associated with Implementation of a Police Crisis Intervention Team*, S. MED. J., https://sma.org/southern-medical-journal/article/costs-and-savings-associated-with-implementation-of-a-police-crisis-intervention-team (last visited Jan. 21, 2024)....................................22

Peterson R. Re-arrests of Homeless Defendants in New York City [Internet]. 2016; Available from: www.nycja.org/library.php 13............................................15

Police Complaints Board: Office of Police Complaints, PCB Policy Report #19-2: Updates for the Crisis Intervention Officers Program (Washington, DC: PCB, 2020), https://policecomplaints.dc.gov/sites/default/files/dc/sites/office%20of%20police%20complaints/publication/attachments/Updates CIO.FINAL_.pdf (accessed Feb. 23, 2024)..........................................................................................17

Scottie Andrew, *This Town of 170,000 Replaced Some Cops with Medics and Mental Health Workers. It's Worked for Over 30 Years*, CNN (July 5, 2020), https://www.cnn.com/2020/07/05/us/cahoots-replace-police-mental-health-trnd/index.html...............................................................................................................22

*State Option to Provide Qualifying Community-Based Mobile Crisis Intervention Services*, CTRS. FOR MEDICARE & MEDICAID SERVS. https://www.medicaid.gov/medicaid/benefits/behavioral-health-services/state-option-provide-qualifying-community-based-mobile-crisis-intervention-services/index.html(last visited Feb. 21, 2024) ....................................................21

Stephanie O;Neill, *Police and the Mentally Ill: LAPD Unit Praised as Model for Nation*, KPCC (March 09, 2015), available at http://www.scpr.org/news/2015/03/09/50245/police-and-the-mentally-ill-lapd-unit-praised-as-m/ ...............................................................................................16

*Survey: Police needlessly overburdened by mentally ill abandoned by mental health system*, MENTAL ILLNESS POLICY ORG, (2011), https://mentalillnesspolicy.org/crimjust/homelandsecuritymentalillness.html......................11

Thomas M. Green, "*Police As Frontline Mental Health Workers: The Decision to Arrest or Refer to Mental Health Agencies*," 20 INTL J. OF LAW AND PSYCHIATRY 469 (1997)...........................................................................................12

Thomas S. Dee &Jaymes Pyne, *A Community Response Approach to Mental Health and Substance Abuse Crises Reduces Crime*, SCI. ADVANCES, 10 June 2022, at 1 ................................................................................................................11, 22

Tim Craig et al., *Seven police officers suspended after video shows hood placed on head of Black man who later died*, THE WASH. POST, Sep. 3, 2020 ...................................18

The Treatment of Persons with Mental Illness in Prisons and Jails: A State Survey. Treatment Advocacy Center & National Sheriffs Association. 2014 ......................15

U.S. Dep't of Health & Human Servs., SHO # 21-008, Letter on Medicaid Guidance on the Scope of and Payments for Qualifying Community-Based Mobile Crisis Intervention Services (Dec. 28, 2021), https://www.medicaid.gov/federal-policyguidance/downloads/sho21008.pdf........................20

U.S. Dep't of Just. and Health and Human Servs., *Guidance for Emergency Responses to People with Behavioral Health or Other Disabilities* 3-4 (2023)...............5, 7, 9

U.S. Substance Use Mental Health Services Administration, *Crisis Services: Meeting Needs, Saving Lives* 7 (2020) https://store.samhsa.gov/sites/default/files/pep20-08-01-001.pdf ........................................4, 5

U.S. Substance Use Mental Health Services Administration, *National Guidelines for Behavioral Health Crisis Care Best Practice Toolkit* 33 (2020), https://www.samhsa.gov/sites/default/files/national-guidelines-for-behavioral-health-crisis-care-02242020.pdf ...................................................................................9, 18, 22

U.S. Dep't of Justice, *Investigation of the City of Minneapolis and the Minneapolis Police Department* 57 (2023)...............................................................................7

U.S. Dep't of Justice, *Investigation of the Louisville Metro Police Department and Louisville Metro Government* 66 (2023).......................................................................7, 8

## INTEREST OF AMICI CURIAE

*Amici* are organizations that provide services to D.C. residents with mental disabilities, experts on behavioral health services, and public health and disability advocacy organizations that work on behalf of millions of adults and children with disabilities.

**Mental Health America**, founded in 1909, is a national community-based non-profit dedicated to addressing the needs of those living with mental illness and promoting the mental health of all.

The **American Association of People with Disabilities** is a national disability-led and cross-disability rights organization that advocates for equal opportunity and independent living for over 60 million Americans with disabilities.

**Miriam's Kitchen** is a registered nonprofit organization that helps individuals in Washington, D.C., obtain the housing, health, and critical resources needed to end chronic homelessness. Through engaging guests with healthy, made-from-scratch meals, Miriam's Kitchen connects them with personalized social services that assist them with re-building their lives. Beyond its intensive program offering, Miriam's Kitchen regularly engages community leaders and elected officials who advocate on its guests' behalf.

The **Public Defender Service for the District of Columbia** is a federally funded, independent organization governed by an 11-member board of trustees whose mission is to provide and promote quality legal representation for indigent adults and children facing a loss of liberty in the District of Columbia and thereby protect society's interest in the fair administration of justice.

The **Total Family Care Coalition** (TFCC) is the leading provider of family advocacy and support to parents of children with mental health disabilities in the District of Columbia. Since its incorporation in 2006, TFCC has provided peer support services to as many as 600 children and their families annually. Like Plaintiff Bread for the City, TFCC has regularly had to respond to

1

and try to de-escalate crises experienced by its clients, because of the District's inadequate mental health crisis response.

**Whitman-Walker Health** (WWH) is a federally qualified health center serving as a health care home for residents of the District of Columbia and the surrounding counties.  WWH provides mental, behavioral, medical, and legal assistance to their patients and clients.  Whitman-Walker envisions a society where all people are seen for who they are, treated with dignity and respect, and afforded equal opportunity to health and wellbeing.

**The Arc of DC** is one of the longest-serving disability rights organizations in the Washington metropolitan area.  It offers a variety of services to people with intellectual and developmental disabilities, promotes and protects the human rights of people with intellectual and developmental disabilities, and actively supports their full inclusion and participation in the community.

**Disability Rights DC at University Legal Services** (DRDC) is the federally authorized Protection and Advocacy System for the District of Columbia.  Since receiving the mayoral designation as the District's Protection and Advocacy agency in 1996, DRDC has represented the rights of people with disabilities, including those with mental health disabilities.

