**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| **BREAD FOR THE CITY,** | |
| **Plaintiff,** | |
| **v.** | **Civil Action No. 1:23-cv-01945-ACR** |
| **DISTRICT OF COLUMBIA,** | |
| **Defendant.** | |

**REPLY IN FURTHER SUPPORT OF DEFENDANT'S**
**MOTION TO DISMISS PLAINTIFF'S COMPLAINT**

# TABLE OF CONTENTS

INTRODUCTION……………………………………………………………………..1

ARGUMENT…………………………………………………………………………..1

I.     Plaintiff Lacks Organizational Standing Because It Fails To Allege an Injury
       Independent of Its Diversion of Resources…………………………….................1

II.    Plaintiff Fails To Allege a Violation of the ADA or the Rehabilitation Act………….6

       A.  Plaintiff Is Not a "Qualified Individual with a Disability" Nor Is Plaintiff
           Discriminated Against "By Reason of [It's] Disability."…………………….…...7

       B.  Plaintiff Is Not Excluded from Participation or Denied the Benefits of
           Services……………………………………………………………………..9

           1.  The Question of What Constitutes a "Service" Under the ADA Is Not a
               Question of Fact Entitled to Deference at the Motion To Dismiss
               Stage …………………………………………………………………….…9

           2.  Plaintiff Misidentifies the Service at Issue…………………………….…12

           3.  Plaintiff Is Not Excluded from Participation or Denied the Benefits of
               Services Through a Lack of Equal Opportunity or Through the District's
               Methods of Administration……………..…………………………………16

III.   Response to the U.S. Department of Justice's Statement of Interest……………..…17

IV.    Response to the Mental Health America Amicus Brief…………………….…..……19

CONCLUSION………………………………………………………………………20

# TABLE OF AUTHORITIES

**Cases**                                                                                                  **Pages**

*Alexander v. Choate,*
  469 U.S. 287 (1985). ................................................................................. 10, 11, 17
*Am. Council of the Blind v. Paulson,*
  525 F.3d 1256 (D.C. Cir. 2008)........................................................................ 7
*Arpaio v. Obama,*
  797 F.3d 11 (D.C. Cir. 2015)............................................................................ 9
*Ashcroft v. Iqbal,*
  556 U.S. 662 (2009) ............................................................................... 2, 3, 4
*Buchanan v. Maine,*
  469 F.3d 158 (1st Cir. 2006)............................................................................. 8
*Capital Area Immigrants' Rights Coalition v. Trump,*
  471 F. Supp. 3d 25 (D.D.C. 2020)..................................................................... 4
*Cmtys. Actively Living Indep. & Free v. City of L.A.,*
  2011 WL 4595993 (C.D. Cal. Feb. 10, 2011) .................................................. 13
*Coleman v. Pension Benefit Guar. Corp.,*
  94 F. Supp. 2d 18 (D.D.C. 2000)..................................................................... 14
*Ctr.for Indep. of the Disabled v. Bloomberg,*
  980 F. Supp. 2d 588 (S.D.N.Y. 2013) ........................................................ 13, 14
*Ctr for Responsible Sci. v. Gottlieb,*
  346 F. Supp. 3d 29 (D.D.C. 2018)................................................................. 2, 3
*Ctr for Responsible Sci. v. Hahn,*
  809 Fed. 10 (D.C. Cir. 2020)........................................................................... 2
*D'Amore v. Small Bus. Admin.,*
  2023 WL 6215358 (D.D.C. Sept. 25, 2023)................................................... 9, 10
*Equal Rts. Ctr. v. District of Columbia,*
  741 F. Supp. 2d 273 (D.D.C. 2010).................................................................. 7
*Garnett v. Zeilinger,*
  485 F. Supp. 3d 206 (D.D.C. 2020)............................................................... 4, 5
*Jarzynka v. UPMC Health Sys.,*
  2011 WL 4565612 (W.D. Pa. 2011)............................................................... 10
*Jones v. City of Monroe,*
  341 F.3d 474 (6th Cir. 2003) ........................................................................ 11
*Lewis v. Humboldt Acquisition Corp.,*
  681 F.3d 312 (6th Cir. 2012) ........................................................................ 11
*Modderno v. King,*
  82 F.3d 1059 (D.C. Cir. 1996)....................................................................... 17
*Morgan Distributing Co, Inc. v. Unidynamic Corp.,*
  868 F.2d 992 (8th Cir. 1989) ........................................................................ 14
*O.A. v. Trump,*
  404 F. Supp. 3d 109 (D.D.C. 2019)................................................................. 4
*Olmstead v. L.C. ex rel. Zimring,*
  527 U.S. 581 (1999) ...................................................................................... 8

Plaintiff's reliance on *L.E. by & Through Cavorley v. Superintendent of Cobb Cnty. Sch. Dist.*,
  55 F.4th 1296 (11th Cir. 2022) ........................................................................... 10
*Privacy Info. Ctr. v. Presidential Advisory Comm'n on Election Integrity*,
  878 F.3d 371 (D.C. Cir. 2017) .............................................................................. 1
*Rodde v. Bonta*,
  357 F.3d 988 (9th Cir. 2004) ............................................................................... 16
*Rodriguez v. City of New York*,
  197 F.3d 611 (2d Cir. 1999) ................................................................................ 11
*Traynor v. Turnage*,
  485 U.S. 535 (1988) ............................................................................................ 17
*Wright v. Giuliani*,
  230 F.3d 543 (2d Cir. 2000) ................................................................................ 12
*Wright v. Giuliani*,
  2000 WL 777940 (S.D.N.Y. June 14, 2000) ...................................................... 14

