UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

BREAD FOR THE CITY,

        Plaintiff,

    v.

DISTRICT OF COLUMBIA,

        Defendant.

Civil Action No. 23-1945 (ACR)

**<u>SUPPLEMENTAL STATEMENT OF INTEREST</u>**

## TABLE OF CONTENTS

INTRODUCTION ................................................................................................................... 1

ARGUMENT ......................................................................................................................... 1

   I.   "How should the Court define the activity, program, or service at issue in this case and the benefits of that activity, program, or service?" ............................................................ 1

      A.   The Phrase "Services, Programs, or Activities" Applies to Anything a Public Entity Does and, by its Plain Meaning, Includes Expansive Government Systems and Operations. ..................................................................................................................... 3

      B.   The Proper Definition of the Service, Program, or Activity at Issue, and the Benefit Derived From it, Turns on the Discrimination Alleged and the Nature and Purpose of the Government Function. ....................................................................................... 5

         1.   The Appropriate Scope of the Service, Program, or Activity at Issue Depends on the Legal Claim .................................................................................................................. 5

         2.   The Definitions Should Comport with the Facts Alleged and Established Legal Principles ................................................................................................................... 8

   II.   "How, if at all, does the D.C. Circuit's decision in *Modderno v. King*, 82 F.3d 1059 (D.C. Cir. 1996), apply to this case?" .............................................................................. 12

   III.   "What is the citation (both statutory/regulatory and in the Complaint) for Plaintiff's contention that many or all individuals experiencing mental-health emergencies qualify as having a 'disability' under the ADA and the Rehabilitation Act because they ae ' regarded as' having a disability?" .............................................................................. 16

   IV.   "Is there any case law addressing "equal opportunity" as a distinct type of claim under the ADA and the Rehabilitation Act?" .............................................................................. 19

# TABLE OF AUTHORITIES

## Cases

*Ability Ctr. of Greater Toledo v. City of Sandusky,*
  385 F.3d 901 (6th Cir. 2004) ................................................ 20

*Alexander v. Choate,*
  469 U.S. 287 (1985) ................................................ passim

*Am. Council of Blind of Metro. Chi. v. City of Chicago,*
  667 F. Supp. 3d 767 (N.D. Ill. 2023) ................................................ 5

*Am. Council of the Blind v. Paulson,*
  525 F.3d 1256 (D.C. Cir. 2008) ................................................ 21, 22, 23

*Amundson ex rel. Amundson v. Wis. Dep't of Health Servs.,*
  721 F.3d 871 (7th Cir. 2013) ................................................ 14

*Ashby v. Warrick Cnty. Sch. Corp.,*
  908 F.3d 225 (7th Cir. 2018) ................................................ 8

*Barden v. City of Sacramento,*
  292 F.3d 1073 (9th Cir. 2002) ................................................ 3, 5, 11

*Brown v. District of Columbia,*
  928 F.3d 1070 (D.C. Cir. 2019) ................................................ 6

*Brown v. Gov't of D.C.,*
  390 F. Supp. 3d 114 (D.D.C. 2019) ................................................ 9

*Childress v. Fox Assocs., LLC,*
  932 F.3d 1165 (8th Cir. 2019) ................................................ 21

*Cmntys. Actively Living Indep. & Free ("CALIF") v. City of Los Angeles,*
  Civ. A. No. 09-0298, 2011 WL 4595993 (C.D. Cal. Feb. 10, 2011) ................................................ 8, 10, 11

*Crowder v. Kitagawa,*
  81 F.3d 1480 (9th Cir. 1996) ................................................ 6

*Disabled in Action v. Bd. of Elections in City of N.Y.,*
  752 F.3d 189 (2d Cir. 2014) ................................................ 11

*Est. of LeRoux v. Montgomery County,*
  Civ. A. No. 22-0856, 2023 WL 2571518 (D. Md. Mar. 20, 2023) ................................................ 24

*Frame v. City of Arlington*,
    657 F.3d 215 (5th Cir. 2011) .................................................................. 3, 4

*Franklin v. Capitol Hilton Hotel*,
    325 F. Supp. 3d 25 (D.D.C. 2018) ................................................................ 9

*Fraternal Ord. of Police v. Gates*,
    562 F. Supp. 2d 7 (D.D.C. 2008) ................................................................. 9

*Greene v. City of New York*,
    Civ. A. No. 21-5762, 2024 WL 1308434 (S.D.N.Y. Mar. 26, 2024) ........................ 8

*Hahn ex rel. Barta v. Linn County*,
    130 F.Supp.2d 1036 (N.D. Iowa 2001) ......................................................... 14

*Helen L. v. DiDario*,
    46 F.3d 325 (3d Cir.) ............................................................................. 6

*Henrietta D. v. Bloomberg*,
    331 F.3d 261 (2d Cir. 2003) ............................................................... passim

*Hindel v. Husted*,
    875 F.3d 344 (6th Cir. 2017) .................................................................. 22

*Johnson v. City of Saline*,
    151 F.3d 564 (6th Cir. 1998) ................................................................... 4

*King v. Marion Cir. Ct.*,
    Civ. A. No. 14-1092, 2016 WL 3365239 (S.D. Ind. June 17, 2016) ......................... 9

*L.E. ex rel. Cavorley v. Superintendent of Cobb Cnty. Sch. Dist.*,
    55 F.4th 1296 (11th Cir. 2022) ................................................................. 7

*Long v. Howard Univ.*,
    439 F. Supp. 2d 68 (D.D.C. 2006) ............................................................. 22

*Messier v. Southbury Training Sch.*,
    562 F. Supp. 2d 294 (D. Conn. 2008) .......................................................... 23

*Modderno v. King*,
    82 F.3d 1059 (D.C. Cir. 1996) ......................................................... 12, 13, 14

*MX Grp v. City of Covington*,
    293 F.3d 326 (6th Cir. 2002) .............................................................. 17, 19

*Nat'l Ass'n of the Deaf v. Trump*,
    486 F. Supp. 3d 45 (D.D.C. 2020) ......................................................... 20

*Nat᾽l Fed᾽n of the Blind v. Lamone*,
    813 F.3d 494 (4th Cir. 2016) ...................................................... 7, 15, 22

*Nat᾽l Org. on Disability v. Tartaglione*,
    Civ. A. No. 01-1923, 2001 WL 1231717 (E.D. Pa. Oct. 11, 2001) ......................................... 20

*Oconomowoc Residential Programs v. City of Milwaukee*,
    300 F.3d 775 (7ᵗʰ Cir. 2002) .......................................................... 20

*Olmstead v. L.C. ex rel. Zimring*,
    527 U.S. 581 (1999) .............................................................. 2, 6, 13, 14

