UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| **BREAD FOR THE CITY,**<br><br>   **Plaintiff,**<br><br>   v.<br><br>**DISTRICT OF COLUMBIA,**<br><br>   **Defendant.** | Civil Action No. 1:23-cv-01945-ACR |

### DEFENDANT DISTRICT OF COLUMBIA'S SUPPLEMENTAL BRIEF

Defendant District of Columbia (the District) responds to the Court's April 30, 2024 Minute Order (April 30 Order) to "file supplemental briefing addressing" four questions. As explained below, the resolution of these questions further demonstrates that the District's Motion to Dismiss the Complaint [42] should be granted. First, the appropriate characterization of the relevant "service" at issue for purposes of analyzing Plaintiff's parallel claims under Title II of the Americans with Disabilities Act (ADA or Title II) and Section 504 of the Rehabilitation Act is a legal conclusion; a proper reading of the allegations in the Complaint under the guidance of Supreme Court precedent reveals that the "service" Plaintiff seeks is a mental health crisis response by mental health professionals. On the Court's second question, *Modderno v. King*, 82 F.3d 1059 (D.C. Cir. 1996), is dispositive, because it held that services provided for mental health impairments need not be comparable to services provided for physical impairments, and that decision has not been disturbed by subsequent caselaw or statutory amendments. For the Court's third question, Plaintiff pleaded that most—but not all—individuals experiencing a mental health crisis have a disability, but even if *all* individuals experiencing a mental health crisis were disabled under the ADA, the conclusion that Plaintiff was not discriminated against

by reason of disability would remain unchanged.  Finally, courts have not analyzed "equal opportunity" ADA claims as a distinct line of cases, and Plaintiff cannot escape clear binding precedent by suggesting that they do.  For all these reasons, and those stated in support of the District's Motion to Dismiss [42-1] and its Reply [61], Plaintiff has failed to state a plausible claim to relief, and the Complaint should therefore be dismissed.

## ARGUMENT

**I.       The Service at Issue Is Mental Health Professionals Responding to Mental Health Crises; Plaintiff's Contention Otherwise Is a Legal Conclusion Owed No Deference.**

**How should the Court define the activity, program, or service at issue in this case and the benefits of that activity, program, or service?  If the parties have competing views, how should the Court choose between them?**

Plaintiff has previously argued that the service at issue in the Complaint is a "unified emergency response system."  *See* Pl.'s Opp'n Def.'s Mot. Dismiss [47] at 19–20.  But this formulation is, fundamentally, a legal conclusion, not a factual allegation entitled to deference.  To be sure, "[i]n deciding whether to dismiss a complaint for failure to state a claim, the court must treat the complaint's factual allegations—including mixed questions of law and fact—as true and draw all reasonable inferences therefrom in the plaintiff's favor."  *Alford v. Providence Hosp.*, 60 F.Supp.3d 118, 123 (D.D.C. 2014).  But the Court should neither "assume the truth of [Plaintiff's] legal conclusions" nor accept factual labels "that are unsupported by the facts set out in the [C]omplaint."  *Arpaio v. Obama*, 797 F.3d 11, 19 (D.C. Cir. 2015); *see Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).  Formulaic recitations of the elements of a claim, including Title II or Section 504 claims, "will not do."  *Iqbal*, 556 U.S. at 678  (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007)).  Because "cases addressing meaningful access are necessarily fact-specific," the Court should consider Plaintiff's factual allegations to determine the specific service that is at issue under Title II and Section 504.  *Am. Council of the Blind v. Paulson*, 525

F.3d 1256, 1267 (D.C. Cir. 2008); *see Iqbal*, 556 U.S. at 678 (quoting *Twombly*, 550 U.S. at 557); District's Mem. in Support of Mot. to Dismiss (District's Mem.) [42-1] at 14–17 (citing and discussing cases conducting this fact specific analysis); District's Reply [61] at 9–15 (same).[1]

