## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

BREAD FOR THE CITY,

                    Plaintiff,

    v.

DISTRICT OF COLUMBIA,

                    Defendant.

Civil Action No. 1:23-cv-01945-ACR

## PLAINTIFF'S RESPONSE TO THE COURT'S REQUEST FOR SUPPLEMENTAL BRIEFING

## <u>TABLE OF CONTENTS</u>

Page

I.    How should the Court define the activity, program, or service at issue in this case
and the benefits of that activity, program, or service? If the parties have competing
views, how should the Court choose between them? ...........................................................1

    A.    The District operates a single, unified, emergency response program. ..................3

    B.    The benefit of the District's emergency response program is the provision
of timely and effective emergency assistance........................................................10

II.   How, if at all, does the D.C. Circuit's decision in *Modderno v. King*, 82 F.3d 1059
(D.C. Cir. 1996), apply to this case? In particular, the parties should address
whether *Modderno*'s precedential value is affected by the Supreme Court's
decision in *Olmstead v. L.C. ex rel. Zimring*, 527 U.S. 581 (1999), or subsequent
amendments to the ADA.................................................................................................12

III.  What is the citation (both statutory/regulatory and in the Complaint) for Plaintiff's
contention that many or all individuals experiencing mental-health emergencies
qualify as having a "disability" under the ADA and the Rehabilitation Act because
they are "regarded as" having a disability? How, if at all, does that contention affect
the analysis in this case? ...............................................................................................15

    A.    A plaintiff can plausibly allege disability-based discrimination by showing
that the government provides unequal benefits when addressing health
conditions occurring with greater frequency among people with (actual
and/or regarded-as) disabilities. .............................................................................16

    B.    Bread has plausibly alleged that mental health disabilities occur with
"greater frequency" among people with actual disabilities and/or people
regarded as having disabilities. ..............................................................................19

IV.   Is there any case law addressing "equal opportunity" as a distinct type of claim
under the ADA and the Rehabilitation Act?....................................................................22

V.    How, If at All, Could Plaintiff Amend its Complaint To More Clearly Support Its
"Regarded As" Theory of Disability or To Elaborate on How Mental-Health
Services Relate to its Mission? ......................................................................................28

    A.    Amendments supporting the "Regarded As" theory.............................................29

    B.    Amendments concerning Bread's mission.............................................................30

Conclusion .................................................................................................................................30

TABLE OF AUTHORITIES

Page(s)

Cases

*Alexander v. Choate*
    469 U.S. 287 (1985)........................................................................................................ passim

*Alexander v. Washington MTA*
    826 F.3d 544 (D.C. Cir. 2016)............................................................................................15, 19

*Allah v. Goord*
    405 F. Supp. 2d 265 (S.D.N.Y. 2005)........................................................................................27

*American Council of Blind v. Paulson*
    463 F. Supp. 2d 51 (D.D.C. 2006).............................................................................................25

*American Council of the Blind v. Paulson*
    525 F.3d 1256 (D.C. Cir. 2008)................................................................................10, 25, 26

*Amundson ex rel. Amundson v. Wisc. Dep't of Health Servs.*
    721 F.3d 871 (7th Cir. 2013) ......................................................................................................13

*ARC of Iowa v. Reynolds*
    559 F. Supp. 3d 861 (S.D. Iowa 2021) .....................................................................................17

*Argenyi v. Creighton Univ.*
    703 F.3d 441 (8th Cir. 2013) ......................................................................................................26

*Bragdon v. Abbott*
    524 U.S. 624 (1998)..............................................................................................................23, 24

*Brook. Ctr. for Indep. of the Disabled v. Bloomberg*
    980 F. Supp. 2d 588 (S.D.N.Y. 2013)........................................................................................2, 4

*Chandris, Inc. v. Latsis*
    515 U.S. 347 (1995)................................................................................................................2, 3

*Civic Ass'n of the Deaf of the City of N.Y. v. Giuliani*
    915 F. Supp. 622 (S.D.N.Y. 1996)............................................................................................24

*Cmtys. Actively Living Indep. & Free v. City of L.A.*
    No. 09-cv-0287, 2011 WL 4595993 (C.D. Cal. Feb. 10, 2011) .............................................2, 4

*D'Amore v. Small Bus. Admin.*
    No. 21-cv-1505, 2023 WL 6215358 (D.D.C. Sept. 25, 2023)...................................................2

*Disability Rights S.C. v. McMaster*
    564 F. Supp. 3d 413 (D.S.C. 2021)............................................................................................17

*Disability Rights S.C. v. McMaster*
   24 F. 4th 893 (4th Cir. 2022) ................................................................17

*E.T. v. Morath*
   571 F. Supp. 3d 639 (W.D. Tex. 2021) ...................................17, 24, 27

*E.T. v. Paxton*
   41 F.4th 709 (5th Cir. 2022) ................................................................17

*Epps v. Potomac Elec. Power Co.*
   389 F. Supp. 3d 53 (D.D.C. 2019) .........................................................2

*Fauconier v. Clarke*
   966 F.3d 265 (4th Cir. 2020) ...............................................................21

*Folkerts v. City of Waverly, Iowa*
   707 F.3d 975 (8th Cir. 2013) ...............................................................25

*Fraternal Ord. of Police v. Gates*
   562 F. Supp. 2d 7 (D.D.C. 2008) ...........................................................2

*Getzes v. Mackereth*
   No. 1:13-civ-2067, 2013 WL 5786000 (M.D. Pa. Oct. 28, 2013) ............9

*Gorman v. Bartch*
   152 F.3d 907 (8th Cir. 1998) ...........................................................3, 10

*Greene v. City of New York*
   No. 21-cv-05762, 2024 WL 1308434 (S.D.N.Y. Mar. 26, 2024).............8

*Henrietta D. v. Bloomberg*
   331 F.3d 261 (2d Cir. 2003).........................................10, 17, 18, 23, 28

*Jones v. City of Monroe, MI*
   341 F.3d 474 (6th Cir. 2003) .................................................................3

*L.E. by & Through Cavorley v. Superintendent of Cobb Cnty. Sch. Dist.*
   55 F.4th 1296 (11th Cir. 2022) ..........................................................3, 9

*McGary v. City of Portland*
   386 F.3d 1259 (9th Cir. 2004) .............................................................27

*McNally v. Prison Health Services*
   46 F. Supp. 2d 49 (D. Me. 1999) ...........................................................7

*Modderno v. King*
   82 F.3d 1059 (D.C. Cir. 1996) ............................................11, 12, 13, 14

*Munson v. California*
   No. 2:09–cv–0478, 2012 WL 3260453 (E.D. Cal. Aug. 8, 2012) ..........................................27

*Munson v. California*
    No. 2:09–cv–0478, 2012 WL 5304757 (E.D. Cal. Oct. 25, 2012) .......................................27

*Nat'l Fed'n of the Blind v. Lamone*
   813 F.3d 494 (4th Cir. 2016) .................................................................................................9

*Nurriddin v. Bolden*
   818 F.3d 751 (D.C. Cir. 2016) .............................................................................................19

*Olmstead v. L.C. ex rel Zimring*
   527 U.S. 581 (1999).............................................................................6, 7, 11, 12, 23

*Rodde v. Bonta*
   357 F.3d 988 (9th Cir. 2004) .......................................................................................7, 16, 17

*Shotz v. Cates*
   256 F.3d 1077 (11th Cir. 2001) ...........................................................................................18

*Smith v. Scalia*
   44 F. Supp. 3d 28 (D.D.C. 2014) (Jackson, J.) ..................................................................2, 3

*Socal Recovery, LLC v. City of Costa Mesa*
    56 F.4th 802 (9th Cir. 2023) ........................................................................................20, 21

*Tugg v. Towey*
   864 F. Supp. 1201 (S.D. Fla. 1994) ...........................................................................24, 25, 26

*Valley Housing LP v. City of Derby*
   802 F.Supp.2d 359 (D. Conn. 2011)....................................................................................20

*Wheeler v. American Univ.*
   619 F. Supp. 3d 1 (D.D.C. 2022) ...................................................................................20, 21

Statutes

29 U.S.C.
   § 794(a) .................................................................................................................................3
   § 794(b)(1)(A).......................................................................................................................4

