# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| BREAD FOR THE CITY, | |
| Plaintiff, | |
| v. | No. 1:23-cv-01945-ACR |
| DISTRICT OF COLUMBIA, | |
| Defendant. | |

**SUPPLEMENTAL AMICUS BRIEF ON BEHALF OF MENTAL HEALTH AMERICA, THE AMERICAN ASSOCIATION OF PEOPLE WITH DISABILITIES, MIRIAM'S KITCHEN, THE PUBLIC DEFENDER SERVICE FOR THE DISTRICT OF COLUMBIA, THE TOTAL FAMILY CARE COALITION, THE ARC OF DC, DISABILITY RIGHTS DC AT UNIVERSITY LEGAL SERVICES, THE SCHOOL JUSTICE PROJECT, AND THE JUDGE DAVID L. BAZELON CENTER FOR MENTAL HEALTH LAW IN OPPOSITION TO DEFENDANT'S MOTION TO DISMISS**

BAKER & HOSTETLER, LLP

Elizabeth B. McCallum (DC Bar No. 541361)
Lindsey N. Simmons (DC Bar No. 90010131)
Daniel P. Wicklund (DC Bar No. 90022368)
Washington Square, Suite 1100
1050 Connecticut Avenue, NW
Washington, D.C. 20036
Telephone: (202) 861.1500
Email:  emccallum@bakerlaw.com
         lsimmons@bakerlaw.com
         dwicklund@bakerlaw.com

THE JUDGE DAVID L. BAZELON
CENTER FOR MENTAL HEALTH LAW

Megan E. Schuller (DC Bar No. 90023318)
Ira Burnim (DC Bar No. 406154)
Lewis Bossing (DC Bar No. 984609)
Brit Vanneman (DC Bar No. 1736194)
1090 Vermont Avenue, NW, Suite 220
Washington, D.C. 20005
Telephone: (202) 467.5730
Email:  megans@bazelon.org
         lewisb@bazelon.org
         britv@bazelon.org

*Attorneys for Amici Curiae Mental Health America, the American Association of People with Disabilities, Miriam's Kitchen, the Public Defender Service for the District of Columbia, the Total Family Care Coalition, the Arc of DC, Disability Rights DC at University Legal Services, the School Justice Project, and the Judge David L. Bazelon Center for Mental Health Law*

i

**CONSENT OF THE PARTIES TO THE FILING**
**FEDERAL RULE OF APPELLATE PROCEDURE 29(A)(2)**

This brief is filed at the invitation of the Court, and with the consent of Michael Perloff, counsel for Plaintiff.  Defendant takes no position on the filing of this brief.

**CORPORATE DISCLOSURE STATEMENT**

Pursuant to Rule 26.1 of the Federal Rules of Appellate Procedure, counsel for *amici curiae* certifies that no *amici* have a parent corporation and that no publicly held corporation owns 10% or more of any *amici*'s respective stock.

**STATEMENT PURSUANT TO FEDERAL RULE**
**OF APPELLATE PROCEDURE 29(A)(4)(E)**

The undersigned certifies that no party's counsel authored this brief in whole or in part, and that no party, party's counsel, or any other person other than *amici*, their members, or their counsel, contributed money that was intended to fund preparing or submitting this brief.

Dated: June 24, 2024

By: /s/ *Elizabeth B. McCallum*

Elizabeth B. McCallum (DC Bar No. 541361)
Washington Square, Suite 1100
1050 Connecticut Avenue, NW
Washington, D.C. 20036
Telephone: (202) 861.1500
Facsimile: (202) 861.1783
Email: emccallum@bakerlaw.com

# TABLE OF CONTENTS

CONSENT OF THE PARTIES TO THE FILING .................................................................... ii

CORPORATE DISCLOSURE STATEMENT ............................................................ ii

STATEMENT PURSUANT TO FRAP 29(a)(4)(E) .................................................... ii

INTEREST OF *AMICI CURIAE* ............................................................................. 1

SUMMARY OF ARGUMENT ................................................................................. 1

ARGUMENT ........................................................................................................... 6

    1.    <u>Question No. 1</u>: How should the Court define the activity, program, or service at issue in this case and the benefits of that activity, program, or service? If the parties have competing views, how should the court choose between them? .................................................................................. 6

        A.    The Court should define the "program" at issue as the emergency response program, the "benefit" of which is an effective and timely emergency response.  If there are competing views, the program should be defined consistent with the purpose of the ADA and Rehabilitation Act, and on a motion to dismiss, mixed questions of law and fact should be resolved in the manner most favorable to Plaintiff. ................................................................................ 6

    2.    <u>Question No. 2</u>: How, if at all, does the D.C. Circuit's decision in *Modderno v. King*, 82 F.3d 1059 (D.C. Cir. 1996), apply to this case?  In particular, the parties should address whether *Modderno*'s precedential value is affected by the Supreme Court's decision in *Olmstead v. L.C., ex rel. Zimring*, 527 U.S. 581 (1999), or subsequent amendments to the ADA. ........................................... 10

        A.    *Modderno* rested on a safe harbor for otherwise discriminatory insurance benefit design set forth in the ADA and is limited to that context alone.  It thus does not control here, and the propositions about comparing mental health and physical disabilities relied on by the District were mere *dicta* in the opinion and were rejected by the Supreme Court's later decision in *Olmstead*. ............................................ 10

    3.    <u>Question No. 3</u>: What is the citation (both statutory/regulatory and in the complaint) for Plaintiff's contention that many or all individuals experiencing mental-health emergencies qualify as having a "disability" under the ADA and the Rehabilitation Act because they are "regarded as" having a disability? How, if at all, does that contention affect the analysis in this case? .................... 14

A.   The ADA defines disability to include both actual and perceived disabilities.  Plaintiffs' complaint explains that most mental health emergencies arise from disabilities covered under the ADA at ¶ 24.  The vast majority of individuals who experience mental health emergencies have actual disabilities; others are "regarded as" having a disability.  There is no requirement that all individuals subject to the District's discriminatory practice have a disability to find discrimination. ..........................................................................................14

4.   Question No. 4: Is there any case law addressing "equal opportunity" as a distinct type of claim under the ADA and the Rehabilitation Act? ......................19

A.   There is case law, as well as statutory and regulatory language, establishing "equal opportunity" as a distinct type of claim under the ADA and the Rehabilitation Act.  This claim may alternatively be viewed as a "reasonable modification" claim under the law and the allegations in the Complaint. .....................................................................19

i.   "Equal opportunity" is a distinct type of claim under the ADA and the Rehabilitation Act. ..........................................................19

ii.   The District's failure to provide reasonable modifications to ensure people with mental disabilities are provided an equal opportunity to benefit from DC's emergency response program compels denial of the Motion to Dismiss. ......................22

CONCLUSION ....................................................................................................................23

# **TABLE OF AUTHORITIES**

**Page(s)**

**Cases**

*Alexander v. Choate,*
    469 U.S. 287 (1985)........................................................................................8

*American Council of the Blind v. Paulson,*
    525 F.3d 1256 (D.C. Cir. 2008) ...............................................................10, 12

*Amundson ex rel. Amundson v. Wisc. Dep't of Health Servs.,*
    721 F.3d 871 (7th Cir. 2013) ....................................................................2, 13

*Barden v. City of Sacramento,*
    292 F.3d 1073 (9th Cir. 2002) ..................................................................3, 20

