**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

BREAD FOR THE CITY,

                    Plaintiff,

     v.

DISTRICT OF COLUMBIA,

                    Defendant.

Civil Action No. 1:23-cv-01945-ACR

**PLAINTIFF'S REPLY IN SUPPORT OF ITS SUPPLEMENTAL BRIEF**

## TABLE OF CONTENTS

**Page**

INTRODUCTION ................................................................................................................1

DISCUSSION ...................................................................................................................1

I.      How should the Court define the activity, program, or service at issue in this case
        and the benefits of that activity, program, or service? If the parties have competing
        views, how should the Court choose between them? ..........................................................1

II.     How, if at all, does the D.C. Circuit's decision in *Modderno v. King*, 82 F.3d 1059
        (D.C. Cir. 1996), apply to this case? In particular, the parties should address
        whether *Modderno*'s precedential value is affected by the Supreme Court's
        decision in *Olmstead v. L.C. ex rel. Zimring*, 527 U.S. 581 (1999), or subsequent
        amendments to the ADA. ...................................................................................................8

III.    What is the citation (both statutory/regulatory and in the Complaint) for Plaintiff's
        contention that many or all individuals experiencing mental-health emergencies
        qualify as having a "disability" under the ADA and the Rehabilitation Act because
        they are "regarded as" having a disability? How, if at all, does that contention affect
        the analysis in this case? ...................................................................................................14

IV.     Is there any case law addressing "equal opportunity" as a distinct type of claim
        under the ADA and the Rehabilitation Act? ....................................................................18

        CONCLUSION....................................................................................................................22

TABLE OF AUTHORITIES

Page(s)

<u>Cases</u>

*Alexander v. Choate*
    469 U.S. 287 (1985)................................................................1, 7, 11, 12, 20

*Am. Council of the Blind v. Paulson*
    525 F.3d 1256 (D.C. Cir. 2008)........................................................13, 18

*Banneker Ventures, LLC v. Graham*
    798 F.3d 1119 (D.C. Cir. 2015)................................................................2

*Berardelli v. Allied Servs. Inst. of Rehab. Med.*
    900 F.3d 104 (3d Cir. 2018)............................................................1, 2, 8

*Bragdon v. Abbott*
    524 U.S. 624 (1998)................................................................................20

*Brooklyn Ctr. for Indep. of Disabled v. Bloomberg*
    980 F. Supp. 2d 588 (S.D.N.Y. 2013)....................................................4, 5

*C.G. v. Pennsylvania Department of Education*
    734 F.3d 229 (3d Cir. 2013)....................................................................21

*Chevron U.S.A. Inc. v. Nat. Resources Def. Council, Inc.*
    467 U.S. 837 (1984)..........................................................................19, 20

*Civic Ass'n of the Deaf of the City of N.Y. v. Giuliani*
    915 F. Supp. 622 (S.D.N.Y. 1996)........................................................20

*Cmtys. Actively Living Indep. & Free v. City of L.A.*
    Civ. A. No. 09-0298, 2011 WL 4595993 (C.D. Cal. Feb. 10, 2011).........................4

*Davis v. District of Columbia*
    949 F. Supp. 2d 1 (D.D.C. 2013)............................................................19

*Does 1-5 v. Chandler*
    83 F.3d 1150 (9th Cir. 1996)..................................................................21

*E.E.O.C. v. Aramark Corp.*
    208 F.3d 266 (D.C. Cir. 2000)..................................................................9

*Ficken v. Clinton*
    841 F. Supp. 2d 85 (D.D.C. 2012)..........................................................19

*Frame v. City of Arlington*
    657 F.3d 215 (5th Cir. 2011) ............................................................11, 12

ii

*Gorman v. Bartch*
  152 F.3d 907 (8th Cir. 1998) ..........................................................................8

*Greene v. City of New York*
  2024 WL 1308434 (S.D.N.Y. Mar. 26, 2024) ......................................................16

*K.N. v. Gloucester City Bd. of Educ.*
  379 F. Supp. 3d 334 (D.N.J. 2019) ..................................................................2

*King v. Our Lady of the Lake Hosp., Inc.*
  455 F. Supp. 3d 249 (M.D. La. 2020)..........................................................18, 19

*L.E. by and through Cavorley v. Superintendent of Cobb Cty. Sch. Dist.*
  55 F. 4th 1296 (11th Cir. 2022) ....................................................................2, 3

*Loper Bright Enterprises v. Raimondo*
  No. 22-451 S.Ct. (June 28, 2024) ..............................................................19, 20

*Modderno v. King*
  82 F.3d 1059 (D.C. Cir. 1996) ....................................1, 8, 9, 10, 11, 12, 13, 14, 15

*Nat'l Fed'n of the Blind v. Lamone*
  813 F.3d 494 (4th Cir. 2016) ..........................................................................6

*Olmstead v. L.C. ex rel Zimring*
  527 U.S. 581 (1999)..............................................................................5, 8, 10, 11

*Silva v. Baptist Health S. Fla., Inc.*
  856 F.3d 824 (11th Cir. 2017) ..................................................................18, 19

*Tugg v. Towey*
  864 F. Supp. 1201 (S.D. Fla. 1994) ..............................................................5, 20

*Van Velzor v. City of Burleson*
  43 F. Supp. 3d 746 (N.D. Tex. 2014) ................................................................17

Statutes

29 U.S.C. § 794(a) ........................................................1, 7, 8, 14, 17, 18, 20

29 U.S.C. § 794(d) ..........................................................................................8

42 U.S.C. § 12102(4) ....................................................................................10

42 U.S.C. § 12132........................................................................1, 8, 14, 18, 20

42 U.S.C. § 12134........................................................................................20

42 U.S.C. § 12201(a) ..............................................................................17, 20

42 U.S.C. § 12201(c) ..................................................................................................8

1992 Rehabilitation Act ..........................................................................................9, 10

ADA Amendments Act ...............................................................................................9

DOJ's Rehabilitation Act ...........................................................................................20