The **School Justice Project** (SJP) is a special education legal services organization that works to ensure that older, court-involved students with disabilities have access to a quality education, both during incarceration and throughout reentry.

Since 1972, the **Judge David L. Bazelon Center for Mental Health Law** (the "Bazelon Center") has advocated for the civil rights, full inclusion, and equality of adults and children with mental disabilities.  The Bazelon Center was instrumental in the passage of the Americans with

Disabilities Act (ADA) and played a key role in numerous cases reforming service systems for people with mental health disabilities.

This Court's decision will have a substantial impact on District residents who have a mental health disability. *Amici* believe their decades-long experience and expertise can help inform the Court's determination in this important case.

## SUMMARY OF ARGUMENT

Defendant does not deny that the District dispatches medical personnel in response to physical health emergencies, but almost always sends armed police officers to respond to mental health emergencies involving people with a mental health disability.

Even though the District already has existing, albeit insufficiently staffed and utilized, programs to help people in mental health crises, less than 1% of 911 calls primarily or exclusively involving mental health emergencies get a response from a mental health professional.[1]  As a result, when 911 calls involve individuals in  mental health crisis in the District, far too often these individuals end up handcuffed, humiliated, arrested, imprisoned, injured, or dead.  When the police respond, such individuals are also unlikely to get the care they need or engage with the mental health system.  As the D.C. Health Matters Collaborative, a collective of hospitals and health centers, found in 2021, "an armed response may be the antithesis of what and who is needed to address [mental health emergencies].  Too often, a call to 911 from a worried family member … results in harm to people who are simply experiencing a crisis and need support, understanding,

---

[1] Compl. ¶¶ 9, 89-91.

and treatment."[2]  The solution is the District expanding its mental health crisis services[3]—that is, the array of services available to help persons experiencing a mental health crisis.[4]  Doing so is both feasible and necessary to comply with federal civil rights law.

*Amici*, organizations that work every day with people with mental disabilities in D.C. and nationally, write to explain why a health response by mental health responders is required by law and is better than a police response for mental health emergencies.  They describe the harms that the District's current emergency response system imposes on people with mental health disabilities, including the lived experience of several individuals.  These harms include avoidable uses of force, arrests, incarceration, injury, and death.

Data, research, and the extensive experience of *amici* provide evidence that deploying mental health crisis responders, rather than police officers, in response to mental health crises can help avoid such harms including by connecting people to services that will help them avoid future crises.  This brief explains how the District can do so by expanding its existing mental health emergency response services to ensure that people with mental health disabilities have an equal opportunity to benefit from the District's emergency response programs and services.

---

[2] Millar, Melissa et al., *Re-Routing Behavioral Health Crisis Calls from Law Enforcement to the Health System*, DC HEALTH MATTERS COLLABORATIVE, May 2021, at 7 [hereinafter DC Collaborative].

[3] *See, e.g.*, U.S. Substance Use Mental Health Services Administration (SAMHSA), *Crisis Services: Meeting Needs, Saving Lives* 7 (2020), https://store.samhsa.gov/sites/default/files/pep20-08-01-001.pdf ("The crisis continuum includes various crisis services for individuals with urgent behavioral health needs…").

[4] Calls to 911 or the police about the behavior of people with a mental health disability may concern an individual who does not believe themselves to be "in crisis."  We include these calls when we refer in this brief to calls involving or regarding a "mental health crisis."

**ARGUMENT**

## I.   THE DISTRICT'S EMERGENCY RESPONSE SYSTEM UNLAWFULLY DISCRIMINATES AGAINST PEOPLE WITH MENTAL HEALTH DISABILITIES

Title II of the Americans with Disabilities Act ("ADA") provides that "no qualified individual with a disability shall, by reason of such disability, be … denied the benefits of the services, programs, or activities of a public entity, or be subjected to discrimination by any such entity." 42 U.S.C. § 12132.  Section 504 of the Rehabilitation Act of 1973 ("Rehabilitation Act") provides the same for "any program or activity receiving Federal financial assistance." 29 U.S.C. § 794.  District residents who experience a mental health crisis almost universally are people with disabilities to whom these broad anti-discrimination laws apply.[5]

Regulations implementing those statutes require that covered entities, like the District, ensure that people with disabilities have "the opportunity to participate in or benefit from" the District's services, programs, and activities that is "equal to that afforded others" and is "as effective in affording equal opportunity to obtain the same result" or "to gain the same benefit." 28 C.F.R. § 35.130(b)(1)(i)-(iii) (ADA); *accord* § 41.51(b)(1)(i)-(iii) (Rehabilitation Act).  People with disabilities may not be provided different or separate benefits or services, "unless" the difference "is necessary to provide qualified individuals with disabilities with aids, benefits, or services that are as effective as those provided to others." *Id.* § 35.130(b)(1)(iv) (ADA); *accord* § 41.51(b)(1)(iv) (Rehabilitation Act).  The District also may not administer its programs in a manner that "has the purpose or effect of defeating or substantially impairing accomplishment of

---

[5] Mental illness is the most prevalent disability in the United States.  SAMHSA, *Crisis Services: Meeting Needs, Saving Lives* 41 (2020), https://www.samhsa.gov/sites/default/files/national-guidelines-for-behavioral-health-crisis-care-02242020.pdf.  *See also* U.S. Dep'ts of Just. and Health and Human Servs., *Guidance for Emergency Responses to People with Behavioral Health or Other Disabilities* 3-4 (2023) [hereinafter DOJ and HHS Guidance] (discussing the ADA protections for people who experience mental health crises).

5

the objectives of the public entity's program with respect to individuals with disabilities." *Id.*
§§ 35.130(b)(3) (ADA), 45.51(b)(3) (Rehabilitation Act).

Additionally, the District has an affirmative obligation to make "reasonable modifications
in policies, practices, or procedures" when "necessary to avoid discrimination on the basis of
disability," unless the modification "would fundamentally alter the nature of the service, program,
or activity." *Id.* § 35.130(b)(7); *see also Olmstead v. L.C.*, 527 U.S. 521, 604 (1999) (explaining
defendant's burden of proof for a fundamental alteration defense).