Regulations

8 C.F.R. § 35.104 ...................................................................................................... 7
28 C.F.R. § 35.130(d) ............................................................................................... 8

## INTRODUCTION

Plaintiff's Opposition to the District's Motion to Dismiss (Opposition) makes clear that Plaintiff's claims are based on a novel argument that the Americans with Disabilities Act (ADA) and Section 504 of the Rehabilitation Act require public entities to allocate the *same* resources to services addressing mental health disabilities as those it offers to address physically disabling conditions, such that the level of benefit and outcome of the services rendered achieves "parity." Yet Plaintiff, the U.S. Department of Justice, and amici organizations all fail to cite a single case that says this is so.  Plaintiff's ADA claim analysis faulters at every step.  Plaintiff is not a qualified individual with a disability, Plaintiff is not discriminated against by reason of its disability, and Plaintiff is not excluded from participation or denied the benefits of the service at issue.  And, before even reaching the merits of the ADA claim, Plaintiff fails to establish that it has standing to bring the claim at all because the only injury it alleges is self-inflicted, caused by its decision to divert resources, not any harm to its core programs caused by alleged deficiencies in the District's emergency response system.  The Court should grant the District's Motion to Dismiss (Motion).

## ARGUMENT

### I.   Plaintiff Lacks Organizational Standing Because It Fails To Allege an Injury Independent of Its Diversion of Resources.

Plaintiff brought this lawsuit on its own behalf under a theory of organizational standing, alleging that it has been directly and concretely injured by the District's allegedly discriminatory mental health emergency response system, and Plaintiff bears the burden of establishing all the elements of standing.  *Elec. Privacy Info. Ctr. v. Presidential Advisory Comm'n on Election Integrity*, 878 F.3d 371, 377 (D.C. Cir. 2017).  Here, it is clear at the very least that Plaintiff fails to allege a cognizable organizational injury, because the only sufficiently-pled harm in the

Complaint—to Plaintiff itself—is a self-inflicted diversion of resources.  Mem. in Supp. of Mot. to Dismiss (Mot.) [42-1] § I.  Plaintiff never makes the necessary connection demonstrating that its core mission of providing services is harmed by the District's response to calls for emergency mental health services at Bread's location.

Plaintiff's opposition makes much of the areas where the District and Plaintiff do not disagree.  For example, in its Complaint [1], Plaintiff has sufficiently alleged that it has spent resources on mental health emergency response training for its staff, and that when its staff respond to mental health emergencies, that time has been diverted from performing other tasks at Bread.  *See, e.g.*, Pl.'s Opp'n to Mot. to Dismiss (Pl.'s Opp'n) [47] at 16–18.  And, for the purposes of evaluating Plaintiff's standing at this stage of the litigation, Plaintiff's factual allegations regarding prior interactions between its clients and Metropolitan Police Department (MPD) officers are taken as true.  *Id*. at 17; *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).  But that only gets Plaintiff so far.  The key question when evaluating an organizational injury is not whether the plaintiff is diverting resources, but *why* the plaintiff is diverting such resources.  To be cognizable, the organization must be diverting its resources not by choice but by necessity, to counteract harm inflicted to its core organizational programs.  *See Ctr for Responsible Sci. v. Gottlieb*, 346 F. Supp. 3d 29, 41 (D.D.C. 2018), *aff'd per curiam sub nom. Ctr for Responsible Sci. v. Hahn*, 809 Fed. 10 (D.C. Cir. 2020).  In other words, the diversion of resources alone— even if the diversion harms an organization's core programs—is insufficient to establish standing where the government's action itself does not harm the organization's core programs.  *Id.*

Plaintiff argues that *Gottlieb* does not support finding Plaintiff lacks standing here, saying that "[u]nlike the plaintiff in *Gottlieb*, Bread alleges that the harm of a default police response makes providing client services more difficult and requires it to expend resources to counteract

that harm." Pl.'s Opp'n at 21. But, tellingly, Bread makes no reference to the Complaint to substantiate its claim that "the harm of a default police response makes providing client services more difficult . . . ." *Id*. Similarly, Plaintiff declines to advance any facts to support its allegations that a police response to mental health emergencies "makes it harder for Bread to provide mental health services to its clients," or that it "increases client demands for Bread's services." *Id*. at 12–13. Such factual allegations are strictly necessary because, as *Gottlieb* explains, "[t]he diversion itself cannot alone constitute the harm." 346 F. Supp. 3d at 41.

In contrast, when Plaintiff does cite the Complaint in support of its injury, and hence its standing, it relies *not* on harms to its own core mission of providing client services, but only on alleged harm to its clients themselves. For example, Plaintiff claims that "Bread's clients do not receive a timely and effective response from the District's emergency response system and therefore require this crisis response service from Bread instead." Pl.'s Opp'n at 17 (citing Compl. ¶¶ 165–66). Whether individual clients are harmed by an alleged lack of a timely and effective response is not a harm in and of itself to Bread. And whether clients therefore "require" such services specifically from Bread such that Bread is *compelled* to provide them— and whether this compulsion can be construed as an injury attributable to the District—is a bald legal conclusion that the Court need not credit. *See Iqbal*, 556 U.S. at 678.