*P.M. ex rel. Martine v. City of Winfield*,
    Civ. A. No. 19-0623, 2020 WL 10181570 (N.D. Ala. June 10, 2020) .................................... 19

*Pierce v. District of Columbia*,
    128 F. Supp. 3d 250 (D.D.C. 2015) ................................................... 21

*Smith v. United States*,
    508 U.S. 223 (1993) ...................................................................... 3

*Socal Recovery, LLC v. City of Costa Mesa*,
    56 F.4th 802 (9th Cir. 2023) ......................................................... 18

*Traynor v. Turnage*,
    485 U.S. 535 (1988) ............................................................... 13, 14

*United States v. Florida*,
    682 F. Supp. 3d 1172 (S.D. Fla. 2023) .............................................. 23

*Young v. City of Claremore*,
    411 F. Supp. 2d 1295 (N.D. Okla. 2005) .............................................. 5

**Statutes**

29 U.S.C. § 794 ............................................................................ 1

42 U.S.C. § 12102(1)(A) ........................................................... 16

42 U.S.C. § 12132 ................................................................... 1, 8

42 U.S.C. § 12201(c) .................................................................. 13

iv

42 U.S.C. §§ 12131-12134 ..................................................................................... 1

**Regulations**

28 C.F.R. § 35.101(b) .......................................................................................... 17

28 C.F.R. § 35.102(a) ............................................................................................ 3

28 C.F.R. § 35.108(a) .......................................................................................... 17

28 C.F.R. § 35.108(d) ..................................................................................... 16, 17

28 C.F.R. Pt. 35, App. B ................................................................................. 14, 17

28 C.F.R. § 35.130(b) ................................................................................... passim

**Other Authorities**

Black's Law Dictionary ......................................................................................... 4

Grant P.H. Shuman, *Escaping the Purpose of the ADA: The "Safe Harbor" Provision and Disability-Based Distinctions in Insurance Policies and Programs* ....................................... 12

Oxford English Dictionary ..................................................................................... 3

U.S. Department of Justice, *Investigation of the City of Minneapolis and the Minneapolis Police Department* ................................................................................................ 20

U.S. Department of Justice, *Investigation of the Louisville Metro Police Department and Louisville Metro Government* ............................................................................. 20

Washington D.C. Office of Unified Communications, "About" .................................. 10

Washington D.C. Office of Unified Communications, "We Answer the Call" .............. 10

## INTRODUCTION

Pursuant to this Court's April 30, 2024 Order, the United States of America respectfully submits this supplemental brief to address this Court's questions regarding the Defendant's pending Motion to Dismiss.  Plaintiff Bread for the City contends that Defendant the District of Columbia (the "District") administers its emergency response system in a manner that discriminates against people with mental health disabilities, in violation of Title II of the Americans with Disabilities Act, 42 U.S.C. §§ 12131–12134 ("ADA"), and Section 504 of the Rehabilitation Act, 29 U.S.C. § 794.  As set forth in the Government's initial Statement of Interest (ECF No. 50), the Department of Justice conducts work around the country to remedy such discrimination and has a strong interest in the proper interpretation of the law in this context.  After the hearing on the District's dispositive motion, the Court invited the parties and the Government to submit supplemental briefing to address five issues.  *See* Apr. 30, 2024 Min. Order.  The United States accepts the Court's invitation and respectfully addresses the first four issues below.  The fifth issue, regarding how the Plaintiff might amend its Complaint, is not addressed because the Government does not take a position on how the Plaintiff should amend its claims.  For ease of reference, portions of the Court's first four questions are reproduced in the headings below.

## ARGUMENT

I.  **"How should the Court define the activity, program, or service at issue in this case and the benefits of that activity, program, or service?"**

The service, program, or activity at issue in this case is the District's emergency response system, and the benefit is a timely and effective response to emergencies.  Title II of the ADA provides that "no qualified individual with a disability shall, by reason of such disability, be excluded from participation in or be denied the benefits of the services, programs, or activities of a public entity, or be subjected to discrimination by any such entity."  42 U.S.C. § 12132.  The

Department of Justice's Title II regulation prohibits public entities from providing a qualified individual with a disability with an aid, benefit, or service that is not as effective in affording an equal opportunity to "obtain the same result," or "gain the same benefit" as that provided to others. 28 C.F.R. §§ 35.130(b)(1)(i)-(iii).[1]

As set forth below, the term "services, programs, or activities" applies to expansive government systems encompassing multiple programs and operations *as well as* discrete subsidiary services within those systems.  "Benefits" refers to the useful or helpful effects of any government function.  When analyzing the relevant scope of these terms in a particular case, a court should begin by considering where the alleged discrimination occurs.  If it involves a desired benefit stemming only from one discrete government function, a narrow review of discrimination within that specific function is likely proper.  But, if the benefit depends on multiple aspects of a comprehensive system, a broader view would generally be necessary to assess the alleged discrimination.

Here, the relevant service, program, or activity in which the discriminatory conduct is alleged is identified in the Complaint as the District's unified emergency response system, and the purpose—the intended benefit—of that system is identified as providing "timely and effective responses to a wide range of emergencies, including mental health emergencies."  Compl. ¶¶ 2, 77.  The facts alleged support these definitions of the service, program, or activity and the benefit. *See infra* § B(2).  Moreover, adopting these definitions aligns with the established legal principle, set forth in caselaw, that courts must avoid definitions that obscure discrimination.  *See Alexander*

---

[1] The implementing regulation offers, at minimum, compelling guidance on what Title II requires.  *See Olmstead v. L.C. ex rel. Zimring*, 527 U.S. 581, 598 (1999) ("the well-reasoned views of the agencies implementing a statute constitute a body of experience and informed judgment to which courts and litigants may properly resort for guidance.").

*v. Choate*, 469 U.S. 287, 301 n.21 (1985).  It is Defendant's narrow definition that runs afoul of that principle by collapsing the discriminatory policy into the definition of the benefit.  *See id.*

> A.  **The Phrase "Services, Programs, or Activities" Applies to Anything a Public Entity Does and, by its Plain Meaning, Includes Expansive Government Systems and Operations.**

Title II of the ADA applies broadly to "all services, programs, and activities provided or made available by public entities."  28 C.F.R. § 35.102(a).  Recognizing "services, programs, and activities" as a catch-all phrase that prohibits all discrimination by a public entity, some courts have also cautioned that attempting to distinguish which public functions are services, programs, or activities "would disintegrate into needless 'hair-splitting arguments.'"  *Barden v. City of Sacramento*, 292 F.3d 1073, 1076 (9th Cir. 2002) (quoting *Innovative Health Sys. v. City of White Plains*, 117 F.3d 37, 45 (2d Cir. 1997), *superseded on other grounds, Zervos v. Verizon N.Y., Inc*., 252 F.3d 163, 171 n.7 (2d Cir. 2001)).