"The Supreme Court instructs courts to focus on narrow programs and benefits offered by a public entity when evaluating claims under the ADA and Section 504." *See L.E. ex rel. Cavorley v. Superintendent of Cobb Cnty. Sch. Dist.*, 55 F.4th 1296, 1302 (11th Cir. 2022). "To prevent the antidiscrimination legislation from being emptied of its meaning through broad definitions of the program at issue," *id.* at 1303, a plaintiff cannot claim that an "amorphous objective" is the specific service at issue, *Alexander v. Choate*, 469 U.S. 287, 303 (1985) (finding "the benefit provided through Medicaid is a particular package of health care services, such as 14 days of inpatient coverage" rather than "adequate health care"). Here, the only support for Plaintiff's contention that the District's "emergency response program" is a single service is that the District "respon[ds] to a wide range of emergencies, including mental health emergencies." Compl. ¶ 77; *see* Pl.'s Opp'n [47] at 21. The concept of "responding to emergencies" is just the type of "amorphous objective" that the *Alexander* Court warned against, for three primary reasons: (1) the District provides many different kinds of emergency services; (2) Plaintiff's allegations focus on the unique nature of mental health services; and (3) mental health crisis services are provided through several avenues, including outside the 9-1-1 call system.

---

[1] To the extent that Plaintiff takes a different view of this analytical framework in its opening supplemental brief, the District will address how the Court should decide between competing views in its supplemental response. *See* Pl.'s Opp'n [47] at 20 ("[A]t this stage, the Court must credit [Plaintiff]'s plausible allegations.").

3

First, the face of Plaintiff's Complaint specifically identifies four different District agencies that provide any number of different emergency responses: the Office of Unified Communications (OUC), the Metropolitan Police Department (MPD), Fire and Emergency Medical Services (FEMS), and the Department of Behavior Health (DBH). *Id.* at ¶¶ 23, 78. It is true that individuals may generally access any one of a number of different emergency services by calling OUC at "911." *See id.* at ¶¶ 78, 82, 87. But "OUC staff" then "choose which first responders to dispatch to the scene" of the emergency. *Id.* at ¶ 87. The Court should begin by asking the same question the District asks: "9-1-1, what's your emergency?" Revealingly, Plaintiff's Complaint is not about most of the other emergency services the District provides in response to 9-1-1 calls, such as how MPD responds to crimes, or FEMS responds to fires. Plaintiff does not allege that anyone, with a mental impairment or not, lacks meaningful access to those basic emergency services. Instead, Plaintiff baldly asserts that it is "'common sense'" to conclude that "a unified emergency response program constitutes the appropriate unit of analysis in this matter." Pl.'s Opp'n [47] at 21, 25 (quoting *Iqbal*, 556 U.S. at 679). But such a broad label lumps services as disparate as the District's response to "large-scale emergencies" like "earthquakes and terrorist attacks" into the same bucket as the services the District offers daily in response to individual emergencies or personal crises. Pl.'s Opp'n at 24; *see* District's Reply at 9–15. "Emergency response" is simply too amorphous, broad, and conclusory a label for what is alleged to sustain Plaintiff's Complaint. *See Iqbal*, 556 U.S. at 678; *Alexander*, 469 U.S. at 303; *Arpaio*, 797 F.3d at 19.

Next, Plaintiff's Complaint itself identifies "mental health emergencies or crises" as the specific kind of emergency at issue. Compl. ¶ 4. Plaintiff's allegations and its own alleged business practices clearly differentiate "*physical* health emergencies" from "*mental* health

4

emergencies." *Id.* at ¶¶ 149–50 (emphases original); *see, e.g.*, *id.* at ¶¶ 10, 139, 144–45, 179–80. Plaintiff vociferously alleges that the training needed to adequately respond to criminal activity, medical emergencies, and mental health crises are vastly different. *See, e.g.*, *id*. at ¶¶ 117–38, 197, 205.  And Plaintiff seeks "an emergency response program that provides parity between physical health emergencies and mental health emergencies" by "ensur[ing] that mental health professionals are the default first responders for typical mental health emergencies." *Id.* at 45–46 (Prayer for Relief B.); *see id.* at ¶¶ 139, 197, 205.  In other words, Plaintiff alleges that mental health crises are so different from other types of emergencies that mental health crises need a completely different set of first responders—that is, different services.