42 U.S.C.
    § 1220(a) ...........................................................................................................24
    § 12101(a)(4) ....................................................................................................12
    § 12101(a)(5) ....................................................................................................17
    § 12102 .............................................................................................................15
    § 12102(1) .........................................................................................................20
    § 12102(3)(A) ..............................................................................................15, 20
    § 12102(4)(A) ...................................................................................................19
    § 12132 ...............................................................................................................3
    § 12201(a) .........................................................................................................23
    § 12201(c) .........................................................................................................12

Americans with Disabilities Act (ADA) ...........................1, 3, 6, 12, 15, 16, 17, 18, 19, 22, 23, 24

Pub. L. 110-325, § 2(a)(5), Sept. 25, 2008, 122 Stat. 3553 ........................................................19

Rehabilitation Act ...................................................1, 3, 13, 14, 15, 17, 18, 19, 22, 23

Other Authorities

28 C.F.R.
    § 35.130(b) ........................................................................................................24
    § 35.130(b)(1)(ii) .........................................................................................23, 24
    § 35.130(b)(1)(iii) ........................................................................................23, 24
    § 41.51(b) ..........................................................................................................24
    § 41.51(b)(1)(ii) ................................................................................................23
    § 41.51(b)(1)(iii) ...............................................................................................23
    § 41.51(b)(1)(iii) ...............................................................................................23
    § 130(b)(7)(i) ....................................................................................................28
    § 130(b)(7)(ii) ...................................................................................................28

75A Am. Jur. 2d Trial § 597 ........................................................................................2

American Heritage Dictionary,
    https://www.ahdictionary.com/word/search.html?q=program ...................................4

DOJ, Investigation of the City of Phoenix and the Phoenix Police Dep't 87-101 (2024),
    https://www.justice.gov/crt/media/1355866/dl?inline ...............................................7

Kalb, et al., *Predictors of Mental Health Crises Among Individuals With Intellectual and Developmental Disabilities Enrolled in the START Program*, 72 Psychiatric Services 273, 273 (March 2021), available at
    https://ps.psychiatryonline.org/doi/epdf/10.1176/appi.ps.202000301 ...................29

McGrath, et al., *The Bidirectional Associations Between Psychotic Experiences and DSM-IV Mental Disorders*, 173 The Am. Journal of Psychiatry 997, 1002 (Oct. 2016), available at
    https://ajp.psychiatryonline.org/doi/10.1176/appi.ajp.2016.15101293 ...................29

Merriam-Webster's Dictionary,
    https://www.merriam-webster.com/dictionary/benefit ...........................................................9
    https://www.merriam-webster.com/dictionary/program ...........................................................4

MK Nock et al., *Mental Disorders, Comorbidity and Suicidal Behavior; Results from the
    National Comorbidity Survey Replication*, 15 Molecular Psychiatry 868, 868 (2010),
    available at https://www.nature.com/articles/mp201519 ........................................................29

MPD General Order 308.04
    § III(5) ................................................................................................................................21
    § III(6) ................................................................................................................................21

**PLAINTIFF'S RESPONSE TO THE COURT'S REQUEST FOR SUPPLEMENTAL BRIEFING**

This case concerns the District's emergency response program.  Bread alleges that the program provides effective emergency services to all emergencies except the ones occurring primarily among people with mental health disabilities, which the District subjects to ineffective and, at times, harmful aid.  After an April 30 hearing, the Court asked for supplemental briefing on five questions related to the District's pending Motion to Dismiss.  Below, Bread answers each question, showing that it plausibly alleges that the District's program discriminates in violation of the Americans with Disabilities Act (ADA) and the Rehabilitation Act.

I.     **How should the Court define the activity, program, or service at issue in this case and the benefits of that activity, program, or service? If the parties have competing views, how should the Court choose between them?**

**Brief Answer**:  Government actions are part of the same "program" if officials perform them as part of a unified system aimed at the same goal.  A program's "benefit" is the "useful aid" it provides.  The Court should resolve any dispute about these definitions by applying traditional tools of statutory analysis.  But, with respect to any dispute over the application of these definitions to the facts, the Court must defer to the Complaint's plausible allegations, unless they conflict with a statutory principle (which they do not).

Discussion

The parties' definitional disagreement concerns (i) the scope of the District's emergency response program—specifically, whether the District's response to mental and physical health emergencies is part of a single program, and (ii) that program's benefits.

While there appears to be no case outlining a precise methodology for answering these questions, basic principles of pleading, as well as statutory construction and application, suggest a straightforward course.  Defining the relevant terms (such as "program" and "benefit") turns

entirely on statutory construction and therefore is a question of law.  *Chandris, Inc. v. Latsis*, 515 U.S. 347, 369 (1995).  Discerning a program's operations, purpose, structure and related facts presents pure questions of fact.  *See, e.g. D'Amore v. Small Bus. Admin.*, No. 21-cv-1505 (CRC), 2023 WL 6215358, at *5 (D.D.C. Sept. 25, 2023) (relying on statement of material facts to define what the program at issue offered the public); *Brook. Ctr. for Indep. of the Disabled v. Bloomberg*, 980 F. Supp. 2d 588, 599-602 (S.D.N.Y. 2013) (hereinafter "BCID") (defining structure of city's emergency preparedness program, and "purpose" of various components, based on record evidence); *Cmtys. Actively Living Indep. & Free v. City of L.A.*, No. 09-cv-0287, 2011 WL 4595993, at *13 (C.D. Cal. Feb. 10, 2011) (hereinafter "CALIF") (same).  Finally, applying the definition of the relevant terms to the facts presents "a mixed question of law and fact."  75A Am. Jur. 2d Trial § 597.

Generally, "the ultimate answer to mixed questions of law and fact must come from the jury."  *Id.*; *see also Latsis*, 515 U.S. at 369 ("If reasonable persons, applying the proper legal standard, could differ [on the key mixed question at issue in *Latsis*] . . . it is a question for the jury." (citation omitted)).  Accordingly, "in deciding whether to dismiss a complaint for failure to state a claim, the court must treat the complaint's factual allegations—*including mixed questions of law and fact*—as true and draw all reasonable inferences therefrom in the plaintiff's favor." *Smith v. Scalia*, 44 F. Supp. 3d 28, 36 (D.D.C. 2014) (Jackson, J.) (emphasis added; internal citation and quotation marks omitted); *accord Epps v. Potomac Elec. Power Co.*, 389 F. Supp. 3d 53, 65 (D.D.C. 2019) (same); *Fraternal Ord. of Police v. Gates*, 562 F. Supp. 2d 7, 11 (D.D.C. 2008) (same).

Cases construing a program's scope or benefits adhere to these principles.  When courts have rejected a plaintiff's definition of these terms, they have often done so because the plaintiff's

articulation either did not reflect what the government program sought to offer, conflicted with a statutory principle, or both.  For example, in *Alexander v. Choate*, 469 U.S. 287, 303 (1985), the Court rejected the plaintiffs' definition of a program's benefit as "adequate healthcare" because that definition did not actually reflect "the individual services offered" and because it conflicted with the statute by implying that equal access to the benefit required equal health *outcomes*, rather than an *equal opportunity* to obtain effective healthcare.  The Sixth Circuit rejected a definition on similar grounds.  *See Jones v. City of Monroe, MI*, 341 F.3d 474, 479 (6th Cir. 2003) (holding that the benefit at issue was "free downtown parking at specific locations," not, as the plaintiff suggested, "free downtown parking accessible to any destination she selects").  By contrast, when the plaintiff's construction of the program or benefit comports with something the government seeks to provide, courts have generally deferred to the Complaint's allegations, even if "reasonable persons . . . could differ," *Latsis*, 515 U.S. at 369.  *See, e.g.*, *L.E. by & Through Cavorley v. Superintendent of Cobb Cnty. Sch. Dist.*, 55 F.4th 1296, 1303 (11th Cir. 2022) (reversing district court in ADA case based on its "re-definition of the public program" from the definition supplied in the complaint); *Gorman v. Bartch*, 152 F.3d 907, 913 (8th Cir. 1998) (defining the benefit as the one the plaintiff "sought in this case").