*Boots v. Northwestern Mut. Life Ins. Co.,*
    77 F. Supp. 2d 211 (D.N.H. 1999)...............................................................13

*Browning v. Clinton,*
    292 F.3d 235 (D.C. Cir. 2002) ......................................................................9

*Colbert v. D.C.,*
    110 F. Supp. 3d 251 (D.D.C. 2015) .............................................................12

*Daubert v. Lindsay Unified School Dist.,*
    760 F.3d 982 (9th Cir. 2014) .........................................................................3

*Disability Advocs, Inc. v. Paterson,*
    653 F. Supp. 2d 184, 314 (E.D.N.Y. 2009) ................................................23

*Disability Advocs, Inc. v. New York Coal. For Quality Assisted Living,*
    675 F.3d 149 (2d Cir. 2012)..........................................................................23

*Disabled in Action v. Bd. Of Elections in N.Y.,*
    752 F.3d 189 (2d Cir. 2014)............................................................................9

*Does v. CVS,*
    982 F.3d 1204 (9th Cir. 2020) ...................................................................8, 10

*EEOC v. Aramark,*
    208 F.3d 266 (D.C. Cir. 2000) .....................................................................12

*Fry v. Napoleon Cmty, Sch.,*
    580 U.S. 154 (2017)..................................................................................7, 22

*Henrietta D. v. Bloomberg*,
    331 F.3d 261 (2d Cir. 2003)..................................................................18, 23

*Johnson v. Callanen*,
    608 F.Supp.3d 476 (W.D. Texas 2022) ........................................................10

*King v. Our Lady of the Lake Hospital, Inc.*,
    455 F. Supp. 3d 249 (M.D. La. 2022).........................................................21

*Modderno v. King*,
    82 F.3d 1059 (D.C. Cir. 1996) ....................................4, 5, 10, 11, 12, 13

*Montgomery v. D.C.*,
    No. 18-1928 (JDB), 2019 BL 289761 .........................................................10

*National Federation of the Blind v. Lamone*,
    813 F.3d 494 (4th Cir. 2016) ..................................................................8, 9

*Nurriddin v. Bolden*,
    818 F.3d 751 (D.C. Cir. 2016) ....................................................................14

*O'Connor v. Consolidated Coin Caterers Corp.*,
    517 U.S. 308 (1996)....................................................................................13

*Olmstead v. L.C., ex rel. Zimring.*,
    527 U.S. 581 (1999)....................................................1, 5, 11, 13, 23

*Pushkin v. Regents of the University of Colorado*,
    658 F. 2d 1372 (10th Cir. 1981) .................................................................21

*Rouse v. Berry*,
    848 F. Supp. 2d 4 (D.D.C. 2012) ................................................................12

*Sacchetti v. Gallaudet Univ.*,
    181 F. Supp. 3d 107 (D.D.C. 2016) ............................................................10

*Silva v. Baptist Health South Florida, Inc.*,
    856 F.3d 824 (11th Cir. 2017) ....................................................................21

*Socal Recovery LLC v. City of Costa Mesa*,
    56 F. 4th 802 (9th Cir. 2023) .....................................................................17

*Tugg v. Towe*,
    864 F. Supp. 1201 (S.D. Fla. 1994) ...........................................................21

**Statutes**

29 U.S.C. § 705 *et seq*.................................................................................14

29 U.S.C. § 794 ............................................................................................2, 7

42 U.S.C. § 12101 *et seq.* ............................................3, 8, 13, 15, 16, 19, 20

42 U.S.C. § 12102 *et seq.* ...............................................................14, 15, 17

42 U.S.C. § 12132 ........................................................................................2, 7

42 U.S.C. § 12201(c) ......................................................................................11

ADA Amendments Act of 2008, Pub. L. No. 110-325, §2(b)(4), 122 Stat. 3553,
3554 (2008) ...........................................................................................15

## Regulations and Rules

28 C.F.R. Appendix B to Part 35 ....................................................................17

28 C.F.R. §35.101 *et seq* ...............................................................................15

28 C.F.R. § 35.103 *et seq* .................................................................................7

28 C.F.R. § 35.130 *et seq.* .......................................................2, 3, 4, 19, 20, 22

28 C.F.R. §35.108 *et seq* ...................................................................6, 14, 15, 17

28 C.F.R. § 36.105(b) .....................................................................................15

28 C.F.R. § 41.51 *et seq.* ................................................................................19

45 C.F.R. § 92.102(c) .....................................................................................15

Fed. R. Civ. P. 12(b)(6)....................................................................................9

## Other Authorities

CENTER FOR DISEASE CONTROL, MANY ADULTS WITH DISABILITIES REPORT
FREQUENT MENTAL DISTRESS, (September 11, 2020) ...............................14

CLEVELAND CLINIC, NERVOUS BREAKDOWN.................................................16

D.C., METRO. POLICE, OPS 308:04 GENERAL ORDER: INTERACTING WITH MENTAL
HEALTH CONSUMERS § III(6) (2015) .......................................................15

DEP'T OF HEALTH & HUMAN SERVICES, GUIDANCE ON 'LONG COVID' AS A
DISABILITY UNDER THE ADA, SECTION 504, AND SECTION 1557 (2021) ...............15

DEP'T OF JUSTICE, CIVIL RIGHTS DIVISION, INVESTIGATION OF THE CITY OF
PHOENIX AND THE PHOENIX POLICE DEPARTMENT (2024)...............1, 3, 22

DEP'TS OF JUST. AND HEALTH AND HUMAN SERVS., Guidance for Emergency
    Responses to People with Behavioral Health or Other Disabilities  (2023) ...........................22

NATIONAL ALLIANCE ON MENTAL ILLNESS,
    *Navigating a Mental Health Crisis* .........................................................................................16

ROBYN A. CREE, ET AL., *Frequent Mental Distress Among Adults, by Disability
    Status, Disability Type, and Selected Characteristics - United States, 2018*, 69
    CDC MORBIDITY AND MORTALITY WKLY. REP. 36  (Sep. 11, 2020) ......................................14

SUBSTANCE ABUSE AND MENTAL HEALTH SERVICES ADMINISTRATION, WHAT IS
    MENTAL HEALTH? ..................................................................................................................16

## INTEREST OF *AMICI CURIAE*

*Amici* are all organizations that work every day with people with mental disabilities in D.C. and nationally and are very familiar with how mental disabilities may lead to mental health emergencies and how people with mental health disabilities are affected by the District's emergency response program.  They also include organizations with deep expertise on Section 504 of the Rehabilitation Act ("Rehabilitation Act") and the Americans with Disabilities Act ("ADA").  *Amici* played a significant role in the ADA's passage and collaborated with business and civil rights organizations to craft language that became the ADA Amendments Act of 2008 ("ADAAA"), restoring the ADA's expansive definition of "disability."  Further, *amici* were central to moving *Olmstead v. L.C.*, *ex rel*. *Zimring.*, 527 U.S. 581 (1999), through the court system.

*Amici* further described their interests in this matter in their initial brief filed on February 23, 2024, and adopt and incorporate those statements here.  *Amici* believe their decades-long experience and expertise can help inform the Court's determination in this important case.