<u>Other Authorities</u>

28 C.F.R. § 35.108(d)(2)(ii) ......................................................................................10

28 C.F.R. § 35.130(b)(1)(ii) ......................................................................................19

28 C.F.R. § 35.130(b)(1)(iii) .....................................................................................19

28 C.F.R. § 35.130(b)(3) ...........................................................................................17

28 C.F.R. § 35.130(c) § 41.51(c) ..............................................................................13

28 C.F.R. § 41.51(b)(1)(ii) ........................................................................................19

28 C.F.R. § 41.51(b)(1)(iii) .......................................................................................19

28 C.F.R. § 45.51(b)(3) .............................................................................................17

43 Fed. Reg. 2132 (Jan. 13, 1978) ............................................................................20

56 Fed. Reg. 35716 (July 26, 1991) ..........................................................................20

https://www.merriam-webster.com/dictionary/program .............................................3

¶ 88. MPD General Order 308.04 §§ III(5) & (6) ....................................................15

P. L. 102-569, § 506 ...................................................................................................9

Pub. L. 110-325, § 2(a)(6), Sept. 25, 2008, 122 Stat. 3553 ......................................10

## INTRODUCTION

The District's responses to the Court's questions reveal a misunderstanding of disability rights statutes, regulations, caselaw, and logic.  First, on the program definition, the District urges the Court to prioritize narrowness over tracking the plaintiff's legal claims, an approach that conflicts with the extensive case law the United States discusses in its supplemental brief and obscures discrimination claims in precisely the way *Alexander v. Choate*, 469 U.S. 287, 301 (1985) proscribed.  Second, *Modderno* is centrally an insurance case and, to the extent it has broader applicability, does not speak to the claims here.  Third, the District's "regarded-as" analysis is unpersuasive because it turns on its inaccurate reading of both *Modderno* and the program definition.  Lastly, on the Court's final question, the District errs by suggesting that because ensuring equal opportunity is a central statutory objective, it cannot also provide a distinct basis for liability.  Bread discusses the District's response to each of the Court's questions in turn.

## DISCUSSION

I.  **How should the Court define the activity, program, or service at issue in this case and the benefits of that activity, program, or service? If the parties have competing views, how should the Court choose between them?**

As the United States's brief explains, the definition of a program and its benefits depends on the legal claims.  *See* ECF 71 at 1-11 ("United States Supp. Br.").  Federal disability laws cover "services," "programs," and "activities," 42 U.S.C. § 12132 (Americans with Disabilities Act (ADA)); 29 U.S.C. § 794a (Rehabilitation Act, covering "any program or activity")—terms that encompass government systems in their entirety as well as the components that comprise them. *See id.* at 3-4 (discussing definitions of the terms).  Discrimination, thus, can exist at many levels of a government's operations; the legal claim tells courts where to look.  For instance, while a school can be a program, *see Berardelli v. Allied Servs. Inst. of Rehab. Med.*, 900 F.3d 104, 125 (3d Cir. 2018) (analyzing access to school as a whole), so too can its subsidiary educational

1

offerings, such as an "afterschool program," *see K.N. v. Gloucester City Bd. of Educ.*, 379 F. Supp. 3d 334, 345 (D.N.J. 2019).  Likewise, a school's benefit can be "educational activities" generally, *Berardelli*, 900 F.3d at 125 (cleaned up), or "in-person education" specifically, *L.E. by and through Cavorley v. Superintendent of Cobb Cty. Sch. Dist.*, 55 F. 4th 1296, 1302 (11th Cir. 2022).  All of these framings accurately describe what a school does and courts have adopted each of them in different cases depending on what best fits the relevant legal claims.

Focusing on the legal claims is particularly important at the motion to dismiss stage.  As Bread explained previously, ECF 73 at 2-3 ("Bread Supp. Br."), determining whether the complaint's allegations describe a statutory "program" presents a mixed question of law and fact that the complaint controls.  The District appears largely to agree with the latter point.  ECF 75 at 2 ("Def.'s Supp. Br.") (stating that complaints govern mixed questions).  Moreover, if the plaintiff puts forward a plausible explanation of a factual issue, the "complaint survives" even if the defendant provides an "alternative explanation[]" that is plausible too.  *See Banneker Ventures, LLC v. Graham*, 798 F.3d 1119, 1129 (D.C. Cir. 2015) (cleaned up).  Accordingly, if broader and narrower constructions of the relevant government activity are both plausible and consistent with applicable precedent, then the complaint determines the appropriate level of generality with which to view the government's conduct.

Here, Bread's claims center on the District's emergency response program.  Fully assessing the claims requires treating that program, and specifically its handling of health emergencies, as the operative unit of analysis.  The program's benefit is the provision of "timely and effective" emergency aid.  Because the Complaint's allegations about the program's scope and benefit are plausible, consistent with applicable case law, and facilitate analysis of Bread's discrimination theories, the Court must defer to them at this point in the proceedings.  *See* Bread Supp. Br. 1-11.

2

The District's contrary framework rests on the misperception that courts must define programs as narrowly as possible. The case law discussed in the United States's recent brief (at 3-8) refutes this point. Indeed, *L.E.*, *supra*, the main case the District cites for its narrowness principle, *see* Def.'s Supp. Br. 2, serves only to illustrate its errors. There, a school district refused to provide the accommodation that the plaintiff-students alleged they needed to attend classes in person and instead merely offered virtual instruction. *L.E.*, 55 F. 4th at 1299. Defining the benefit as education generally, not "in-person education" as the students had, the district court held that virtual classes sufficed. *Id.* at 1302. The Eleventh Circuit reversed, explaining that the district court's "re-definition of the public program" precluded it from answering "the operative question": "whether virtual schooling is a reasonable accommodation for in-person schooling, not [for] education in general." *Id.* at 1302 (cleaned up). The trial court's overbroad definition in *L.E.* contains the same flaw as the District's overly narrow definition here: each one prevents analysis of the discrimination that the plaintiff challenges. Courts avoid that result by defining the program and benefits in light of the legal claim, precisely what the United States and Bread urge here.