The District does not dispute that police officers are the District's primary responders to
calls for help involving people experiencing mental health crises.  The District's often ineffective
and harmful police response to these calls (*see infra* at 12-18) stands in stark contrast to its response
to people who are experiencing physical health crises.  Those individuals receive prompt and often
life-saving, rather than life-threatening, emergency medical care at the scene, from health
personnel—trained paramedics or Emergency Medical Technicians (EMTs).  This difference
denies people with mental health disabilities an equal opportunity to benefit from the District's
emergency response program.

The appropriateness of sending a health response to people experiencing a physical health
emergency is obvious.  An individual experiencing a physical health emergency, like a heart attack
or a diabetic crisis, would not expect the police to respond to a call to help them.   Further, that
person would not expect to be treated as a threat and handcuffed and placed in the back of a police
car, without even having received medical attention.  The response by the District in such situations
is to send medical professionals.  A person with a mental health disability experiencing a mental
health crisis should similarly receive a health response and should be able to expect mental health
crisis responders to be dispatched to provide needed health care services.

As the U.S. Department of Justice (DOJ) and U.S. Department of Health and Human Services (HHS) have explained, the equal opportunity mandate of the ADA and the Rehabilitation Act requires "that people with behavioral health disabilities receive a health response in circumstances where others would receive a health response—for example, if call centers would dispatch an ambulance or a medic rather than law enforcement to respond to a person experiencing a heart attack or a diabetic crisis, equal opportunity would entail dispatching a health response in similar circumstances involving a person with a behavioral health disability."[6]  The views of these agencies, charged with implementing the ADA and the Rehabilitation Act, "'constitute a body of experience and informed judgment to which courts and litigants may properly resort for guidance.'"  *Olmstead*, 527 U.S. at 598 (citing *Bragdon v. Abbott*, 524 U. S. 624, 642 (1998), and quoting *Skidmore v. Swift & Co.*, 323 U. S. 134, 139-140 (1944)).

In two recent investigations, the DOJ concluded that a jurisdiction that unnecessarily dispatches police officers, rather than mental health personnel, in response to calls for help involving people with mental health disabilities violates the ADA.  As DOJ explained in its "letter of findings" to Minneapolis, "such a response deprives people with behavioral health disabilities of an equal opportunity to benefit from the City's emergency response services."[7]  DOJ's letter describes in detail the harms of a police response and states that Minneapolis is required to fund and use an existing mobile response team program "that provides a behavioral health response."[8] In an investigation of Louisville, DOJ likewise found an ADA violation because "Louisville Metro's … emergency response to behavioral health crises stands in stark contrast to its response

---

[6] DOJ and HHS Guidance, *supra* note 5, at 3-4.
[7] U.S. Dep't of Justice, *Investigation of the City of Minneapolis and the Minneapolis Police Department* 57 (2023) [hereinafter Minneapolis].  *See also id.* at 57-66.
[8] *Id.* at 57.

to people who are experiencing physical health crises.  Those individuals receive a prompt and often life-saving medical response by appropriately trained EMT professionals."[9]  DOJ's letter also explains that an unnecessary police response leads to avoidable arrests and incarceration, which carry unique risks for people with disabilities.[10]

As DOJ's findings make clear, the ADA requires that mental health response teams be dispatched to mental health crises where, as here, the jurisdiction makes a health response to physical health crises.[11]  The District's decision to structure its emergency response program so that police, rather than mental health workers, respond to people experiencing mental health crises, while people with physical health crises receive a medical response, violates the ADA and the Rehabilitation Act.

## II.    DISPATCHING MENTAL HEALTH RESPONDERS RATHER THAN POLICE TO ADDRESS MENTAL HEALTH EMERGENCIES IS NOT ONLY REQUIRED BY LAW, IT IS ALSO SAFER AND MORE EFFECTIVE THAN DISPATCHING POLICE

Data, research, and on-the-ground experience clearly demonstrate that sending police to mental health emergencies is not as effective as, and does not provide people with mental health disabilities an equal opportunity to enjoy the same benefits as, the District's response to physical health emergencies.

### A.  Experts Agree Mental Health Responders, Not Police, Should Be Dispatched to Respond to Emergencies Involving Mental Health Crises

National and local experts agree that a police response is not an effective way to address most mental health emergencies and too often harms people in crisis, unlike emergency responses to physical health emergencies.  They recommend instead a response from trained mental health

---

[9] U.S. Dep't of Justice, *Investigation of the Louisville Metro Police Department and Louisville Metro Government* 66 (2023) [hereinafter Louisville].  *See also id.* at 59-67.
[10] *Id.* at 63.
[11] *Id.* at 65.

personnel.[12]  Such a response can avoid police involvement in most cases and has the added benefit of reducing admission to psychiatric hospitals, emergency rooms, and jails.[13]

The federal Substance Abuse and Mental Health Services Administration (SAMHSA)—an agency within HHS—urges communities to invest in a mental health response to mental health emergencies rather than relying on a police response.  SAMHSA concluded that the reliance on police is more likely to exacerbate, than alleviate, the mental health issue prompting the emergency response.[14]  According to SAMHSA, "well-intentioned law enforcement responders to a crisis call often escalate the situation," including due to "the presence of police vehicles and armed officers that generate anxiety" for individuals in a crisis."[15]  SAMHSA recommends communities have a continuum of mental health crisis services, including: a regional call center,[16] 24/7 mobile mental health crisis services that the center can deploy,[17] and crisis "stabilization" services briefly provided in residential settings that can include staffed crisis apartments and respite centers.[18]  The joint DOJ-HHS federal guidance for responding to behavioral health crises, discussed above, cites SAMHSA's expert determination that a mental health response is needed and far preferable to a police response for most mental health crises.[19]

---

[12] *See* Judge David L. Bazelon Center for Mental Health Law, *When There's a Crisis, Call a Peer* 8-10 (2024), https://www.bazelon.org/wp-content/uploads/2024/01/Bazelon-When-Theres-a-Crisis-Call-A-Peer-full-01-03-24.pdf.

[13] *Id.*; SAMHSA, *Peer Support Services in Crisis Care* 4 (June 2022).

[14] SAMHSA, *National Guidelines for Behavioral Health Crisis Care Best Practice Toolkit* 33 (2020), https://www.samhsa.gov/sites/default/files/national-guidelines-for-behavioral-health-crisis-care-02242020.pdf.

[15] *Id.*

[16] *Id.* at 19.

[17] *Id.* at 14, 22.

[18] *Id.* at 13, 22-23.