Likewise, Plaintiff later argues that "Bread experiences increased client demand for its services because of the challenged action." Pl.'s Opp'n at 19. But again, the referenced paragraphs of the Complaint do not substantiate this claim. Instead, Plaintiff points to the time and money expended to train its staff for treating individuals in crisis—a diversion injury, not a standalone increased demand for services. *Id*. (citing Compl. ¶¶ 164–68, 170–71, 190). And that it must adjust its staffing to compensate when staffers respond to mental health crises—another

diversion injury.  *Id*. (citing Compl. ¶¶ 189, 193).  And alleged downstream effects, like lost billing for scheduled appointments that are cancelled due to its staff responding to mental health crises—yet another diversion injury.  *Id*. (citing Compl. ¶¶ 183, 185).  By no means does the District "ignore[] Bread's allegations explaining how the harm to clients makes it harder for Bread to engage in its mission of providing primary health and wellbeing services."  *Id*. (citing Compl. ¶¶ 174–86).  Rather, each allegation in those cited paragraphs deals exclusively with harms and burdens caused by Bread's own diversion of resources, not the District's response to mental health emergencies.  *See, e.g.*, Compl. ¶ 174 (harms caused by "[e]nlisting staff to address crises").  Simply put, Plaintiff has failed to allege any way in which the allegedly unlawful action of the District harms Plaintiff's activities and services *independently* of Plaintiff's own diversions of resources.  In this way, Plaintiff's situation differs from *Capital Area Immigrants' Rights Coalition v. Trump*, 471 F. Supp. 3d 25 (D.D.C. 2020) and *O.A. v. Trump*, 404 F. Supp. 3d 109 (D.D.C. 2019), because in both those cases, the challenged government action directly impeded the services those organizations were providing to their clients.  *See* Pl.'s Opp'n at 19.  That action therefore created an increased client demand for services from those organizations *regardless* of whether those organizations had decided to allocate more resources to counteract the government's actions.  *Id*.

Plaintiff also cites to *Garnett v. Zeilinger*, 485 F. Supp. 3d 206 (D.D.C. 2020), as an analogous situation in which Plaintiff was found to have organizational standing.  Pl.'s Opp'n at 21–22.  The District agrees that this case is illustrative, because it highlights this distinction between harm to services and diversion harms.  In *Garnett*, the Plaintiffs, including Bread itself, claimed that the District failed to operate its Supplemental Nutrition Assistance Program (SNAP) in accordance with that law.  *Garnett*, 485 F. Supp. 3d at 210.  And in that case, Bread could

draw a direct line between the alleged deficiencies in the District's administration of the SNAP program (which allegedly caused District SNAP recipients not to receive the benefits to which they were entitled, which would have been spent on food) and an increased burden on Bread's core services of providing "food, SNAP-related legal services and counseling, and assistance with management of [Society Security] benefits." *Id*. at 216.  This direct linkage was key:  The Court found that Bread's preexisting programs were directly burdened by the District's actions since a failure to provide SNAP benefits caused more clients to need the very services Bread was already providing (*e.g.* food), and Bread was forced to take steps to meet that increased burden. *Id*. at 217.  In other words, the Court upheld Bread's organizational standing because Bread had shown an "impairment of [ ] non-abstract interests . . . ." *Id*.

But here, in this case, Plaintiff repeats again and again that providing emergency mental health services is *not* part of its core mission.  *See* Compl. ¶¶ 13, 14, 22, 143, 147.  So, to the extent that Plaintiff is relying on harm it has experienced by now choosing to provide such services, *see, e.g.*, *id*. ¶ 140, those are strictly diversion harms, *not* independent harms to core, preexisting programs such as occurred in *Garnett*.  The question is not simply whether Plaintiff has diverted resources to programs independent of this lawsuit itself, *see* Pl.'s Opp'n at 15 (quoting *Garnett*, 485 F. Supp. 3d at 217), but rather whether Plaintiff has diverted resources to counter harms to itself that existed independent of its diversions.  Once again, when this dispositive question is framed directly, Plaintiff fails to provide any citation to facts in the Complaint that would support its argument that it has standing.  *See id*. at 15 ("[T]he challenged action increases the clients in need of emergency health services, and Bread is forced to divert resources to counteract this harm in order to fulfill its mission of providing mental healthcare.").  Simply put, even if the Court takes as true that "[t]he challenged action increases the clients in

need of emergency health services," *id.*, providing such services is, by Plaintiff's own admission, not part of their mission.  Nor does Plaintiff ever explain how the challenged action increases the clients in need of *non*-emergency services, or why the steps they are taking are required to improve or protect their "mission of providing mental healthcare."  *Id.*

In sum, at the motion to dismiss stage, the District is not disputing that Plaintiff has expended its own resources to help its clients because Plaintiff believes that the District's emergency mental health response program is lacking, or that had Plaintiff not done so, it could have spent those resources elsewhere.  But this initiative on the part of Plaintiff to divert resources to help people experiencing mental health crises does not confer upon it standing to challenge the District's administration of its emergency services in this case.  That is because Plaintiff simply has not shown that the District's actions actually harms it in any way independently of its own actions to try to counteract what it perceives to be potential harm to its clients.  Put another way, if the plaintiff in this lawsuit were an individual who spent money out of his own pocket to help a friend he believed was injured by the District, it is clear he would lack a personalized injury necessary to bring suit on his own behalf.  Article III simply does not recognize such "Good Samaritan" standing, either on the part of individuals, or of organizations. Plaintiff lacks standing and this Complaint should consequently be dismissed.