By their ordinary meaning, the words "service," "program," and "activity" each encompass expansive government systems and operations.  *See Smith v. United States*, 508 U.S. 223, 228 (1993) (when a word is not defined by statute, it is normally construed "in accord with its ordinary or natural meaning").  For instance, "the Supreme Court has broadly understood a 'service' to mean 'the performance of work commanded or paid for by another,' or 'an act done for the benefit or at the command of another.'"  *Frame v. City of Arlington*, 657 F.3d 215, 226 (5th Cir. 2011) (quoting *Holder v. Humanitarian Law Project*, 561 U.S. 1, 24 (2010)).  Additionally, the Oxford English Dictionary defines the term to include "[t]he meeting of a public need such as health or communications through the organized provision of labour, equipment, etc.," and "[t]he provision of. . . a utility," such as water or gas, and "a system or organization" for doing these things.  *Service*, Oxford English Dictionary, V.ii.34.a and V.ii.32.a, *available at* https://perma.cc/8378-KYYV (last visited June 21, 2024).  Black's Law Dictionary similarly defines a "public service" as "a service

provided or facilitated by the government for the general public's convenience and benefit." *Public Service*, Black's Law Dictionary (11th ed. 2019).   Under each of these definitions, emergency response is a service provided by a public entity.   It is "work commanded by another (i.e., voters and public officials), paid for by another (i.e., taxpayers), and done for the benefit of another" (i.e., residents and visitors who experience or witness an emergency).   *See Frame*, 657 F.3d at 226 ("[I]n common understanding, building and altering public sidewalks are services, programs, or activities of a public entity.").

Emergency response also meets the definitions of "program" and "activity," both of which encompass broad operations.   In fact, government programs are commonly understood to provide multiple services or benefits.   *See Entitlement Program*, Black's Law Dictionary (11th ed. 2019) ("A government program guaranteeing certain benefits, such as financial aid or government-provided services, to people or entities that meet the criteria set by law.").   Similarly, governmental activities are broadly defined as "[a] government agency's conduct that is expressly or impliedly mandated or authorized by . . . law and that is carried out for the benefit of the general public." *Governmental Function*, Black's Law Dictionary (11th ed. 2019) (also termed governmental act; governmental activity); *see also Activity*, Black's Law Dictionary (11th ed. 2019) (the "collective acts of one person or of two or more people engaged in a common enterprise"); *Johnson v. City of Saline*, 151 F.3d 564, 570 (6th Cir. 1998) ("the word 'activities,' on its face, suggests great breadth and offers little basis to exclude any actions of a public entity").   The "benefit" of a service, program, or activity is "the helpful or useful effect" it has.   *Benefit*, Black's Law Dictionary (11th ed. 2019).

Applying these common understandings, courts have recognized broad operations that may include many different components, such as the installation and maintenance of a city's network

of thousands of traffic signals, as a service, program, or activity under Title II.  *Am. Council of Blind of Metro. Chi. v. City of Chicago*, 667 F. Supp. 3d 767, 774 (N.D. Ill. 2023) ("[t]he City's maintenance of signalized intersections and the pedestrian grid plainly constitutes a service, program, or activity of a public entity" and "the City 'is required to ensure that it operates its signalized intersections and the pedestrian grid in a manner that, 'when viewed in [their] entirety, [are] readily accessible to and usable by individuals with disabilities.'") (quoting *Am. Council of Blind of N.Y., Inc. v. City of New York*, 495 F. Supp. 3d 211, 232 (S.D.N.Y. 2020)).  Defendant's attempt to carve up the program, service, or activity at issue and recognize only its discrete components constitutes hair-splitting that serves to evade review under the ADA.

    **B.**    **The Proper Definition of the Service, Program, or Activity at Issue, and the Benefit Derived From it, Turns on the Discrimination Alleged and the Nature and Purpose of the Government Function.**

        1.    <u>The Appropriate Scope of the Service, Program, or Activity at Issue Depends on the Legal Claim.</u>

When reviewing the service, program, or activity—and its benefits—courts should begin by considering where the alleged discrimination occurs.  Disability-based discrimination may be cabined to discrete government operations, or it may exist across expansive systems.  In most cases, the scope of the relevant services, programs, or activities, and their benefits, is inherent in the discrimination alleged.  For instance, in *Barden*, 292 F.3d at 1073, an action challenging the failure to install curb ramps in newly constructed or altered sidewalks and maintain existing sidewalks to ensure accessibility, the relevant focus was "public sidewalks."  *Id.*[2]  In *Alexander*,

---

[2]    *See also Young v. City of Claremore*, 411 F. Supp. 2d 1295, 1304 (N.D. Okla. 2005) ("Plaintiff claims to have been denied the ability to operate the golf cart as a mobility device, for the purpose of transportation on streets, roads, and highways in Claremore. Therefore, the 'benefits of a public entity's services, programs, or activities' from which Plaintiff alleges to have been excluded are the use of streets, roadways, and highways of the City of Claremore for purposes of transportation.").

469 U.S. at 289, Medicaid recipients challenged a reduction in the number of inpatient hospital days their state's Medicaid program would reimburse.  Although the Supreme Court recognized that the Medicaid Program provides the broader benefit of a "package of health care services," the plaintiff's challenge was limited to one aspect of the program.  The Court therefore analyzed the subsidiary benefit, hospital services, that was the focus of the plaintiffs' claim.  *Id.* at 302-03.

Similarly, where the alleged denial involves a range of services or benefits, courts have considered them together.  *See Henrietta D. v. Bloomberg*, 331 F.3d 261, 283 (2d Cir. 2003) (plaintiffs alleged unequal access to "public assistance, Medicaid, Food Stamps, housing, and *other benefits and services available to qualifying members of the general public*") (emphasis in original); *Crowder v. Kitagawa*, 81 F.3d 1480, 1485 (9th Cir. 1996) (plaintiffs challenged Hawaii's quarantine policy, which effectively precludes visually-impaired people who rely on guide dogs from using a variety of public services, such as public transportation, public parks, government buildings and facilities, and tourist attractions).  This is similarly illustrated in cases involving the integration mandate, where plaintiffs challenge the discriminatory administration of complex long-term care systems with a range of community-based and institutional services, often operated by different departments.  *See, e.g.*, *Brown v. District of Columbia*, 928 F.3d 1070, 1075 (D.C. Cir. 2019) (plaintiffs alleging they were unnecessarily confined in nursing facilities sought transition services to access community based care); *Helen L. v. DiDario*, 46 F.3d 325, 338 (3d Cir.) (recognizing disability discrimination occurring across programs with different budget line items, Pennsylvania's nursing home program and its attendant care program).  The common benefit in such cases is "needed medical services" in the most integrated setting appropriate.  *See Olmstead v. L.C. ex rel. Zimring*, 527 U.S. 581, 600–01 (1999).