   Finally, the Court should consider that there are several different ways "individuals can request assistance for a mental health emergency from the District[ ]." *Id.* at ¶ 78.  Individuals can call 9-1-1. *See id.* at ¶ 79. As alleged, they are "highly unlikely to get a response from a mental health professional" when calling 9-1-1 because "the District has adopted a series of policies and made a series of funding decisions that ensure that MPD officers, rather than mental health professionals, serve as default first responders to mental health emergencies." *Id.* at ¶¶ 76, 92. *See id.* at ¶¶ 82–91; *cf. id.* at ¶¶ 134–39.  But Plaintiff is not alleging that the District has denied anyone meaningful access to the benefits of the public services that MPD does provide. *See, e.g.*, *id.* at ¶ 150 ("[C]alling 911 has historically resulted in MPD officers arriving on the scene.").  To the contrary, the underlying thrust of Plaintiff's Complaint is that "the District . . . should not rely on police to respond to typical mental health emergencies" because of "the importance of leaving such duties to mental health professionals" who are allegedly better at dealing with this kind of emergency than police. *Id.* at ¶ 75; *see id.* at ¶¶ 25–74.  Because Plaintiff does not want what MPD provides, those cannot be the specific services at issue. *See*

5

*id.* at ¶¶ 140–58, 197–99, 205–07; *cf.* 28 C.F.R. § 35.130(e)(1) ("Nothing in this part shall be construed to require an individual with a disability to accept an accommodation, aid, service, opportunity, or benefit provided under the ADA or this part which such individual chooses not to accept.").

Indeed, Plaintiff further alleges that "individuals can contact" DBH's "Access Helpline, which is staffed with mental health professionals who attempt to resolve mental health emergencies by phone" or "send teams of mental health clinicians and certified peer support specialists, called Community Response Teams (CRTs), to provide assistance at the scene." Compl. ¶ 80. The "Child and Adolescent Mobile Psychiatric Services (ChAMPS)" provides a similar service "through a grant provided by" DBH "when young people ages 6-17 have a mental health emergency." *Id.* at ¶ 81. Plaintiff further alleges that OUC can transfer . . . call[s] to the Access Helpline" and will "dispatch[ ] MPD" if "no one at the Access Helpline answers OUC's attempt to transfer a call" to DBH. *Id.* at ¶¶ 93, 97. Plaintiff itself "has a practice of refraining from contacting MPD to the greatest extent possible," even when an unarmed "individual presents a physical danger to others," and "will attempt to de-escalate the situation on its own and call CRT or ChAMPS directly" if it cannot de-escalate "[t]he typical mental health emergency" that allegedly does "not present a danger to others." *Id.* at ¶¶ 25, 156–58.[2] This

---

[2] Plaintiff's allegation that OUC call-takers—9-1-1 operators—"cannot transfer a mental health emergency call to the Access Helpline if the individual in crisis is under 18 or has ingested a substance such as alcohol or drugs" is of no moment. Compl. ¶ 95. The allegation says nothing about the availability of ChAMPS for youth calls or EMS for situations involving drug or alcohol overdoses. *See, e.g.*, *id.* ¶¶ 81, 118. Youth is not a disability. And emergencies related to the "current illegal use of drugs" do not relate to any protected disability. 28 C.F.R. § 35.131(a)(1). Nor is the District required "to permit an individual to participate in or benefit from the services, programs or activities [the District offers] when that individual poses a direct threat to the health or safety of others." 28 C.F.R. § 35.139(a).

distinction from the mental health crisis response system through 9-1-1 further demonstrates the separation of such services from physical health emergency services.

In sum, the nub of Plaintiff's Complaint is that "[w]hether individuals contact the Access Helpline, CRTs, or ChAMPS directly, or reach the Access Helpline through 9-1-1, it can take hours for mental health professionals to arrive at the scene." *Id.* at ¶ 105. And Plaintiff wants "the District [to] employ[ ] mental health professionals who [can] respond to crises promptly and provide appropriate care." *Id.* at ¶ 193; *see id.* at *id.* at 27–30 (III.D. "The District Has Deprived CRTs and ChAMPS of the Resources Necessary to Provide Emergency Mental Health Services"), 45–46 (Prayer for Relief B.). The specific service plausibly alleged in Plaintiff's Complaint is therefore mental health professionals responding to mental health crises.