This caselaw indicates that, at the motion to dismiss stage, courts should defer to a plaintiff's allegations about a program's scope and benefit as long as those allegations plausibly describe what the government seeks to provide and do not conflict with a statutory principle—the same approach required by this Court's precedents on the pleading standard, *see, e.g.*, *Smith*, 44 F. Supp. 3d at 36.

### A.    The District operates a single, unified, emergency response program.

The Rehabilitation Act proscribes discrimination in a "program" or an "activity," 29 U.S.C. § 794(a), and the ADA bars discrimination in "benefits of [governmental] services, programs, or

activities," 42 U.S.C. § 12132.  A "program" is "a plan or system under which action may be taken toward a goal."  Program, Merriam-Webster's Dictionary;[1] *see also* Program, American Heritage Dictionary (defining "program" as a "system of services, opportunities, or projects, usually designed to meet a social need").[2]  This definition, with its emphasis on "systems" comports with the Rehabilitation Act's construction of the statutory phrase "program or activity" as encompassing, among other things, "all of the operations . . . of a local government."  29 U.S.C. § 794(b)(1)(A).

Based on the definition of "program," government actions are part of the same program if they are taken within an integrated "system" and share a common "goal."  The courts relied on this type of reasoning in *BCID* and *CALIF*, the two emergency preparedness cases.  In each one, the courts treated a range of government actions (including managing emergency shelters and conducting evacuations) as part of a single program because the actions shared a common goal (i.e., of "sav[ing] lives, protect[ing] property and return[ing] the City to normal service levels") and pursued those goals within a unified system.  *See CALIF*, WL 4595993, at *13; *BCID*, 980 F. Supp. 2d at 596.

Here, Bread has plausibly alleged that the District operates a unified emergency response program that responds to both physical and mental health emergencies.  The Complaint states that the District operates an emergency response "program," Compl. ¶ 77, that is made up of internal "systems," *id.* ¶ 99, and references (plural) emergency response "services," *see, e.g.*, *id.* ¶ 1.  Moreover, people seeking assistance with both physical and mental health emergencies can access the emergency response program through the same entry point (dialing 911) and, when they use

---

[1] https://www.merriam-webster.com/dictionary/program

[2] https://www.ahdictionary.com/word/search.html?q=program

that entry point, will speak with the same District officials.  *Id.* ¶¶ 2, 78, 79 118.  For both types of emergencies, 911 call-takers undertake the same function of assessing the situation and determining the appropriate place to route the call.  *Id.* ¶¶ 87, 89-91, 118.  For both types of emergencies, the first responders also aim to perform the same functions—i.e., assessing the situation, attempting to stabilize the person in crisis, and connecting them to follow up care.  *See* ECF 47 (Pl. Opp'n to Def.'s MTD) at 4 (summarizing Complaint's allegations on this point) (hereinafter "Opp'n to MTD").  And for both types of emergencies, the responders and call-takers all work toward the same goal: "[p]roviding timely and effective responses" to the health crisis.  Compl. ¶ 77.  The main difference between the two responses is that the program performs these tasks effectively for people seeking assistance with physical health emergencies but not for those seeking assistance with mental health ones.

The Complaint's allegations concerning the integrated nature of the dispatch system, the similarity of the functions undertaken for each type of emergency, and the identical purpose with which those functions are pursued, combine to plausibly allege that the District's emergency physical and mental health responses are part of the same program.

The District wrongly contends that the Court must reject the Complaint's definition of the program because it is broader than the disability statutes allow.  The District's concern appears to be the way the program definition sets up the comparison at the heart of Bread's equal opportunity claim.  On the District's view, responding to physical health emergencies is too distinct a task from responding to mental health emergencies to facilitate a meaningful comparison.  *See* ECF 42-1 (MTD) at 16 (hereinafter "MTD").  But the District has yet to articulate a material difference between mental and physical health crises; indeed, mental health crises can have physiological symptoms and vice versa, *see* MTD Opp'n at 23.  Nor has the District identified a material

distinction between mental and physical health emergency responses.  As the Complaint plausibly alleges, calls about mental and physical health emergencies generally go to the same dispatchers, and both types of emergencies involve officials attempting to undertake the same functions to accomplish the same purpose.

Supreme Court precedent supports the scope of Bread's definition of the program.  In *Olmstead v. L.C. ex rel Zimring*, 527 U.S. 581, 587 (1999), the Supreme Court considered whether, consistent with the ADA, the Department of Justice's (DOJ) integration regulation could be read to prevent states from unnecessarily treating people with severe mental illnesses in institutions. The Court upheld the interpretation, *id.* at 599-600, and explained that institutionalized care could qualify as statutory discrimination because "[d]issimilar treatment correspondingly exists in this key respect: In order to receive needed medical services, persons with mental disabilities must, because of those disabilities, relinquish participation in community life they could enjoy given reasonable accommodations, while persons without mental disabilities can receive the medical services they need without similar sacrifice," *id.* at 601.  This analysis reflects the Supreme Court's authoritative interpretation of the word "discrimination" as used in the ADA, a term that not only grounds the integration mandate but also many other ADA claims; indeed, Bread brings a statutory "discrimination" claim here, *see* Compl., First Cause of Action (labeling ADA claim as "*[d]iscrimination* on the [b]asis of [d]isability"(emphasis added)).  The Court's analysis, in turn, treats state-provided "medical services" as the relevant "program" and endorses evaluating discrimination by comparing access to different types of medical services (i.e., those provided in institutions and those provided everywhere else).

This conception of a "program" is far broader than the one alleged here.  The full range of state-provided medical care involves a significantly wider array of procedures, aimed at vastly

more ailments, than emergency health aid alone.   Nonetheless, the Court deemed "medical services" a sufficiently narrow construct to ground the analysis of its landmark opinion.   This conclusion refutes the District's contention that treatments for different health emergencies cannot be part of the same program and that the differences between such treatments cannot give rise to a discrimination claim.  *See* MTD at 16.

Other decisions further underscore the District's errors.  For example, in *Rodde v. Bonta*, 357 F.3d 988, 995, 998 (9th Cir. 2004), the Ninth Circuit assessed whether a county discriminated in providing access to "specialized medical expertise," setting up a comparison between access to rehabilitative services used primarily by people with disabilities and access to all other specialized medical services.   Like the *Olmstead* Court, the Ninth Circuit deemed access to "specialized medical expertise" an appropriate definition and treated the comparison between access to different types of "specialized medical procedures" as sufficiently meaningful to ground the discrimination analysis.  *Id.* at 995.  Another court similarly defined a county jail's prescription service as the relevant program, which in turn led it to assess discrimination by comparing the jail's policy for dispensing HIV medication to its policy for dispensing other medications. *McNally v. Prison Health Services*, 46 F. Supp. 2d 49, 58-59 (D. Me. 1999).  There, like *Rodde*, *Olmstead*, and this case, the analysis involved a comparison of the government's treatment of different conditions.

Consistent with these decisions, the United States Department of Justice (DOJ) has concluded repeatedly and reaffirmed very recently, that, as a general matter and in this very case, emergency mental and physical health responses are appropriately understood as part of the same program.  *See* ECF 50 (DOJ Statement of Interest) at 7; DOJ, Investigation of the City of Phoenix

and the Phoenix Police Dep't 87-101 (2024);[3] Opp'n to MTD at 21-22 (citing DOJ findings, letters, and guidance documents).

There appears to be no authority concluding that emergency physical and mental health responses must be analyzed as distinct programs.  The closest that exists is *Greene v. City of New York*, No. 21-cv-05762, 2024 WL 1308434, at *1 (S.D.N.Y. Mar. 26, 2024).  There, the plaintiffs challenged the procedures for transporting individuals deemed "emotionally disturbed" to mental hospitals, not the city's emergency response program as a whole.  The court held transport procedures non-discriminatory because they applied solely to people with mental health disabilities.  *Id.* at *16.  *Greene*'s analysis of a discrete emergency service exclusively for people with disabilities does not speak to Bread's claims alleging discrimination with respect to the District's emergency response program as a whole.  Demonstrating the difference, the *Greene* court granted the plaintiffs leave to amend, *id.* at *20, and the plaintiffs added new claims alleging discrimination in New York City's emergency response program in its entirety.  *See* 3d Am. Compl., ECF 212 ¶¶ 444-52, *Greene*, 1:21-cv-05762 (June 7, 2024).