## SUMMARY OF ARGUMENT

*Amici* appreciate the Court's invitation to file this supplemental brief.  As the Complaint alleges and as *amici* described in their earlier brief, dispatching mental health responders to address mental health emergencies is more effective and safer than a default policy of dispatching police officers to such calls for help.[1]

---

[1] Amicus Brief at 8-19.  *See also* DEP'T OF JUSTICE, CIVIL RIGHTS DIVISION, INVESTIGATION OF THE CITY OF PHOENIX AND THE PHOENIX POLICE DEPARTMENT, 86-100 (2024) [hereinafter DOJ Phoenix Report] (detailing harms flowing from a default police response to 911 calls involving mental health emergencies, including among other things handcuffing and ultimately arresting a 15 year old in response to a call from her mother stating that the daughter was upset and would not get into her mother's car, despite her mother's statements that she had mental health issues).

*Amici* agree with Plaintiff that the District's practice of sending police to respond to 911 calls for mental health emergencies, while sending medical personnel to other medical emergencies, is discrimination against District residents with mental health disabilities.[2]  Both mental health emergencies and other health emergencies are, in fact, *health* emergencies. Because a mental health emergency is, in the vast majority of cases, a marker for and evidence of a mental health disability, sending police rather than a health-centered response denies individuals with mental health disabilities equal opportunity to benefit from the District's emergency response program.

Title II of the ADA and the Rehabilitation Act prohibit the District from excluding people with disabilities from participation in or denying them the benefits of public services, programs, or activities, or otherwise subjecting them to discrimination.[3]  This means that when providing an aid, benefit, or service to people with disabilities, the District must ensure that it is as "effective in affording equal opportunity to obtain the same result … as that provided to others."[4]  It also means the District must make reasonable modifications in policies, practices, or procedures when "necessary to avoid discrimination on the basis of disability," unless it "would fundamentally alter the nature of the service, program, or activity."[5]

Discrimination under these statutes takes many forms.  In passing the ADA, Congress recognized that "individuals with disabilities continually encounter various forms of discrimination, including "outright intentional exclusion," but also "failure to make

---

[2] *See* Complaint ¶¶ 1-3.

[3] *See* 42 U.S.C. § 12132; 29 U.S.C. § 794.

[4] 28 C.F.R. § 35.130(b)(1).

[5] 28 C.F.R. § 35.130(b)(7).

modifications to existing facilities and practices."[6]  The District's practice here violates the ADA and Rehabilitation Act in several ways.  It is a denial of equal opportunity to benefit from the District's emergency response program.  It is a discriminatory method of administering the District's emergency response program.  It is also a failure to reasonably modify the District's response to mental health emergencies to avoid discriminating against people with mental health disabilities and ensure they have an equal opportunity to benefit.  In each of these ways, the District's conduct is disability discrimination prohibited by the ADA and Rehabilitation Act, and the Court should therefore deny the Motion to Dismiss.

On the Court's Question 1 about how to define the "service, program, or activity" and "benefit" at issue, the Court need look no further than the Complaint, which defines the "program" as the District's emergency response program, and the "benefit" as an effective and timely emergency response.[7]  Governing law indicates that "activity, program, or service" should be defined to fulfill the purpose of the ADA and Rehabilitation Act and that defendants should not be permitted to define "activity, program, or service" so as to avoid liability for discrimination.[8]  In addition, whether Plaintiff's definition of the "activity, program, or service"

---

[6] 42 U.S.C. § 12101(a)(5).

[7] *See* Compl. ¶ 77.

[8] *See also Barden v. City of Sacramento*, 292 F.3d 1073, 1076 (9th Cir. 2002) (holding that the ADA encompasses "anything a public entity does" (citation omitted)); *Daubert v. Lindsay Unified School Dist.*, 760 F.3d 982, 987 (9th Cir. 2014) (finding that whether "a public function constitutes a public program under Title II turns not so much on whether a particular public function can technically be characterized as a service, program or activity, but [on] whether it is a normal function of a government entity") (internal quotations omitted). The DOJ Phoenix Report, *supra* note 1, similarly recognized that "Phoenix's public services and programs include its emergency response and law enforcement systems. This means that [Phoenix Police Department]'s 911 call center, as well as officer encounters, are subject to the ADA."

at issue here is an appropriate one is a mixed question of law and fact, concerning which all reasonable inferences must be drawn in favor of the Plaintiff on a motion to dismiss.

As explained in detail below, the Court need not decide the three other questions— the effect of *Modderno v. King*, 82 F.3d 1059 (D.C. Cir. 1996), the percentage of people experiencing mental health crises who have a disability, or the contours of Plaintiff's equal opportunity claim—if it focuses on the well-established "reasonable modification" framework when deciding the District's motion.  The District must reasonably modify policies and practices as necessary to ensure people with disabilities have an equal opportunity to benefit from a public program or service.[9]  It is clear that at least some (indeed, the vast majority of) people who experience a mental health emergency have a mental disability.[10]  The District's refusal to reasonably modify its practice of dispatching police officers to 911 calls involving mental health emergencies—for example, by sending a health-centered response such as the District's Community Response Team—thus denies people with mental health disabilities an equal opportunity to benefit from the emergency response program.[11]  This is a distinct legal framework that is well established in the law and that is not addressed in *Modderno*. And finally, if the District's practices violate the requirement to make reasonable modifications, the Court need not consider whether Plaintiff's Complaint also states a distinct and separate equal opportunity claim.  The failure to make reasonable modifications is sufficient grounds to find discrimination under the ADA and Rehabilitation Act.[12]

---

[9] *See* 28 C.F.R. § 35.130(b)(7).

[10] *See infra* Section 3 (Q3).

[11] *See* Compl. ¶¶ 80, 131, 197, 205.

[12] *See infra* Section 4 (Q4).

Even if Questions 2, 3, and 4 remain of concern, the answers support this Court denying the District's Motion to Dismiss.  On Question 2, *Modderno* is limited to its specific insurance context, and the express "safe harbor" provided for insurance benefit design, as a later decision of the D.C. Circuit has found, and thus does not apply to the case at hand.  Also, the *dicta* in *Modderno* on which the District relies—refusing to compare the treatment of people with mental health disabilities to the treatment of people with other health conditions—depends on a premise rejected by the Supreme Court:  that "discrimination" under the ADA does not extend to discrimination among members of a protected class.[13]

On Question 3, under any of the alleged forms of discrimination, it is not necessary to consider whether some of the individuals qualify as having a disability because they are "regarded as."  The vast majority of people with mental health emergencies in fact have a mental health disability, and there is no requirement under the ADA and Rehabilitation Act that everyone subjected to or harmed by the District's discriminatory practice be a person with a disability.[14]  It is sufficient that the District is denying many people with mental health disabilities an equal opportunity to benefit from its emergency response program and has failed to reasonably modify its practices to provide a health-centered response that avoids discrimination.  For example, it would violate the ADA and the Rehabilitation Act if a hospital emergency room referred only people experiencing chest pain to its security guards, while providing a health response to all others.  This would discriminate against many people with

---

[13] *Olmstead v. L.C., ex rel. Zimring.*, 527 U.S. 581, 598-601, 598 n.10 (1999).

[14] *See infra* Section 3 (Q3).

disabilities, such as people with heart disease,[15] although not all people experiencing chest pain have a disability.  Similarly, it violates the ADA and the Rehabilitation Act to have an inaccessible courthouse although many of the people harmed, such as people temporarily using crutches or pushing strollers, may not have a disability and even though many people with other types of disabilities can access the courthouse.