Even if the disability statutes recognized some type of narrowness principle, the District is wrong to argue that Bread has defined the program broader than what they allow. A "program" is "a plan or system under which action may be taken toward a goal." *Program*, Merriam-Webster's Dictionary.[1] Here, Bread alleges that the District brought four agencies together to undertake the functions of receiving calls from the public about emergencies and dispatching appropriate responders to provide a range of services to address emergencies. Compl. ¶¶ 2, 78, 79, 87, 89-91, 118. The Complaint further alleges that all actors in this interconnected system pursue the shared goal of ensuring that all emergencies receive a "timely and effective" response. *Id.* ¶ 77; *see also*

---

[1] https://www.merriam-webster.com/dictionary/program

Bread Supp. Br. 11 (discussing relevant allegations on this point).  The District asserts that the emergency response program addresses too many "disparate" emergencies to qualify as a statutory "program," Def.'s Supp. Br. 4, but ignores that across all the emergencies it handles, the program performs the same, discrete functions of assessing the caller's need and deploying the right responder.

The emergency preparedness cases show that a single program can address multiple types of emergencies if it performs the same functions in doing so.  *See Cmtys. Actively Living Indep. & Free v. City of L.A.*, Civ. A. No. 09-0298, 2011 WL 4595993 (C.D. Cal. Feb. 10, 2011) ("*CALIF*"); *Brooklyn Ctr. for Indep. of Disabled v. Bloomberg*, 980 F. Supp. 2d 588 (S.D.N.Y. 2013) ("*BCID*"). This conclusion is supported by either party's interpretation of the cases.  *Compare* ECF 47 at 24-25 ("Bread Opp'n"), *with* ECF 61 at 13 ("Def.'s Reply").  On Bread's (accurate) understanding, the courts treated the emergency plans as a whole as the relevant "programs."  *See* Bread Opp'n at 24-25. Consistent with Bread's analysis, the preparedness plans, like the emergency response program here, undertook the same functions (e.g., helping people evacuate and ensuring the availability of temporary shelters) for a range of emergencies (from natural disasters to man-made ones).  *See* Bread Opp'n at 24-25.

Bread's analysis is also supported by the District's view of the cases, which assumes that the courts treated the relevant programs as the preparedness plans' subcomponents, such as "evacuation assistance," rather than the preparedness plans as a whole.  Def.'s Reply at 13.  New York City's provision of evacuation assistance addressed different emergencies (such as "coastal storm[s]" and "terrorist attacks") and was implemented by four different agencies.  *BCID*, 980 F. Supp. 2d at 601, 602, 603, 605 (noting role of 311, fire and police departments, and Metro Transit Authority).  Its main unifying feature was that, across all types of emergencies, it undertook the

4

same functions of providing "[b]uilding [e]vacuations," *id.* at 602, and "[t]ransportation" from the emergency zone, *id.* at 605.  Thus, even on the District's view, the emergency preparedness cases show that an overlap in functions is sufficient to bind a set of government operations even if they address different types of emergencies.  Such a linkage exists here.  No matter the request for service, the emergency response program undertakes the same fundamental tasks of  evaluating the request for aid and making sure the right personnel respond.

This type of overlap explains why, contrary to the District's assertions, the District's response to emergency physical and mental health crises can be meaningfully compared.  Whether assessed at level of dispatch, or in terms of the response in the field, the emergency response program performs the same functions in addressing either type of crisis.  *See* Bread Opp'n at 4 (discussing allegations about these functions).  The Court thus can evaluate whether, by relying on qualified professionals in the physical health context and unqualified ones in the mental health context, the program denies equal opportunities.  *See Tugg v. Towey*, 864 F. Supp. 1201, 1206, 1208 (S.D. Fla. 1994) (holding that a public therapy program discriminated by supplying hearing patients with therapists who could speak their primary language but denying Deaf patients therapists who could communicate using ASL).

The District has yet to identify a difference between the functions involved in addressing physical and mental health emergencies.  Its most recent brief suggests that the Complaint concedes such a difference because the prayer for relief asks that "mental health professionals," as opposed to EMTs, respond to mental health emergencies.  Def.'s Supp. Br. 7.  Yet this request recognizes a difference in skill, not in function, and such a difference does not prevent meaningful comparisons.  For example, the Supreme Court in *Olmstead v. L.C. ex rel Zimring*, 527 U.S. 581, 601 (1999), contemplated a comparison between community- and institution-based medical care,

even though doctors working in each setting likely have different skills and specialties. *See id.* (treating "medical services" as the program").  Similarly here, assessing the difference between the District's response to physical and mental health crises presents a judicially manageable task.

After repeatedly urging the Court to focus on narrowness, the District now suggests that assessing Bread's claims requires the Court to go broader and consider not merely the emergency response program's treatment of health crises but also its handling of public safety and fire emergencies.  Def.'s Supp. Br. 4.  Yet Bread alleges discrimination specifically in the emergency response program's approach to health emergencies.  If the District delivers unequal benefits in that context, it gives the general public an opportunity to benefit that people with mental health disabilities lack. That inequality alone violates the equal opportunity mandate and therefore constitutes discrimination.  *See* Bread Supp. Br. 22-28.  Proving that the inequality also extends to the District's handling of fire and public safety emergencies is not necessary for the Bread to prevail.  *See Nat'l Fed'n of the Blind v. Lamone*, 813 F.3d 494, 504 n.6 (4th Cir. 2016) (explaining that the court did not need to assess whether Maryland's "overall voting program" engaged in disability discrimination once it found that the program discriminated in the context of providing absentee ballots).[2]

The District's remaining arguments are equally uncompelling.  It emphasizes that people can seek aid for mental health emergencies not only by dialing 911 but also by dialing the Access

---

[2] Bread likely would prevail if the Court compared the District's handling of mental health crises not only to its handling of physical health crises but also to its handling of crimes and fires.  The District likely deploys police to almost every report of a crime and firefighters to almost every report of a fire, just as it deploys EMTs and paramedics to almost every report of a physical emergency, *see* Compl. ¶ 118.  Yet, whereas the District deploys competent professionals to these emergencies, it sends unqualified police officers to handle mental health emergencies.  Thus, no matter the comparison, the emergency response program singles out emergencies generally occurring among people with mental health disabilities for a worse response.