[19] DOJ and HHS Guidance, supra note 5, at 1-3 (citing SAMHSA, *National Guidelines For Behavioral Health Crisis Care* 8, 19 (2020), https://www.samhsa.gov/sites/default/files/nationalguidelines-for-behavioral-health-crisis-care0-2242020.pdf).

District-based experts have reached the same conclusion.  In 2021, the D.C. Council created the D.C. Police Reform Commission, an independent body tasked with assessing policing practices in the District.[20]  The Commission included a diverse set of members who live in and care about the District – advocates, educators, representatives of the police, and current and former District officials, among others.[21]  It studied nationwide and District practices and spoke to over 100 District officials and residents, including the Chief of Police, police union representatives, and mental health care providers.[22]  It recommended that "behavioral healthcare professionals" should be "the default first responders to 911 calls involving individuals in crisis."[23]  "Relying mainly or exclusively on police as crisis responders," it found, "unnecessarily puts … residents and officers at risk of harm" and is "a fundamental misuse of law enforcement resources," which "perpetuat[es] fear and mistrust of police, while often leaving peoples' needs unaddressed."[24]

Another District-based group, a collective of hospitals and health care providers called the D.C. Health Matters Collaborative, evaluated the District's mental health emergency response system in 2021 and also concluded "the District should [e]stablish[]a practice of dispatching trained behavioral health providers to mental health crisis calls through 911 instead of law enforcement."[25]  The Collaborative interviewed a wide array of professionals involved in mental health and emergency response and studied best practices.[26]  It found, "Police are the primary source … contacted by others observing a person in a mental health crisis, and people experiencing

---

[20] D.C. Police Reform Commission, *Decentering Police to Improve Public Safety* 5 (2021), https://dccouncil.gov/police-reform-commission-full-report/ [hereinafter D.C. Police Commission Report].
[21] *Id.* at 12-13.
[22] *Id.*
[23] *Id.* at 15.
[24] *Id.* at 34.
[25] D.C. Collaborative, *supra* note 3, at 5, 30-31.
[26] *Id.* at 3.

a mental health condition have a higher likelihood of death at the hands of police."[27] As one social worker interviewed observed, "We know they need help, but we know that our decision to call MPD could lead to [them] being harmed."[28]  The report also vividly describes accounts of when police are the first responders to mental health crises, noting that "the fact of their presence can be traumatizing or inappropriate," and that police presence may exacerbate family conflict and result in the isolation of a family member needing help.[29]  The Collaborative proposed expanding the existing District mental health crisis services, like the Community Response Teams (CRTs), to provide a mental health, rather than a police, response.[30]

Moreover, a dedicated mental health response would relieve burdens on already overburdened police officers who are not equipped to deal with mental health crises.  A national survey reflects the sentiment of most police officers that they are overburdened by mental health crisis calls.[31] Approximately 84% of police stated there has been an increase in the number of calls responding to mental health incidents over their career,[32] 80% reported the number of time spent on these calls has increased or substantially increased, and 56% stated the increase is due to inability to connect individuals with mental health treatment.[33]

---

[27] *Id.* at 11.
[28] *Id.* at 15.
[29] *Id.*
[30] *Id.* at 31.
[31] *Survey: Police needlessly overburdened by mentally ill abandoned by mental health system*, MENTAL ILLNESS POLICY ORG (2011), https://mentalillnesspolicy.org/crimjust/homelandsecuritymentalillness.html.
[32] *Id.*
[33] *Id.*

In short, mental health workers are better suited to deal with mental health crises because of their experience and specialized training.[34]

## B. Unnecessary Police Response to Mental Health Emergencies Places People with Mental Health Disabilities at Risk of Serious Harm

District police are trained to respond as police officers, not as mental health workers, and they do not have the training and experience that mental health workers do.[35]  Indeed, encounters with law enforcement can be dangerous and sometimes deadly[36] for people with mental health disabilities, with the risks to Black and brown people being especially high.[37]  These harms, discussed below, demonstrate why police responses to mental health emergencies deny people with mental health disabilities an equal opportunity to benefit from the District's emergency response program, in violation of the ADA and Rehabilitation Act.

Many of these dangerous encounters begin with a call to 911.[38]  National data indicates that a large proportion of calls for assistance involving a mental health issue come from a family

---

[34] *See* Judge David L. Bazelon Ctr. For Mental Health & Legal Def. Fund, *Community-Based Services for Black People with Mental Illness* 15 (Jan. 2023), https://www.naacpldf.org/wp-content/uploads/2023-LDF-Bazelon-brief-Community-Based-Services-for-MH48.pdf; Thomas S. Dee &Jaymes Pyne, *A Community Response Approach to Mental Health and Substance Abuse Crises Reduces Crime*, SCI. ADVANCES, 10 June 2022, at 1.

[35] H. Richard Lamb et al., *The Police and Mental Health*, 53 PSYCHIATRIC SERVS. 1266 (2002).; Eddie Kane et al., *Effectiveness of Current Policing-Related Mental health Interventions: A Systematic Review*, 28 CRIM. BEHAV. AND MENTAL HEALTH 108 (2018); and Thomas M. Green, "*Police As Frontline Mental Health Workers: The Decision to Arrest or Refer to Mental Health Agencies*," 20 INTL J. OF LAW AND PSYCHIATRY 469 (1997).

[36] Michael S. Rogers, MD et al., *Effectiveness of Police Crisis Intervention Training Programs*, 47 J. AM. ACAD. PSYCHIATRY L. 414, 414 (2019), http://jaapl.org/content/jaapl/47/4/414.full.pdf (noting that between 2015-2018, approximately 25 percent of the roughly 1,000 people shot by police involved a person with mental illness).

[37] D.C. Police Commission Report, *supra* note 20, at 34 (citing Disability Community and Policing Working Group as convened by the DC Developmental Disabilities Council, Recommendations to Support DC's Disability Community (Washington, DC: 2020)).

[38] Eric Flack & Jordan Fischer, *DMV police are called on tens of thousands of mental health runs a year. Most don't get any training on how to handle it* (Nov. 11, 2020) (describing statistics related to calls to 911 in the District), https://www.wusa9.com/article/news/911-mentally-ill-crisis-

member or friend.[39]  The call may be requesting a wellness check or reporting a suicide threat.[40]

The call may even be from the person experiencing the crisis.[41]  Calls also come in from members

of the public concerned about a person with a mental health disability or their behavior.[42]

Too often, police responses to 911 calls end in avoidable tragedy.  Individuals with

disabilities may account for 30% to 50% of the incidents of police use of force.[43]  One study found

that of the over 7,500 people shot and killed by law enforcement officers in the United States since

2015, one in five were of people with mental illness.[44]  Other reviews put the percentage even

higher.[45]  The risks are greater for Black and brown people:  As the D.C. Police Reform

---

intervention-training-police-mental-health-dc-police-secret-service-metro-transit-police-fairfax-montgomery/65-3270ab6a-e15c-4ecb-9605-de5490668ca2 (last visited Feb. 16, 2024).