## II.    <u>Plaintiff Fails To Allege a Violation of the ADA or the Rehabilitation Act.</u>

Plaintiff has not pled facts sufficient to state a claim under Title II of the ADA or Section 504 of the Rehabilitation Act.  To establish a violation of Title II, a plaintiff must show that:

> (1) he or she is a qualified individual with a disability; (2) he or she was either excluded from participation in or denied the benefits of a public entity's services, programs or activities, or was otherwise discriminated against by the public entity; and (3) such exclusion, denial of benefits, or discrimination was by reason of his or her disability.

*Equal Rts. Ctr. v. District of Columbia*, 741 F. Supp. 2d 273, 283 (D.D.C. 2010) (cleaned up);

*see also Am. Council of the Blind v. Paulson*, 525 F.3d 1256, 1267–68 (D.C. Cir. 2008) (same

standard applies to Rehabilitation Act claims).  Plaintiff's claim fails each prong.

### C.  Plaintiff Is Not a "Qualified Individual with a Disability" Nor Is Plaintiff Discriminated Against "By Reason of [It's] Disability."

Plaintiff argues that it is a "qualified individual with a disability"—the first prong of the

Title II standard—because "anyone who needs emergency medical assistance can call 911."

Pl.'s Opp'n at 25.  But this allegation, while accurate, is unrelated to the relief Plaintiff seeks.  It

is correct that individuals with disabilities and individuals without must be able to meaningfully

access or call 911.  Indeed, 911 is a service provided by the government, through which Office of

Unified Command (OUC) call-takers field calls about various emergencies and can dispatch

available emergency response services to the site of a given emergency.  Compl. ¶ 87.  But, as

explained below, 911 is not the service at issue here.  And applying the test for the "qualified

individual" prong illustrates 911's irrelevance to the issues Plaintiff's Complaint presents.  An

"qualified individual with a disability" is defined as:

> an individual with a disability who, with or without reasonable modifications to rules, policies, or practices, the removal of architectural, communication, or transportation barriers, or the provision of auxiliary aids and services, meets the essential eligibility requirements for the receipt of services or the participation in programs or activities provided by a public entity.

8 C.F.R. § 35.104.  Here, Plaintiff does not allege that individuals with mental health disabilities

require an accommodation that the District is not providing that would allow Plaintiff to *call* 911.

If, for example, an individual claimed that they needed an accommodation to effectively

communicate with 911 operators during a mental health crisis that the District was not providing,

*that* could be an ADA claim.  But that is not the case here.

Applied to a different definition of the service at issue here—one based on Plaintiff's allegations and the relief Plaintiff seeks—Plaintiff do not (and cannot) satisfy the first "qualified individual" prong or the interrelated third "by reason of disability" prong.  As discussed below, Plaintiff's Opposition makes clear that the service to which Plaintiff seeks meaningful access is a better-resourced Community Response Team (CRT) program that would be dispatched during all mental health emergencies.  *See* Pl.'s Opp'n at 38–39; Compl. (Prayer for Relief).  But it does not make sense to ask whether an individual with a disability would be "qualified" here because the service Plaintiff seeks to expand (CRTs) would exist exclusively for the benefit of individuals with the exact disability these services are designed to address.  *See* Mot. at 27–272.

For the same reason, Plaintiff cannot allege discrimination on the basis of disability—the services they seek would only be available to individuals with disabilities.  *See id.* at 27. Plaintiff contends that the District's analysis of the third prong is not legally correct because in *Olmstead v. L.C. ex rel. Zimring,* 527 U.S. 581 (1999)*,* the Supreme Court held that a service aimed solely at individuals with disabilities—mental health institutions—could be discriminatory under the ADA if individuals were unjustly confined to the institutions.  Pl.'s Opp'n at 39.  But *Olmstead* institutionalization cases are a special category of ADA cases that fall under a different legal theory and regulatory framework than the one Plaintiff advances here.  *See Buchanan v. Maine*, 469 F.3d 158, 173 (1st Cir. 2006) (noting that "[it]t is significant that this case does not raise the special category of claims about deinstitutionalization of institutionalized mentally ill patients" and citing to 28 C.F.R. § 35.130(d) as the basis for *Olmstead* actions); U.S. Dep't of Justice, Statement of the Department of Justice on Enforcement of the Integration Mandate of Title II of the Americans with Disabilities Act and *Olmstead v. L.C.* (June 22, 2011), available at http://www.ada.gov/olmstead/q&a_olmstead.htm (last accessed March 22, 2023) ("[i]n

*Olmstead*, the Court held that the plaintiffs could make out a case under the integration mandate even if they could not prove 'but for' their disability, they would have received the community-based services they sought.").  Plaintiff points to no other authority (nor could Plaintiff) that would allow Plaintiff to escape Title II's requirement that demonstrating (or even alleging) discrimination on the basis of disability requires a comparison of individuals with and without disabilities' access to a particular government service.  Thus, regardless of the definition of the service at issue, Plaintiff fails to satisfy the first and third prongs of the Title II standard.

> ### D.       Plaintiff Is Not Excluded from Participation or Denied the Benefits of Services.

>> #### 1.       The Question of What Constitutes a "Service" Under the ADA Is Not a Question of Fact Entitled to Deference at the Motion To Dismiss Stage.

Plaintiff's contention that emergency response services are a single government service under the ADA is a legal conclusion, not a question of fact.  And, at the motion to dismiss stage, while the Court must accept Plaintiff's *factual* allegations as true, it "do[es] not assume the truth of legal conclusions."  *Arpaio v. Obama*, 797 F.3d 11, 19 (D.C. Cir. 2015) (internal quotation marks and citation omitted).