Typically, courts that focus on a subsidiary benefit of a larger program do so where the Complaint alleges discrimination specific to this particular subsidiary benefit, out of concern that broader definition would obscure the denial of the subsidiary benefit.  *See, e.g.*, *L.E. ex rel. Cavorley v. Superintendent of Cobb Cnty. Sch. Dist.*, 55 F.4th 1296, 1302 (11th Cir. 2022) (agreeing with students, on appeal, that the district court impermissibly broadened their claim and redefined the scope of the program at issue, misconstruing the students' argument as a denial of the benefits of education generally rather than the benefits of in-person classes); *Nat'l Fed'n of the Blind v. Lamone*, 813 F.3d 494, 504 (4th Cir. 2016) (adopting the plaintiff's proposed focus on the state's absentee voting program, where defendants urged an analysis of the entire voting program and argued that access to other voting alternatives—including in-person voting—was sufficient under the ADA).  This concern is consistent with the Supreme Court's caution to avoid definitions that "effectively den[y] otherwise qualified [] individuals the meaningful access to which they are entitled," *Alexander*, 469 U.S. at 301, or collapse the discriminatory policy into the definition of the relevant benefit.  *Id.* at 301 n.21.

Here, the District attempts to do just that by artificially framing a service definition solely around the response to mental health emergencies alone.  But a narrow focus on either the allegedly ineffective and harmful police-led response to mental health emergencies, or the limited mental health-led response to these emergencies (Compl. ¶¶ 2, 9) would overlook the discrimination Plaintiff seeks to remedy—an opportunity to benefit from emergency response that is not equal to the opportunity afforded to the general public.  Compl. ¶¶ 197-98.  Plaintiff contends that the District operates a unified emergency response program, "the purpose of which is to provide timely and effective responses to a wide range of emergencies, including mental health emergencies," but provides a different and less effective response to the one type of health emergency primarily

experienced by people with mental health disabilities.  Compl. ¶¶ 2-3, 24, 77.  Just as public entities may not exclude people with disabilities from, or deny them the benefits of, their services, programs, or activities, 42 U.S.C. § 12132, they may not craft service definitions to have the same effect.

Finally, a pleading's focus on a particularized and narrow service is likely to lead to a corresponding narrow definition of the program, service, or activity at issue.  For example, in *Greene v. City of New York*, Civ. A. No. 21-5762, 2024 WL 1308434, at *2-3 (S.D.N.Y. Mar. 26, 2024), plaintiffs challenged the City's policies for involuntarily transporting people to hospitals during psychiatric emergencies pursuant to New York law.  As such, the court found that "Plaintiffs cannot claim they were denied a service, because the program they challenge provides a service—transport to a hospital for mental health care—exclusively to the mentally disabled." *Id.* at *15.  In contrast to *Greene*, Bread for the City's Complaint is centered on the District's unified emergency response, not on a narrow, statutorily based mental health transport function, and alleges facts that demonstrate the unified nature of that system.[3]

2.    The Definitions Should Comport with the Facts Alleged and Established Legal Principles.

Plaintiff's allegations about the nature and purpose of a service, program, or activity are necessarily fact-bound.  *See Cmntys. Actively Living Indep. & Free ("CALIF") v. City of Los Angeles*, Civ. A. No. 09-0298, 2011 WL 4595993, at *1 (C.D. Cal. Feb. 10, 2011) (citing evidence in the record about the essential components and purpose of the program); *see also Ashby v.*

---

[3]    In adopting a narrow definition of the relevant program, service, or activity, the court dismissed comparisons between medical and mental health emergencies because the state law and policies that were the focus of the complaint apply exclusively to people with mental health disabilities.  *Id.* at *16.  While the existence of a subsidiary service, defined by statute, does not preclude challenges to the overarching service, program, or activity that contains it, *see supra* § I(A), as pled, the narrow focus in *Greene* belied the unified nature of an emergency response system.

*Warrick Cnty. Sch. Corp.*, 908 F.3d 225, 234 (7th Cir. 2018) (recognizing that the inquiry into whether a program involving private and public entities is a "service, program, activity" of the public entity is fact intensive); *King v. Marion Cir. Ct.*, Civ. A. No. 14-1092, 2016 WL 3365239, at *2 (S.D. Ind. June 17, 2016) (analyzing ADA claim that Defendant failed to provide an interpreter for its program required looking at relevant statutes and reviewing the record to understand the structure of the program "and then determine whether the program fits the definition of a service, program, or activity under Title II of the ADA. . . these issues do not present pure questions of law").

Courts must accept such fact-bound allegations as true at this stage. *Fraternal Ord. of Police v. Gates*, 562 F. Supp. 2d 7, 11 (D.D.C. 2008) (internal citations omitted) ("The court must treat the complaint's factual allegations—including mixed questions of law and fact—as true, drawing all reasonable inferences in the plaintiff's favor."); *see also Brown v. Gov't of D.C.*, 390 F. Supp. 3d 114, 122, 124 (D.D.C. 2019) ("In limited circumstances, a Court may be able to resolve a purely legal question at the motion-to-dismiss phase" but a dispute about the nature of the forum in a First Amendment case "raises a mixed question of law and fact that must await resolution at a later stage in proceedings.").

However, it is appropriate at the motion to dismiss stage for a court to consider whether the plaintiff's formulation of the benefits of the service, program, or activity, is plausible. *See Franklin v. Capitol Hilton Hotel*, 325 F. Supp. 3d 25, 28 (D.D.C. 2018) ("A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged.") (quoting *Ashcroft v. Iqbal*, 556 U.S. 662 2009) (citing *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 556 (2007))). Based on the facts alleged, and the District's own public statements, emergency response is a unified

government function with a common goal.  *See* Compl. ¶¶ 77, 195.  The timely and effective response to each category of emergency rests on the same interconnected system, which is centered around the Office of Unified Communications (OUC).  Compl. ¶ 79.  The most common way to request assistance is by calling 911, Compl. ¶ 82, at which point OUC is responsible for dispatching the appropriate fire, police, or physical health responder, or transferring to the Access Helpline for a mental health response.  Compl. ¶¶ 87-88.  OUC's mission "is to provide accurate, professional, and expedited service to the citizens and visitors of the District of Columbia."  Washington D.C. Office of Unified Communications, "About," *available at* https://perma.cc/6WJZ-RWAE (last visited May 29, 2024).  It acts as the "gateway" to all emergency responses.  Washington D.C. Office of Unified Communications, "We Answer the Call," *available at* https://perma.cc/H2X6-BVQK (last visited May 29, 2024) (Office telecommunicators "serve as the gateway to emergency and non-emergency services in the District.").  Further, to accomplish its common purpose, the system carries out the same basic functions—assessment, stabilization, and connection to follow-up services in response to each type of emergency.  *See* Pl.'s Opp. at 4, 21 (citing Compl.).