## II. *Modderno* Is Controlling and Dispositive; *Olmstead* Did Not Overrule It.

> **How, if at all, does the D.C. Circuit's decision in *Modderno v. King*, 82 F.3d 1059 (D.C. Cir. 1996), apply to this case? In particular, the parties should address whether *Modderno*'s precedential value is affected by the Supreme Court's decision in *Olmstead v. L.C. ex rel. Zimring*, 527 U.S. 581 (1999), or subsequent amendments to the ADA.**

The D.C. Circuit's decision in *Modderno v. King*, 82 F.3d 1059 (D.C. Cir. 1996), is dispositive here. As an initial matter, although *Modderno* dealt specifically with a claim under Section 504, cases interpreting Title II of the ADA and Section 504 of the Rehabilitation Act are interchangeable because the claims and defenses at issue are virtually identical. *See* 29 U.S.C. § 794(a) (Section 504); 42 U.S.C. § 12132 (Title II); *Am. Council of the Blind*, 525 F.3d at 1260 n.2 (explaining "courts have tended to construe section 504 *in pari materia* with Title II of the ADA" and "cases interpreting either are applicable and interchangeable" (quotation marks omitted)); *Harrison v. Rubin*, 174 F.3d 249, 253 (D.C. Cir. 1999) (citing *Zukle v. Regents of*

*Univ. of Cal.*, 166 F.3d 1041, 1045 n.11 (9th Cir. 1999) ("There is no significant difference in analysis of the rights and obligations created by the ADA and the Rehabilitation Act.")).

In *Modderno*, the plaintiff—who had a mental illness—attempted to make the same argument Plaintiff makes here: that treating mental illness differently from physical health conditions constitutes discrimination under Section 504. 82 F.3d at 1060–61. The D.C. Circuit squarely rejected that contention. *See id.* at 1061–63. While recognizing that the Rehabilitation Act broadly defines a protected disability as "a physical or mental impairment," 29 U.S.C. § 705(9)(A), 20(A); *see also* 42 U.S.C. § 12102(1)(A) (same definition under Title II), the court explained that the statute mentions both "by way of assuring that the remedies provided . . . are comprehensive, rather than to assure any kind of equality as between sufferers of mental, as opposed to physical, disability." *Modderno*, 82 F.3d at 1061 (discussing the definition then codified at 29 U.S.C. 706(8)(B)). In other words, "[t]here is nothing . . . that requires that any benefit extended to one category of handicapped persons also be extended to all other categories of handicapped persons" in either statute. *Id.* at 1062 (quoting *Traynor v. Turnage*, 485 U.S. 535, 549 (1988)). Meaning, Plaintiff's demand for the District to provide an expanded benefit—a different response to mental health crises on par with its response to physical medical emergencies—is not legally cognizable under *Modderno*. *See* Compl. ¶¶ 75–76, 134–39, 193, 197, 205; *see also id.* at 45–46 (Prayer for Relief B.).

The Supreme Court's decision in *Olmstead v. L.C. ex rel. Zimring*, 527 U.S. 581 (1999) (plurality opinion), did not disturb the D.C. Circuit's holding in *Modderno*. The *Olmstead* Court "confront[ed] the question whether the proscription of discrimination may require placement of persons with mental disabilities in community settings rather than in institutions." 527 U.S. at 587. The Court ultimately recognized that "unjustified isolation of persons with disabilities is a

8

form of discrimination" because "Congress explicitly identified unjustified 'segregation' of persons with disabilities as [an historic] 'form of [systemic] discrimination" that the ADA is designed to address.  527 U.S. at 600 (original brackets omitted) (quoting 42 U.S.C. § 12101(a)(2)).  Twenty years on, that holding does not distinguish between unjustifiable segregation claims related to "care[ ] for . . . mentally *or* physically disabled individual[s]" in this Circuit.  *Brown v. District of Columbia*, 928 F.3d 1070, 1073 (D.C. Cir. 2019) (emphasis added).  Nor does it remotely suggest that comparing the benefits offered for medical emergencies to the benefits offered for mental health crises establishes a discrimination claim under Title II and Section 504.  Simply put, *Olmstead* does not address what *Modderno* decided: The District is not prohibited from providing public benefits "that leave some disabled individuals [in need of medical attention in a physical health emergency] better off and the remainder [in need of mental health crisis intervention] no worse off."  *Modderno*, 82 F.3d at 1062; *see also* Compl. ¶¶ 75–76, 134–39, 193, 197, 205; *id.* at 45–46 (Prayer for Relief B.).