Even if the Court had concerns about Plaintiff's definition (which it should not), the District has failed to offer an acceptable alternative.  The District contends that responding to distinct health emergencies constitutes different services or programs, such that the District's response to one type of emergency (say, heart attacks) cannot, for purposes of a discrimination claim, be compared to another (say, a broken back).  *See* MTD at 16.  This illogical approach betrays the statutory text—the word "program" refers not just to discrete acts but also a system of services—and ignores the integrated nature of the District's response to physical and mental health emergencies.

---

[3] https://www.justice.gov/crt/media/1355866/dl?inline

The District's characterization also defies the Supreme Court's efforts to protect the purpose of the disability statutes.  If the District's characterization prevailed, its 911 employees could dispatch high school interns to address calls about low blood sugar (an emergency primarily, but not exclusively, affecting people with diabetes) but EMTs to all other health crises.  The District's theory would allow it to avoid liability for this obvious discrimination against people with diabetes because its responses to one health condition could not even be compared to its response to others.  The Supreme Court explicitly rejected this type of definitional gamesmanship. *See Alexander*, 469 U.S. at 301 ("The benefit itself, of course, cannot be defined in a way that effectively denies otherwise qualified handicapped individuals the meaningful access to which they are entitled . . .").

Courts properly have applied *Alexander* to reject government officials' attempts to define their way out of discrimination.  *See Nat'l Fed'n of the Blind v. Lamone*, 813 F.3d 494, 504 (4th Cir. 2016) ("The logic of *Alexander* further suggests that we should proceed cautiously to avoid defining a public program so generally that we overlook real difficulties in accessing government services."); *L.E.*, 55 F.4th at 1302 (same); *Getzes v. Mackereth*, No. 1:13-CV-2067, 2013 WL 5786000, at *4 (M.D. Pa. Oct. 28, 2013) (rejecting officials' attempts to apply an overly narrow definition).

In sum, applying the definition of "program" to the Complaint's allegations plausibly shows that the District's response to physical and mental health emergencies constitutes one program.  Because no statutory principle conflicts with this approach—and indeed, Supreme Court precedent and other authorities support it—the Complaint's approach controls at this stage of the litigation.

**B.     The benefit of the District's emergency response program is the provision of timely and effective emergency assistance.**

A program's "benefit" is the "useful aid" the program seeks to provide.  *See* Benefit, Merriam-Webster's Dictionary.[4]  Judicial interpretations of the term reflect this understanding. For instance, in *American Council of the Blind v. Paulson*, 525 F.3d 1256, 1268 (D.C. Cir. 2008), the D.C. Circuit described the benefit of the United States currency program as its ability to offer a "universal medium or common standard" for transactions.  Likewise, in *Gorman*, 152 F.3d at 913, a case concerning a city's "program or service" of transporting arrestees from the arrest site to the jail, the Eighth Circuit concluded that the relevant benefit was for transportees to "be handled and transported in a safe and appropriate manner consistent with [their] disabilit[ies]."  These definitions both focus on the "useful aid" that the programs sought to provide the public rather than what the government in fact provided.

An alternative approach of defining the benefit as what the government actually delivers would undermine disability law.  It would allow the government to argue that whatever it provides today—no matter how inaccessible—is simply the "benefit" it offers, such that any requested changes, including requests for reasonable modifications, would entail demanding a new benefit, which governments need not give.  The Second Circuit rejected exactly this approach, concluding that the government cannot evade liability by "deliver[ing] nothing to anyone." *Henrietta D. v. Bloomberg*, 331 F.3d 261, 277 (2d Cir. 2003).

Here, Bread has plausibly alleged that the benefit of the District's emergency response program—the useful aid it seeks to provide—is rendering emergency responses that are designed to be "timely and effective."  The Complaint alleges that providing such responses is the "purpose"

---

[4] https://www.merriam-webster.com/dictionary/benefit

of the program, *see* Compl. ¶ 77, and contains allegations demonstrating how the program's operations objectively manifest that goal.  For example, the Complaint alleges that the District invites members of the public to call 911 for aid with any emergency, including mental and physical health ones.  *Id.* ¶¶ 79, 87-88, 118.  Staff affiliated with the program must devote a significant share of their duties to rendering "timely and effective" aid for such emergencies.  *See id.* ¶¶ 80, 81 (Access Helpline and affiliated staff); ¶ 87 (Office of Unified Communications staff) ¶¶ 121, 123 (Fire and Emergency Medical staff), ¶ 89 (MPD).  And members of the public regularly rely on the emergency response program when they need "timely and effective" emergency assistance.  *See id.* ¶ 74 (discussing incidents where the public called 911 for help with a mental health emergency); ¶ 149 (alleging that Bread calls 911 for physical health emergencies). In sum, these alleged facts plausibly demonstrate that rendering timely and effective emergency assistance is the useful aid that the District's emergency response program seeks to provide.

As with the question of program scope, the Court must defer to this understanding unless it conflicts with a statutory principle.   Contrary to the District's assertions, *Alexander*'s construction of the Rehabilitation Act presents no such obstacle. The *Alexander* plaintiffs erred in defining a Medicaid program's benefits as "adequate healthcare" because equal access to that benefit would have required ensuring that "handicapped Medicaid users will be as healthy as its nonhandicapped users," a mandate the Court found that Congress did not intend.  *See* 469 U.S. at 303, 305–06.  Here, though, Bread does not equate the program's benefit with the ultimate outcome for users; that is, Bread does not contend that to deliver emergency response services equally, the District must make those with mental health disabilities as healthy as those without.  Rather, Bread argues that people with mental health disabilities must have the *same opportunity* to receive timely and effective responses for their medical emergencies as members of the general public do for

-11-

theirs.  Thus, analyzing access to the benefit in this case calls for looking at the structure of the program and its capacity to deliver effective care in different settings, not the ultimate health results of the participants.

Because the Complaint's definition of the benefit is plausible and comports with the statute and relevant caselaw, the Court must defer to it at this stage.

**II.    How, if at all, does the D.C. Circuit's decision in *Modderno v. King*, 82 F.3d 1059 (D.C. Cir. 1996), apply to this case? In particular, the parties should address whether *Modderno*'s precedential value is affected by the Supreme Court's decision in *Olmstead v. L.C. ex rel. Zimring*, 527 U.S. 581 (1999), or subsequent amendments to the ADA.**

**Brief Answer**:  *Modderno* is inapposite because it (1) arose in the insurance context, (2) relies on analysis that no longer constitutes good law, (3) considers only a facial discrimination claim and not the claims Bread raises, and (4) is factually distinguishable.

### Discussion

*Modderno* is inapposite for four independent reasons.  First, by challenging an insurance plan, *Modderno* implicated considerations absent here.  Health insurers' business model depends on allocating different levels of coverage to different medical conditions.  If that constituted discrimination, it would threaten the industry.  Congress integrated these concerns into the ADA, balancing industry risk with the rights of people with disabilities by creating a special safe harbor provision for insurers.  *See* 42 U.S.C. § 12201(c).  The *Modderno* court was well aware of these considerations, *see* 82 F.3d at 1065 (discussing safe harbor provision), and explicitly stated that disability law claims that might prevail in other contexts were inappropriate in the insurance setting, *id.* at 1061 n.1.  This case does not implicate the particular practical and statutory considerations involved in challenges to insurance programs.

Second, subsequent legal developments have eclipsed parts of *Modderno*'s reasoning. Since the decision, Congress amended the ADA's definition of "disability" to overrule court

decisions that "narrowed the broad scope of the protections intended to be afforded." 42 U.S.C. §

12101(a)(4).   These amendments unsettle *Modderno*'s conclusion that people with "mental

illnesses" do not necessarily have statutory disabilities because the definition of "disability" that

the circuit relied on no longer applies.   Additionally, *Modderno* assumed that disability law does

not require equality between people with different types of disabilities.   82 F.3d at 1061.   Three

years later in *Olmstead*, 527 U.S. at 598 n.10, the Supreme Court concluded otherwise, stating that

to deny the possibility of unlawful discrimination between members of the same protected class

was wrong "as a matter of precedent and logic."   *See also Amundson ex rel. Amundson v. Wisc.*

*Dep't of Health Servs*., 721 F.3d 871, 874 (7th Cir. 2013) (Easterbrook, J.) (overruling prior circuit

precedent proscribing intraclass discrimination claims based on *Olmstead*).   These developments

rattled *Modderno*'s foundation, diminishing its vitality.