On Question 4, equal opportunity claims have been upheld where individuals with a disability were denied the opportunity to access the same benefit received by individuals without disabilities.  Such claims have been recognized as separate and distinct from claims based on the failure to make reasonable modifications.[16]

For these reasons, whether the District's practices are viewed through the lens of the obligation to provide equal opportunity or to make reasonable modifications, or are otherwise found to be discriminatory, the District's motion should be denied.

## ARGUMENT

1. <u>Question No. 1</u>: How should the Court define the activity, program, or service at issue in this case and the benefits of that activity, program, or service? If the parties have competing views, how should the court choose between them?

   A. The Court should define the "program" at issue as the emergency response program, the "benefit" of which is an effective and timely emergency response.  If there are competing views, the program should be defined consistent with the purpose of the ADA and Rehabilitation Act, and on a motion to dismiss, mixed questions of law and fact should be resolved in the manner most favorable to Plaintiff.

   Title II of the ADA provides that "no qualified individual with a disability shall, by reason of such disability, be excluded from participation in or be denied the benefits of services,

---

[15] 28 C.F.R. § 35.108(b)(2) (listing heart diseases as an example of a physical or mental impairment).

[16] *See infra* Section 4 (Q4).

programs, or activities of a public entity, or be subjected to discrimination by any such entity."[17]
The Rehabilitation Act contains the same anti-discrimination mandate for entities receiving
federal financial assistance.[18]

Plaintiff argues that DC's emergency response program discriminates against people with
mental health disabilities by sending police as the default responders to mental health
emergencies, while sending teams of emergency medical technicians ("EMTs") to other medical
or health emergencies.[19]  The "program" at issue, for purposes of the Plaintiff's claim, is the
District's emergency response program.[20]  The benefit of the program "is to provide timely and
effective responses to a wide range of emergencies, including mental health emergencies."[21]

The District defines the program more narrowly, as the District's *mental health
emergency response service*[22] and asserts that since everyone who has a mental health
emergency gets the same default response—the dispatch of Metropolitan Police Department
officers—there is no discrimination.

---

[17] 42 U.S.C. § 12132.

[18] 29 U.S.C. § 794.  *See Fry v. Napoleon Cmty, Sch.*, 580 U.S. 154, 159 (2017) ("Title II forbids
any 'public entity' from discriminating based on disability; §504 applies to the same prohibition
to any federally funded 'program or activity.'").  *See also* 28 C.F.R. § 35.103(a) (stating that
Title II of the ADA "shall not be construed to apply a lesser standard than the standards applied
under [§ 504] of the Rehabilitation Act of 1973 or the regulations issued by Federal agencies
pursuant to [it]").

[19] Tr. of Mot. to Dismiss Hr'g at 79:20-21.

[20] Compl. ¶¶ 77, 195, 202.

[21] Compl. ¶ 77; *see also* Compl. ¶¶ 3, 197-98, 205-06.

[22] Tr. at 88:11-15.

This Court should reject the District's framing of the program at issue.  The law requires "activity, program, or service" be defined to fulfill the purposes of the ADA and Rehabilitation Act, and efforts to define away liability for discrimination through arguments about the scope of activity, program, or service should be rejected.[23]  In *Alexander v. Choate*, the Supreme Court cautioned that a program and its benefit "cannot be defined in a way that effectively denies otherwise qualified handicapped individuals the meaningful access to which they are entitled," explaining that "antidiscrimination legislation can obviously be emptied of meaning if every discriminatory policy is 'collapsed' into one's definition of what is the relevant benefit."[24]  The Fourth Circuit recently followed this directive in *National Federation of the Blind v. Lamone*,[25] in which plaintiffs with visual impairments challenged the State's absentee ballot program.  The court rejected the State's claim that there was no discrimination because the "program" at issue was the statewide voting program in general—under which plaintiffs had the opportunity to vote. Rather, the correct "program," for purposes of analyzing the plaintiffs' claims, was the State's absentee ballot program, which allowed "non-disabled voters" to "vote privately and independently without assistance" while "denying that same benefit to plaintiffs on the basis of their disability."[26]  The Fourth Circuit found that rejecting the defendants' framing was necessary

---

[23] *See* 42 U.S.C. §12101(b)(5), which provides that "it is the intent of Congress that the primary object of attention in cases brought under the ADA should be whether entities covered under the ADA have complied with their obligations."

[24] 469 U.S. 287, 301 & n.21 (1985).

[25] 813 F.3d 494, 504 (4th Cir. 2016).

[26] *Id.* (emphasis added); *see also Does v. CVS*, 982 F.3d 1204, 1210-11 (9th Cir. 2020) (rejecting defendants' claim that program's benefit was limited to pharmaceutical care for only individuals prescribed HIV/AIDS medications, rather than general prescription drug benefit).

to get at the clear disability discrimination at issue and "afford persons with disabilities services" that are "equal to that afforded others."[27]

Here, too, the District is attempting improperly to define away the disability discrimination Plaintiff Bread for the City has alleged.  People with heart attacks in the District receive a timely and effective health response; they are dispatched medical personnel who assess their needs and transport them to hospitals as necessary.[28]  People with mental health crises do not receive a health response at all—they receive a public safety response.  If a public entity is permitted to avoid discrimination claims by slicing its programs and services into units that conveniently make its actions non-discriminatory on the grounds that each of those units treats everyone alike, that would effectively gut the ADA and Rehabilitation Act's anti-discrimination mandates.  Under the District's analysis, a public hospital's emergency room could refer patients experiencing chest pains to security guards for care, while providing a health response to all other patients, on the grounds that everyone with chest pain is treated the same way, even though such action would plainly discriminate against people with heart conditions and other disabilities.

Finally, if there were any doubt about Plaintiff's description of the program, activity, or service at issue, this Court in deciding the Motion to Dismiss should accept as true the factual allegations in Plaintiff's Complaint regarding the emergency response program and its benefits.[29]

---

[27] *National Federation of the Blind v. Lamone*, 813 F.3d 494, 505 (4th Cir. 2016) (quoting *Disabled in Action v. Bd. Of Elections in N.Y.*, 752 F.3d 189, 198-99 (2d Cir. 2014)).

[28] Compl. ¶ 17.

[29] *See Browning v. Clinton*, 292 F.3d 235, 242 (D.C. Cir. 2002) (in deciding a Rule 12(b)(6) motion to dismiss, the court must accept all factual allegations in a complaint as true and take them in the light most favorable to the plaintiff).

The D.C. Circuit has recognized that whether a plaintiff has been denied the benefit of a program or service is fact specific,[30] and courts in this District have held that determining whether conduct amounts to discrimination under the ADA is better addressed after discovery, and not on a motion to dismiss.[31]  Other jurisdictions have come to the same conclusion.  For example, in *Johnson v. Callanen*,[32] the court applied Fifth Circuit law and found differing definitions of the allegedly discriminatory program should not be resolved at the pleading stage.[33]

The Complaint alleges that the District's police-driven approach to mental health emergencies denies individuals with mental health disabilities the opportunity to equally benefit from the District's emergency response program, including because sending the police is not an effective or safe response.[34]  This is plainly discriminatory.  Accordingly, the Motion to Dismiss should be denied.