Helpline's separate number.  Def.'s Supp. Br. 5-6.  The presence of this entry point, the District contends, means that Bread has not plausibly alleged that mental health response is part of a unified emergency response program.  *Id.*  Yet, although the Access Helpline has its own phone number, it is connected to the 911 system, and both are part of the overall emergency response program.  Compl. ¶¶ 88, 93, 97, 111.  The Access Helpline can route calls to 911 operators for a police or medical response; and 911 operators can send calls back to the Access Helpline.  *Id.* ¶¶ 88, 111.  While the District has work to do to make the Access Helpline's integration with 911 effective, *id.* ¶¶ 99-101, 104, these flaws in execution do not change the system's design.  The District's emphasis on the Access Helpline as an additional entry point is like arguing that a sunroom is not part of a house because it has its own door.

The District also errs by asserting that the Complaint conflicts with *Alexander v. Choate*, 469 U.S. 287 (1985) by treating "'an amorphous objective' [as] the specific service at issue." Def.'s Supp. Br. 3.  The District uses the phrase "amorphous objective" to ground all its arguments against Bread's definitions.  *See id.  Alexander* itself, though, used the phrase to make a singular point: a plaintiff cannot define a program's "benefit" to facilitate a demand that people with and without disabilities receive equal outcomes.  *Alexander*, 469 U.S. at 303 (rejecting the plaintiff's definition because it assumed that the Rehabilitation Act "guaranteed the handicapped equal results from the provision of state Medicaid").  Bread's definition of the benefit (and, for that matter, the program) does not advance such a claim but rather one that seeks equal opportunities.  The inequality alleged here requires analyzing how the emergency response program operates based on (among other things) its dispatch and personnel decisions—not, as in *Alexander*, the ultimate health results it produces for users.  Accordingly, the benefit Bread alleges the program offers—"timely and effective" emergency health responses—is similar to the benefits that courts

recognized in other cases.  *See, e.g.*, *Gorman v. Bartch*, 152 F.3d 907, 913 (8th Cir. 1998) (defining benefit of prisoner transport program as ensuring that transportees are "handled and transported in a safe and appropriate manner consistent with [their] disabilit[ies]"); *Berardelli*, 900 F.3d at 125 (defining benefit of a school as "educational activities").

The District ends its analysis with an errant attempt to make hay of Bread's requested relief. Because Bread "wants" the District to employ mental health professionals for mental health emergencies, the District asserts that this must be the relevant program or service.  Def.'s Supp. Br. 7.  That is a non sequitur.  The remedy a plaintiff demands does not define the program it challenges.  That work is done by the Complaint's plausible allegations about the program's scope and benefits.  Here, Bread has plausibly alleged that the District operates an emergency response program that provides timely and effective emergency health responses.  As these constructions permit an evaluation of Bread's legal claims and are plausible and consistent with relevant case law, the Court must defer to them at this stage.

II.  **How, if at all, does the D.C. Circuit's decision in *Modderno v. King*, 82 F.3d 1059 (D.C. Cir. 1996), apply to this case?  In particular, the parties should address whether *Modderno*'s precedential value is affected by the Supreme Court's decision in *Olmstead v. L.C. ex rel. Zimring*, 527 U.S. 581 (1999), or subsequent amendments to the ADA.**

*Modderno* does not control here because it centers on claims arising in the insurance setting.  The plaintiff in that case challenged an insurance plan that capped lifetime benefits for mental illnesses at $75,000 but allowed unlimited lifetime benefits for physical illness.  *Modderno*, 82 F.3d at 1060.  In challenging an insurance plan, the case implicated the tension between disability statutes and an industry that depends on providing different benefits for different health conditions.  United States Supp. Br. 12-13; Bread Supp. Br. 12.  To protect the operation of insurance plans, Congress incorporated a safe-harbor provision into the Rehabilitation Act as part of a set of amendments to the statute in 1992.  29 U.S.C. § 794(d) (incorporating 42 U.S.C.

8

12201(c)); P. L. 102-569, § 506.  The safe-harbor provision was central to *Modderno*.  The court reasoned that the plaintiff's claims failed under both the statute as it existed before Congress amended it in 1992 and after it added the safe-harbor provision.  *Id.* at 1061, 1065.  However, in a subsequent opinion, the D.C. Circuit clarified that the safe-harbor provision was the dispositive factor.  *E.E.O.C. v. Aramark Corp.*, 208 F.3d 266, 272 (D.C. Cir. 2000).  Specifically, the court stated that a plaintiff who argued that *Modderno* rested on whether the insurance plan "discriminate[d] on the basis of disability" advanced a "misreading of *Modderno*." *Id.*  Rather, the court explained, *Modderno*'s interpretation of the safe-harbor provision for insurers "was essential to its reasoning as well as to its disposition of the claims before it." *Id.*

The District relies solely on the section of *Modderno* interpreting the pre-1992 Rehabilitation Act.  Def.'s Supp. Br. 8-11.  To the extent that this part of the opinion has any relevance outside the insurance context or to the current version of the statute, its logic does not apply to Bread's claim.  The District's argument to the contrary rests on three errors.

First, the District incorrectly reads *Modderno* as rejecting any claim that involves a comparison between a program's treatment of physical and mental health conditions.  Def. Supp. Br. 8.  What the court actually held was that providing unequal benefits for physical and mental *impairments* (limiting benefits for the latter but not the former) could not support a facial discrimination claim.  *Modderno*, 82 F.3d at 1061.  To state a facial discrimination claim, *Modderno* reasoned, the plaintiff had to show that the insurance plan differentiated using the "statutory concept of disability"—not the distinct concept of "impairment." *Id.*  In so reasoning, the *Modderno* court relied on the statutory concept of disability as it existed at the time.