[39] *See*, *e.g.*, Emma Frankham, *Mental Illness Affects Police Fatal Shootings*, Contexts Vol. 17, No. 2, pp. 70-72 (Spring 2018) (Nationwide, 41 percent of police contacts with people experiencing a mental health crisis begin from a 911 call from a family member or friend), https://journals.sagepub.com/doi/pdf/10.1177/1536504218776970.

[40] Jon Gerberg & Alice Li, *When a call to the police for help turns deadly*, The Wash. Post (June 22, 2022) (analyzing information from nationwide police shooting database).

[41] *Id.*

[42] *See generally* J. David L. Bazelon Ctr. for Mental Health Law, *When There's a Crisis Call a Peer* 5-6 (Jan. 2024), https://www.bazelon.org/wp-content/uploads/2024/01/Bazelon-When-Theres-a-Crisis-Call-A-Peer-full-01-03-24.pdf.

[43] DOJ and HHS Guidance, *supra* note 5, at 2.

[44] *Id*. (between 20 and 25% of all fatal police encounters involve a person with a serious mental illness); Ayobami Laniyonu and Phillip Atiba Goff, *Measuring disparities in police use of force and injury among persons with serious mental illness*, BMC Psychiatry, 2021, at 6 (a person suffering from a serious mental illness is about twelve times more likely to experience use of force and about eleven times more likely to experience injury from police encounters than persons without serious mental illness).

[45] SAMHSA, *National Guidelines for Behavioral Health Crisis Care Best Practice Toolkit*, at 68 (2020), https://www.samhsa.gov/sites/default/files/national-guidelines-for-behavioral-health-crisis-care-02242020.pdf ("Estimates suggest that 25-50% of fatal encounters with law enforcement involve a person experiencing mental illness.").

Commission noted, "[p]eople of color who also have disabilities are disproportionately represented in the number of people who have been harmed by police officers."[46]

Roughly 40% of police encounters that result in the death of a person with mental illness began with a 911 call from concerned friends or family seeking help.[47]  For instance, Thomas Goodeyes Gay, a 35-year-old father of three, was fatally shot by Oklaho=ma police after his father called 911 expressing concern about him acting paranoid.  Thomas, who had a behavioral health disability, was unarmed.[48]  Such tragedies are the unfortunate consequence of relying inappropriately on the police to respond to mental health crises, rather than mental health personnel who have the experience and training needed for the task.

Even when a 911 call does not end in a shooting, dispatching police officers to respond to 911 calls involving people with mental health disabilities risks serious harm with the individual being unnecessarily arrested and  incarcerated.[49]  District judges have noted they "see dozens of defendants with behavioral health disorders who should have been diverted from the criminal justice system to support services instead of being arrested."[50]  Indeed, people with mental health disabilities are grossly overrepresented among those in jail.[51]  Although people with a serious mental illness comprise only 4% to 5% of the U.S. population, they make up 20% of the jail

---

[46] D.C. Police Commission Report, *supra* note 20, at 35 (citing Disability Community and Policing Working Group as convened by the DC Developmental Disabilities Council, Recommendations to Support DC's Disability Community (Washington, DC: 2020)).

[47] Frankham, Emma, *Mental Illness Affects Police Fatal Shootings*, CONTEXTS, Jul. 27, 2018, at 4.

[48] Dylan Goforth, *Bartlesville family copes with questions, loss, following fatal officer-involved shooting*, THE FRONTIER, Oct. 21, 2019, https://www.readfrontier.org/stories/bartlesville-family-copes-with-questions-following-fatal-officer-involved-shooting.

[49] Compl. ¶¶ 58-65.

[50] Office of the D.C. Auditor, *Improving Mental Health Services and Outcomes for All: The D.C. Department of Behavioral Health and the Justice System*, at x (Feb. 2018).

[51] Jennifer Bronson, Phd. & Marcus Berzofsky, *Indicators Of Mental Health Problems Reported By Prisoners And Jail Inmates,* 2011-2012, BUREAU OF JUST. STAT. at 1-16 (June 2017), https://bjs.ojp.gov/content/pub/pdf/imhprpji1112.pdf.

population.[52]  Over two million people with serious mental illness are booked into jail each year.[53]

Jails are now among the largest providers of mental health care in the United States.[54]  Once in

jail, people with serious mental illness are incarcerated longer than other prisoners—in some

facilities twice as long or more—and most do not receive needed treatment.[55]  Upon release, with

public benefits interrupted and a criminal record, they are more likely to be unemployed, homeless,

and rearrested.[56]

---

[52] Treatment Advoc. Ctr., *Serious Mental Illness (SMI) Prevalence in Jails and Prisons* (Sept. 2016), https://www.treatmentadvocacycenter.org/reports_publications/serious-mental-illness-prevalence-in-jails-and-prisons/.

[53]  National Association Of State Mental Health Program Directors, *Cops, Clinicians, or Both? Collaborative Approaches to Responding to Behavioral Health Emergencies*, at 4 (Aug. 2020), https://www.nasmhpd.org/sites/default/files/2020paper11.pdf.

[54]  *Rethinking How Law Enforcement is Deployed*, Brennan Center (Nov. 2022), https://www.brennancenter.org/our-work/research-reports/rethinking-how-law-enforcement-deployed.

[55] The Treatment of Persons with Mental Illness in Prisons and Jails: A State Survey 14 . Treatment Advocacy        Center        &        National        Sheriffs        Association.        2014, https://www.treatmentadvocacycenter.org/wp-content/uploads/2023/11/Treatment-Behind-Bars.pdf; Prison Legal News, *Many U.S. Prisoners Mentally Ill, Few Receive Treatment* (Mar. 15, 2007) (64% of nation's jail inmates had been treated for or exhibited signs of mental disorder in previous year, but only 1 in 6 inmates received mental health care while incarcerated), https://www.prisonlegalnews.org/news/2007/mar/15/many-us-prisoners-mentally-ill-few-receive-treatment/.