In its Opposition, Plaintiff announces a rule:  defining the scope of a service at issue in an ADA claim is purely a question of fact and Plaintiff's definition of that service must therefore be accepted as true at the motion to dismiss stage.  Pl.'s Opp'n at 27–28.  But that "rule" is neither announced by any court nor gleaned from the cases Plaintiff cites.  *Id.* at 27.  For example, Plaintiff points to *D'Amore v. Small Bus. Admin.*, No. 21-cv-1505 (CRC), 2023 WL 6215358 (D.D.C. Sept. 25, 2023), noting that the court there "rel[ied] on [the] statement of material facts to define the 'benefit' of the program at issue on motion for summary judgment."  Pl.'s Opp'n at 27 (citing *D'Amore*, 2023 WL 6215358, at *5).  While true that the *D'Amore* court cited

defendant's statement of material facts in its findings on the definition the benefit at issue, the court did *not* find that its definition of the service was a question of fact; the court actually reached the opposite conclusion. *D'Amore*, 2023 WL 6215358, at *4–5. The court specifically found that where, as here, the scope of the service is defined too broadly, it is within the court's discretion to redefine the scope of the service by narrowing it to the specific individual service at issue. *Id.* (citing *Jarzynka v. UPMC Health Sys.*, 2011 WL 4565612, at *4–5 (W.D. Pa. 2011), for its finding that "a plaintiff who alleged a hospital denied him the right to refuse treatment had defined benefit too broadly because the service the hospital offered was medical services, not the absence of medical services" (internal quotation marks omitted)).

Plaintiff's reliance on *L.E. by & Through Cavorley v. Superintendent of Cobb Cnty. Sch. Dist.*, 55 F.4th 1296, 1303 (11th Cir. 2022) [herein after *L.E.*] is similarly misplaced. Pl.'s Opp'n at 27. Plaintiff argues that the Eleventh Circuit's holding that "the district court erred in redefining the scope of the program from what the record clearly showed" supports Plaintiff's view that the definition of the service at issue is a matter of fact to be determined by the plaintiff. *Id*. But the case contains no such finding. Instead, the *L.E.* court held that the "the district court erred by misconstruing the [s]tudents' argument as a right to education *generally*, despite the record clearly establishing that the [s]tudents are alleging a denial of access to *in-person* education—a specific service, program, or activity that [the public entity] provides to all students." 55 F.4th at 1304 (internal quotations omitted). The court further noted that the district court's finding was improper because "the Supreme Court instructs courts to focus on narrow programs and benefits offered by a public entity when evaluating claims under the ADA and Section 504." *Id.* at 1302 (citing *Choate*, 469 U.S. at 301 & n.21(citing the government's

statement that "[a]ntidiscrimination legislation can obviously be emptied of meaning if every discriminatory policy is 'collapsed' into one's definition of what is the relevant benefit")).

Plaintiff also attempts to distinguish the Supreme Court's holding in *Choate*—a case that rejected respondent's overly-broad definition of the service at issue—by arguing that the Supreme Court intended its findings to be the "exception to the principle" that the "scope and benefits of a government service are generally questions of fact." Pl.'s Opp'n at 46–47. But the Court never recognized the rule Plaintiff invents nor did the Court limit its holding as an "exception" to such a rule. Instead, the Court simply found—in unambiguous terms—that the relevant government benefit under the Rehabilitation Act cannot be "the amorphous objective of 'adequate health care.'" *Choate*, 469 U.S. at 303. Rather, in that case, the relevant "benefit provided through Medicaid [wa]s a particular package of health care services, such as 14 days of inpatient coverage." *Id.* The Court reiterated that while the "package of services has the general aim of assuring that individuals will receive necessary medical care, [] the benefit provided remains the individual services offered—not 'adequate health care.'" *Id.*

In addition to Plaintiff's own citations, the weight of authority shows that defining the scope of the service at issue under the ADA is a legal determination, and courts frequently narrow the scope in spite of plaintiff's attempt to define the scope broadly. *See, e.g., Jones v. City of Monroe,* 341 F.3d 474, 480 (6th Cir. 2003) (internal quotation marks omitted), *abrogated in part on other grounds by Lewis v. Humboldt Acquisition Corp.*, 681 F.3d 312 (6th Cir. 2012) (en banc) (reversing the lower court's "conclusion" because the nature of the benefit at issue was "not appropriately defined as free downtown parking generally, but rather as the provision of all-day and one-hour parking in specific locations."); *Rodriguez v. City of New York*, 197 F.3d 611, 618 (2d Cir. 1999) (reversing a District Court's finding of an ADA violation because, in part, of

11

a "fail[ure] to focus on the particular services provided by appellants"); *Wright v. Giuliani*, 230 F.3d 543, 546 (2d Cir. 2000) (affirming the District Court's rejection of plaintiffs' definition of the service at issue because "the relevant question is not the amorphous concept of emergency housing, but whether plaintiffs have access to the particular emergency housing granted to able-bodied, homeless New York City residents").  Plaintiff provides no authority finding, let alone even suggesting, that defining the scope of the government benefit is a factual allegation that must be taken as true at the motion to dismiss stage.  And, here, the Court should resolve the Parties' dispute about the definition of the service at issue under the ADA by, as other courts have done, looking at the *facts* in the record and heeding the Supreme Court's direction to narrowly define the scope of the program at issue.