Where the alleged discrimination concerns the operation of a broad system, as it does here, an analysis of that system, rather than a single component of it, is necessary.  For example, in *CALIF*, 2011 WL 4595993, at *1, the plaintiffs alleged that the city's emergency preparedness programs failed to address the needs of residents with disabilities, making them more vulnerable than other residents in the event of an emergency.  The court cited to evidence, developed through discovery, about the essential components and purpose of the program, which a city official said was "designed to apply equally to all of its residents" to "save lives, protect property, and return the city to normal service levels' by 'assist[ing] in the response and recovery efforts following a

disaster." *Id.* at *1, 13.  It explained that the "purpose" of the city program was "to anticipate the needs of its residents in the event of an emergency" and minimize last-minute requests for assistance.  *Id.* at *14.  The court also cited evidence showing that the alleged failures spanned multiple aspects of the comprehensive program—including provisions to notify people with disabilities of an emergency, and evacuate, transport, or temporarily house them—and that the related responsibilities spanned multiple city departments.  *Id.* at *2, 13.   In this context, it was necessary to consider the entire program to evaluate the alleged discrimination.   Likewise, as alleged here, OUC selects from the same menu of responses for each emergency.  Compl. ¶¶ 87-88.  An analysis of the alleged discrimination necessarily requires an assessment of OUC's practices, and an assessment of each of the three categories of response that are currently dispatched to mental health emergencies.  *See* Compl. ¶¶ 9, 89-90 (mental health emergencies in the District may be met with a police-led response, a physical health-led response, or a mental health-led response).

Further, both the ADA's broad mandate and the relevant caselaw instruct that the court should delineate its focus in the way that tracks the discrimination alleged.  *See Barden*, 292 F.3d at 1077 (citations omitted) (the ADA must be construed "generously" and "broadly in order to effectively implement the ADA's fundamental purpose of 'provid[ing] a clear and comprehensive national mandate for the elimination of discrimination against individuals with disabilities.'"); *Disabled in Action v. Bd. of Elections in City of N.Y.*, 752 F.3d 189, 199 (2d Cir. 2014) (internal citations omitted) (defining the relevant benefit as anything less than the opportunity to fully participate in a voting program would "render meaningless the mandate that public entities may not 'afford [ ] persons with disabilities services that are not equal to that afforded others.'").  It is the District's narrow framing that contradicts this principle by inappropriately collapsing the

11

discriminatory policy into the definition of the relevant benefit, *Alexander,* 469 U.S. at 301 n.21, and effectively obscuring the unequal opportunity alleged.  Plaintiff's claim requires comparing it to the experience of the general population during a wide range of other health-related emergencies.  *See* Compl. ¶ 2.  A narrow focus on one type of emergency response would exclude allegations about the general population's experience from the Court's analysis, thereby preventing a meaningful comparison and undermining the ADA's fundamental purpose.

Plaintiff's allegations, accepted as true, support its proposed formulation of the relevant service, program, or activity as a unified "emergency response" system that provides the benefit of "timely and effective responses to a wide range of emergencies, including mental health emergencies."  Compl. ¶¶ 2, 77.  As alleged, the discrimination arises from this unified system.  Further, construing the service, program, or activity consistent with Plaintiff's allegations is consistent with established legal principles.  For these reasons, the Court should adopt these formulations at this stage.

## II.      **"How, if at all, does the D.C. Circuit's decision in _Modderno v. King_, 82 F.3d 1059 (D.C. Cir. 1996), apply to this case?"**

*Modderno* does not apply to Plaintiff's claim.  To the extent that it permits unequal benefits for people with mental health conditions, or mental health disabilities, that holding is limited to the terms and conditions of insurance and benefits plans.  Health insurance and benefit plans are particularly unique, in that they typically set varying limitations on covered services, based in part on financial risk associated with each type of care.[4]  The ADA addresses this by incorporating what has become known as a "safe harbor provision" for insurers and other entities that administer

---

[4]      *See* Grant P.H. Shuman, *Escaping the Purpose of the ADA: The "Safe Harbor" Provision and Disability-Based Distinctions in Insurance Policies and Programs*, 36 Gonz. L. Rev. 549, 550 (2001) ("[I]n a sense, the business of insurance and an antidiscrimination statute have little in common because insurance is inherently discriminatory").

benefit plans based on underwriting and classifying risk.  42 U.S.C. § 12201(c).  Extending its

holding beyond terms and conditions of insurance and benefits plans is inconsistent with the

Supreme Court's decision in *Olmstead*, 527 U.S. at 598.  Moreover, whether public entities may

extend different, lesser benefits to people with different disabilities is irrelevant here because

Bread for the City does not challenge this kind of intra-class discrimination.  Rather, Plaintiff

challenges discrimination within a unified service, program, or activity that is extended to all

residents—and is designed to offer the same benefit to everyone.

In *Modderno*, the D.C. Circuit considered whether a Foreign Service Benefit Plan violated

the Rehabilitation Act by limiting the lifetime maximum coverage for mental health benefits,

without imposing similar limits on the benefits for physical illness.  *Id.* at 1060.  It was in this

distinct context that the Court relied on earlier cases, also regarding benefit plans, to hold that

while one "may fairly assume" the coverage restrictions would cause inequality for people with

mental health disabilities, such inequality in insurance plans is not "the sort of harm the

Rehabilitation Act was intended to redress."  *Modderno*, 82 F.3d at 1061, 1062 n.1 (contrasting

"such matters as architectural barriers, job qualifications, and access to public transportation and

educational services"); *id.* at 258 (relying on Supreme Court precedent in the same distinct context

to conclude that Section 504 does not prohibit coverage limits that leave some people with

disabilities "better off and the remainder no worse off") (citing dicta in *Traynor v. Turnage*, 485

U.S. 535, 549 (1988)).  Because the District's emergency response system is unrelated to health

insurance or benefit plans, this reasoning does not apply to Plaintiff's claim.[5]

---

[5]      The court also concluded that the Plan's reference to categories of illness, as opposed to
disabilities, was "not enough to catapult it into the 'facially discriminatory' category."  *Id.* at 257.
This reasoning is equally irrelevant because Bread for the City has not alleged facial
discrimination.