Likewise, the ADA Amendments Act of 2008 ("the Amendments") did not disturb *Modderno*.  *See* PL 110-325 (Sept. 25, 2008).  The ADA and amended ADA remain virtually identical to the provision of the Rehabilitation Act on which the holding in *Modderno* is based.  *Compare* 42 U.S.C. § 12102(1)(A) ("a physical or mental impairment"); PL 101-336, § 3(2)(A) (July 26, 1990) (same), *with* 29 U.S.C. § 705(9)(A), (20)(A) (same), *and Modderno*, 82 F.3d at 1061 (same).  Moreover, the Amendments were designed to ensure that courts interpret the ADA definition of a handicapped individual consistently with the Rehabilitation Act of 1973.  *See* PL 110-325, § 2(a)(3).  In short, Congress's stated purpose was to restore the definition of disability narrowed by *Sutton v. United Airlines, Inc.*, 527 U.S. 471 (1999), and *Toyota Motor Mfg., Ky., Inc. v. Williams*, 534 U.S. 184 (2002).  *See* PL 110-325, § 2(a)(4)–(7).  The Amendments do not

9

otherwise touch Title II or call *Alexander*, 469 U.S. 287, or *Modderno*, 82 F.3d 1059, into question because no iteration of the ADA or the Rehabilitation Act suggests that Congress intended to "assure any kind of equality . . . between . . . mental. . . [and] physical. . . disabilities" so long as the benefits made available in response to any particular mental health crisis or medical emergency are meaningfully available to all persons regardless of their physical or mental impairments. 82 F.3d at 1061; *see* PL 110-325, §§ 3–7.

"Perhaps mentally disabled individuals are more vulnerable to discrimination than the physically disabled," as Plaintiff's Complaint seems to assume. *Modderno*, 82 F.3d at 1062. "If so, then Congress might wish to enact a statute affording the mentally disabled special protection" in the form of an express federal right to specific mental health crisis responses from mental health professionals (who are not police officers) that are equivalent to medical emergency responses. *Id.*; *see* Compl. ¶¶ 139, 197, 205; *cf. FDA v. Alliance for Hippocratic Medicine*, 602 U.S. ----, No. 23-235, 2024 WL 2964140 at *12 (June 13, 2024) ("Citizens and doctors who object to what the law allows others to do may always take their concerns to the Executive and Legislative Branches and seek greater regulatory or legislative restrictions on certain activities."). But even assuming some logical or practical measure of parity between such services might be divined, the Rehabilitation Act, ADA, and the Amendments are "simply not such a statute." *Modderno*, 82 F.3d at 1062. "Nothing . . . prohibits a public entity from providing benefits, services, or advantages . . . to a particular class of individuals with disabilities beyond those [it is] required" to provide to any other class of individuals with different disabilities. 28 C.F.R. § 35.130(c); *cf.* 28 C.F.R. § 41.51 ("[T]he exclusion of a specific class of handicapped persons from a program limited by federal statute or executive order to a different class of handicapped persons is not prohibited.").

Put another way, the District is required to ensure that the mentally impaired have meaningful access to the generally available benefits of the District's medical emergency response system. *See, e.g.*, 28 C.F.R. §§ 35.130(b)(1), 41.51(b)(1). They do. And the District is required to ensure that its mental health crisis response is accessible to individuals with physical impairments. *See, e.g.*, *id*. It is. But neither the ADA nor the Rehabilitation Act require the District to provide any able or disabled person with specific emergency medical responses or mental health crisis responses "simply to meet the reality that the [physically and the mentally impaired may] have greater . . . needs" for one service than they may have for the other service or than any non-impaired member of the public may have for either service on any given day. *Alexander*, 469 U.S. at 303; *see* Compl. ¶ 24. "To conclude otherwise would be to find that [these anti-discrimination statutes] require[ ] [the District] to view certain illnesses, *i.e.*, those particularly affecting the [mentally impaired], as more important than others and more worthy of cure through government subsidization." *Alexander*, 469 U.S. at 303–04. And that result may cause or compel local governments to *diminish* and *reduce* medical emergency responses to establish parity with mental health crisis responses. *See* Compl. ¶¶ 75–76, 134–39, 193, 197, 205; *see also id.* at 45–46 (Prayer for Relief B.). Pitting of one disability against another in this way was squarely rejected by *Modderno*. 82 F.3d at 1062 ("We simply cannot believe that a statute enacted for the benefit of the disabled produces this result.").