Third, *Modderno* involved a facial discrimination challenge, not an equal opportunity

claim, a methods of administration claim, or even a reasonable accommodation one.   Here, Bread

does not contend that the District's program discriminates on its face (and therefore need not show

a perfect, or even close to, 1:1 correspondence between the population harmed and the protected

class); nor does Bread plead a claim of intraclass discrimination (instead, it argues the program

fails to address the needs of people with mental health disabilities compared to the general public).

*Modderno* therefore does not speak to the claims at issue here.

That *Modderno* is a facial discrimination case is clear from the question presented, which

the court-appointed amicus for Ms. Modderno (a pro se plaintiff) defined as follows: "Does a claim

of *facial discrimination* in insurance coverage against those with mental disabilities state a cause

of action under the Rehabilitation Act where the Rehabilitation Act requires insurance providers

to justify distinctions based on disability with a substantial basis in actuarial data?"   Brief of

Amicus Curiae in Support of Appellant, No. 94-cv-5400, 1995 WL 17204326 (C.A.D.C. Oct. 6, 1995) at * 1 (emphasis added).   Accordingly, the amicus brief solely discussed a facial discrimination theory.  *See, e.g.*, *id.* at 5, 15, 20.

The court's analysis tracked the question presented.  It held that, because the challenged insurance plan did not distinguish between people with disabilities and those without, the plan did not fall into the "'facially discriminatory' category."  82 F.3d at 1061.  The court then explained why "[e]ven if the coverage limits in the Plan were thought to be 'facially discriminatory,'" that theory would still fail.  *Id.* at 1062.  Finally, the court discussed why the 1992 amendment to the Rehabilitation Act did not save the claim but only "reinforce[d] our reading" of the statute.  *Id.* at 1063.

Likely referencing the pro se plaintiff's personally filed brief, the court also noted that "Modderno's broadest argument is that the Plan violates § 504 because it provides 'unequal benefits.'"  *Id.* at 1060.  The court did not define the term "unequal benefits" (because Ms. Modderno did not do so herself, *id.* at 1061) but appeared to understand it as an argument for equal health results, since, in rejecting the argument, the court quoted *Alexander*'s conclusion that the Rehabilitation Act does not guarantee such results.  *See id.*  As discussed previously, Bread seeks equal opportunities, not equal outcomes.  Thus, *Modderno* does not address the theory of discrimination pleaded here.

Finally, *Modderno* is factually distinguishable.  Ms. Modderno's insurance plan capped lifetime benefits for mental illnesses at $75,000 while imposing no cap on physical health benefits.  *Id.* at 1060.  While the insurance program offered better benefits for physical health coverage, the benefits awarded for mental health care was still substantial and, therefore, "satisf[ied] *Alexander*'s requirement that the disabled 'benefit meaningfully'" from the program.   *Id.* at 1062 n.2.

-14-

Consequently, in the court's view, everyone received an effective benefit but the plaintiff alleged discrimination because the physical health benefit was superior.  Here, Bread does not ask the District to transform a meaningful benefit into an excellent one; instead, it challenges the District's provision of a wholly ineffective benefit for mental health crises while affording an effective one for physical health crises.  Thus, the inequality claim in this case arises in a setting where the program does not satisfy "*Alexander*'s requirement that the disabled 'benefit meaningfully'" from the program.  *Id.*

In sum, *Modderno* arose in the insurance setting, rested on legal analysis that is no longer good law, did not consider the type of discrimination theories Bread raises, and involved distinct facts.  The decision does not bear on this case.

**III.    What is the citation (both statutory/regulatory and in the Complaint) for Plaintiff's contention that many or all individuals experiencing mental-health emergencies qualify as having a "disability" under the ADA and the Rehabilitation Act because they are "regarded as" having a disability? How, if at all, does that contention affect the analysis in this case?**

**Brief Answer**:  Individuals have a statutory "disability" if they have an actual disability, 42 U.S.C. § 12102, are regarded as having a disability, *see id.*; 42 U.S.C. § 12102(3)(A), or both, *Alexander v. Washington MTA*, 826 F.3d 544, 547, 550 (D.C. Cir. 2016).  The Complaint plausibly alleges that most people who experience mental health crises meet one or both of these standards. *See, e.g.*, Compl. ¶¶ 24, 74(c)-(f), 84.  This showing, in turn, plausibly establishes that the District engages in discrimination "by reason of disability."  A plaintiff can satisfy that element by showing that a program provides unequal benefits when addressing conditions occurring with greater frequency among people with actual and/or regarded-as disabilities—which Bread has plausibly alleged here.

**Discussion**

Bread first discusses how the statutory definition of disability relates to its claims and then explains why the Complaint plausibly alleges that people experiencing mental health crises generally have actual mental health disabilities and/or are regarded as having such disabilities.

>  **A.**     **A plaintiff can plausibly allege disability-based discrimination by showing that the government provides unequal benefits when addressing health conditions occurring with greater frequency among people with (actual and/or regarded-as) disabilities.**

At the last hearing, the regarded-as construction of disability arose in the context of questions about whether alleging ineffective treatment of mental health crises can support a claim of discrimination "by reason of" mental health disabilities.  *See, e.g.*, Apr. 30, 2024 Hr'g Tr. at 6:19-20.  The answer to that question is yes:  One way to satisfy the "by reason of disability" element is to show that a defendant provides unequal benefits when addressing manifestations of disability, such as health conditions that occur with greater frequency among people with disabilities.

This conclusion follows from the Supreme Court's decision in *Alexander*.  There, the Court held that a 14-day cap on inpatient care did not constitute discrimination in part because the record lacked evidence showing that the allotted coverage failed to "effectively treat[]" "illnesses uniquely associated with the handicapped or occurring with greater frequency among them."  469 U.S. at 302 n.22.  In so reasoning, the Court implied that if such evidence did exist—if the record showed that a program singled out illnesses "uniquely associated with *or* occurring with greater frequency," though not necessarily exclusively, among people with disabilities—a discrimination claim might arise.  The Ninth Circuit recognized this point in *Rodde*, 357 F.3d at 998, where it held that a county violated the ADA by closing the only hospital providing specialized care for complex conditions "disproportionately" occurring among people with disabilities while

-16-

continuing to operate hospitals providing specialized care to the general public.  *Id.* at 997.  The Ninth Circuit explained that the *Rodde* plaintiffs demonstrated disability-based discrimination by establishing the presence of the circumstances the Supreme Court found wanting in *Alexander.  Id.*  Both decisions thus concluded that programs can discriminate by denying equal benefits when addressing a manifestation of disability, such as an illness occurring more frequently among people with certain disabilities, even if the programs do not target a specific "disability" itself.

Other courts have likewise held that programs discriminate by failing to take into account health risks significantly affecting people with disabilities.  For instance, several courts struck down state bans on mask mandates during the heart of the pandemic because those mandates denied people with disabilities an equal opportunity to attend in-person school.  *See, e.g.*, *E.T. v. Morath*, 571 F. Supp. 3d 639, 659 (W.D. Tex. 2021), *vacated and remanded on standing grounds sub nom. E.T. v. Paxton*, 41 F.4th 709, 722 (5th Cir. 2022).  Even though everyone faces risks from COVID-19, these decisions held that bans on mask mandates discriminated by reason of disability because they prevented schools from addressing the needs of people whose disabilities placed them at heightened risk of contracting the virus or suffering severe symptoms from it.  *Id.* at 646; *Disability Rights S.C. v. McMaster*, 564 F. Supp. 3d 413, 425 (D.S.C. 2021), *vacated in part on standing grounds*, 24 F. 4th 893, 896 (4th Cir. 2022); *ARC of Iowa v. Reynolds*, 559 F. Supp. 3d 861, 876-77 (S.D. Iowa 2021) (same).  Similarly, *Henrietta D.* found the "by reason of disability" element satisfied where a social services system did not account for the heightened risks of severe illnesses that people with HIV face when they tried to access that system.  331 F.3d at 267.