2.  <u>Question No. 2</u>: **How, if at all, does the D.C. Circuit's decision in *Modderno v. King*, 82 F.3d 1059 (D.C. Cir. 1996), apply to this case?  In particular, the parties should address whether *Modderno*'s precedential value is affected by the Supreme Court's decision in *Olmstead v. L.C., ex rel. Zimring*, 527 U.S. 581 (1999), or subsequent amendments to the ADA.**

A.  ***Modderno* rested on a safe harbor for otherwise discriminatory insurance benefit design set forth in the ADA and is limited to that context alone.  It thus does not control here, and the propositions about comparing mental health and physical disabilities relied on by the District were mere *dicta* in the opinion and were rejected**

---

[30] *American Council of the Blind v. Paulson*, 525 F.3d 1256, 1267 (D.C. Cir. 2008).

[31] *See Montgomery v. D.C.*, No. 18-1928 (JDB), 2019 BL 289761 at *11; *See also Sacchetti v. Gallaudet Univ.*, 181 F. Supp. 3d 107, 130 (D.D.C. 2016).

[32] *Johnson v. Callanen*, 608 F.Supp.3d 476, 487 (W.D. Texas 2022).

[33] *Id.* at 484 & n. 10.  The Ninth Circuit in *Does v. CVS*, similarly assumed the pleading allegations regarding the scope of a program's benefit were true in order to reverse a lower court's determination that the benefit at issue was narrowly defined as prescription drug services for HIV/AIDS patients. *Does v. CVS*, 982 F.3d 1204, 1212 (9th Cir. 2020).

[34] Compl. ¶¶ 3, 18, 198, 206.

**by the Supreme Court's later decision in *Olmstead*.**

*Modderno* does not require dismissal. First, under a reasonable modification theory of liability, *Modderno* is not controlling, because it does not apply the "reasonable accommodation" framework discussed below in response to Question 4.

Second, as the D.C. Circuit has explained, *Modderno* is limited to the context of insurance benefit design, for which the ADA and Rehabilitation Act both provide a "safe harbor" that is inapplicable here.

The plaintiff in *Modderno* challenged an insurance plan that imposed a lifetime limit for mental health benefits but not other benefits as a violation of Section 504 of the Rehabilitation Act. In analyzing the plaintiff's Rehabilitation Act claim, the *Modderno* court cited and relied on 42 U.S.C. § 12201(c) of the ADA, which provides that the ADA does not prohibit or restrict (among other things) "a person or organization covered by this chapter from establishing, sponsoring, observing or administering the terms of a bona fide benefit plan that is not subject to State laws that regulate insurance," so long as it is not "used as a subterfuge to evade the purposes" of the ADA.[35] The *Modderno* court explained that its analysis rested on this insurance "safe harbor" (incorporated into Section 504 of the Rehabilitation Act in 1992), holding that the insurance plan at issue "passes muster under the § 501(c) safe-harbor" and thus "cannot violate amended § 504."[36] The court also stated that "whether or not Modderno stated a claim under the 1992 amendment of § 504 [of the Rehabilitation Act] ***apart from the safe-harbor provision***" is

[35] 82 F.3d 1059, 1063-64 (D.C. Cir. 1996) (quoting 42 U.S.C. §12201(c) of the ADA of 1990).

[36] *Id*. at 1064-65.

"a question on which we express no opinion."[37]  The D.C. Circuit later confirmed this in *EEOC v. Aramark*, stating that "*Modderno*'s interpretation of the safe harbor was essential to its reasoning as well as to its disposition of the claims before it."[38]

In other words, the D.C. Circuit in *Modderno* based its ruling on the safe harbor for insurance plans, not whether the alleged discrimination between the insurance coverage provided to people with "mental illness" and insurance coverage provided to people with "physical illness" would violate the ADA and the Rehabilitation Act in the absence of the safe harbor provision.  Accordingly, *Modderno*'s precedential value remains limited to the insurance benefit design and does not apply here.[39]

Third, even if *Modderno* were not limited to its insurance context, its discussion of whether plaintiffs state a discrimination claim under the Rehabilitation Act based on some people with disabilities being treated differently than other people with disabilities has been

---

[37] *Id.* at 1065 (emphasis added).  *See also id.* at 1063 (noting that whether the plan would be illegal under "general language" of the amended Rehabilitation Act is "a claim on which we need not pass" because the safe harbor applies).

[38] 208 F.3d 266, 272 (D.C. Cir. 2000).  The *Modderno* court also noted that the Supreme Court in *Alexander* recognized the difference between challenges to the terms of an insurance plan and other forms of disability discrimination under the Rehabilitation Act.  *See* 82 F.3d at 1061 n.1.

[39] 82 F.3d at 1061.  Further cases citing *Modderno* focus on the insurance safe harbor or other non-applicable aspects of the opinion.  *See, e.g.*, *Aramark*, 208 F.3d 266, 272 (discussed above; holding that *Modderno* was "clear precedent" for application of the insurance safe harbor); *American Council of the Blind v. Paulson*, 525 F.3d 1256, 1268 (D.C. Cir. 2008) (*Modderno* supports the assertion that states are not required to expand Medicaid benefits to account for greater needs of disabled individuals); *Rouse v. Berry*, 848 F. Supp. 2d 4, 7-8 (D.D.C. 2012) (discussing *Modderno* for an examination of "subterfuge" under the safe harbor provision); *Colbert v. D.C.*, 110 F. Supp. 3d 251, 256-257 (D.D.C. 2015) (discussing *Modderno* in the context of *Alexander* for the assertion that the Rehabilitation Act does not require a State create "additional or different substantive benefits," but must make "reasonable accommodations" to enable equal and "meaningful access" to the benefits and services provided to others).

overruled by the Supreme Court in *Olmstead v. L.C.*, *ex rel*. *Zimring*.[40]  The dissent

in *Olmstead* argued that "this Court has never endorsed an interpretation of the term

'discrimination' that encompassed disparate treatment among members of the same protected

class."[41]  The majority rejected this argument as "incorrect as a matter of precedent and

logic."[42]  "It is well established that federal statutes prohibiting discrimination are violated when

adverse action is taken against an individual on the basis of the protected trait."[43]  To the extent

that *Modderno* ever stood for the proposition that plaintiffs cannot allege unlawful discrimination

by comparing the treatment of people with mental health disabilities with the treatment of people

with physical health disabilities, it is no longer good law.[44]

      For all these reasons, *Modderno* does not control.

---

[40] *See Boots v. Northwestern Mut. Life Ins. Co.*, 77 F. Supp. 2d 211, 218 (D.N.H. 1999) (stating that *Olmstead* "rejected" the argument from *Modderno* and other similar cases that disparate treatment of different members of a protected class is not discrimination). *See also Amundson ex rel. Amundson v. Wisc. Dep't of Health Servs.*, 721 F.3d 871, 874 (7th Cir. 2013) (recognizing that "discrimination among persons with different disabilities" can support a claim under the ADA and Rehabilitation Act and overruling prior circuit precedent proscribing intraclass discrimination claims based on *Olmstead*.).

[41] *Olmstead*, 527 U.S. at 616 (Thomas, J., dissenting).

[42] *Id. at *598 n. 10* (citing *O'Connor v. Consolidated Coin Caterers Corp.*, 517 U.S. 308, 312 (1996)).

[43] *See Boots*, 77 F.Supp. at 218.