Legal developments post-dating *Modderno* have rejected the premises of this analysis.  The 2008 ADA Amendments Act, which the District improperly downplays, broadened the statutory

concept of disability to increase the overlap between impairments and disabilities.  *See* 42 U.S.C. § 12102(4); Pub. L. 110-325, § 2(a)(6), Sept. 25, 2008, 122 Stat. 3553.  Of particular relevance, the regulations implementing the amendments state that certain impairments will in "virtually all cases" constitute a statutory disability.  28 C.F.R. § 35.108(d)(2)(ii).  Further, *Olmstead* concluded that disability claims could arise from differential treatment of people with different types of disabilities, 527 U.S. at 598 n.10, a determination that undermines *Modderno*'s statement that the Rehabilitation Act does not "assure any kind of equality as between sufferers of mental, as opposed to physical, disability."  Def. Supp. Br. 8 (quoting *Modderno*, 82 F.3d at 1060).  Contrary to the District's analysis, *Olmstead* treated this conclusion as a general principle of discrimination law rather than one limited to integration mandate cases, such as *Olmstead* itself.  *See Olmstead*, 527 U.S. at 598 n.10 (approving of intraclass discrimination claims in disability discrimination cases based on their existence in age, sex, and race discrimination cases).  These developments raise questions about the value of *Modderno*'s analysis of facial discrimination claims.  That analysis is, in any case, irrelevant here because Bread does not raise a facial discrimination claim nor does Bread allege that the District discriminates against people with mental health disabilities as compared to people with physical health disabilities.

Indeed, *Modderno* expressly declined to extend its analysis of the pre-1992 Rehabilitation Act to methods of showing discrimination "by reason of disability" other than ones predicated on facial discrimination, let alone ones arising outside the insurance context.  The court stated that "[w]e are of course not saying that distinctions not framed in terms of 'disability' per se are ipso facto valid under the [Rehabilitation] Act."  *Modderno*, 82 F.3d at 1061.  It noted that claims that might fail in the insurance context (namely disparate impact ones) might succeed in other settings. *Id.* at 1061 n.1.  And it did not address how plaintiffs could meet the "by reason of disability"

element for an equal opportunity claim, a methods of administration claim, or a reasonable accommodations one.  This point alone undermines the District's reliance on *Modderno*.

Second, the District incorrectly contends that Bread's claim, like the one in *Modderno*, "pit[s] . . . one disability against another," compelling "local governments to diminish and reduce medical emergency responses to establish parity with mental health crisis responses."  Def.'s Supp. Br. 11.  Bread challenges a program serving the general public—not a program for people with physical health disabilities—and its claim does not risk degrading emergency services for everyone.  The discrimination statutes do not require such a remedy.  When a public entity offers a program to everyone, it must "adhere to the ADA's nondiscrimination requirement" with regard to the services it offers.  *Olmstead*, 527 U.S. at 603 n.14.  The Fifth Circuit held that "when a city decides to build a sidewalk but makes that sidewalk inaccessible to individuals with disabilities without adequate justification, disabled individuals are denied the benefits" of that program. *Frame v. City of Arlington*, 657 F.3d 215, 227 (5th Cir. 2011).  The court held that the city had a duty to fix the sidewalk, *id.* at 232, not tear down all sidewalks so that no one can travel safely.

The risk present in *Modderno* that a remedy would leave both people with mental health disabilities and those with physical heath disabilities collectively worse off does not apply to Bread's claim for two reasons.  First, the court held that the *Modderno* plaintiff "benefit[ted] meaningfully" from the available mental health coverage up to $75,000, 82 F.3d at 1062 n.2, but sought to obtain a superior benefit (unlimited coverage), *id.* at 1060.  Bread, by contrast, asserts that people with mental health disabilities do not have meaningful access to (or equal opportunity to benefit from) the emergency response program.  The nondiscrimination mandates of the disability statutes require that public entities provide people with disabilities an opportunity to "benefit meaningfully."  *Alexander*, 469 U.S. at 297 (holding that plaintiffs had meaningful access

to inpatient care based partly on the absence of any record evidence that the limitations on inpatient care would deny effective treatment of illnesses occurring more frequently among people with disabilities, *id.* at 302 n.22).  The District concedes that, even under its reading of *Modderno*, it is "required to ensure that the mentally impaired have meaningful access to the generally available benefits of the District's medical emergency response system."  Def. Supp. Br. 11.

The heart of Bread's claim here is that people with mental health disabilities do not have meaningful access to the emergency response program whereas others do.  In other words, Bread claims that people with mental health disabilities lack an equal opportunity to benefit from the District's emergency response program because the response to mental health emergencies (unlike the response to physical health emergencies) is ineffective and dangerous.  That distinguishes Bread's case from *Modderno*, where the plaintiff already received meaningful access to insurance coverage but wanted more, *Modderno*, 82 F.3d at 1062 n.2, and *Alexander*, where the plaintiffs sought more than the 14 days of inpatient care provided to everyone else, *Alexander*, 469 U.S. at 290.  Instead, Bread's claim is analogous to the one brought by plaintiffs with mobility impairments who challenged poorly maintained sidewalks in *Frame*.  The Fifth Circuit held that such a sidewalk "benefits people without disabilities, yet that benefit is unnecessarily denied to similarly situated people with physical disabilities."  657 F.3d at 231.  Here, the District cannot go below the floor set by the disability statutes of providing people with disabilities an equal opportunity to enjoy meaningful access to publicly available services.

The second consideration in *Modderno* that does not apply here is that *Modderno* involved a unique interplay between the plaintiff's claim and the rights of insurers as espoused in *Alexander*.  Specifically, *Alexander* approved across-the-board caps on insurance coverage.  469 U.S. at 304.  Thus, the insurer could have responded to Ms. Modderno's claim of inequality in physical and

mental health benefits by capping *all* benefits at $75,000. *Modderno*, 82 F.3d at 1062 (citing *Alexander*, 469 U.S. at 304). Imposing such a limit would have left people with disabilities collectively worse off, because they would be subject to a cap on benefits for their physical illnesses *and* their mental health ones, and the court reasoned that Congress would not have wanted such an outcome. *Id.* Here, by contrast, there is no court decision establishing a benchmark against which to assess Bread's requested relief. That is, no court has addressed whether the District could replace its EMTs with police officers or otherwise reduce the effectiveness of its emergency services (and thereby limit benefits for everyone as insurers can), nor would it be practical for the District to do so (in the way it is practical for an insurer to change its benefit policy). Remedying the inequality in this case would not "cause or compel local governments to diminish" services, Def.'s Supp. Brief 11, any more than addressing visually-impaired plaintiffs' complaints about inaccessible currency would require the United States to issue bills that no one can tell apart. *See Am. Council of the Blind v. Paulson*, 525 F.3d 1256, 1268 (D.C. Cir. 2008) (holding that treasury department must make currency accessible to people with visual impairments).