[56] Lucius Couloute & Daniel Kopf, *Out of Prison & Out of Work:  Unemployment Among Formerly Incarcerated People* (Jul. 2018) (unemployment rate for formerly incarcerated people is nearly five        times        higher        than        that        for        general        population        in        U.S.), https://www.prisonpolicy.org/reports/outofwork.html; Lucious Couloute, *Nowhere to Go: Homelessness Among Formerly Incarcerated People* (Aug. 2018) (formerly incarcerated people almost        ten        times        more        likely        to        be        homeless        than        general        public), https://www.prisonpolicy.org/reports/housing.html; U.S. Dep't of Health & Human Servs., Office of the Asst. Sec. for Planning & Eval., *Incarceration & Reentry* ("Each year . . . 9 million cycle through local jails.  More than two-thirds of prisoners are rearrested within 3 years . . . and half are reincarcerated."),  https://aspe.hhs.gov/topics/human-services/incarceration-reentry-0  (last visited Feb. 23, 2024); Elaine Michelle Albertson et al., *Eliminating gaps in medicaid coverage during reentry after incarceration*, Amer. J. Pub. Health, 110(3): 317-321 (Mar. 2020) ("Too often . . . people who arrived with Medicaid leave the correctional system without insurance coverage."), https://www.ncbi.nlm.nih.gov/pmc/articles/PMC7002937/.

A police response is also, by definition, an armed response and often leads to the individual being handcuffed and searched.  And a police response can be traumatic, particularly when guns are drawn.  In effect, people with mental health disabilities are treated like criminals because their health emergency involves mental rather than physical health.[57]  In many ways, a police response can exacerbate, rather than help, the situation—unlike a mental health response.[58]

In contrast, mental health responders are unarmed and do not behave in this way.  In *amici*'s experience, mental health responders are able to deescalate mental health crises, provide immediate emergency counseling that resolves most situations, and help people remain in their housing and receive needed care.[59]  Police are also less likely than a mental health responder to link the individual to resources that can help address their mental health needs and avoid mental

---

[57] Compl. ¶¶ 66-68.  *See* D.C. Police Reform Commission Report, *supra* note 20, at 39 (describing how experience of being handcuffed exacerbates trauma, increases the risk of conflict, and breeds mistrust of police).

[58] Compl. ¶¶ 53-56.  *See* Kristen M. Folkerts, Isra Merchant, & Chenxi Yang, *A Tri-Country Analysis of the Effects of White Supremacy in Mental Health Practice and Proposed Policy Alternatives*, 19 COLUM. SOCIAL WORK REV. 86, 97 (2022) (citing a study revealing that 25-40% of Americans with mental health illnesses face incarceration in their lifetimes). Such treatment also may cause people with mental health disabilities, who often have had previous adverse experiences with the police, to suffer unnecessary additional trauma.  *Id.*

[59] *See, e.g.*, SAMHSA, *National Guidelines for Behavioral Health Crisis Care Best Practice Toolkit*, at 19-21 (2020), https://www.samhsa.gov/sites/default/files/national-guidelines-for-behavioral-health-crisis-care-02242020.pdf (explaining what mobile crisis care does).

health crises in the future.[60]   Mental health response programs are far more successful at linking

people to services. [61]

Finally, dispatching police reinforces the stigma associated with having a mental health

condition, as well as the inaccurate perception that people with mental health disabilities are

violent and dangerous.   To the contrary, people with mental health disabilities are no more likely

to commit crimes than others and are *not* more violent than the population at large.   In fact, they

are more likely to be victims of violent crime than the general population.[62]

For example, David Murphy, a veteran with PTSD, was experiencing pain in his lower

back.[63]   Mr. Murphy's cousin called 911 and requested an ambulance, but also explained to the

operator about David's past experience with PTSD.[64]   Soon thereafter, six District police officers

---

[60] *See, e.g.,* Eric Westervelt, *Removing Cops From Behavioral Health Crisis Calls: "We Need To Change the Model,"* NPR (Oct. 19, 2020), https://www.npr.org/2020/10/19/924146486/removing-cops-from-behavioral-crisis- calls-we-need-to-change-the-model (stating that the goal of San Francisco's Street Crisis Response Team program is to "better guide people to long-term supportive services, and to end the in-and-out emergency rooms and homeless shelter cycle"); Judge David L. Bazelon Ctr. For Mental Health L., *Diversion To What? Evidence-Based Mental Health Services That Prevent Needless Incarceration* 7 (Sept. 2019), http://www.bazelon.org/wp-content/uploads/2019/09/Bazelon-Diversion-to-What-Essential-Services- Publication_September-2019.pdf

[61] Stephanie O'Neill, *Police and the Mentally Ill: LAPD Unit Praised as Model for Nation*, KPCC (March 09, 2015), available at http://www.scpr.org/news/2015/03/09/50245/police-and-the-mentally-ill-lapd-unit-praised-as-m/.

[62] *Mental Health Myths and Facts*, MENTALHEALTH.GOV (last visited Feb. 23, 2024), https://www.mentalhealth.gov/basics/mental-health-myths-facts; *see also* Heather Stuart, *Violence and Mental Illness: An Overview*, 2 WORLD PSYCHIATRY 121, 123 (2003) ("[M]embers of the public undoubtedly exaggerate both the strength of the relationship between major mental disorders and violence, as well as their own personal risk").

[63] David Murphy, *I live with PTSD in DC. The city both helped and endangered me*, GREATER GREATER WASHINGTON, Aug. 2, 2023.

[64] *Id.*

arrived at the scene.[65]  The mere mention of a mental health diagnosis triggered a police response–

and demonstrates the inequities in the District's emergency response system.

The District's own data shows that emergency calls involving people with mental health

disabilities do not present any substantial risk.  For instance, data from the Metropolitan Police

Department (MPD) indicates that behavioral health calls in DC rarely involve violence.  In nearly

90% of them, the individuals' "level of resistance" was "cooperative" or "passive."[66]

In sum, police are not mental health personnel and, even with training, do not have the

expertise or experience to respond in the way a mental health professional would.

## III.   EXPERIENCES OF PEOPLE WITH MENTAL HEALTH DISABILITIES DEMONSTRATE THE TRAGIC CONSEQUENCES THAT CAN RESULT WHEN POLICE ARE DISPATCHED TO MENTAL HEALTH CRISES

As shown above, when we rely on the police to respond to mental health crises, rather than

mental health workers who have the experience and training needed for the task, the interactions

sometimes result in tragedy.  There are many heartbreaking accounts confirming the dangers of a

police response to mental health emergencies.  Many of these involve avoidable deaths.  *Amici*

describe just a few of these accounts in an attempt to illustrate the lived experiences of people

affected by practices like the District's.