### 2.      Plaintiff Misidentifies the Service at Issue.

Having established that the Court *can* determine the scope of the program or service at issue under the ADA, the District turns to the question of how to define the scope here.  As explained in the District's Motion, the "District's emergency response program" is not a "a service, program, or activity within the meaning of Title II."  Compl. ¶ 195; Pl.'s Opp'n at 20. Plaintiff's Opposition makes clear that what Plaintiff really wants is for the District's CRT program to be as equally well-resourced as Fire and Emergency Medical Services (FEMS)— services provided in response to physical health emergencies—and to be dispatched to mental health emergencies at the same speed; in other words, Plaintiff seeks access to a CRT service that achieves parity with the response provided by FEMS to physical health emergencies.  Pl.'s Opp'n at 38–39; Compl. (Prayer for Relief).  But, for the reasons described below, the District's emergency response program is not a cognizable "service, program, or benefit" within the meaning of the ADA, and thus Plaintiff has failed to state a claim.

Plaintiff's reliance on two district court cases (cited by the District) involving two jurisdictions' disaster responses—*Brook. Ctr.for Indep. of the Disabled v. Bloomberg*, 980 F. Supp. 2d 588 (S.D.N.Y. 2013) [hereinafter *BCID*]; *Cmtys. Actively Living Indep. & Free v. City of L.A.*, No. CV 09-0287 CBM (RZx), 2011 WL 4595993 (C.D. Cal. Feb. 10, 2011) [hereinafter *CALIF*)—is misplaced.   Pl.'s Opp'n at 31–32.   As the District discussed in its Motion, *CALIF* and *BCID* squarely support the District's argument that Plaintiff cannot identify "service" or "program" as broadly as emergency or "emergency medical response."   Mot. at 20–21. Plaintiff's argument that the *CALIF* and *BCID* courts viewed the "emergency preparedness plans as a unified program" disregards the courts' actual analyses in each case.   Pl.'s Opp'n at 31. Labeling a conglomerate of services as a single "program"—as Plaintiff does here—does not relieve Plaintiff of the burden to identify specific services at issue that require an accommodation to allow for meaningful access.   *CALIF* and *BCID* illustrate this point.   Even if those courts generally refer to emergency response systems as a single program for the purpose of unifying claims about individual services under the umbrella of a single federal case, both courts made clear that the ADA's legal analysis applied to *each individual service* within the emergency response system.

For example, in *BCID*, the court found that the city's emergency evacuation services violated the ADA because the city offered evacuation assistance to residents but failed to accommodate individuals with physical disabilities who required assistance exiting buildings. 980 F. Supp. 2d 588 at 643.   In a separate ADA analysis, the court found that the emergency response plan's failure to provide for interim housing during an emergency did not violate the ADA because it did not provide the service to anyone, and, therefore, it was not required to provide the service to individuals with disabilities (even though they were more in need of such a

13

service).  *Id.* at 643–54 ("The disabilities statutes do not require that substantively different services be provided to the disabled, no matter how great their need for the services may be. They require only that covered entities make 'reasonable accommodations' to enable 'meaningful access' to such services as may be provided, whether such services are adequate or not." (citation and quotation marks omitted)).  In contrast, Plaintiff here attempts to compare how a web of services utilized in responding to individuals experiencing a physical health emergency to how a different web of services is utilized in responding to a mental health emergency.  As noted in the District's Motion, that is not how the *CALIF* and *BCID* courts applied the ADA framework, and doing so would not be appropriate or relevant here.  Mot. at 20–21.

Plaintiff suggests that the Court could save the Complaint from its defects by evaluating individual functions of the crisis response system, such as "assessment, stabilization/de-escalation, and connection to follow-up services" under the ADA framework.  Pl.'s Opp'n at 25. But Plaintiff's Complaint does not contain allegations about what those individual services entail such that the Court could determine whether individuals with mental health disabilities have meaningful access to those services compared to individuals without mental health disabilities. And Plaintiff cannot amend its complaint through briefing.  *See Coleman v. Pension Benefit Guar. Corp.*, 94 F. Supp. 2d 18, 24 n.8 (D.D.C. 2000) (citing *Morgan Distributing Co, Inc. v. Unidynamic Corp.*, 868 F.2d 992, 995 (8th Cir. 1989) ("It is axiomatic that a complaint may not be amended by the briefs in opposition to a motion to dismiss.").  Thus, Plaintiff's alternative theory of analysis cannot save its overly broad definition of the service at issue from this fatal deficiency.  *See Wright v. Giuliani*, No. 99 CIV. 10091 (WHP), 2000 WL 777940, at *10 (S.D.N.Y. June 14, 2000), aff'd, 230 F.3d 543 (2d Cir. 2000) (finding plaintiffs were unlikely to succeed on their ADA claim because "[p]laintiffs have only presented evidence regarding the

amorphous concept of emergency housing, and have not demonstrated a lack of access to the housing granted to able-bodied homeless New Yorkers").

Plaintiff's further attempts to poke holes in the District's logic fall flat and only serve to shine a light on the faults in its own. Plaintiff contends that the District "implies that emergency medical care provided to someone who broke an arm must be analyzed separately from aid rendered to someone who experienced a cardiac arrest." Pl.'s Opp'n at 30. What Plaintiff means by "analyzed separately" is entirely unclear. Regardless, the relevant analysis when looking at whether a service violates the ADA is whether an individual with a disability has meaningful access to the same service provided to someone without a disability. *See* Mot. at 17. So, in Plaintiff's example, the relevant question under the ADA would be whether an individual with a mental health disability experiencing a cardiac event has meaningful access to the same treatment as a non-disabled individual experiencing a cardiac event. Plaintiff's claim, on the other hand, is based on the—incorrect—notion that services offered for one type of disability must be equally resourced or provide the same level of benefit as services provided to address another type of disability. *See* Section II.B.3, below. Under Plaintiff's theory, an ADA claim could arise if there is any disparate level of treatment for different disabling conditions; run-of-the-mill broken wrist would need to be treated with the same level of emergency service as a massive heart attack. Surely, if an individual was provided substandard care for either condition, the individual could seek relief in the form of a tort action, but requiring that the response to those two scenarios be *equal* in all respects makes no logical sense as a practical matter or for determining whether a public entity violated the ADA. Indeed, Plaintiff's tautological refrain that "a medical emergency is a medical emergency" is belied by the thrust of the *entire* case: different emergencies require different services. Pl.'s Opp'n at 30.