To the extent that *Modderno* suggests that discrimination can never occur when people with one type of disability are favored over another, the Supreme Court's subsequent opinion in *Olmstead* rejects that view, deeming it "incorrect as a matter of precedent and logic." 527 U.S. at 598 n.10.  In doing so, the Court drew from cases involving intra-class discrimination in other contexts, unrelated to the integration mandate, where the "fact that one person in the protected class has lost out to another person in the protected class is [] irrelevant, so long as he has lost out because of his [protected status]." *Id.* (quoting *O'Connor v. Consolidated Coin Caterers Corp.*, 517 U.S. 308, 312 (1996)); s*ee also Amundson ex rel. Amundson v. Wis. Dep't of Health Servs.*, 721 F.3d 871, 874 (7th Cir. 2013) (*Olmstead* supersedes earlier cases that held disability discrimination requires comparisons to people outside the protected class).  Courts have similarly held that Title II and Section 504 prohibit discrimination based on the severity of disabilities, which necessarily involves examining discrimination among different groups of individuals with disabilities.  *See Hahn ex rel. Barta v. Linn County*, 130 F.Supp.2d 1036, 1050 (N.D. Iowa 2001) (collecting cases).

The ADA permits intraclass distinctions in limited circumstances, to provide extra benefits to a discrete disability group.  But while public entities may provide additional "special benefits" to people with disabilities, 28 C.F.R. Pt. 35, App. B (Section 35.130 General Prohibitions Against Discrimination), the reverse is prohibited.  *See Olmstead*, 527 U.S. at 603 n.14.  Although public entities have substantial discretion to decide which services, programs, or activities are offered, they must still "adhere to the ADA's nondiscrimination requirement with regard to the services they in fact provide." *Id*.  The Supreme Court's dicta in *Traynor v. Turnage*, 485 U.S. 535, 549 (1988), that "nothing in the Rehabilitation Act [] requires that any benefit extended to one category of handicapped persons also be extended to all other categories of handicapped persons" does not

preclude evidence of intra-class discrimination to support a "denial of benefits" or "unequal opportunity" claim where the service, program, or activity—and its intended benefit—is extended to everyone.

Therefore, whether the ADA proscribes intra-class discrimination in this context is irrelevant because Bread for the City does not allege discrimination between people with physical health and mental health disabilities. Rather, its allegations relate to a service, program, or activity—emergency response—that is extended to all residents and is designed to achieve the same benefit for everyone. *See* Compl. ¶¶ 2, 77. Bread for the City alleges that District residents generally receive a health-led response to all health-related emergencies except one—the one type that is primarily experienced by people with mental health disabilities. *See, e.g.*, *id.* ¶¶ 9, 87–88. While Plaintiff alleges that mental health emergencies typically arise from mental health disabilities (*id.* ¶ 24) physical health emergencies such as injuries, choking, childbirth, heart attacks, and strokes routinely happen to people without any disability. Therefore, "[Plaintiff] contends that the District's emergency response system treats people with mental health disabilities differently from the public at large, not people with other disabilities." Pl.'s Opp. at 33, n.5, ECF No. 47. This aligns with a recognized framework for disability discrimination claims, in that it challenges public entities for denying people with disabilities the opportunity to participate in or benefit from a service, program, or activity that is "equal to that afforded" to the general public. 28 C.F.R. § 35.130(b)(1); *see Lamone*, 813 F.3d at 507 (quoting *Cal. Council of the Blind v. County of Alameda*, 985 F. Supp. 2d 1229, 1239 (2013) ("[I]nferior voting experience 'not equal to that afforded others'"); *Henrietta D. v. Bloomberg*, 331 F.3d 261, 283 (2d Cir. 2003) (Plaintiffs sought equal and meaningful access to benefits available to "qualifying members of the general public").

III.   <u>**"What is the citation (both statutory/regulatory and in the Complaint) for Plaintiff's contention that many or all individuals experiencing mental-health emergencies qualify as having a 'disability' under the ADA and the Rehabilitation Act because they are 'regarded as' having a disability?"**</u>

A plaintiff may state a claim under Title II of the ADA where the unequal opportunity to benefit from a public entity's service, program, or activity is predominantly experienced by people with disabilities.  Plaintiff has alleged that mental health emergencies are primarily experienced by people who actually have mental health disabilities.  *See* Compl. ¶ 24.  The additional contention that people are "regarded as" having a disability provides further support for the assertion that many mental health emergencies are experienced by people who meet the ADA's definition of disability.  However, this additional contention is not essential to Plaintiff's claim in this case.  The ADA's definition of disability includes (1) "a physical or mental impairment that substantially limits one or more major life activities;" (2) "a record of such an impairment;" or (3) "being regarded as having such an impairment[.]"  42 U.S.C. § 12102(1)(A).  Plaintiff alleges that "the typical, or most common, mental health emergencies arise from depression, anxiety, and post-traumatic stress disorders[,]" and that they also arise from bipolar disorders and schizophrenia, both of which "are much lower incidence disabilities in the general population."  Compl. ¶ 24.  These conditions typically meet the first prong of the definition of disability.

In fact, diagnoses such as major depressive disorder, post-traumatic stress disorders, bipolar disorder, and schizophrenia will "virtually always be found to impose a substantial limitation on a major life activity."  28 C.F.R. § 35.108(d)(2)(ii)-(iii).  Moreover, "[t]he primary object of attention in cases brought under title II of the ADA should be whether public entities have complied with their obligations and whether discrimination has occurred, not the extent to which an individual's impairment substantially limits a major life activity.  Accordingly, the threshold issue of whether an impairment substantially limits a major life activity should not

16

demand extensive analysis." 28 C.F.R. § 35.108(d)(1)(ii).  Both the substantial limitation, and the ultimate definition of disability, "shall be construed broadly in favor of expansive coverage, to the maximum extent permitted by the terms of the ADA."  28 C.F.R. § 35.108(a)(2)(i); *see also* 28 C.F.R. § 35.108(d)(i).  This broad reading is consistent with the purpose of the ADA Amendments Act of 2008, which clarified the definition of disability to make it easier for people with disabilities to obtain protection under the ADA.  28 C.F.R. § 35.101(b).

Separately, the definition of disability covers people who are "regarded as" having a disability, even if they do not actually have one.  By including this category, "Congress acknowledged that society's accumulated myths and fears about disability and diseases are as handicapping as are the physical limitations that flow from actual impairment."  28 C.F.R. Pt. 35, App. B (Section 35.104 Definitions) (quoting *School Bd. of Nassau County v. Arline*, 480 U.S. 273 (1987).  Therefore, a person who is denied an equal opportunity to benefit because of "myths, fears, and stereotypes associated with disabilities" would be considered to have a disability for purposes of establishing disability-based discrimination, *see* 28 C.F.R. Pt. 35, App. B (Section 35.104 Definitions), and where the public entity can articulate no legitimate reason for the denial, such as a failure to meet eligibility criteria, a concern about the perceived disability may be inferred.  *Id*.; *see also MX Grp v. City of Covington*, 293 F.3d 326, 340-42 (6th Cir. 2002) (finding that people recovering from drug addiction were people with disabilities under Title II and Section 504 and that Plaintiff, a drug treatment provider, adduced sufficient evidence to show that the city denied a zoning permit because, based on fear and stereotypes, it equated drug addiction with criminality).  While Plaintiff may be able to show that additional people are "regarded as" having a disability, it is not necessary to reach this question.