### III. Plaintiff's Definition of Disability Is Inconsequential.

**What is the citation (both statutory/regulatory and in the Complaint) for Plaintiff's contention that many or all individuals experiencing mental-health emergencies qualify as having a "disability" under the ADA and the Rehabilitation Act because**

11

**they are "regarded as" having a disability?  How, if at all, does that contention affect the analysis in this case?**

The ADA defines disability as "(A) a physical or mental impairment that substantially limits one or more major life activities of such individual; (B) a record of such an impairment; or (C) being regarded as having such an impairment."  42 U.S.C. § 12102(1); *see Alexander v. Wash. Metro. Area Transit Auth.*, 826 F.3d 544, 546–47 (D.C. Cir. 2016).  The applicable regulations define a mental impairment as "[a]ny mental or psychological disorder, such as an intellectual disability . . ., organic brain syndrome, emotional or mental illness, and specific learning disabilities."  29 C.F.R. § 1630.2(h)(2).  The Amendments, enacted to ensure 'a broad scope of protection' for individuals under the ADA (and consequently, the Rehabilitation Act)," *Alexander*, 826 F.3d at 47 (quoting 42 U.S.C. § 12101 note), provide that "[a]n individual meets the requirement of 'being regarded as having such an impairment' if the individual establishes that he or she has been subject to an action prohibited under [the ADA] because of an actual or perceived physical or mental impairment whether or not the impairment limits or is perceived to limit a major life activity," 42 U.S.C. § 12102(3).

Plaintiff's Complaint states that the "typical, or most common mental health emergencies arise from depression, anxiety, and post-traumatic stress disorders (PTSD)," which Plaintiff alleges are disabilities covered under the ADA.  Compl. ¶ 24.  In other words, Plaintiff here alleges that most, but not all, mental health emergencies involve an individual with a disability.  Plaintiff has not alleged that the fact of an individual having a mental health episode—without knowing more about the individual experiencing the crisis—*must* mean that an individual has a qualifying disability.  *See Bresaz v. Cnty. of Santa Clara*, 136 F. Supp. 3d 1125, 1136 (N.D. Cal. 2015) ("Plaintiffs have cited no authority to suggest that a single episode, suffered by an individual with no diagnosis of mental illness and no history of mental illness, is sufficient to

constitute a mental impairment under the ADA. The Court has found none in the Court's own research.").

Nevertheless, regardless of the application of the definition of disability here—whether *everyone* who experiences a mental health crisis is regarded as disabled or whether *most* individuals who experience mental health crises are disabled—the conclusion under the ADA and the Rehabilitation Act remains the same: Plaintiff does not identify any discrimination. Title II of the ADA provides that "no qualified individual with a disability shall, by reason of such disability, be excluded from participation in or be denied the benefits of the services, programs, or activities of a public entity, or be subjected to discrimination by any such entity." 42 U.S.C. § 12132. And Plaintiff does not—and cannot—allege that a service provided exclusively or predominately to individuals with a particular disability discriminates against individuals with that disability *by reason of such disability.*

Even taking as true Plaintiff's allegation in the Complaint that many (but not all) individuals experiencing a mental health disability suffer from a condition that satisfies the definition of disability under the ADA and Rehabilitation Act, *see* Compl. ¶ 24, Plaintiff would still fail to state a claim that the District's provision of particular services—here, whether mental health professionals respond to mental health crises—turns on whether the individual *has* a disability. *See* Section I, above. Instead, the services provided by the District in an emergency turn entirely on the nature of the emergency. In *Modderno*, the court explained that this type of distinction does not constitute discrimination based on disability:

> The [Rehabilitation Act] thus focuses on disability, yet the Plan in no way uses that criterion, as would, for example, a plan that distinguished between disabling and non-disabling mental illness. Rather the Plan distinguishes between mental and physical illness—a distinction that seems no more pertinent to the concerns of the Act than would a special provision on lower back pain, so long as the provision did not distinguish between lower back pain that "substantially limit[ed] one or more

13

of [a] person's major life activities" and lower back pain that did not have such an impact.