*Alexander*'s method of analyzing the "by reason of disability" element, and the similar methods used in the decisions discussed above, effectuates the statutory text and purpose of the ADA and Rehabilitation Act.  Programs that differentiate based on manifestations of disability

provide distinct experiences for people with actual disabilities (and/or people regarded as having disabilities) as compared to the general population.  For instance, in *Rodde*, the hospital closure meant that most of the public could receive all the specialized medical care they needed but people with disabilities often would be unable to receive the care they most required.

That the hospital closure may also have harmed some without disabilities did not alter the courts' analysis, nor should it have.  Disability law bars not only intentional discrimination but also programs that fail to address the needs of people with disabilities through "benign neglect." *Alexander*, 469 U.S. at 295; *see also* 42 U.S. § 12101(a)(5) (defining ADA's mandate to include preventing people with disabilities from being "relegate[ed] to lesser services").  Impediments in the latter category are not intended to harm people with disabilities, and so they may hurt a broader pool of people than the protected class.  For this reason, the disability statutes do not require a perfect fit.  If they did, a courthouse could defend its failure to install a ramp by asserting that the omission hindered parents with strollers in addition to people with mobility impairments.  That is not the law—not in the context of courthouse ramps, *see Shotz v. Cates*, 256 F.3d 1077, 1080 (11th Cir. 2001), or elsewhere, *see Henrietta D.*, 331 F.3d at 278 (concluding that plaintiffs satisfied the "by reason of disability" even though the dysfunctional social services system harmed people with and without disabilities).  Instead, a plaintiff can satisfy the "by reason of disability" element by focusing on how a program treats a manifestation of disability—and, specifically, by showing that it provides unequal benefits when addressing conditions occurring "with greater frequency" among people with disabilities.

Here, Bread can make out the "by reason of disability" element if it plausibly alleges that mental health crises—the conditions it contends receive less effective treatment (as discussed in Part IV, *infra*)—occur "with greater frequency" among people with mental health disabilities.

-18-

Bread can make this showing in several ways because the ADA and Rehabilitation Act define "disability" in several ways.  Specifically, Bread can plausibly allege that mental health crises occur with greater frequency among people with "actual disabilities."  Additionally, Bread can plausibly allege that the District "regards" mental health crises as occurring with greater frequency among people with mental health disabilities.  Either showing provides an independent basis for establishing the "by reason of disability" element, and plaintiffs can allege both (indeed the same individuals can satisfy both).  *Washington MTA*, 826 F.3d at 547, 550 (holding that the district court should have considered the "regarded-as" definition of disability alongside the "actual disability" definition because the complaint implicated both).  Here, Bread plausibly alleged both.

### B.   Bread has plausibly alleged that mental health disabilities occur with "greater frequency" among people with actual disabilities and/or people regarded as having disabilities.

The District has essentially conceded that mental health crises occur more frequently among people with mental health disabilities.  Its motion emphasizes that its responses to mental health crises are "directed at individuals with disabilities," MTD at 22, an argument that recognizes the type of link between condition and disability that meets the *Alexander* test outlined above.

Analyzing and applying the ADA's definition of disability to the Complaint yields the same conclusion.  That definition, which is directly incorporated into the Rehabilitation Act, *Nurriddin v. Bolden*, 818 F.3d 751, 756 n.3 (D.C. Cir. 2016), must "be construed in favor of broad coverage," 42 U.S.C. § 12102(4)(A), as "the primary object of attention in cases brought under the ADA should be whether entities covered under the ADA have complied with their obligations," not whether the definition is met, Pub. L. 110-325, § 2(a)(5), Sept. 25, 2008, 122 Stat. 3553.  As noted previously, Congress explicitly added these notes on construction (as well as a new definition) in 2008 to overrule court decisions defining "disability" too narrowly.  *Id.*  These principles control both the "actual" and "regarded as" definitions of disability.  42 U.S.C. § 12102(4)(A).

-19-

Starting with the former construction, Bread has plausibly alleged that mental health crises occur with greater frequency among people with actual mental health disabilities. Actual disabilities are "physical or mental impairment[s] that substantially limit[] one or more major life activities." *Id.* § 12102(1). Here, Bread alleged that "[t]he typical or most common mental health emergencies arise from depression, anxiety, and post-traumatic stress disorders." Compl. ¶ 24. Courts have recognized these conditions as "actual" statutory disabilities. *See, e.g.*, *Wheeler v. American Univ.*, 619 F. Supp. 3d 1, 20 (D.D.C. 2022) (finding that depression as manifested by suicidal ideations constitutes a disability); *Valley Housing LP v. City of Derby*, 802 F.Supp.2d 359 (D. Conn. 2011) (crediting testimony that PTSD can constitute a disability). Bread's potential amendments bolster this point by alleging, for instance, that, in Bread's experience, people with mental health disabilities experience mental health crises at its facilities more frequently than any other group it serves—a connection that academic research corroborates. Part V, ¶ 3, *infra*. But even without those amendments, taking Bread's allegations as true and according them reasonable inferences, the Complaint's explanation of the link between "typical" mental health crises and mental health disabilities plausibly alleges that crises occur with greater frequency among people with mental health disabilities than others. Compl. ¶ 24.

Turning to the "regarded as" inquiry, this definition of disability (as amended in 2008) is met when a person is "subjected to a prohibited action because of an actual or perceived physical or mental impairment, whether or not that impairment substantially limits, or is perceived to substantially limit, a major life activity." 42 U.S.C. § 12102(3)(A). At its core, the regarded-as analysis is a fact-intensive inquiry that "turns on how an individual is perceived by others." *Socal Recovery, LLC v. City of Costa Mesa*, 56 F.4th 802, 817 (9th Cir. 2023). To plausibly allege that a defendant "regarded" individuals as having a disability, plaintiffs can allege a link between facts

that may underlie the defendant's perceptions—such as official policies or unfounded stereotypes—and the defendant's actions. *See id.*; *Fauconier v. Clarke*, 966 F.3d 265, 277 (4th Cir. 2020) (holding that defendant's reliance on its own medical classification to trigger an adverse result plausibly alleged that defendant "regarded" the plaintiff as having a disability).

Here, the Complaint plausibly alleges that the District generally regards people seeking emergency assistance for mental health crises as having mental health disabilities. The Complaint explains that when the District receives emergency calls primarily or exclusively concerning a mental health crisis, it codes the calls with terms that implicate mental health disabilities. Compl. ¶ 84. For example, the District designates some such calls with the code "mental health consumer." *Id.* The MPD general order governing responses to mental health crises—a document of which this Court has previously taken judicial notice, *Wheeler*, 619 F. Supp. at 14 n.2—defines "mental health consumer" in a way that mirrors the ADA's definition of actual disability. *See* MPD General Order 308.04 § III(5) &(6) (defining "mental health consumer" as a "[p]erson who [*sic*] a member [of MPD] reasonably believes is suffering from a mental illness," and "mental illness" as a "[d]isorder in thought or mood so substantial that it impairs judgment").[5] The District also codes mental health emergency calls using the designation "suicide attempted," Compl. ¶ 84, and the Complaint plausibly shows that District officials treat the subjects of suicide-related calls as if they have mental health disabilities, alleging that MPD officers have rushed individuals to mental health facilities based on off-hand threats of self-harm, *see id.* ¶ 74(e), (f).

Other Complaint allegations further show that the District regards most people who experience mental health crises as having mental health disabilities. The District's very decision to send law enforcement to mental health crises—and no other health emergencies—comports with

---

[5] https://go.mpdconline.com/GO/GO_308_04.pdf.

Bread's allegation that people with mental health disabilities are incorrectly stigmatized as "violent."  *Id.* ¶ 26-29; *see also* ¶¶ 53, 55 (alleging that MPD officers assume people experiencing mental health crises pose threats even when they do not).

Bread's potential amendments provide additional support for the regarded-as argument. They allege that people with mental health disabilities are far more likely to experience mental health crises than others, Part V ¶ 3, *infra*, and that mental health crises frequently arise from health disabilities, *id.* ¶ 4, *infra*.  *See also* Compl. ¶ 24 (making similar point).  The high correlation between crisis and disability makes it plausible that District officials perceive such a link in their operations.  Indeed, another of Bread's potential amendments shows that officials not only make that link but do so in a highly stigmatizing way: According to a former supervisor at the Office of Unified Communication, staff "regularly" refer to subjects of mental health calls, and rarely others, with terms like "crazy or nut."  Part V ¶ 1, *infra*.