[44] Additionally, subsequent amendments of the ADA have further circumscribed *Modderno*'s precedential value. In 2008, Congress amended the ADA's definition of disability to overrule court decisions that "narrowed the broad scope of the protections intended to be afforded."  42 U.S.C. § 12101(a)(4).  *Modderno*'s discussion of the definition of "disability" in connection with whether people with "mental illness" have a "disability" under the Rehabilitation Act relied on the earlier definition and is thus outdated.

3.  **Question No. 3**: **What is the citation (both statutory/regulatory and in the complaint) for Plaintiff's contention that many or all individuals experiencing mental-health emergencies qualify as having a "disability" under the ADA and the Rehabilitation Act because they are "regarded as" having a disability?  How, if at all, does that contention affect the analysis in this case?**

    A.  **The ADA defines disability to include both actual and perceived disabilities. Plaintiffs' complaint explains that most mental health emergencies arise from disabilities covered under the ADA at ¶ 24.  The vast majority of individuals who experience mental health emergencies have actual disabilities; others are "regarded as" having a disability.  There is no requirement that all individuals subject to the District's discriminatory practice have a disability to find discrimination.**

        As an initial matter, the vast majority of people who have mental health emergencies have an actual disability as defined by the ADA and Rehabilitation Act.  Indeed, a mental health emergency is a marker of a mental health disability.[45]  For the small minority who do not, they may be "regarded as" having a mental health disability and thus also covered by the ADA and Rehabilitation Act.[46]  The definition of disability is quite broad under the ADA and the Rehabilitation Act.  "Disability" is defined as: (i) a physical or mental impairment that substantially limits one or more major life activities or the operation of a major bodily

---

[45] According to the Centers for Disease Control ("CDC"), "[a]dults with disabilities report experiencing frequent mental distress almost 5 times as often as adults without disabilities and that frequent mental distress among individuals with non-mental health disabilities could be a sign of undiagnosed mental health conditions." "Mental Health for All," CENTER FOR DISEASE CONTROL , https://www.cdc.gov/ncbddd/disabilityandhealth/features/mental-health-for-all.html (last visited June 20, 2024) (citing to Robyn A. Cree, et al., *Frequent Mental Distress Among Adults, by Disability Status, Disability Type, and Selected Characteristics — United States, 2018*, 69 CDC MORBIDITY AND MORTALITY WKLY. REP. 36, 1238-40  (Sep. 11, 2020), https://www.cdc.gov/mmwr/volumes/69/wr/pdfs/mm6936a2-H.pdf) (finding that people with disabilities experience frequent mental distress nearly five times as often as people without disabilities, and that frequent mental distress among individuals with non-mental health disabilities could be a sign of undiagnosed mental health conditions)).

[46] 42 U.S.C. § 12102(3); 28 C.F.R. § 35.108(a)(iii).  "The Rehabilitation Act incorporates the definition of 'disability' from the Americans with Disabilities Act." *Nurriddin v. Bolden*, 818 F.3d 751, 757 (D.C. Cir. 2016); *See* 29 U.S.C. § 705(9)(B), (20)(B) (cross-referencing 42 U.S.C. § 12102).

function ("actual disability"); (ii) a record of such an impairment; or (iii) being regarded as having such an impairment ("regarded as").[47]  The statute instructs that "disability" is to be broadly construed "to the maximum extent permitted by the terms" of the ADA.[48]

Major life activities include "caring for oneself, …sleeping, … learning, …concentrating, thinking, communicating, and working."[49]  Major life activities also include the operation of "neurological [and] brain" functions.[50]  An individual is protected by the ADA if any *one* of these activities, or another major life activity, is substantially limited by the person's mental condition or its symptoms.[51]  The implementing regulation explains that "mental impairment" expressly includes "any mental or psychological disorder such as … emotional or mental illness."[52]  The impairment does not need to entirely prevent an individual from performing a major life activity, and it does not need to be severe, permanent, or long-term.[53]  Important here,

---

[47] 28 C.F.R. § 35.108(a).

[48] 42 U.S.C. § 12102(4)(A) (directing that under the ADA "disability" should be "construed in favor of broad coverage of individuals . . . to the maximum extent permitted by the terms of this chapter"); 28 C.F.R. § 35.101 (same).

[49] 42 U.S.C. § 12101(2).

[50] 42 U.S.C. § 12102(2)(B).

[51] 42 U.S.C. § 12101(4)(C).

[52] 28 C.F.R. § 35.108(b); *see also* 28 C.F.R. § 36.105(b); 45 C.F.R. § 92.102(c).

[53] ADA Amendments Act of 2008, Pub. L. No. 110-325, §2(b)(4), 122 Stat. 3553, 3554 (2008) (codified as 42 U.S.C. § 12101) (expressly rejecting the standard "that to be substantially limited in performing a major life activity under the ADA 'an individual must have an impairment that prevents or severely restricts the individual from doing activities that are of central importance to most people's daily lives'"); 42 U.S.C. § 12102(4) (rules of construction regarding the definition of disability); 28 C.F.R. § 35.108(d) (discussing what is required to establish coverage). *See Also* U.S. DEP'T OF HEALTH & HUMAN SERVICES, GUIDANCE ON 'LONG COVID' AS A DISABILITY UNDER THE ADA, SECTION 504, AND SECTION 1557 (2021),

a person with an episodic impairment that comes and goes is still protected by the ADA, if it would substantially limit a major life activity when active.[54]  And whether an impairment is considered a disability under the ADA is to be determined without consideration of ameliorative measures such as medications or learned behavioral modifications.[55]

Under the ADA's expansive definition of disability, and in *amici*'s experience working with people with mental health disabilities every day, the vast majority of people experiencing a mental health emergency have a disability.  Mental health emergencies reflect that an individual is experiencing an impairment to their ability to focus, concentrate, communicate, and engage in major life activities.[56]  In *amici*'s experience, this is often associated with and can lead to depression, withdrawal, anxiety, grief, fright, shame, humiliation, or anger,[57]  which in turn present as mental health emergencies and prompt calls—by friends, bystanders, or the individual themselves—to 911.

---

https://archive.ada.gov/long_covid_joint_guidance.pdf.

[54] 42 U.S.C. § 12101(4)(D).

[55] 42 U.S.C. § 12101(4)(E).

[56] *See What is Mental Health?* SUBSTANCE ABUSE AND MENTAL HEALTH SERVS. ADMIN., https://www.samhsa.gov/mental-health (last visited June 23, 2024). *See also Navigating a Mental Health Crisis* NATIONAL ALLIANCE ON MENTAL ILLNESS, https://namicobb.org/wp-content/uploads/sites/45/2019/07/Crisis-Guide-Infographics.pdf (last visited June 24, 2024).

[57] *See Nervous Breakdown*, CLEVELAND CLINIC, https://my.clevelandclinic.org/health/diseases/22780-nervous-breakdown (last visited June 23, 2024) (Individuals "having a mental health crisis . . . may feel like [they're] losing control." This can result in symptoms "such as fear, anxiety, worry, nervousness and depression." Individuals can feel "stuck, overwhelmed, or incapacitated, which makes [the individual] unable to cope and function with life.").