Turning to the District's last error, its reading of the "special benefits" provision of disability law distorts that concept. *See* United States Br. 14-15. The "special benefits" regulations permit a public entity to extend benefits to one group of people with disabilities without being required to extend the same benefit to other groups with disabilities. 28 C.F.R. § 41.51(c), 28 C.F.R. § 35.130(c). For example, a government program that provides ASL interpreters to people who are hearing impaired need not also provide them to people with visual impairments. Contrary to the District's argument, Def. Supp. Br. 8, *Modderno*'s holding does not rely on this regulation; rather, the opinion makes passing reference to a case that itself invokes the "special benefits" concept. *See* 82 F.3d at 1062 (citing *Traynor v. Turnage*, 485 U.S. 535, 549 (1988)). *Modderno*

does so in the context of explaining why insurance limits are permissible as long as people with disabilities have meaningful access.  82 F.3d at 1062.  Here, the emergency response program does not provide meaningful access for people with mental health disabilities.  Nor is it a special benefit for people with physical disabilities, as the District claims for the first time in this round of briefing. Def. Suppl. Br. 1 (referring to the program as "services provided for physical impairments"); *Id.* at 16 (referring to the program as "providing different services responsive to different disabilities").  Bread has plausibly alleged that the District's emergency response program serves all D.C. residents experiencing emergencies, Compl. ¶ 2, and nowhere does the Complaint mention *any* special benefit for people with physical disabilities.  Instead, Bread alleges that the benefit of the emergency response program "is to provide timely and effective responses to a wide range of emergencies," *id.* ¶ 77, including animal bites or overdoses, *id.* ¶ 118—emergencies that can happen to anyone, regardless of disability status.  Accepting the District's argument would allow a city to declare sidewalks to be a special benefit for people with non-mobility disabilities and thereby refuse to make them accessible.  Once the District's premise that the emergency response program is a special benefit for people with physical disabilities is removed, its reliance on *Modderno* can no longer stand.

**III.** **What is the citation (both statutory/regulatory and in the Complaint) for Plaintiff's contention that many or all individuals experiencing mental-health emergencies qualify as having a "disability" under the ADA and the Rehabilitation Act because they are "regarded as" having a disability? How, if at all, does that contention affect the analysis in this case?**

Bread plausibly alleges that most if not all people who experience mental health crises have an actual disability, are regarded by the District as having a disability, or both.  Bread Supp. Br. 19-22.  Based on these allegations, the plausibility of which the District does not dispute, Bread has shown that the District's emergency response program discriminates by reason of disability because it singles out a manifestation of actual and/or perceived disability for an ineffective and

14

often harmful response.  Bread Supp. Br. 15-22.  In this way, Bread has satisfied the "by reason of disability" element for the disability law claims discussed in Bread's brief: equal opportunity, methods of administration, and reasonable accommodation.  *See id.*  The District's arguments to the contrary are unpersuasive.

The District errs in its first contention: that under *Modderno*, Bread cannot show "by reason of disability" because the District's response "turn[s] entirely on the nature of the emergency," Def. Supp. Br. 13, not the individual's disability status, *id.* at 14.  Bread has plausibly alleged that mental health crises occur more frequently among people with mental health disabilities. *See* Bread Supp. Br. 15-22 (discussing allegations). Targeting such a manifestation of mental health disability for worse responses constitutes disability-based discrimination.  *See id.  Modderno* does not hold otherwise. The case is limited to facial discrimination claims and centers on the insurance context, Section II, *infra*, and in any event does not discuss the theories of discrimination raised here.

Further, the District's argument fails to account for the overlap between actual and regarded-as disabilities—the statutory concept of disability includes both and the same people can have both.  Bread Supp. Br. 19.  As explained in Bread's supplemental brief, the District generally regards mental health emergency calls as arising from a mental health disability.  *Id.* at 21-22.  The District even uses an approximation of the statutory concept of disability to define the response to certain mental health emergencies involving a "mental health consumer."  Compl. ¶ 88; *see also* MPD General Order 308.04 §§ III(5) & (6); Bread Supp. Br. 21.  That analysis shows how the District's own policies belie its argument that the services provided turn on the nature of the emergency; they in fact often turn on the statutory concept of disability itself or a "close surrogate." *Modderno*, 82 F.3d at 1061.  Thus, even if *Modderno* had any relevance here, the facts found absent there are present here, underscoring the errors in the District's analysis.

The District does not otherwise dispute Bread's claims except to recycle its incorrect characterization of the program at issue.  According to the District, even if "*everyone* who experiences a mental health crisis is 'regarded-as' . . . having a disability," the alleged inadequacy of a service "provided only to people with disabilities cannot establish discrimination."  Def. Supp. Br. 14.  This argument rests on two premises: first, that the program at issue in this case serves only people with disabilities; and second, that programs serving only people with disabilities cannot discriminate by reason of disability.  Neither is right.  On the first premise, as explained in Section I, *infra*, the program at issue in this case is not mental health response specifically but emergency response generally, and that program serves the public rather than only those with disabilities.  In support of its contrary position, the District cites a case, Def. Supp. Br. 14, where plaintiffs challenged a program providing "transport to the hospital for mental health care" only to people with mental health disabilities as opposed to challenging the "denial of services provided to non-disabled individuals."  *Greene v. City of New York*, 2024 WL 1308434, at *15 (S.D.N.Y. Mar. 26, 2024).  That case does not apply here because Bread challenges the emergency response program as a whole, alleging that it fails to provide people with mental health disabilities an opportunity to benefit that is equal to that afforded the general public.