For example, Daniel Prude, a 41-year-old Black man, died after officers in Rochester, NY,

found him wandering shirtless and shoeless in the snow, unarmed.  Officers put a spit mask on his

head and aggressively restrained him.  Daniel died from the injuries sustained during the incident.[67]

---

[65] *Id.*

[66] D.C. Police Commission Report, *supra* note 20, at 38 (citing Police Complaints Board: Office of Police Complaints, PCB Policy Report #19-2: Updates for the Crisis Intervention Officers Program (Washington, DC: PCB, 2020), https://policecomplaints.dc.gov/sites/default/files/dc/sites/office%20of%20police%20complaints/publication/attachments/Updates CIO.FINAL_.pdf (accessed Feb. 23, 2024).

[69] Tim Craig et al., *Seven police officers suspended after video shows hood placed on head of Black man who later died*, The Wash. Post, Sep. 3, 2020.

Danny Ray Thomas, a father who was struggling with the loss of two children, was shot and killed by police in Harris County, Texas. Danny, who was unarmed, was exhibiting signs of a mental health crisis. He was wandering in the middle of the street with his pants at his ankles and was foaming at the mouth. When he did not respond to commands, a police deputy fatally shot him.[68]

There are many such stories of tragedies that could have been avoided. These stories exemplify the critical importance of sending a mental health response, rather than a police response, to mental health emergencies.

## IV.     THE RELIEF SOUGHT IS READILY ACHIEVABLE

The relief Bread for the City seeks is not only urgently needed and legally required, it is also readily achievable. Providing a mental health response to mental health crises would not, as the District contends, require the District to provide entirely new services.[69] Instead, the District can expand its existing emergency response services for people experiencing a mental health crisis.

These include D.C.'s Access Helpline, which is a mental health telephone hotline operated by the D.C. Department of Behavioral Health.[70] According to the District, the Access Helpline operates "24-hour[s], seven-day-a-week" and is "staffed by licensed and trained behavioral health professionals, [that] serves as … [a] Crisis and Triage hub: providing crisis management, counseling, information regarding community services, as well as routine care in the community. The Access Helpline also receives calls from the '988' National Suicide Prevention Life Line

---

[68] Jason Miles, *New lawsuit filed in case of man fatally shot by HCSO deputy in 2018*, KHOU.com, Sept. 20, 2022, https://www.khou.com/article/news/local/lawsuit-filed-against-former-hcso-deputy/285-782f0572-661b-4542-98b5-60ea85e5f6f0; *Family of man shot and killed by former HCSO deputy still waits for justice 4 years later*, ABC13.com, Sept. 20, 2022, https://abc13.com/danny-ray-thomas-man-shot-by-deputy-harris-county-sheriffs-office-shooting-cameron-brewer/12244430/.
[69] Mot. to Dismiss at 6.
[70] DC Council Committee on Health, *FY 2023 Performance Oversight Pre-Hearing Questions Dep't. of Behavioral Health* 84 (Jan. 29, 2024), https://lims.dccouncil.gov/Hearings/hearings/247.

emanating from the District."[71]  The Access Helpline can send Community Response Teams when efforts to resolve the situation by phone are not successful.[72]  Child and Adolescent Mobile Crisis Services (ChAMPS) is another mobile crisis unit in the District, specifically designed to respond to youth experiencing mental health crises.[73]

At present, however, due to limited capacity, the District can rarely send a mental health response when a person with a mental health disability is in crisis.[74]  Under the current system, for example, the Access Helpline receives fewer than 1% of mental-health-related 911 calls.[75]  The District says it is committed to expanding its mental health crisis services, but its efforts are too little and too late.

Though not at issue on a motion to dismiss, *amici* note that the District has various means by which it can secure funding for this purpose.[76]  For instance, the District can seek funds from the national Medicaid program.[77]  In fact, the District has already sought federal funding through Medicaid for, among other things, mental health mobile crisis services.[78]  The federal government

---

[71] *Id.*

[72] *Id.*

[73] *Id.* at 38-39.

[74] Compl. ¶¶ 91, 96, 105, 110-12, 158, 160.

[75] Compl. ¶ 91.

[76] Judge David L. Bazelon Ctr. for Mental Health Law, *When There's a Crisis Call a Peer* 46-47 (Jan. 2024), https://www.bazelon.org/wp-content/uploads/2024/01/Bazelon-When-Theres-a-Crisis-Call-A-Peer-full-01-03-24.pdf (explaining funding sources for mental health crisis services).

[77] *See* U.S. Dep't of Health & Human Servs., SHO # 21-008, *Letter on Medicaid Guidance on the Scope of and Payments for Qualifying Community-Based Mobile Crisis Intervention Services* (Dec. 28, 2021) (discussing enhanced federal Medicaid financing for qualifying mobile crisis services), https://www.medicaid.gov/federal-policyguidance/downloads/sho21008.pdf; Richard G. Frank & Vikki Wachino, *Building A Sustainable Behavioral Health Crisis Continuum*, BROOKINGS (Jan. 6, 2022), https://www.brookings.edu/blog/usc-brookings-schaeffer-on-healthpolicy/2022/01/06/building-a-sustainable-behavioral-health-crisis-continuum/.

[78] DC DEPT. OF HEALTH CARE FINANCE, DISTRICT OF COLUMBIA PROPOSED SECTION 1115 BEHAVIORAL HEALTH TRANSFORMATION DEMONSTRATION 15, 18 (June 3, 2019),

regularly provides grants to states to support their development of community-based mobile crisis

intervention services.[79]  In addition, new Medicare regulations permit increased reimbursement

under that program for crisis supports provided in the community.[80]  Localities across the country

are combining federal and local funds, including from hospitals, private insurers, foundations, and

law enforcement agencies, to build mental health response capacity and expand and improve crisis

services.[81]

Further, the District will realize cost savings from using mental health workers rather than

police as responders to mental health crises.  Such savings will go far towards paying for the

District's expansion of services.  Studies demonstrate that "when communities respond to

individuals in crisis with law enforcement responses like arrest, court, and jail services, taxpayer

---

https://www.medicaid.gov/sites/default/files/Medicaid-CHIP-Program-Information/By-Topics/Waivers/1115/downloads/dc/dc-behavioral-health-transformation-pa.pdf.