15

3.     **Plaintiff Is Not Excluded from Participation or Denied the Benefits of Services Through a Lack of Equal Opportunity or Through the District's Methods of Administration.**

Plaintiff's arguments that people with mental health disabilities lack equal opportunity to benefit from the District's emergency response program and that the District discriminates against individuals with mental health disabilities through methods of administration suffers from the same fatal defect explained above, namely, that the "benefit" Plaintiff identifies is not an individual benefit, but rather the availability or efficacy of different individual services that the District might offer.

Plaintiff relies heavily on the Ninth Circuit's holding in *Rodde v. Bonta*, 357 F.3d 988 (9th Cir. 2004), but that case is inapposite.  In *Rodde*, a county consolidated care for individuals with disabilities to a single hospital, and—when faced with budget shortfalls—decided to close that hospital.  *Id.* at 993.  The lower court found that, as a result of the closure, patients with disabilities who depended on the hospital would not be able to find substitute care elsewhere.  *Id.* The Ninth Circuit found that the county's actions violated the ADA because the county singled out the part of its existing health care service offered to individuals with disabilities for cuts.  *Id.* The court attempted to distinguish the county's actions from the Supreme Court's finding in *Choate,* in which the Court found that a state did not violate the Rehabilitation Act when it made across-the-board cuts in the maximum number of hospital days, even though that cut disproportionately burdened individuals with disabilities.  *Id.* at 995–96.  The court found as a factual matter that the county was targeting individuals with disabilities—rather than the even-handed treatment the of the benefits cuts in *Choate*—in violation of the ADA.  *Id.*

Here, there is no allegation of discriminatory targeting or elimination of existing services for individuals with disabilities, and *Rodde* does not diminish the District's argument.  Indeed, *Choate* is more closely aligned with the instant case.  Plaintiff acknowledges that the service

16

Plaintiff wishes to access—CRTs—currently exists but not with the level or resources or staffing

Plaintiff believes is necessary to adequately handle the District's needs.  Pl.'s Opp'n at 38–39.

And Plaintiff seeks that it be funded and resourced in parity with the resources devoted to

physical emergencies.  But, as *Choate* and its progeny make clear, that lack of parity is not an

ADA claim.  And, in *Modderno v. King*, 82 F.3d 1059 (D.C. Cir. 1996), the D.C. Circuit

explicitly endorsed this interpretation of *Choate*, finding:

> [Plaintiff's] broadest argument is that the Plan violates § 504 because it provides "unequal benefits" to persons with mental illness.  Although [Plaintiff] does not offer a yardstick by which to measure inequality, we may fairly assume that the restrictions cause inequality, in some sense of the word, as between those disabled by mental illness and persons disabled only by physical impairments or not disabled at all.  The question, however, is whether the probable inequality is the sort of harm the Rehabilitation Act was intended to redress.  The Supreme Court has held unanimously that it is not.  *Alexander v. Choate*, 469 U.S. 287, 105 S.Ct. 712, 83 L.Ed.2d 661 (1985).  The Court in *Alexander* concluded that Tennessee's generalized limitations on Medicaid payments, which fell disproportionately on disabled individuals because of their greater medical needs, were not subject to challenge under § 504 merely because of that disproportion.

82 F.3d 1059 1060–61; *see Traynor v. Turnage,* 485 U.S. 535, 549 (1988) ("There is

nothing in the Rehabilitation Act that requires that any benefit extended to one category

of handicapped persons also be extended to all other categories of handicapped

persons.").  It is thus clear that under the ADA, a lack of parity between different services

addressing different mental and physical emergencies does not constitute discrimination

in any form.  And Plaintiff's ADA claim should be accordingly dismissed.

### III.    Response to the U.S. Department of Justice's Statement of Interest

The United States Department of Justice's (DOJ) statement of interest largely echoes the

legal arguments and cases cited by Plaintiff in its Opposition.  *See* U.S. Dept. of Justice Statement

of Interest (Statement) [50].  And, for all of the foregoing reasons stated above and in the District's

Motion, the DOJ's ADA analysis is incorrect.

In the last two years, DOJ, through its 2022 guidance,[1] the Statement of Interest filed here, and two of its recent reports investigating police departments,[2] has advanced a novel theory of what "equal opportunity" looks like for an individual with a mental health disability's access to emergency behavioral health services.[3]  Though the ADA has been on the books for over 30 years (and Section 504 of the Rehabilitation Act decades before that) and, if Plaintiff's Complaint is correct, the discrimination alleged here is pervasive throughout the country, neither Plaintiff nor the DOJ have identified a single ADA (or Section 504) case that has expanded the scope of the ADA so much as to require "parity" between emergency services offered for mental and physical disabilities.  *See* Compl. ¶¶ 42-43.  And, for the reasons explained in the District's Motion and here, the ADA does not apply to issues in the District's emergency response system Plaintiff seeks to address.