That some people who experience a mental health crisis may not have a disability does not defeat Plaintiff's claim.  First, individualized evidence of disability status is not necessary to establish a cause of action under the ADA.  *See Socal Recovery, LLC v. City of Costa Mesa*, 56 F.4th 802, 814–15 (9th Cir. 2023) (treatment providers "can satisfy the 'actual disability' prong *on a collective basis* by demonstrating that they serve or intend to serve individuals with actual disabilities") (emphasis in original).  Second, nothing in the statute or regulation requires proof that everyone harmed by a discriminatory practice has a disability.  To the contrary, discriminatory practices often harm members of the general public, and remedying those practices often benefits them.  For example, an inaccessible sidewalk or bathroom may pose barriers to people without disabilities who are carrying strollers or wheeled suitcases.  This does not negate the discrimination against people with disabilities who use wheelchairs.  Similarly, while captioning makes it easier for everyone to understand a public broadcast, that has no bearing on an entity's obligation to ensure effective communication with people with hearing disabilities.  Each of these hypotheticals involves discrimination by reason of disability, despite the incidental harm to others.

The mere fact that "others cannot avail themselves" of a service does not make the "minimal access" provided to people with disabilities any less discriminatory.  *See Henrietta D.*, 331 F.3d at 282.  As alleged here, people with mental health disabilities are denied an equal opportunity to benefit from the District's unified emergency response system because the one category of emergencies "uniquely associated with" people with these disabilities receives a different, less effective response.  *See Alexander*, 469 U.S. at 302 n.22; *see* Compl. ¶ 24.  Such allegations, if taken as true, show that the unequal opportunity to benefit is by reason of disability.  That some members of the general public may face similar burdens does not negate the fact that people's mental health disabilities are a substantial cause of the unequal opportunity to benefit.

IV.    **Is there any case law addressing "equal opportunity" as a distinct type of claim under the ADA and the Rehabilitation Act?"**

While "equal opportunity" is a distinct requirement, in this context it is appropriate to consider this and the "reasonable modification" requirement together.   Under the law, public entities must provide an equal opportunity for people with disabilities to participate in and benefit from their services, programs, and activities.  28 C.F.R. §§ 35.130(b)(1)(i)-(iii).  This is a distinct responsibility, and failing to meet it may violate the ADA.   However, in this case, it is logical to analyze the "equal opportunity" and "reasonable modification" requirements in tandem.   As discussed below, courts often consider the failure to provide an "equal opportunity" alongside the failure to satisfy other requirements, such as the requirement to make reasonable modifications to avoid discrimination unless the entity can show that the modifications would fundamentally alter the nature of the service, program, or activity.  28 C.F.R. § 35.130(b)(7).

This combined analysis is not always necessary or appropriate.   In particular, such an inquiry "makes little sense in the context of a statute that discriminates on its face rather than in its application" because the only possible modification "that would avoid discrimination on the basis of disability would be the actual removal of the law," which "would fundamentally alter the ordinance."  *MX Grp., Inc.*, 293 F.3d at 345 (quoting *Bay Area Addiction Rsch. & Treatment, Inc. v. City of Antioch*, 179 F.3d 725, 734 (9th Cir. 1999)); *see also P.M. ex rel. Martine v. City of Winfield*, Civ. A. No. 19-0623, 2020 WL 10181570, at *3-5 (N.D. Ala. June 10, 2020) (Plaintiff stated a prima facie case under Title II by sufficiently pleading that he was a qualified individual with a disability who was excluded from full participation in a program, by reason of disability, without examining reasonable modifications).

However, because the affirmative obligation to make modifications is a vehicle for remedying the unequal opportunity, the facts relevant to assessing compliance with each

requirement often overlap. *See Ability Ctr. of Greater Toledo v. City of Sandusky*, 385 F.3d 901, 910 (6th Cir. 2004) ("In stating that public entities shall not deny qualified disabled individuals the benefits of public services, [Title II] necessarily requires that public entities provide such individuals the means necessary to acquire access to these services."); *Oconomowoc Residential Programs v. City of Milwaukee*, 300 F.3d 775, 784 (7th Cir. 2002) ("Whether the requested accommodation is necessary requires a 'showing that . . . ' without that accommodation, people with disabilities will be denied an equal opportunity to live in a residential community); *see also Nat'l Ass'n of the Deaf v. Trump*, 486 F. Supp. 3d 45, 57-58 (D.D.C. 2020) ("'[D]eaf individuals lack meaningful access to government activities or programs without the provision of interpretive assistance.'. . . Closed captioning and transcripts may constitute a reasonable accommodation under some circumstances, but not here.") (citations omitted)); *Nat'l Org. on Disability v. Tartaglione*, Civ. A. No. 01-1923, 2001 WL 1231717, at *3 (E.D. Pa. Oct. 11, 2001) ("[T]he specific issue at the center of this case [is] whether the ADA requires Defendants to take additional steps to avoid discrimination and provide equal access to the voting process").

In many contexts, including this one, the Department has found it helpful to analyze these requirements together. Most notably, following investigations into emergency response systems, the Department concluded that the administration of emergency response violated the ADA because people with behavioral health disabilities were deprived of an equal opportunity to benefit *and* the jurisdiction could make reasonable modifications, including expanding and improving its existing alternative response, to avoid discrimination. *See* U.S. Dep't of Just., *Investigation of the City of Minneapolis and the Minneapolis Police Department* (June 16, 2023), *available at* https://perma.cc/STU8-HQ3J, at 57-66; U.S. Dep't of Just., *Investigation of the Louisville Metro Police Department and Louisville Metro Government* (Mar. 8, 2023), *available at*

https://perma.cc/W9CA-2BNR, at 59–68.    This analysis aligns best with what some courts

describe as a "reasonable accommodation claim," *see Henrietta D.*, 331 F.3d at 274,[6] in that it

considers both whether plaintiffs are denied an equal opportunity to benefit, and whether the public

entity has failed to make reasonable modifications that are necessary to avoid that discrimination.