*Modderno*, 82 F.3d at 1061. Similarly here, just as a 9-1-1 call reporting a house fire will receive a FEMS response and a crime in progress will receive an MPD response, a 9-1-1 call reporting a mental health crisis will receive a response that is based on the description of that emergency, not the individual's status as mentally or physically impaired or not. *See id*. Plaintiff does not contend otherwise. Plaintiff's entire Complaint is, instead, premised on a dissatisfaction with the services provided in response to mental health crises, a dissatisfaction framed by a comparison to different services which are provided in response to a different kind of crisis. *See, e.g.*, Compl. ¶ 2. But the alleged inadequacy of those services cannot sustain an ADA or Rehabilitation Act claim. *See* District's Mem. at 22-24.

If, on the other hand, Plaintiff alleges that the *everyone* who experiences a mental health crisis is "regarded as" having a mental impairment that satisfies the definition of disability under the statutes, Plaintiff would still run into the same problem: The alleged inadequacy of a service provided only to individuals with disabilities cannot establish discrimination. *See, e.g., Greene v. City of New York,* 2024 WL 1308434, at *15 (S.D.N.Y. Mar. 26, 2024) ("A program which provides services exclusively to the mentally disabled cannot discriminate against the mentally disabled within the meaning of the ADA and Rehabilitation Act.") (citing *Disability Advocs., Inc. v. McMahon*, 124 F. App'x 674, 676 (2d Cir. 2005)); District's Mem.. at 26-27; Reply at 12. In other words, if Plaintiff is alleging that individuals with episodic or diagnosed mental health conditions are or should be provided with a special and specific service because of their condition or disability, the alleged failure of that service to meet a particular standard is not cognizable under Title II or Section 504.

14

## IV. "Equal Opportunity" Is Not a Distinct Claim Under the ADA or Rehabilitation Act.

**Is there any case law addressing "equal opportunity" as a distinct type of claim under the ADA and the Rehabilitation Act?**

Courts do not treat "equal opportunity" claims under the ADA and the Rehabilitation Act as a distinct type of "meaningful access" claim. Plaintiff cannot avoid clear, binding precedent under the ADA and Rehabilitation Act that precludes its claims here by suggesting that this case represents a departure from that precedent.

Indeed, ensuring that individuals with disabilities can enjoy equal opportunity of government benefits and services is a common thread running throughout ADA and Rehabilitation Act jurisprudence. Plaintiff cites to several ADA regulations to support its claims, *e.g.*, Compl. ¶ 15, but relevant here is 28 C.F.R. § 35.130(b)(1)(iii), which states:

> (b)(1) A public entity, in providing any aid, benefit, or service, may not . . . on the basis of disability . . . . (iii) Provide a qualified individual with a disability with an aid, benefit, or service that is not as effective in affording equal opportunity to obtain the same result, to gain the same benefit, or to reach the same level of achievement as that provided to others.

This language merely states the elements of a Title II claim. In promulgating regulations under the ADA, the Department of Justice (DOJ) explained that the regulations addressing equality of opportunity—Paragraphs (b)(1)(i) through (b)(1)(iii)—"are taken from the regulations implementing section 504 and simply restate principles long established under section 504." Nondiscrimination on the Basis of Disability in State and Local Government Services, 56 Fed. Reg. 35694-01 (July 26, 1991). And, as the D.C. Circuit has noted, "[o]ne of the primary purposes of the Rehabilitation Act is 'to empower individuals with disabilities to maximize employment, economic self-sufficiency, independence, and inclusion and integration into society, through . . . the guarantee of equal opportunity.'" *Am. Council*, 525 F.3d at 1260 (quoting 29 U.S.C. § 701(b)(1)); *see Singh v. George Washington Univ. Sch. of Med. & Health*

15

*Scis.*, 508 F.3d 1097, 1102 (D.C. Cir. 2007) ("The ADA promotes equal opportunity for the disabled . . ."). Equality of opportunity "to gain the same benefit" is, thus, not some novel strand of ADA and Rehabilitation Act caselaw that allows Plaintiff to claim a new or different benefit by comparing different services, it is a fundamental feature of all Title II and Section 504 analysis. 28 C.F.R. § 35.130(b)(1)(iii); *see, e.g.*, *Modderno*, 82 F.3d 1059.