In sum, Bread has plausibly alleged that mental health crises occur with greater frequency among people with actual mental health disabilities and that the District, in administering its emergency response program, regards this as so.  Following *Alexander*, that conclusion supports a claim of disability-based discrimination if the District's emergency response program singles out mental health crises, a manifestation of mental health disabilities, for less effective treatment.  As explained next, the program does just that.

## IV.   Is there any case law addressing "equal opportunity" as a distinct type of claim under the ADA and the Rehabilitation Act?

**Brief Answer**:  Construing the equal opportunity regulations as an independent basis for liability comports with congressional intent and, accordingly, many cases cite a violation of the equal opportunity regulations as a specific basis for liability under the disability statutes.  The reasoning in these decisions overlaps substantially with the analysis used in reasonable

modification cases.  In both settings, courts often use commonsensical, qualitative analysis to determine if a program provides people with disabilities the same opportunities to benefit as others.

### Discussion

Both the Rehabilitation Act and the ADA, as authoritatively construed by DOJ's implementing regulations, prohibit government programs from "afford[ing] a qualified individual with a disability an opportunity to benefit . . . that is not equal to that afforded others."  28 C.F.R. §§ 41.51(b)(1)(ii) (Rehabilitation Act), 35.130(b)(1)(ii) (ADA).  The statutes as so construed also forbid programs from "[p]rovid[ing] a qualified individual with a disability with a benefit . . . that is not as effective in affording equal opportunity to obtain the same result, to gain the same benefit, or to reach the same level of achievement as that provided to others."  *Id.* §§ 41.51(b)(1)(iii); 35.130(b)(1)(iii).

These requirements provide an independent basis for liability.  Congress directly incorporated DOJ's Rehabilitation Act regulations into the ADA.  42 U.S.C. § 12201(a).  Thus, DOJ's Rehabilitation Act regulations, including its equal opportunity regulations, *see* 28 C.F.R. §§ 41.51(b)(1)(ii) & (iii), not only offer guidance on how to interpret the word "discrimination" but effectively define it.  *See Bragdon v. Abbott*, 524 U.S. 624, 632 (1998) (stating that courts must "construe the ADA to grant at least as much protection as provided by the regulations implementing the Rehabilitation Act").  The conception of discrimination espoused in the equal opportunity regulations provides just as sound a basis for establishing liability as the one supplied by the reasonable modification regulation, *see Henrietta D.*, 331 F.3d at 274, 278, and the integration regulation, *see Olmstead*, 527 U.S. at 607.  To conclude otherwise would result in the ADA providing less protection than "the regulations implementing the Rehabilitation Act,"

*Bragdon*, 524 U.S. at 632, in derogation of Congress's expressed command, 42 U.S.C. § 1220(a),

and binding Supreme Court precedent, *Bragdon*, 524 U.S. at 632.[6]

Accordingly, courts frequently invoke the equal opportunity mandate in finding violations

of the disability statutes.  For instance, courts invoked this concept in striking down bans on mask

mandates in the height of the pandemic.  *See, e.g.*, *E.T.*, 571 F. Supp. 3d at 658 (holding ban

unlawful because it denied "students with disabilities [an] 'opportunity to participate in or benefit

from' in-person instruction that is 'equal to that afforded others'" (quoting 28 C.F.R. §

35.130(b)(1)(ii))).  Another court applied the equal opportunity mandate to hold that a city violated

the ADA by removing street alarm boxes that Deaf individuals needed to contact the fire

department. *Civic Ass'n of the Deaf of the City of N.Y. v. Giuliani*, 915 F. Supp. 622, 635 (S.D.N.Y.

1996) ("A number of regulations promulgated under Title II of the ADA would be violated by

removal of the street alarm box system given the absence of accessible notification alternatives…"

including 28 C.F.R. § 35.130(b)(1)(ii) and (iii) . . .").  And, in *Tugg v. Towey*, 864 F. Supp. 1201,

1206, 1208 (S.D. Fla. 1994), the court held that a counseling program deprived Deaf people of an

"equal opportunity" to benefit because it ceased to employ mental health providers fluent in

American Sign Language.  While these cases also found violations of other concepts of disability

discrimination, they treated the denial of equal opportunity as a separate basis for liability.  The

reliance on overlapping theories makes sense, as the disability statutes impose broad mandates that

proscribe discrimination in a variety of interrelated forms.  *See* 28 C.F.R. § 35.130(b), § 41.51(b).

---

[6] For the same reasons, the methods of administration regulation's interpretation of "discrimination" provides an independent basis for statutory liability too.  Bread explained why the District's emergency response program violates that regulation in its opposition. *See* MTD Opp'n at 29-30.

To apply the equal opportunity mandate, courts often use a commonsensical, qualitative analysis to compare the experiences of people with and without disabilities, discerning whether the program either provides services less effectively to people with disabilities or otherwise fails to address their needs.  For example, in *Tugg*, the court did not rely on statistics or other complicated methods of proof in finding discrimination; instead, it based its holding on commonsense inferences about the different experiences Deaf and hearing patients had with the counseling program—specifically, the way that Deaf patients, unlike hearing patients, faced risks of miscommunications and might feel inhibited by the presence of an interpreter.  *Id.* at 1206, 1208.  These distinctions, the court held, meant that the program did not meet the mental healthcare needs of Deaf patients as it met those of hearing patients and therefore denied Deaf patients an "equal opportunity" to benefit.  *Id.*

The "equal opportunity" mandate applies not only to equal opportunity claims but also reasonable modification ones.  To state a reasonable modification claim, the plaintiff must allege that the government (1) engaged in disability-based discrimination and (2) that there exists a facially reasonable modification that would cure the discriminatory conduct.  *See American Council of Blind v. Paulson*, 463 F. Supp. 2d 51, 58, 62 (D.D.C. 2006) (holding program unlawful because the plaintiffs established these two elements), *aff'd and remanded*, 525 F.3d 1256, 1260 (D.C. Cir. 2008).  Satisfying the first element requires showing that a government program denied people with disabilities an equal opportunity to access its benefits (or that it deprived them of meaningful access to those benefits, standards that, following *Alexander*, courts treat as equivalent, *see Folkerts v. City of Waverly, Iowa*, 707 F.3d 975, 984 (8th Cir. 2013) (citing *Alexander*, 469 U.S. at 305)).  Thus, equal opportunity claims and reasonable modification claims define

"discrimination" the same way.  The two theories differ only in the latter's additional requirement that plaintiffs present a facially reasonable remedy, a distinct element.

Accordingly, when it comes to assessing whether a program engaged in discrimination, reasonable modification cases, like equal opportunity ones, often compare the qualitative experiences of program participants with and without disabilities.  *See Paulson*, 525 F.3d at 1274 (holding that United States currency discriminated against visually-impaired individuals after comparing the limits that visually-impaired individuals face when handling bills to the lack of limits for sighted people); *see also Argenyi v. Creighton Univ.*, 703 F.3d 441, 449 (8th Cir. 2013) (stating, in context of reasonable modification case under the ADA's public accommodations provision, that regulated entities must "start by considering how their facilities are used by non-disabled guests and then take reasonable steps to provide disabled guests with a like experience" (cleaned up)).  Thus, reasonable modifications cases provide another source of authority for construing the equal opportunity mandate.

Here, Bread has plausibly alleged that the District's emergency response program deprives people with actual and/or perceived mental health disabilities of an equal opportunity to benefit. The District renders effective emergency assistance to all health crises except the ones occurring with greater frequency among people with mental health disabilities.  *See* MTD Opp'n at 26-29. Consequently, while the general public usually receives effective emergency care, people with mental health disabilities often do not.  People regarded as having such disabilities endure the same problem, as they face a risk that officials will perceive their crises as arising from a mental health disability and therefore render ineffective or dangerous aid.  *See, e.g.*, Compl. ¶ 74(e), (f).