A smaller subset of people may not have an actual mental health disability but may be "regarded as" having such a disability.  This happens when the District's emergency response program perceives the person to have a mental impairment "***whether or not*** [it] limits or is perceived to limit a major life activity."[58]  Importantly, moreover, there is evidence that the Metropolitan Police Department regards ***anyone*** who it "reasonably believes is suffering from a mental illness" as a person with a mental health disability.  Its General Order defines "mental illness" as a "[d]isorder in thought or mood ***so substantial*** that it impairs judgment, behavior, perception of reality, ***or the ability to cope with the ordinary demands of life***."[59]  This definition is practically indistinguishable from the definition of disability as it appears in both the ADA and the Rehabilitation Act.

Because the vast majority of people who experience mental health crises have actual disabilities and are protected under the ADA, the Court need not rely on the "regarded as" subset to hold that Plaintiff's claims should survive the District's motion, however.  Liability here does not depend on ***all*** people who experience a mental health emergency having a mental health disability.[60]  Discrimination exists here because the District's policy of dispatching the police to

---

[58] 42 U.S.C. §12102(3)(A); 28 C.F.R. § 35.108(a)(2)(iii).

[59] D.C., METRO. POLICE, OPS 308:04 GENERAL ORDER: INTERACTING WITH MENTAL HEALTH CONSUMERS §III(6) (2015) (emphasis added).

[60] For example, guidance to the Title II regulation issued as part of notice-and-comment rulemaking explains that 28 C.F.R. § 35.130(b)(3) "prohibits both blatantly exclusionary policies or practices and nonessential policies and practices that are neutral on their face, but deny individuals with disabilities an effective opportunity to participate." Appendix B to Part 35, Title 28.  Such policies and practices as a practical matter impact people both with and without disabilities.  If such policies and practices nevertheless harm people with disabilities too, and do so by reason of disability, then they run afoul of the nondiscrimination mandates of the ADA and Rehabilitation Act.  *See, e.g.*, *Socal Recovery LLC v. City of Costa Mesa*, 56 F. 4th 802, 814 (9th Cir. 2023) (sober living home operators "need not provide individualized evidence of the 'actual

such calls harms the many people with mental health disabilities in DC who do experience a mental health emergency, by denying them an equal opportunity to benefit from the District's emergency response program.[61]  The fact that sending a police response to a mental health emergency may also harm a small group of nondisabled people is not determinative.

Likewise, the District is not cleared of its obligation to reasonably modify its practices simply because doing so may also benefit some nondisabled people.  Plaintiff is seeking a reasonable modification—a health care response to a call to 911 involving a mental health emergency.  Just as a ramp is a necessary modification to city sidewalks for people with physical disabilities, but also helps others—i.e., parents with strollers—a health response to a mental health emergency is a necessary modification here.  Likewise, a public broadcast must provide captioning for people who are Deaf or hard of hearing, even though many people watching the broadcast do not require captioning and some people without disabilities may benefit from it.

---

disability' of their residents" and can satisfy the prong "on a collective basis"); *Henrietta D. v. Bloomberg*, 331 F.3d 261, 278 (2d Cir. 2003) (concluding that plaintiffs satisfied the "by reason of disability" when challenging a dysfunctional social services system that harmed people with and without disabilities).

[61] Compl. ¶¶ 198, 206.

4.   **Question No. 4: Is there any case law addressing "equal opportunity" as a distinct type of claim under the ADA and the Rehabilitation Act?**

   A.  **There is case law, as well as statutory and regulatory language, establishing "equal opportunity" as a distinct type of claim under the ADA and the Rehabilitation Act. This claim may alternatively be viewed as a "reasonable modification" claim under the law and the allegations in the Complaint.**

      i.  **"Equal opportunity" is a distinct type of claim under the ADA and the Rehabilitation Act.**

In enacting the ADA, Congress declared that our "[n]ation's proper goals" for people with disabilities are "to assure ***equal opportunity***, full participation, independent living, and economic self-sufficiency."[62]  As Plaintiff alleges, the District's emergency response program violates Title II of the ADA and Section 504 of the Rehabilitation Act by denying people with mental health disabilities an equal opportunity to benefit from the District's emergency response program.[63]  Regulations implementing those statutes make clear that the denial of equal opportunity is a distinct and actionable claim.  The regulations require that covered entities, like the District, ensure that people with disabilities have "the opportunity to participate in or benefit from" the District's services, programs, and activities that is "equal to that afforded others" and is "as effective in affording equal opportunity to obtain the same result" or "to gain the same benefit."[64]  People with disabilities may not be provided different or separate benefits or services,

---

[62] 42 U.S.C. § 12101(a)(7) (emphasis added).

[63] Compl. ¶¶ 18, 198.

[64] 28 C.F.R. § 35.130(b)(1)(i)-(iii) (ADA); *accord id.* § 41.51(b)(1)(i)-(iii) (Rehabilitation Act).

"unless" the difference "is necessary to provide qualified individuals with disabilities with aids, benefits, or services that are as effective as those provided to others."[65]

As the U.S. Department of Justice explained in a recently issued report finding an ADA violation in the provision of emergency services in Phoenix:

> The City and [the police department] violate the Americans with Disabilities Act (ADA) by discriminating against people with behavioral health disabilities when providing emergency response services.  The ADA prohibits the City from excluding people with disabilities from participation in or denying them the benefits of city services, programs, or activities, or subjecting them to discrimination.  To avoid discrimination, Phoenix must provide people with disabilities an equal opportunity to participate in or benefit from city services.  When providing a service to people with disabilities, the City must also ensure that it is as "effective in affording equal opportunity to obtain the same result … as that provided to others."  Phoenix's public services and programs include its emergency response and law enforcement systems.[66]

The requirement to provide an equal opportunity to benefit is firmly rooted in the ADA, a statute expressly designed to ensure equality of opportunity for people with disabilities.[67]  And not only does the ADA mandate equal opportunity, but it also requires public entities, like the District, to take affirmative steps to ensure people with disabilities have equal opportunity to benefit from its programs, services, and activities.[68]

---

[65] 28 C.F.R. § 35.130(b)(1)(iv) (ADA); *accord id.* § 41.51(b)(1)(iv) (Rehabilitation Act).

[66] Citing *Barden,* 292 F.3d at 1076 (holding that the ADA encompasses "anything a public entity does" (citation omitted)).

[67] 42 U.S.C. § 12101(a)(7).

[68] 28 C.F.R. § 35.130(b)(ii) ("A public entity … may not … afford a qualified individual with a disability an opportunity to participate in or benefit from [an] aid, benefit, or service that is not equal to that afforded others."); 28 C.F.R. § 35.130(b)(iii) ("A public entity … may not … provide a qualified individual with a disability with an aid, benefit, or service that is not effective in affording equal opportunity to obtain the same result, to gain the same benefit, or to reach the same level of achievement as that provided to others.").

Case law, as well, establishes that equal opportunity is a distinct type of claim under the ADA.  In *Silva v. Baptist Health South Florida, Inc.*, for example, the U.S. Court of Appeals for the Eleventh Circuit reversed the district court's dismissal of equal opportunity claims under the ADA and Rehabilitation Act, explaining that these laws focus "on the equal opportunity to participate in obtaining and utilizing services." [69]  Moreover, courts have explained that disability discrimination claims do not need to fit into the categories of disparate treatment, disparate impact, or reasonable accommodation claims.  The Tenth Circuit Court of Appeals in *Pushkin v. Regents of the University of Colorado*, for example, rejected defendants' efforts to cabin a disability discrimination claim as either a disparate treatment or disparate impact claim. [70] It agreed with the district court that the statute was violated "because the plaintiff was excluded from participation in or denied the benefits of or subjected to discrimination under a program receiving [federal financial assistance]." [71]  The Tenth Circuit explained: "[Section] 504 sets forth its own criteria for scrutinizing claims under that statute." [72]  The same is true for the equal opportunity claim asserted by Plaintiff.  The statutory and regulatory language support the validity of the claim.  The ADA and Rehabilitation Act, and their implementing regulations, set forth the criteria for assessing the claim.