The District's second premise is also wrong: a program serving only people with disabilities can discriminate by reason of disability if it fails to meet their needs.  For example, a hospital serving only people with mobility impairments can discriminate by reason of disability if it operates on the 10th floor and fails to install an elevator.  This intuition is captured in the methods-of-administration regulation, which provides that a program also discriminates by disability if it uses "methods of administration . . . [t]hat have the purpose or effect of defeating or substantially impairing accomplishment of the objectives of the public entity's program with

respect to individuals with disabilities." 28 C.F.R. § 35.130(b)(3) (ADA), 28 C.F.R. § 45.51(b)(3) (Rehabilitation Act). This mandate appears in the Rehabilitation Act's implementing regulations, *see id.*, and thus is directly incorporated into the ADA, 42 U.S.C. § 12201(a).

Whether the program at issue is "mental health crisis response" or "emergency response" generally, the District fails the methods-of-administration mandate. Under either definition of the program, the District's reliance on police to administer its aid to mental health emergencies substantially impairs the program's objective of providing a timely and effective response; that is, it "actively undercut[s] the ability of [the] public program to benefit those with [mental health] disabilities." *See Van Velzor v. City of Burleson*, 43 F. Supp. 3d 746, 752 (N.D. Tex. 2014). Actively does not mean intentionally. In *Van Velzor*, the court examined a volunteer-led program tasked with enforcing accessible parking laws as an alternative to police-led enforcement of those laws. *Id.* at 760. The court studied the program's structure, not the intentions of its creators, and held that the program violated the methods-of-administration regulation because it was "ineffective" and "inferior"—no one was able to contact the volunteer-led program to report accessible-parking violations nor did the program actually enforce those laws. *Id.* Similarly, under either party's definition of the program here, Bread has plausibly alleged that the District's reliance on police to administer its response to mental health emergencies is ineffective and harmful, defeating the program's objective as to people with disabilities. *See, e.g.*, Compl. ¶¶ 2, 6, 8, 71-74. The District therefore discriminates by reason of disability in violation of the methods of administration regulation no matter how the program is defined. *See* Bread Opp'n 29-30.

In sum, the District's arguments on the Court's third question are unpersuasive, offering no basis for rejecting Bread's analysis of the by-reason-of-disability element under any of its claims.

**IV. Is there any case law addressing "equal opportunity" as a distinct type of claim under the ADA and the Rehabilitation Act?**

Courts have invoked the equal opportunity mandate as an independent basis for finding a statutory violation.  Some courts have referenced the Department of Justice's (DOJ) equal opportunity regulations in reaching this conclusion.  *See* Bread Supp. Br. 23 (citing cases).  Other courts have adopted similar analysis without citing those regulations.  *See Silva v. Baptist Health S. Fla., Inc.*, 856 F.3d 824, 835 (11th Cir. 2017) (concluding that Deaf patients could state ADA claim by showing that they lacked equal opportunity to communicate with their doctors); *King v. Our Lady of the Lake Hosp., Inc.*, 455 F. Supp. 3d 249, 255 (M.D. La. 2020) (adopting similar holding).  And reasonable modification cases often define "discrimination" synonymously with denials of equal opportunity, although they also require plaintiffs to show a facially reasonable modification to state a claim.  *See* Bread Supp. Br. 25-26, 28 (discussing cases).  Taken together, these decisions show that ensuring equal opportunity not only constitutes a statutory objective but also a distinct, judicially administrable standard for assessing whether a program engaged in unlawful discrimination.

The District recognizes that ensuring equal opportunities for people with disabilities constitutes an important statutory goal but fails to follow this conclusion where it leads.  The District suggests that, because ensuring equal opportunity is "a common thread running throughout ADA and Rehabilitation Act jurisprudence," a denial of equal opportunity cannot serve as an independent basis for statutory liability.  Def.'s Supp. Br. 15.  That gets things backwards.  A program that denies equal opportunities to people with disabilities fails "one of the primary purposes" of the statutes.  *Am. Council of the Blind v. Paulson*, 525 F.3d 1256, 1260 (D.C. Cir. 2008) (cleaned up).  If such a failure does not give rise to liability, what would?

18

The Department of Justice's (DOJ) equal opportunity regulations, 28 C.F.R. §§ 35.130(b)(1)(ii) & (iii), 41.51(b)(1)(ii) & (iii), reaffirm this point.  They do not, as the District asserts, "merely state the elements of a Title II claim."  Def.'s Supp. Br. 15.  Rather, they provide a specific construction of the ADA's and Rehabilitation Act's term "discrimination," explaining that it encompasses the failure to provide people with disabilities the same "opportunit[ies] to participate" or "gain the same benefit" as people without disabilities.  *See* 28 C.F.R. § 35.130(b)(1)(ii) & (iii).  This understanding of discrimination calls for a commonsensical comparison between the way programs operate for people with and without disabilities, an approach that courts have applied, *see* Bread Supp. Br. 24-25, and which constitutes a means of assessing discrimination that differs from concepts such as disparate impact and intentional discrimination that are the dominant approaches in other statutory regimes.  *See, e.g.*, *Davis v. District of Columbia*, 949 F. Supp. 2d 1, 9 (D.D.C. 2013) (stating in Title VII case that intentional discrimination claim requires proof of animus); *Ficken v. Clinton*, 841 F. Supp. 2d 85, 89 (D.D.C. 2012) (discussing centrality of statistics to disparate impact claim in case challenging workplace age discrimination).