[79] *State Option to Provide Qualifying Community-Based Mobile Crisis Intervention Services*, Ctrs. for Medicare & Medicaid Servs. https://www.medicaid.gov/medicaid/benefits/behavioral-health-services/state-option-provide-qualifying-community-based-mobile-crisis-intervention-services/index.html (last visited Feb. 21, 2024).

[80] For example, the 2023 Consolidated Appropriations Act (CAA) establishes "increased payment rates for crisis psychotherapy services when furnished by a mobile unit and some additional settings other than a facility or physician office, beginning in 2024.  *See* Legal Action Ctr., Key Crisis Response Provisions in the FY 2023 Omnibus Funding Bill 1, https://www.lac.org/assets/files/march-2023-Key-Crisis-Provisions-of-FY-2023-Omnibus.pdf (last visited Oct. 9, 2023).

[81] *See, e.g.*, *County Funding Opportunities to Support Community Members Experiencing a Behavioral Health Crisis*, Nat'l Ass'n of Counties (NACo) (Feb. 8, 2023) (describing federal, state, county, and non-governmental resources; "[c]ounties can blend and braid these resources to build a robust, accessible and sustainable behavioral health crisis continuum of care"), https://www.naco.org/resources/county-funding-opportunities-support-community-members-experiencing-behavioral-health; Chris Lee, *Amid a Mental Health Crisis in the U.S., A New KFF Report Examines the Steps that State Medicaid Programs Are Taking to Help Shore Up the Availability of Crisis Services*, Kaiser Fam. Found. (May 25, 2023) (reporting that several states have crisis service initiatives, including crisis stabilization, diversion, and receiving centers), https://www.kff.org/mental-health/press-release/amid-a-mental-health-crisis-in-the-u-s-a-new-kff-report-examines-the-steps-that-state-medicaid-programs-are-taking-to-help-shore-up-the-availability-of-crisis-services-beneficiaries/.

costs are significantly higher than when [appropriate] crisis response services are utilized pre-booking."[82]   For instance, a 2022 Stanford University study found that the cost of dispatching mental health workers in Denver, Colorado was much less than the cost of dispatching the police.[83] A 2020 report showed that the mental health crisis response program in Eugene, Oregon saved the city $8.5 million in public safety costs and $14 million in ambulance and emergency room costs annually.[84]   A 2014 study focused on mobile crisis teams in Louisville, Kentucky, found that while the program cost the city about $2.5 million annually, it also saved the city nearly $3.5 million annually in deferred hospitalizations, reduced inpatient referrals from jail, and avoided bookings and jail time.[85]   Other studies have found that mobile crisis services are 23% less costly than police interventions and dramatically reduce costs for inpatient hospitalization.[86]

The Court has the power to require the District to make the needed changes to its emergency response program to meet the needs of individuals with mental health disabilities and ensure they have an equal opportunity to benefit from the District's emergency response program. Building off the foundation already established by the District, such changes are readily achievable.

---

[82] DOJ and HHS Guidance, *supra* note 5, at 2.

[83] Thomas S. Dee & Jaymes Pyne, *A community response approach to mental health and substance abuse crises reduced crime*, NAT'L LIBRARY OF MEDICINE (June 8, 2022), https://www.ncbi.nlm.nih.gov/pmc/articles/PMC9176742.

[84] Scottie Andrew, *This Town of 170,000 Replaced Some Cops with Medics and Mental Health Workers. It's Worked for Over 30 Years*, CNN (July 5, 2020), https://www.cnn.com/2020/07/05/us/cahoots-replace-police-mental-health-trnd/index.html.

[85] Peggy L. El-Mallakh, et. al., *Costs and Savings Associated with Implementation of a Police Crisis Intervention Team*, S. MED. J., https://sma.org/southern-medical-journal/article/costs-and-savings-associated-with-implementation-of-a-police-crisis-intervention-team (last visited Jan. 21, 2024).

[86] SAMHSA, *National Guidelines for Behavioral Health Crisis Care Best Practice Toolkit* 19 (2020), https://www.samhsa.gov/sites/default/files/national-guidelines-for-behavioral-health-crisis-care-02242020.pdf.

## CONCLUSION

For the above stated reasons, we urge the Court to deny Defendant's motion to dismiss.

Dated:  February 23, 2024                  Respectfully submitted,

BAKER & HOSTETLER LLP

By:  */s/ Elizabeth B. McCallum*

Elizabeth B. McCallum (DC Bar No. 541361)
Orga Cadet (DC Bar No. 1719508)
Daniel P. Wicklund  (Admitted in DC on 2/23/24;
Bar No. Pending)
Washington Square, Suite 1100
1050 Connecticut Avenue, NW
Washington, D.C.  20036
Telephone: 202.861.1500
Facsimile: 202.861.1783
Email:  emccallum@bakerlaw.com
       ocadet@bakerlaw.com
       dwicklund@bakerlaw.com

THE JUDGE DAVID L. BAZELON CENTER
FOR MENTAL HEALTH LAW

Megan E. Schuller (CA Bar No. 281468)
(Application for DC Bar Admission pending)
Ira Burnim (DC Bar No. 406154)
Lewis Bossing (DC Bar No. 984609)
Brit Vanneman (DC Bar No. 1736194)
1090 Vermont Avenue NW, Suite 220
Washington, DC 20005
Tel: (202) 467-5730
Email: megans@bazelon.org
      irab@bazelon.org
      lewisb@bazelon.org
      britv@bazelon.org

*Attorneys for Movants and Proposed Amici Curiae*
*Mental Health America, the American Association*
*of People with Disabilities, Miriam's Kitchen, the*
*Public Defender Service for the District of*
*Columbia, the Total Family Care Coalition,*

23

*Whitman-Walker Health, the Arc of DC, Disability Rights DC at University Legal Services, the School Justice Project, and the Judge David L. Bazelon Center for Mental Health Law*

**CERTIFICATE OF SERVICE**

I hereby certify that on this 23th day of February 2024, I filed a copy of the foregoing, which will electronically serve all counsel of record who have entered an appearance in the case.

By:  */s/ Elizabeth B. McCallum*

Elizabeth B. McCallum (DC Bar No. 541361)
Washington Square, Suite 1100
1050 Connecticut Avenue, NW
Washington, D.C.  20036
Telephone: 202.861.1500
Facsimile: 202.861.1783
Email:  emccallum@bakerlaw.com