---

[1]    *See* DOJ and Dep't of Health & Human Servs. Guidance for Emergency Responses to People with Behavioral Health or Other Disabilities 3-4 (2023), available at https://www.justice.gov/d9/202305/Sec.%2014%28a%29%20%20DOJ%20and%20HHS%20Gu idance%20on%20Emergency%20Responses%20to%20Individuals%20with%20Behavioral%20 Health%20or%20Other%20Disabilities_FINAL.pdf (last accessed Mar. 21, 2024).

[2]    *See* U.S. DOJ and U.S. Attorney's Office District of Minnesota, Investigation of the City of Minneapolis and the Minneapolis Police Department, available at /www.justice.gov/d9/2023-06/minneapolis_findings_report.pdf (last accessed Mar. 21, 2024); U.S. DOJ and U.S. Attorney's Office Western District of Kentucky, Investigation of the Louisville Metro Police Department and Louisville Metro Government; available at https:/ /www.justice.gov/crt/case-document/file/1572951/download (last accessed Mar. 21, 2024).

[3]    In its Statement of Interest, the DOJ states that it only takes a position on the narrow legal issues presented by the District's Title II and Section 504 of the Rehabilitation Act.  Statement at 6 n.1.  Though DOJ repeats Plaintiff's allegations because of the requirement to take Plaintiff's allegations as true at the motion to dismiss stage, *see id.* at 9 n.2, it is notable that DOJ has also recently awarded MPD and DBH a grant to expand the agencies' co-response program, recognizing the program as a best practice for responding to individuals who may be experiencing a mental or behavioral health crisis.  *See* Bureau of Justice Assistance, Metropolitan Police Department_FY23 Law Enforcement Behavioral Health Response Program, available at  https://bja.ojp.gov/funding/awards/15pbja-23-gg-02170-ment (last accessed Mar. 21, 2024).

In fact, DOJ's own technical assistance guides to state and local governments specifically address how local governments can ensure that their 911 operations and emergency response systems comply with the ADA, and they make no mention of local governments needing to take any action or create any services that would guarantee a particular type of response to mental health emergencies.[4]  Instead, the guidance discusses many of the same issues the *CALIF* and *BCID* courts considered, such as ensuring that shelters made available in the event of an emergency have accommodations that are accessible to those with mobility impairments.  The guidance also discusses the need for 911 accommodations for individuals with hearing impairment to ensure that they can effectively communicate with 911 call takers.  Prior to the last two years, the guidance from DOJ has consistently advocated that individual benefits offered by a local government's emergency response programs contain accommodations that allow those individual benefits and services to be accessible to individuals with disabilities.  Plaintiff and DOJ's theory that the ADA requires services addressing a particular disability to achieve parity with services addressing a different disability or emergency is a clear departure from decades of case law and guidance.

**IV.**   **Response to the Mental Health America Amicus Brief**

The amicus brief submitted by Mental Health America (and other organizations) is not persuasive or useful to the Court at this stage of litigation.  Amici "organizations that work every day with people with mental disabilities in D.C. and nationally, write to explain why a health response by mental health responders is required by law and is better than a police response for mental health emergencies," and they "describe the harms that the District's current emergency

---

[4]    *See* ADA, Emergency Planning, https://www.ada.gov/topics/emergency-planning/ (last accessed March 21, 2023)

response system imposes on people with mental health disabilities, including the lived experience of several individuals."  Amicus Brief on Behalf of Mental Health America, Et. Al. (Amicus) [51-1] at 13.   But amici's "data, research" and anecdotes are not appropriately considered at the motion to dismiss stage, where the District argues that the Complaint fails to state a plausible *legal* claim under Rule 12(b)(6).  *See* Mot. at 11 (explaining the Rule 12(b)(6) legal standard).

Amici also misstates the District's position by opening their argument with the statement that the District "does not deny that the District dispatches medical personnel in response to physical health emergencies, but almost always sends armed police officers to respond to mental health emergencies involving people with a mental health disability."  Amicus at 12.  To be clear, the District does not concede that these facts or any of the allegations in the Complaint are true; indeed, Plaintiff's Complaint does not paint an accurate picture of the District's agencies' services regarding responses to mental health emergencies.  The District's Motion merely adheres to the motion to dismiss standard which tests the sufficiency of the allegations in the Complaint (and prohibits the defendant from disputing the facts as alleged).  And, as the District has discussed here and in its Motion, even if all of Plaintiff's allegations were taken as true, Plaintiff's Complaint would still require dismissal because Plaintiff lacks standing and Plaintiff fails to state a claim under the ADA, and therefore under the Rehabilitation Act as well.

## CONCLUSION

For the foregoing reasons, the Court should dismiss Plaintiff's Complaint.

Date: March 22, 2024.                                Respectfully Submitted,


                                                     BRIAN L. SCHWALB
                                                     Attorney General for the District of Columbia

                                                     STEPHANIE E. LITOS

Interim Deputy Attorney General
Civil Litigation Division

*/s/ Matthew R. Blecher*
MATTHEW R. BLECHER [1012957]
Chief, Civil Litigation Division, Equity
Section

/s/ *Honey Morton*
HONEY MORTON [1019878]
Assistant Chief, Equity Section

*/s/ Pamela A. Disney*
PAMELA A. DISNEY [1601225]
BRENDAN HEATH [1619960]
ADAM P. DANIEL [1048359]
Assistant Attorneys General
Civil Litigation Division
400 6th Street, NW
Washington, D.C. 20001
Phone: (202) 807-0371
Email: pamela.disney@dc.gov

*Counsel for Defendants*