Under such a framework, this Court could evaluate whether reasonable modifications to

the District's emergency response system are necessary to avoid denying people with mental health

disabilities an equal opportunity to benefit from that system.    As alleged here, the District's

overreliance on a different, less effective police-led response for mental health emergencies poses

an obstacle that denies people with mental health disabilities an equal opportunity to benefit from

urgent, effective care.  *See, e.g.*, Compl. ¶¶ 2, 197.  This obstacle is both incidental and antithetical

to system's purpose.  *E.g., id.*, ¶¶ 56, 77, 198.  As the D.C. Circuit has recognized, such obstacles

typically reflect a denial of meaningful access—or an unequal opportunity to benefit.  *See Am.*

*Council of the Blind v. Paulson*, 525 F.3d 1256, 1267 (D.C. Cir. 2008).[7]

---

[6]    While some courts delineate between three "theories" of ADA liability, "disparate treatment," "disparate impact," and "reasonable accommodation," it is not necessary to select from one of these theories to assess whether the law was violated. *See Am. Council of the Blind v. Paulson*, 525 F.3d 1256 (D.C. Cir. 2008) (evaluating an ADA claim without reference to these theories); *Pierce v. District of Columbia,* 128 F. Supp. 3d 250 (D.D.C. 2015) (same).  To the extent this Court chooses to adopt this terminology, the reasonable accommodation framework best suits Plaintiff's claim.  However, the Department looks to the language in the statute and regulation as the best guidance when evaluating disability-based discrimination.

[7]    Although some courts use the term "meaningful access" to describe the legal standard under Title II, the accurate term is set forth in the Title II regulation, which requires that a public entity provide "equal opportunity" to benefits, programs, and services. 28 C.F.R. § 35.130(b)(1)(ii)-(iii); *see Childress v. Fox Assocs., LLC*, 932 F.3d 1165, 1171 (8th Cir. 2019) ("A person with a disability receives meaningful access if she receives an "equal opportunity to gain the same benefit" as a person without her disability.").

Further, Bread for the City has identified a change that would remove this obstacle—the expansion of the District's existing mental health-led response—that is used elsewhere in practice and has been recommended to the District by external organizations.  Compl. ¶¶ 7-9, 38-43.  This Court could consider those allegations to assess whether a modification is facially reasonable.  *See Paulson*, 525 F.3d at 1259-60, 1266-67 (declining to decide whether plaintiffs' burden includes demonstrating that a proposed accommodation is facially reasonable because, although the lawsuit did not seek "a specific accommodation dictated by court order," plaintiff "could surmount this hurdle because it identifies accommodations that other countries use in practice, that the National Research Council has recommended for consideration," and that the defendant has not suggested are infeasible).

Whether this proposed modification is reasonable and not a fundamental alteration depends on a fact-based assessment of the entity, which should not be resolved "on the basis of pleadings alone."  *Hindel v. Husted*, 875 F.3d 344, 347-48 (6th Cir. 2017); *see also Long v. Howard Univ.*, 439 F. Supp. 2d 68, 76 (D.D.C. 2006) (quoting *Staron v. McDonald's Corp.*, 51 F.3d 353, 356 (2d Cir. 1995) ("[T]he determination of whether a particular modification is 'reasonable' involves a fact-specific, case-by-case inquiry")).  However, the burden of production for reasonableness is not a "heavy one."  *Henrietta D.*, 331 F.3d at 280.  It is sufficient for a plaintiff to "suggest the existence of a plausible [modification], the costs of which, facially, do not clearly exceed its benefits."  *Id.*  Moreover, "Defendants bear the burden of proving that the requested modification would be a fundamental alteration to the program."  *Lamone*, 813 F.3d at 508; *see also Long*, 439 F. Supp. 2d at 77 n.5 (while the plaintiff must prove the necessity of a modification, "the absence of fundamental alteration is presumed unless the *defendant* proves otherwise" (emphasis in original)).

At this stage, Bread for the City has plausibly alleged a reasonable modification, without which people with mental health disabilities are denied an equal opportunity to benefit from the District's unified emergency response system.  Courts have recognized that where disability-based discrimination is systemic, system-wide modifications are appropriate.  *Paulson*, 525 F.3d at 1274 (finding that changing the U.S. paper currency design was facially reasonable); *Henrietta D.*, 331 F.3d at 267-68, 280-81 (finding the City's DASIS law, which was designed to address systemic obstacles to accessing public benefits, represents an attempt at a reasonable modification and upholding an injunction requiring the agency to follow it).  Indeed, the regulation contemplates the necessity of broad changes to "policies, practices, or procedures."  28 C.F.R. § 35.130(b)(7)(i).  Moreover, the change proposed—the expanded use of existing mental health response teams—is consistent with District's own goal of "enhancing" its mental health emergency responses. Def.'s Mot. to Dismiss at 1, ECF No. 42-1. Courts have found proposed modifications that expand existing services are reasonable, particularly when the modifications align with the jurisdiction's own stated plans and obligations.  *See, e.g.*, *Messier v. Southbury Training Sch.*, 562 F. Supp. 2d 294, 344–45 (D. Conn. 2008) (plaintiffs' requested service expansion, which was consistent with defendants' publicly stated plans, was reasonable); *see also United States v. Florida*, 682 F. Supp. 3d 1172, 1241 (S.D. Fla. 2023) (modifications that "call for expanding access to State services that already exist, and for using existing State programs and tools of program administration to expand such access, are both sufficient to meet the *prima facie* burden of articulating a plausible modification, and they are reasonable.").  Finally, at least one court has already recognized that, where emergency dispatchers may send a variety of resources when 911 is called, deploying mobile crisis teams staffed with behavioral health professionals may be a reasonable modification.

*See Est. of LeRoux v. Montgomery County*, Civ. A. No. 22-0856, 2023 WL 2571518, at *12 (D.

Md. Mar. 20, 2023).

Respectfully Submitted,

MATTHEW M. GRAVES
D.C. Bar. #481052
United States Attorney

KRISTEN CLARKE
Assistant Attorney General
Civil Rights Division

BRIAN P. HUDAK
Chief, Civil Division

STEVEN H. ROSENBAUM
Chief, Special Litigation Section

By:    /s/ *John C. Truong*
        JOHN C. TRUONG
        D.C. BAR #465901
        CHRISTOPHER HAIR
        Assistant United States Attorneys
        601 D Street, N.W.
        Washington, D.C. 20530
        (202) 252-2524 (Truong)
        (202) 252-2543 (Hair)
        john.truong@usdoj.gov
        christopher.hair@usdoj.gov

REGAN RUSH
Principal Deputy Chief
Special Litigation Section

*/s/ Sarah. T. Russo*
SARAH T. RUSSO
Trial Attorney
United States Department of Justice
Civil Rights Division
Special Litigation Section
U.S. Department of Justice
150 M Street, N.E. 10th Floor
Washington, D.C. 20002
(202) 598-0138
sarah.russo@usdoj.gov

*Attorneys for the United States of America*