Moreover, DOJ did not intend for the regulation to require public entities to maintain different services aimed at different disabilities equally, as Plaintiff seeks here. The same ADA regulation goes on to expressly state that the ADA does not prohibit "a public entity from providing benefits, services, or advantages to individuals with disabilities or to a particular class of individuals with disabilities, beyond those required by this part." 28 C.F.R. § 35.130(c). In promulgating that regulation, DOJ made clear that Paragraph (c) means that "State and local governments may provide special benefits, beyond those required by the nondiscrimination requirements of this part, that are limited to individuals with disabilities, *without thereby incurring additional obligations to persons without disabilities or to other classes of individuals with disabilities*." 56 Fed. Reg. at 35705 (emphasis added). And this is consistent with the Supreme Court and D.C. Circuit's binding precedent. *See* Section I, above (citing *Modderno*, 82 F.3d at 1061, *Traynor*, 485 U.S. at 549, and *Alexander*, 469 U.S. at 304). In other words, providing different services responsive to different disabilities does not run afoul of the ADA's mandate that all persons with disabilities be given equal opportunity to recognize the benefit of each particular service provided.

Given that the concept of requiring "equal opportunity" is not distinct from the standard ADA and Rehabilitation Act analysis, it is unsurprising that case law citing the regulation is scant. A handful of circuit courts have referenced 28 C.F.R. § 35.130(b)(1)(iii) in their

16

decisions, and their analysis under Title II of the ADA is consistent with the established body of law that states that there is no discrimination when different benefits are provided to individuals with disabilities, as long as individuals with disabilities remain able to access existing benefits. *See, e.g., Does 1-5 v. Chandler*, 83 F.3d 1150, 1155 (9th Cir. 1996) (finding that a state's general assistance program did not fail to provide "equal opportunity" to disabled residents by cutting benefits provided to individuals with disabilities while providing benefits to families with dependent children "as long as disabled people with children were not excluded from full participation in the program."); C*G v. Pa. Dep't of Educ.*, 734 F.3d 229, 236–37 (3d Cir. 2013) (finding that a state's funding formula that resulted in less funding for students with disabilities did not violate the equal opportunity requirement because the state did not deprive individuals with disabilities of a benefit or opportunity due to their disability).

Here too, Plaintiff does not allege that it lacks equal opportunity to access the benefit or service it seeks compared to individuals without disabilities. Plaintiff alleges instead that the District does not provide mental health professionals for mental health responses adequately to anyone, regardless of disability. *See* Section I, above. This is not an ADA or Rehabilitation Act claim. Plaintiff therefore fails to state a claim for relief as a matter of law.

## CONCLUSION

For the foregoing reasons, and the reasons stated in the District's Motion to Dismiss, the Court should dismiss Plaintiff's Complaint.

Date: June 24, 2024                                       Respectfully submitted,

BRIAN L. SCHWALB
Attorney General for the District of Columbia

STEPHANIE E. LITOS
Deputy Attorney General
Civil Litigation Division

17

*/s/ Matthew R. Blecher*
MATTHEW R. BLECHER [1012957]
Chief, Civil Litigation Division, Equity Section

*/s/ Honey Morton*
HONEY MORTON [1019878]
Assistant Chief, Equity Section

*/s/ Pamela A. Disney*
ADAM P. DANIEL [1048359]
PAMELA A. DISNEY [1601225]
BRENDAN R. HEATH [1619960]
Assistant Attorneys General
Civil Litigation Division
400 6th Street, NW
Washington, D.C. 20001
Phone: (202) 807-0371
Email: pamela.disney@dc.gov

*Counsel for Defendant District of Columbia*