These differences constitute unlawful disability discrimination.  The District exposes people with actual and/or regarded-as mental health disabilities to a far greater risk than others of

being treated by less effective personnel, *see Tugg*, 864 F. Supp. at 1206, 1208 (holding that use of less effective staffing model for people with disabilities denies equal opportunity), or experiencing harm, *see Allah v. Goord*, 405 F. Supp. 2d 265, 280 (S.D.N.Y. 2005) (holding that prison transport service denied person with disabilities its benefits because it exposed the plaintiff to a "risk of incurring serious injuries each time he attempts to take advantage" of it); *Munson v. California*, No. 2:09–cv–0478, 2012 WL 3260453, at *6 (E.D. Cal. Aug. 8, 2012) (adopting similar holding), *report and recommendation adopted*, 2012 WL 5304757 (E.D. Cal. Oct. 25, 2012). The emergency response program thus forces people with actual and/or regarded-as mental health disabilities to choose between using a public program that could harm them, or foregoing use of the public program in moments when they need it, thereby denying them an equal opportunity to benefit. *See E.T.*, 571 F. Supp. 3d at 658, 659 (holding that plaintiffs experienced discrimination when forced to choose between in-person public schooling and their health).

The District errs in contending that its emergency response program cannot discriminate because it provides the same response to people with and without disabilities experiencing physical health crises, and the same response to people with and without disabilities experiencing mental health crises. Discrimination by reason of disability may occur because of policies that treat people the *same* even though their particular needs or the manifestation of their disabilities require them to be treated differently. That is why, "[i]n the context of disability[,] . . . equal treatment may not beget equality." *McGary v. City of Portland*, 386 F.3d 1259, 1267 (9th Cir. 2004). Here, people with mental health disabilities have different needs from the general population—they experience mental health crises more frequently. The District has failed to structure its emergency response program to take those needs into account, thereby singling out a manifestation of mental health disability for worse treatment. The result is that, while most people consistently receive "timely

and effective" health assistance from the District's emergency response program, people with actual and regarded-as mental health disabilities, in many instances, do not. The program's superficial evenhandedness cannot obscure its failure to provide people with disabilities the same opportunities to benefit as those without. Bread's plausible allegations therefore state an equal opportunity claim. That alone justifies denying Defendants' motion.

Nonetheless, if the Court would prefer to resolve the motion on reasonable modification grounds, Bread notes that the Complaint includes allegations sufficient to plead that theory too. As discussed, Bread already has pleaded the facts necessary to show discrimination under that theory (i.e., a denial of equal opportunity). Bread also has pleaded facts alleging that there exists a potential modification reasonable on its face. Specifically, Bread has plausibly alleged that expanding and better integrating the community response teams into its emergency response program is such a modification. *See* Compl. ¶¶ 35-43 (alleging that experts recommend relying on mental health professionals, rather than police, to address mental health emergencies, and other jurisdictions are implementing this approach); *see also Henrietta D.*, 331 F.3d at 280-81 (holding that improving an existing program constituted a reasonable modification).[7]

## V. How, If at All, Could Plaintiff Amend its Complaint To More Clearly Support Its "Regarded As" Theory of Disability or To Elaborate on How Mental-Health Services Relate to its Mission?

Bread respectfully submits that its existing complaint has plausibly stated violations of the disability statutes. However, if the Court believes amendment would be helpful, Bread would add the following facts on the topics above.

---

[7] As discussed in Section III, people contacting DC.'s emergency response program for mental health crises generally have actual and/or regarded-as mental health disabilities. While a public entity need not provide reasonable modifications to individuals who meet the definition of disability *solely* under the "regarded as" prong, 28 C.F.R. 130(b)(7)(ii), it must still provide one to individuals who have actual disabilities. 28 C.F.R. 130(b)(7)(i).

A.      **Amendments supporting the "regarded as" theory**

1.      According to a former Office of Unified Communications (OUC) supervisor (who worked there through 2022), OUC staff regularly used terms such as "crazy" or "nut" to describe the subjects of calls about mental health crises, language staff rarely used when discussing the subjects of other types of calls.

2.      Separate and apart from stereotypes, there is a public perception that mental health crises are associated with mental health disabilities partly because such an association exists.

3.      People with mental health disabilities have mental health crises far more often than members of the general public.  For instance, Bread serves hundreds of people with diagnosed mental health disabilities and those individuals have mental health crises at Bread's facilities more frequently than any other group.  Likewise, Gretchen Gates, a licensed clinical social worker with over a decade of experience in D.C. has found that people with depression, anxiety, and PTSD can face significant challenges with everyday tasks (such as working and maintaining relationships) and can experience multiple mental health crises in a given year.  Academic research further shows that mental health disabilities are associated with a significantly increased risk of mental health crises,[8] including suicide attempts,[9] and use of emergency psychiatric services.[10]

---

[8] McGrath, et al., *The Bidirectional Associations Between Psychotic Experiences and DSM-IV Mental Disorders*, 173 The Am. Journal of Psychiatry 997, 1002 (Oct. 2016), available at https://ajp.psychiatryonline.org/doi/10.1176/appi.ajp.2016.15101293.

[9] MK Nock et al., *Mental Disorders, Comorbidity and Suicidal Behavior; Results from the National Comorbidity Survey Replication*, 15 Molecular Psychiatry 868, 868 (2010), available at https://www.nature.com/articles/mp201519.

[10] Kalb, et al., *Predictors of Mental Health Crises Among Individuals With Intellectual and Developmental Disabilities Enrolled in the START Program*, 72 Psychiatric Services 273, 273 (March 2021), available at https://ps.psychiatryonline.org/doi/epdf/10.1176/appi.ps.202000301.

4.     The opposite is also true:  People who experience mental health crises are far more likely than others to have an underlying mental health disorder that significantly interferes with their ability to perform daily tasks.[11]  For example, research shows that 80% of people who attempt suicide have a mental disorder.[12]  In many instances, people who experience mental health crises but do not have mental health diagnoses receive one later.[13]

**B.     Amendments concerning Bread's mission**

5.     Bread's mission includes providing several categories of services to under-resourced D.C. residents.  This includes primary physical and behavioral/mental health care, which entails providing short-term therapy, referrals to specialists, and short-term mental health support to stabilize patients for physical health services (e.g., calming someone afraid of needles before a shot).  Bread often provides these services to people with mental health disabilities, such as depression, anxiety, and PTSD.  Like most primary care offices, Bread's mission does not involve providing emergency health services, either physical or mental.

## CONCLUSION

For all the foregoing reasons, as well as those raised in Bread's opposition to the District's Motion To Dismiss, that Motion should be denied. In the alternative, Bread requests leave to amend the Complaint if the Court deems it necessary.

Dated: June 24, 2024                                Respectfully submitted,

                                                    /s/ Ashika Verriest
                                                    _____

---

[11] McGrath, *supra* at 999-1000.

[12] Nock, *supra*.

[13] McGrath, *supra* at 1000, 1002.

Ashika Verriest (D.C. Bar No. 90001468)
Jenn Rolnick Borchetta*
Brian Dimmick (D.C. Bar No. 1013979)
Susan Mizner
West Resendes
American Civil Liberties Union Foundation
125 Broad Street
New York, NY 10004
(240)676-3240
averriest@aclu.org
*Admitted pro hac vice

Michael Perloff (D.C. Bar No. 1601047)
Scott Michelman (D.C. Bar No. 1006945)
American Civil Liberties Union Foundation
of the District of Columbia
529 14th Street NW, Suite 722
Washington, D.C. 20045
(202)716-1427
mperloff@acludc.org

Daniel L. Brown (N.Y. Bar No. 2978559)
Steven Hollman (D.C. Bar No. 375658)
Nikole Snyder (D.C. Bar No. 1670948)
Calla N. Simeone (D.C. Bar No. 1766258)
SHEPPARD, MULLIN, RICHTER &
HAMPTON LLP
2099 Pennsylvania Ave. NW, Ste. 100
Washington, D.C. 20006
Telephone: (202) 747-1941
dbrown@sheppardmullin.com
shollman@sheppardmullin.com
nsnyder@sheppardmullin.com
csimeone@sheppardmullin.com

Counsel for Plaintiff**

---

**Plaintiff's counsel would like to thank paralegals Kevin Chen and Hailey Andress, and interns Asha Ramachandran, Katherine Salinas, and Kristen Popham.

-31-