---

[69] 856 F.3d 824, 255 (11th Cir. 2017).  *See, e.g.*, *King v. Our Lady of the Lake Hospital, Inc.*, 455 F. Supp. 3d 249, 253 (M.D. La. 2022) (denying summary judgment and permitting an equal opportunity claim to proceed); *Tugg v. Towe*, 864 F. Supp. 1201, 1208 (S.D. Fla. 1994) (finding that, if proved, plaintiffs claim that they were denied an equal opportunity to participate in or benefit from mental health counseling services, if true, stated a valid claim for relief under the ADA).

[70] 658 F. 2d 1372, 1385 (10th Cir. 1981).

[71] *Id.*

[72] *Id.*

ii. **The District's failure to provide reasonable modifications to ensure people with mental disabilities are provided an equal opportunity to benefit from DC's emergency response program compels denial of the Motion to Dismiss.**

The District sends police to a mental health emergency when trained EMTs are sent to other medical emergencies. The District's refusal to reasonably modify this policy and practice violates the ADA and the Rehabilitation Act. A health-centered response to mental health emergencies is required to provide people with mental health disabilities an equal opportunity to benefit from the emergency response program.[73]

A long line of cases addresses the requirement to make reasonable modifications, including its scope and the available defenses to it.[74] It is a case- and fact-specific inquiry.[75] In some cases, courts have found the necessary modification requires systemic changes in policies and practices. *Olmstead,* for instance, held that, based on the purpose and plain statutory

---

[73] *See* U.S. Dep'ts of Just. And Health and Human Servs., Guidance for Emergency Responses to People with Behavioral Health or Other Disabilities 3-4 (2023) (discussing the ADA protections for people who experience mental health crises); DOJ Phoenix Report, *supra* note 1, at 86 (explaining that Phoenix is required, and has failed, to reasonably modify its emergency services, explaining that "[j]ust as a person in Phoenix experiencing a heart attack or other medical emergency receives a response from trained EMTs, in many circumstances a person experiencing the effects of a behavioral health disability should receive a health-centered response," but the city has "failed to make important modifications necessary to avoid discriminating against people with behavioral health disabilities" in such circumstances).

[74] *See*, *e.g.*, *Fry v. Napoleon Cmty, Sch.*, 580 U.S. 154, 160 (2017) (finding that both Title II of the ADA and Section 504 of the Rehabilitation Act require public entities to make "certain 'reasonable' modifications to existing practices to 'accommodate' persons with disabilities").

[75] 28 C.F.R. § 35.130(b)(7); *see also Olmstead,* 527 U.S. at 604 (explaining defendant's burden of proof for a fundamental alteration defense). DOJ Phoenix Report, *supra* note 1, at 86 (explaining that Phoenix is required, and has failed, to reasonably modify its emergency services, explaining that "[j]ust as a person in Phoenix experiencing a heart attack or other medical emergency receives a response from trained EMTs, in many circumstances a person experiencing the effects of a behavioral health disability should receive a health-centered response," but the city has "failed to make important modifications necessary to avoid discriminating against people with behavioral health disabilities" in such circumstances).

language of the ADA, "States are required to provide community-based treatment for persons with mental disabilities."[76]  *DAI v. Paterson* similarly required the State to put into place a plan to move people with mental disabilities from isolating group "adult homes" to more-integrated supported housing.[77]  The court in *Henrietta D. v. Bloomberg* likewise found that a New York agency had to reasonably modify its policies and practices to provide people living with HIV/AIDS with the transportation, support services, and other actions necessary to allow them to access medication.[78]

 *Amici*'s original brief detailed the ways in which the District could and should reasonably modify its emergency response to move away from dispatching police as a default response, including expanding the Access Helpline and Community Response Teams.[79]  The District's refusal to reasonably modify this policy or practice to send a health-centered instead of a police response denies people with mental health disabilities an equal opportunity to benefit from the emergency response program.

<div align="center">

**CONCLUSION**

</div>

 Based on the above answers in response to the Court's questions, we urge the Court to deny Defendant's Motion to Dismiss.

---

[76] *Olmstead*, 527 U.S. at 607.

[77] *Disability Advocs, Inc. v. Paterson*, 653 F. Supp. 2d 184, 314 (E.D.N.Y. 2009) (vacated on other grounds by *Disability Advocs, Inc. v. New York Coal. For Quality Assisted Living*, 675 F.3d 149 (2d Cir. 2012).

[78] 331 F.3d 261, 291 (2d Cir. 2003).

[79] *See* Amici's Brief, Feb. 24, 2024, at 19-22.

Whether the District's practices are cast as a denial of equal opportunity or of reasonable modifications, the District is in violation of the ADA and the Rehabilitation Act and is engaging in discrimination.

Dated: June 24, 2024                        Respectfully submitted,

                                            BAKER & HOSTETLER LLP

                                            By: /s/ *Elizabeth B. McCallum*

                                            Elizabeth B. McCallum (DC Bar No. 541361)
                                            Lindsey N. Simmons (DC Bar No. 90010131)
                                            Daniel P. Wicklund (DC Bar No. 90022368)
                                            Washington Square, Suite 1100
                                            1050 Connecticut Avenue, NW
                                            Washington, D.C. 20036
                                            Telephone: (202) 861.1500
                                            Facsimile: (202) 861.1783
                                            Email: emccallum@bakerlaw.com
                                                    lsimmons@bakerlaw.com
                                                    dwicklund@bakerlaw.com

            THE JUDGE DAVID L. BAZELON CENTER
                    FOR MENTAL HEALTH LAW

                                            Megan E. Schuller (DC Bar No. 90023318)
                                            Ira Burnim (DC Bar No. 406154)
                                            Lewis Bossing (DC Bar No. 984609)
                                            Brit Vanneman (DC Bar No. 1736194)
                                            1090 Vermont Avenue NW, Suite 220
                                            Washington, DC 20005
                                            Telephone: (202) 467.5730
                                            Email: megans@bazelon.org
                                                    irab@bazelon.org
                                                    lewisb@bazelon.org
                                                    britv@bazelon.org

                                            *Attorneys for Amici Curiae Mental Health America,*

24

*the American Association of People with Disabilities, Miriam's Kitchen, the Public Defender Service for the District of Columbia, the Total Family Care Coalition, the Arc of DC, Disability Rights DC at University Legal Services, the School Justice Project, and the Judge David L. Bazelon Center for Mental Health Law*

## CERTIFICATE OF SERVICE

I hereby certify that on this 24th day of June 2024, I filed a copy of the foregoing, which

will electronically serve all counsel of record who have entered an appearance in the case.


By: */s/ Elizabeth B. McCallum*

Elizabeth B. McCallum (DC Bar No. 541361)
Washington Square, Suite 1100
1050 Connecticut Avenue, NW
Washington, D.C. 20036
Telephone: (202) 861.1500
Facsimile: (202) 861.1783
Email: emccallum@bakerlaw.com