Nothing in the Supreme Court's recent decision in *Loper Bright Enterprises v. Raimondo*, No. 22-451 S.Ct. (June 28, 2024) dilutes the relevance of DOJ's regulations, or the viability of Bread's equal opportunity claim.  Bread has not asked the Court to defer to DOJ's equal opportunity regulations under *Chevron U.S.A. Inc. v. Nat. Resources Def. Council, Inc.*, 467 U.S. 837 (1984).  Rather, it has argued that the Court should look to them because they espouse compelling articulations of the statutory text and Congress's purpose in prohibiting disability discrimination.  Indeed, some courts have adopted the equal opportunity framing without referencing the regulations at all, *see Silva*, 856 F.3d at 835; *Our Lady of the Lake Hosp., Inc.*, 455

19

F. Supp. 3d at 255, and the courts that have relied on the regulations have done so based on their intrinsic persuasiveness, *see, e.g.*, *Alexander*, 469 U.S. at 304 & n.24 (relying on the Department of Health and Human Services' equal opportunity regulations, which are substantially similar to the DOJ regulations cited here, as "an important source guidance" in explaining the meaningful access requirement; the Court did not cite *Chevron* in the discussion); *Tugg v. Towey*, 864 F. Supp. 1201, 1206, 1208 (S.D. Fla. 1994) (citing equal opportunity regulations and endorsing their principles without citing *Chevron*); *Civic Ass'n of the Deaf of the City of N.Y. v. Giuliani*, 915 F. Supp. 622, 635 (S.D.N.Y. 1996) (same). Relying on regulations as a source of guidance remains permissible, particularly where, as here, the regulations were "issued contemporaneously with the statute at issue[] and . . . have remained consistent over time." *Loper Bright*, slip op. at 13, 16-17; *see also* 43 Fed. Reg. 2132 (Jan. 13, 1978) (adopting Rehabilitation Act regulation containing the equal opportunity mandate that remains in place today); 56 Fed. Reg. 35716 (July 26, 1991) (same for ADA's equal opportunity regulation).

More fundamentally, when applying the ADA, the court must look to DOJ's Rehabilitation Act regulations (including its equal opportunity mandate) because Congress expressly incorporated the regulations into the ADA's standard of liability. 42 U.S.C. § 12201(a). Thus, failing to enforce the equal opportunity regulations is no different than failing to enforce the ADA itself. *Bragdon v. Abbott*, 524 U.S. 624, 632 (1998) (stating that courts must "construe the ADA to grant at least as much protection as provided by the regulations implementing the Rehabilitation Act").[3]

---

[3] A further reason to look to these regulations is that Congress specifically delegated authority to the Department of Justice to fill gaps and construe statutory terms. *See* 42 U.S.C. § 12134 (ADA); 29 U.S.C. § 794(a) (Rehabilitation Act). *Loper Bright* expressly recognized that courts remain bound to such express delegations. *See* 22-451, slip op. 17-18. Nonetheless, because the arguments

These arguments refute the District's suggestion that equal opportunity claims do not exist, and the District fares no better when it argues (apparently in the alternative) that Bread failed to state such a claim.  Here, the District again asserts that Bread demands that people with mental health disabilities receive equal access to the "special benefits" it provides people with physical health disabilities.  This argument fails for the reasons discussed previously.  *See* pp. 13-14, *supra*.

The District also seeks refuge in two cases that do not aid it.  In *Does 1-5 v. Chandler*, 83 F.3d 1150, 1154 (9th Cir. 1996), the plaintiffs argued that a state discriminated by capping welfare benefits for people with disabilities but not for people with dependent children.  Rejecting this claim, the court explained that the benefits did not share a "unified purpose" and therefore comprised distinct programs.  *Id.* at 1155.  Here, though, Bread has alleged that the District's physical and mental health emergency responses serve the same purpose of providing "timely and effective" assistance, and therefore are part of the same program.  *See* Bread Supp. Br. 10-11.  The second case the District cites, *C.G. v. Pennsylvania Department of Education*, 734 F.3d 229, 232, 236 (3d Cir. 2013), concerned a challenge to a special education funding formula that resulted in less special education funds going to schools with large shares of students with disabilities.  The court affirmed a trial verdict for the defendant because the lower court found no evidence that the disparity had a concrete impact on the plaintiff's ability to enjoy equal access to the benefit of educational services (the relevant benefit in the case).  *Id.* at 237 & n.14; *see also id.* at 233 (noting that plaintiffs' expert failed to consider how the state distributed other education funds, implying that other funding sources might have balanced the disparity in special education funding).  Here, by contrast, Bread has alleged more than enough at this early stage to plausibly show that the

---

raised above thoroughly demonstrate the appropriateness of continuing to look to the equal opportunity regulations in this case, the Court need not address this broader issue.

difference between the District's delivery of emergency mental and physical health assistance tangibly impedes equal opportunity to access the benefit of a timely and effective emergency response.  *See* Compl. ¶¶ 31-41, 71-74, 117-39.

## CONCLUSION

For the reasons stated here and in Bread's prior briefing, the District's motion should be denied.

Dated: July 15, 2024                                     Respectfully submitted,

*/s/ Michael Perloff*
Michael Perloff (D.C. Bar No. 1601047)
Scott Michelman (D.C. Bar No. 1006945)
American Civil Liberties Union Foundation
of the District of Columbia
529 14th Street NW, Suite 722
Washington, D.C. 20045
(202) 716-1427
mperloff@acludc.org

Ashika Verriest (D.C. Bar No. 90001468)
Jenn Rolnick Borchetta*
Brian Dimmick (D.C. Bar No. 1013979)
Susan Mizner
West Resendes
American Civil Liberties Union Foundation
125 Broad Street
New York, NY 10004
(240)676-3240
averriest@aclu.org
*Admitted pro hac vice*

Daniel L. Brown (N.Y. Bar No. 2978559)
Steven Hollman (D.C. Bar No. 375658)
Nikole Snyder (D.C. Bar No. 1670948)
Calla N. Simeone (D.C. Bar No. 1766258)
SHEPPARD, MULLIN, RICHTER &
HAMPTON LLP
2099 Pennsylvania Ave. NW, Ste. 100
Washington, D.C. 20006
Telephone: (202) 747-1941
dbrown@sheppardmullin.com
shollman@sheppardmullin.com
nsnyder@sheppardmullin.com
csimeone@sheppardmullin.com

Counsel for Plaintiff*

---

*Counsel would like to acknowledge Wesley Streicher and Mahalia Mathelier, two ACLU-DC legal interns, for their assistance with proofing and cite-checking this brief.